CANJGLAC                        Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ERIC GLATT, on behalf of
     himselfand all others
4    similarly situated, et al.,

5                 Plaintiffs,

6         v.                                11 Civ. 6784 WHP AJP

7    FOX SEARCHLIGHT PICTURES, INC.,

8                 Defendant.

9    ------------------------------x

10                                     October 23, 2012
                                       10:55 a.m.
11

12

13   Before:

14                        HON. ANDREW J. PECK,

15                                       U.S. Magistrate Judge

16

17                        APPEARANCES

18

     OUTTEN & GOLDEN, LLP (NYC)
19        Attorneys for plaintiffs
     BY:  ELIZABETH HARTLEY WAGONER, Esq.
20        JUSTIN SWARTZ, Esq.
                    Of counsel
21

     PROSKAUER ROSE LLP (NY)
22        Attorneys for defendant
     BY:  ELISE MICHELLE BLOOM, Esq.
23        AMY F. MELICAN, Esq.
          - and -
24   NICHOLAS BUNIN,
          Vice President, Fox Entertainment
25

CANJGLAC                          Conference

1          (In open court)

2          (Case called)

3          THE COURT: Let me start by noting that Mr. Bunin has

4     flown in for this, and just to let everyone know, I know him

5     from the property discovery forum which deals with discovery

6     issues, as many other groups, but we spent some time at those

7     fora and the dinners and the like afterwards. I don't think it

8     is a recusable event. I am not asking for anyone's consent or

9     anything else. The information is out there.

10          I have read your October 15th letter. Let's try to

11    take the issues one at a time. I have also had a chance at

12    this point to review the original complaint and Judge Pauley's

13    scheduling order and his last conference transcript. So I am

14    somewhat up to speed, but probably not fully on all the things

15    that have gone on in the past.

16          As to the discovery schedule, my view is there should

17    not be expedited discovery. However, I do believe, as you

18    heard listening to the prior conference, in the Sedona

19    cooperation principles for all discovery, not just key

20    discovery, and it seems to me if there are going to be

21    objections, that we should not particularly at this late stage

22    of the case have to wait 30 days for the formal response which

23    will then include objections and perhaps the usual way

24    responding parties get further time, which is to say, here's my

25    formal response which says I object to some things, I'll give

CANJGLAC                      Conference

1   you some things, and as to when you'll actually get those some

2   things, we'll talk, which means it isn't going to be there on

3   the 30th day.

4          With that, is there anything else to say on that or

5   should we go to the more specific issues about class lists and

6   depositions, et cetera?

7          MS. WAGONER:  Yes, your Honor, just one comment, your

8   Honor.  If the court's view is that there should not be an

9   expedited discovery schedule, I would request that the court

10  order two things in addition to what it has already set:

11         First, that Fox produce all of the documents it is

12  going to produce, setting aside the discovery on the date that

13  responses are actually due.

14         THE COURT:  That is correct.  THAT is what I thought I

15  was implying, so now it is specific.

16         MS. WAGONER:  Okay.  The second point which is that

17  there be a date certain that the parties must submit a joint

18  letter outlining any disputes so that there is no delay in that

19  process in terms of getting it in front of the court for us to

20  compel any additional parties.

21         THE COURT:  The request seems to be dated October 10,

22  so I assume the response is due November 10.  Is that

23  everybody's --

24         MS. BLOOM:  By my calculation, your Honor, it is

25  November 13th.

1      THE COURT:  November 10 is a Saturday.  The 12th is in

2  red in the calendar, so it is Veterans Day.  So the 13th it is.

3  You'll need to do a meet-and-confer.  You'll want to get a

4  joint letter to me by the 15th.  Is that too fast or --

5      MS. WAGONER:  That is perfect, your Honor.

6      MS. BLOOM:  Your Honor, that is a little ambitious.

7      THE COURT:  It shouldn't be because I am going to

8  probably give you a date for filing objections which will be

9  less than the 30th day because I think that makes sense.  So

10  you want to pick that date yourself?

11      MS. BLOOM:  Your Honor, could I have a moment to just

12  address the truncated time that you just indicated you might

13  issue?

14      When plaintiff's counsel approached Judge Pauley about

15  amending their complaint, the case had been filed almost a year

16  before, and we had had an extended discovery period as to the

17  original claims, and we had done a significant amount of paper

18  and e-discovery, and I can go through that to the extent it

19  would be helpful to the court.

20      In approaching Judge Pauley with their request for

21  leave to amend the complaint, they were very clear when they

22  said that they didn't anticipate that they would require much

23  new discovery, just some targeted discovery regarding the

24  expanded FEG intern group may be necessary, and I am quoting

25  from their August 2 letter to Judge Pauley.

1          You said you were familiar with this transcript and

2     you have seen the transcript, that he indicated that the

3     plaintiffs had, in fact, said that the discovery -- and I

4     believe it was on Page 14 -- that the discovery would be brief.

5     The discovery that had -- now reading from Page 14, Judge

6     Pauley said, and they, meaning the plaintiff's counsel,

7     represent that only limited additional discovery will be

8     necessary.

9          When we returned from the conference, we were then

10    served with extensive discovery requests, and I know if you

11    just simply look at the number of interrogatories, which I

12    think is 12 or 13 and number of requests, which is 33, that

13    does not tell the full story because if you look at the

14    instructions and the definitions, it is immediately apparent

15    what is being asked for is extensive, and nothing like that was

16    represented to the court.

17          Your Honor --

18          THE COURT:  With all respect, it seems to me -- and

19    you may win -- if you object to this as overly broad and

20    burdensome, et cetera, you may well win on that.  I would

21    rather deal with that sooner rather than on the 30th day when

22    assuming that some of your objections are upheld but some of

23    them are not, when you will then say well, now it is November

24    13th and discovery closes December 14, we can't possibly get

25    the material within, you know, two weeks to allow time for

CANJGLAC                         Conference

1    depositions in the last two weeks.

2           I have looked at the requests.  I think some of them

3    are broad and probably too broad.  If you all want to do that

4    on the fly today, you know, I am willing to do that, although

5    it is not my preferred method of doing it.

6           If you want to have it run in a semi-normal course, it

7    would seem to me that in two weeks instead of 30 days you can

8    figure out what you're objecting to on overbreadth or

9    burdensome, that there is then a chance to discuss that and

10   possibly bring it before the court.

11          MS. BLOOM:  Just one more point on that, maybe two

12   points.  First of all, when the plaintiffs served their

13   discovery, since we had this long period of discovery on

14   Searchlight, they had a very good idea exactly what was

15   involved.  More importantly, they waited until Friday night,

16   the last possible moment to serve us with their amended

17   complaint.  So that had two effects.

18          It is very difficult -- yeah, we can look at their

19   discovery and say it is overbroad, but we need to look at it

20   also in light of what they put in their amended complaint.  One

21   would have thought that might have been the first thing they

22   did.  The other impact of them waiting until Friday night, the

23   last possible moment to serve it is we couldn't intelligently

24   prepare our discovery requests until we got the complaint.  So

25   that puts us at least a week behind the 8-ball.

1          In considering whether to in any way --

2          THE COURT:  I suspect in these typical FSLA-type

3    cases, that the plaintiffs probably don't have much

4    information.  So even though you're a week behind -- and maybe

5    I decide that their objections to yours have to be more

6    expedited to keep you on the same track.  If that is something

7    you like and the quid pro quo, since some of the discovery is

8    the court ordering things and some of it is getting both sides

9    to agree to do certain things together, i.e., cooperation, that

10   is fine.  If you want to suggest a date that you're willing to

11   file objections and that you think it is fair for them to file

12   objections on that same day, let me hear it.

13          MS. BLOOM:  How about two weeks from today?  I want to

14   represent to the court we intend to serve our discovery at the

15   end of the day on plaintiffs.

16          THE COURT:  Two weeks from today is November 6th,

17   which is election day, so that moves you to November 7, and the

18   ultimate response is due the 14th.  I am not sure that gains

19   very much.  Do you really need that much time to sit down with

20   Fox to figure out your objections?

21          Can we get it done Friday, November 2; and, therefore,

22   kill your weekend on both sides with meet and confer and

23   possibly get you to come see me on the 5th or 7th or

24   thereabouts?

25          MS. BLOOM:  I am going to be in a court ordered

1    mediation in Minneapolis on November the 6th.

2              THE COURT:  Make sure to -- you're in New York, it

3    probably doesn't matter one way or the other.  Whoever you're

4    voting for?

5              MS. BLOOM:  I did my absentee ballot.  I already

6    voted.  I took care of that well in advance.

7              I really would ask -- and that is why I said two weeks

8    from today -- we can certainly do it by that Monday, the 5th,

9    and come see your Honor by the end of that week.

10             THE COURT:  Does that work for the plaintiffs?

11             MS. WAGONER:  Yes, it does, your Honor.

12             THE COURT:  Objections, both sides, November 5, and

13   let's see what I've got later in that week.  (Pause)

14             I am on criminal duty, which means we have to do it

15   bright and early first thing in the morning before the

16   criminals wake up, so to speak.  I am being semi-facetious, we

17   can't get them to court from the MCC if they were arrested the

18   night before until 10:00 o'clock or later.  Normally I do it at

19   9:30, expecting to be on the criminal Bench at 10:00.  Do you

20   think you need more than half an hour?  I will give up half an

21   hour of sleep and make it 9:00 o'clock.

22             What is your pleasure?

23             MS. WAGONER:  Me might want to do it at 9:00 o'clock.

24             MS. BLOOM:  We are talking about that Friday?

25             THE COURT:  Let's set it at 9:00.  So November 8,

1    Thursday, at 9:00 am sharp.  If you decide you've worked

2    everything out or you've worked enough out that we can start at

3    9:15 or 9:30 --

4            MS. BLOOM:  Is it possible to do it on Friday?  I have

5    a doctor's appointment at 8:30 on the 8th.

6            THE COURT:  Sure.

7            MS. BLOOM:  Thank you.  I apologize.

8            THE COURT:  The 9th, at 9:00 am, okay.  So I think

9    that takes care of the general scheduling issues.

10           Anything else from either side on those first three

11   and a half pages of order?

12           MS. WAGONER:  On that general scheduling issue, no.

13           THE COURT:  Okay.  Class and subsidiary lists.  I

14   guess my question is to the plaintiff:  What is the rush?

15           And then we'll deal with the defendant:  Why can't you

16   get it sooner rather than later?  What is the urgency?

17           MS. WAGONER:  In a nutshell, the urgency, we need to

18   be able to define the scope of the class we're talking about

19   and which entities are actually subject to the same practices

20   that we described in the complaint.  That is information that

21   we have been trying to get from Fox since well before we even

22   moved to amend the complaint.  We have been trying to get it in

23   discovery.  Fox refused to provide it.

24           THE COURT:  What I am ask is this:  At least as of the

25   moment, you have a December 14th discovery cutoff and Judge

CANJGLAC                         Conference

1   Pauley having said that is not going to be extended.  So

2   assume, you know, whether it is on November 14th or sooner or

3   later or whatever, that you get the list of interns, then what?

4          MS. WAGONER:  We would like to be able to use this

5   time to be conduct fact investigation, and the interns' contact

6   information is essential for us to be able to do that, to be

7   able to call these people, to find out what their experiences

8   were, to learn information in the most efficient way possible.

9          If we have contact information now, we will be able to

10  do that.  In addition to that --

11         THE COURT:  The contact information two weeks later,

12  you'll be able to do that, you'll just, you know, have two

13  weeks less to do it between the date you get it and the

14  certification motions due not until January 18th.

15         MS. WAGONER:  That is true.  We don't want to lose

16  those two weeks.  It may be quite a number of people that we

17  need to reach out to.  It seems to us that --

18         THE COURT:  You also, quite frankly, can put an ad in

19  Variety or whatever and do it through self-help.  Be that as it

20  may, let's just find out what has to be done on the defense

21  side to gather this information, and there is clearly a dispute

22  as to the scope of the interns, whether it is just those that

23  Ms. Hoffman was responsible for or any intern in any Fox

24  company?

25         MS. BLOOM:  Your Honor, as to the scope issue, our

1    recommendation would be that that is an issue that would get

2    decided when we look at the objections.  With regard to the

3    Aimee Hoffman interns, we have already given them a list of the

4    companies that Aimee Hoffman either recruited for, collected

5    paperwork for, was involved in the interview process, and we

6    had already told them that we would be willing to give them the

7    contact information for those interns early.

8           I don't know that I necessarily am happy to describe

9    the process in terms of compiling that information, but I would

10   certainly give it --

11          THE COURT:  Okay.  Does that work?

12          MS. WAGONER:  Your Honor, I am concerned about losing

13   the two weeks.  What we already know from --

14          THE COURT:  What two weeks?

15          Frankly, they don't have to give you this until

16   November 14th.  They have now offered to give it to you by

17   November 5, which is less than two weeks from today.  I don't

18   know exactly what it is going to take them to pull this

19   together, but you decided when you were going to serve the

20   discovery on them.

21          MS. WAGONER:  Your Honor, actually at the October 9th

22   conference before Judge Pauley, we asked Judge Pauley to order

23   defendants to produce this immediately even without a discovery

24   request.

25          THE COURT:  What did he say?

1        MS. WAGONER:  Judge Pauley said he already ruled we

2    were entitled to contact information and they should --

3        THE COURT:  That is different.  Show me the exact

4    page, but my memory is you certainly did not order it

5    expedited.

6        MS. WAGONER:  It was at the very end of the

7    conference.

8        THE COURT:  The last page, Page 18.  "I have already

9    ruled on it.  It shouldn't be a problem.  If there is any

10   dispute about it, send me a letter," et cetera, et cetera.

11       That doesn't say that they have to give it to you by

12   that Monday or Thursday or whatever, there just had to be an

13   agreement whether it is being produced or not being produced.

14   I could push them to do it two, three days earlier.

15       What is the point?

16       MS. WAGONER:  I mean, I guess --

17       THE COURT:  Okay, November 5, but now as to non-Aimee

18   Hoffman interns, I assume Fox is objecting?

19       MS. BLOOM:  Yes, your Honor.  We believe that, yes, we

20   believe that is beyond the scope of what Judge Pauley allowed

21   them to do when they amended their complaint.

22       THE COURT:  Can I see the amended complaint?

23       MS. WAGONER:  Yes, your Honor.

24       (Pause)

25       THE COURT:  Where is the class definition?

1          MS. WAGONER:  The class definition is -- there are a

2     few classes in the case, your Honor, but it first appears on

3     Page 10.

4          THE COURT:  Right, which seems to be the New York

5     corporate intern class, which appears to be in the FEG

6     internship program, which I assume is Ms. Hoffman's program,

7     correct?

8          MS. WAGONER:  We don't think that is right.

9          The problem is Fox has chosen this definition to

10    define their class without giving us any information about

11    where that comes from.  We have asked Fox to tell us well,

12    okay, you're identifying a group of interns who worked that

13    Aimee Hoffman was involved with.  Does that cover all of the

14    Fox entities that had interns and were subject to the same

15    policy?  They have not given us that information.

16         THE COURT:  What policy are you saying is the policy?

17         MS. WAGONER:  The policy is the Fox Entertainment

18    Group internship program, and that Fox Entertainment Group

19    issued guidelines to supervisors.  It tracked all of the

20    interns who worked for it and it is a people --

21         THE COURT:  Hold on.  All who worked for a corporation

22    named Fox Entertainment Group, Inc.?

23         MS. WAGONER:  That is our understanding, your Honor.

24         THE COURT:  That is simple because then it is maybe

25    broader than Hoffman, but it is only people who worked for FEG,

1   Inc., not various Fox subsidiaries, which seems to be where

2   you're going, which then gets into I don't know how many

3   subsidiaries the fair and balanced Fox entities have.  That is

4   a little dig at Fox or the news division of Fox, but they can

5   handle it.

6           MS. WAGONER:  There may be some misunderstanding here

7   because the definition of an employer under the Fair Labor

8   Standards Act is broad.  If Fox Entertainment Group takes the

9   position that it didn't have interns at all, that is a

10  different question from who the employer is under the Fair

11  Labor Standards Act and New York labor law.

12          It is our understanding Fox Entertainment Group

13  administered the internship program for a number of different

14  subsidiaries.  We have been hamstrung during discovery because

15  Fox hasn't been willing to give us information about what

16  subsidiaries are covered by these policies, what subsidiaries

17  Fox Entertainment Group administers an unpaid internship

18  program for.  We need to get that discovery to know that.

19          THE COURT:  It seems at this late stage in the case

20  you're running afoul of the representation to Judge Pauley that

21  you want limited discovery because it seems what you're doing,

22  besides the Hoffman interns, is saying we want all the interns

23  who worked for FEG, Inc.  We also want any intern that worked

24  for some Fox company.  And now is that a 100 percent

25  subsidiary?  Is that a 20 percent subsidiary?  Where do you

1    draw the line?  And I don't know the Fox corporate ownership

2    hierarchy very well.

3          Where exactly are you drawing the line?  Or at this

4    late stage are you trying to get discovery for a third amended

5    complaint which will add Fox News, Inc., if that is an entity,

6    or any other entity that is the actual technical employer of

7    the interns?

8          MS. WAGONER:  I can tell you exactly where we're

9    drawing the line.  In writing our discovery requests, number

10   one, Fox maintains information about interns in its People Soft

11   human resources database and it classifies them under two

12   categories:  Paid Group K and Job Title on Credit Intern.  We

13   want a report from People Soft, all interns listed under Pay

14   Group K and Job Title Credit Intern.  That will satisfy us.

15         THE COURT:  That is not what Question No. 1 says.  It

16   is certainly what your letter seems to be saying.  I guess the

17   question for Fox is we can argue about the merits later, but is

18   it easy enough to run this Pay Group K and Job Title Credit

19   Intern list through People Soft?  It may be accurate, it may be

20   inaccurate.  They want to do with it as they wish.  You will

21   poke holes in it in terms of substance for trial.

22         How hard is it to generate the printout?

23         MS. BLOOM:  In terms of generating the printout, the

24   printout will not give them the information they're looking

25   for, Ms. Wagoner.  I wanted to point out the class definition

1   comes directly from their motion to amend, and I can direct the

2   court to or read into the record the portions of their motion

3   to amend where they specifically talk about the fact that there

4   are no interns in FEG, Inc.

5            So what they articulated that they wanted was interns

6   for whom Aimee Hoffman either recruited or was somehow involved

7   in administering the internship program.

8            THE COURT:  Why don't you hand it up instead of

9   reading it?  It is probably easier.

10           MS. BLOOM:  My copies are marked up.

11           THE COURT:  If you don't care, I don't care.  If

12   plaintiff's counsel doesn't care?

13           MS. WAGONER:  No.  That is fine.

14           (Pause)

15           MS. BLOOM:  I handed up the motion in support of leave

16   to amend as well as the reply memo and directed the court to

17   Page 602.

18           THE COURT:  It certainly looks -- and for the record,

19   it is Page 6 of the opening brief and Page 2 over to the 3rd of

20   the plaintiff's reply brief -- certainly it seems that what you

21   are telling Judge Pauley to allow the amendment was that the

22   definition is, or the commonality is that Ms. Hoffman was the

23   recruiter using the same internship policies.

24           MS. WAGONER:  Your Honor, we gave Judge Pauley the

25   information that we were able to get during discovery.  Now, at

CANJGLAC                    Conference

```
 1    Ms. Hoffman's deposition, Ms. Hoffman was a 30 (b)(6)

 2    representative that --

 3              THE COURT:  Before or after the September 26

 4    submission of your reply brief?

 5              MS. WAGONER:  Before.

 6              THE COURT:  That's what we are limiting it to.

 7              MS. WAGONER:  So at that deposition, your Honor, Fox

 8    would not allow Ms. Hoffman to answer questions about the

 9    internship program at large.  It limited her responses to

10    Searchlight only.  We have only been able to glean scraps of

11    information about the --

12              THE COURT:  Here is the issue.  You're supposed to

13    have a complaint followed by discovery, not the other way

14    around.  You have asked to amend based on what you know, which

15    is other entities followed Ms. Hoffman's policies.  Let me

16    rephrase that to use your exact words:

17              Other FEG subsidiaries, "for which Ms. Hoffman

18    recruited that were governed by the same internship policies as

19    Searchlight."

20              What I think you're saying is now that that was the

21    basis for Judge Pauley granting you leave to amend, you also

22    want any other intern hired by any Fox subsidiary and then

23    you're going to work backwards from there or something to

24    figure out whether they were under a common policy or not.

25              It seems to me particularly at this late stage of the
```

1   case, with less than two months left in discovery, and with you

2   asking the court to expedite the defendant's response, that you

3   should be limited by what you asked Judge Pauley for.

4           What am I missing?

5           MS. WAGONER:  I think the issue is that we haven't

6   been able to get that discovery because Fox wouldn't --

7           THE COURT:  You don't get discovery until you have a

8   plaintiff and a complaint that you've asked Judge Pauley to

9   give you.  Frankly -- and I am not suggesting motion practice.

10  I am not sure that this complaint -- and let me back up because

11  I have not read the motion papers that led to Judge Pauley's

12  order.  Was there a proposed amended complaint attached?

13          MS. WAGONER:  Yes, there was, your Honor.

14          THE COURT:  Was it in essence the same as the one

15  you've just handed up to me that has actually now been filed?

16          MS. WAGONER:  The only thing we revised were the

17  things Judge Pauley had ordered us to revise.  We were not

18  ordered to revise the class definition in any way to tie it to

19  Hoffman.  The class definition remains unchanged from what we

20  attached to our original brief.

21          THE COURT:  Ms. Bloom, is that correct?

22          MS. BLOOM:  They were ordered to make search changes.

23          One of the changes was not as to the class definition.

24  I certainly think Judge Pauley, as were we, operated under the

25  assumption they were looking for the Aimee Hoffman interns.  My

CANJGLAC                    Conference

1    reading of the amended complaint that I just recently received

2    is that they did make all of the changes they were supposed to

3    make.

4              THE COURT:  That is a different issue.  It is one

5    thing if -- you know, I certainly heard you to be saying they

6    told Judge Pauley their only interest was the Hoffman interns,

7    but if this complaint is significant, substantially the same

8    form as the class definition which is not limited to Hoffman,

9    then I think we go back and I'll let you argue on the class

10   certification motion and otherwise, but it may be imperfect,

11   but now we are back to all they want apparently is the Pay

12   Group K and Job Title Credit Intern list at --

13             MS. BLOOM:  For what, your Honor?

14             THE COURT:  Don't worry about it.  The question is, I

15   take it -- I don't firmly believe, obviously, that anything in

16   a computer comes out with a Staples Easy Button, but I

17   certainly would think that is the sort of thing that is an easy

18   run.  Is it?

19             MS. BLOOM:  It might be an easy run, but it doesn't

20   generate the information they're looking for.

21             For example --

22             THE COURT:  Are you satisfied with the run period, not

23   that they're then going to have to go through a gazillion

24   personnel files to find you other information?

25             MS. WAGONER:  Yes, your Honor.

1          MS. BLOOM:  The run is over-inclusive, your Honor.

2          THE COURT:  Okay.

3          MS. BLOOM:  The problem with that, when we did our

4    first stage of discovery which was, as I said, it took eight

5    months to do all the discovery that they wanted, we produced

6    certain things that were over-inclusive, including one

7    privileged document, and now the standing that we had a

8    clawback in our confidentiality agreement, they wouldn't give

9    the document back.  I am very concerned about giving them

10   over-inclusive information.

11         THE COURT:  Why?

12         MS. BLOOM:  I don't even know how many of the 500

13   subsidiaries had interns.  What I know is what Aimee Hoffman

14   did.

15         THE COURT:  Okay.  Here is the question:

16         The first stage, you're going to give them this run

17   from People Soft.  Maybe they're going to call some of these

18   people up.  Now, it may be that the people at Soft Run don't

19   have addresses and phone numbers, it just has names.  I don't

20   know.  Whatever it is, Ms. Wagoner has just said whatever it is

21   it is and she will accept it and not ask for any follow-up.

22         MS. WAGONER:  I don't know that is the only document

23   responsive to Request No. 1 and we won't ask for follow-up,

24   that that is it.

25         THE COURT:  Okay.

1          MS. BLOOM:  I am sorry.  Maybe I should let Mr. Bunin

2     address this.  I am not sure what I am including.  There is 500

3     subsidiaries for FEG.

4          THE COURT:  It all runs through People Soft.

5          MS. BLOOM:  He has to address that.

6          THE COURT:  Mr. Bunin?

7          MR. BUNIN:  Your Honor, yes, there are a miriad of

8     different entities that that run through People Soft.  Job

9     codes that run different data elements that can be used in

10    terms of your inquiry can be created, but we have to know what

11    we are creating.

12         THE COURT:  It seems to me we'll get to a time period

13    in a minute, but that it is for any Fox entity that is in what

14    appears to be a centralized People Soft database that come

15    within Pay Group K and Job Title Credit, either.  Is that a

16    search that you can easily perform?

17         MR. BUNIN:  It can be done, yes, your Honor.

18         THE COURT:  Okay.

19         MS. BLOOM:  Your Honor if what they're saying now is

20    that it would be Aimee Hoffman people plus other companies that

21    use the same policies, something like that can pick up people

22    that had nothing to do with this.

23         THE COURT:  I am going to assume that this is

24    excessively over-inclusive in some ways and under-inclusive in

25    the other, but this is discovery.  Whether it is admissible, it

1    probably isn't.  So if they think they will be able to use this

2    to call some people up and find out, you know, what Fox's

3    policies were, et cetera, maybe that will be of some use to

4    them.  Maybe it won't.  If they then try to use it at

5    deposition or otherwise, your people will explain why it is a

6    useless document.

7           It is what they want, and if I don't do it this way,

8    there is the risk, because their complaint is broader than just

9    the Aimee Hoffman interns, that you're going to have to spend a

10   lot more time making the list accurate.  Is that really of

11   benefit to you?  They can make their own decisions.  Is that a

12   benefit to Fox?

13          MS. BLOOM:  Your Honor, and I think my concern is

14   similar to what you had articulated before, that this is going

15   to somehow generate a list of people, many of whom have nothing

16   to do with the current lawsuit.

17          THE COURT:  Right.

18          MS. BLOOM:  The next thing that will happen is they're

19   going to go out, and like they have been doing, they're going

20   to try to find more plaintiffs and come back and try to move to

21   amend the complaint to add even more companies.

22          THE COURT:  That makes it easy.

23          Are you agreeing there will be no further amendments

24   to the complaint in terms of adding plaintiffs other than if

25   the class certification motion or any other motion, collective

1    action is granted?  And that there will be no adding of

2    additional companies?

3            MS. WAGONER:  We can agree that barring the need to

4    replace a plaintiff if something happens to somebody or some

5    emergency.

6            THE COURT:  If a plaintiff dies or is incapacitated, I

7    will consider that you've got a possible opt-out with respect

8    to that.  Other than that, there will be no additional

9    defendants named and no additional plaintiffs other than

10   through the class certification and related motions.

11           Agreed?

12           MS. WAGONER:  Yes, that is fine.

13           THE COURT:  All right.  With that overcoming your

14   concern, about the only other fear may be that they're going to

15   upset your former interns or present interns.

16           MS. BLOOM:  It actually doesn't, your Honor, address

17   the concern because my concern is that the way they're trying

18   to define the class, it arguably includes all 500 FEG

19   subsidiaries or 500-plus.  That clearly was not what was

20   intended when we went before Judge Pauley.

21           THE COURT:  Since Judge Pauley knows what he was

22   thinking at the time of class certification motions, on January

23   18th and your response thereafter you will make that argument

24   to Judge Pauley.

25           MS. BLOOM:  Except that there is a big difference

CANJGLAC                      Conference

```
 1   between the 10 companies that Aimee Hoffman was responsible for

 2   administering that were the only ones that even having a

 3   colorful argument should be part of this case, and that is the

 4   argument they made to Judge Pauley.

 5          THE COURT:  I appreciate that, and when I thought that

 6   their motion papers did not have a proposed amended complaint

 7   attached and that they went from an Aimee Hoffman argument to

 8   an all intern argument and sandbag the Judge, you and Judge

 9   Pauley, I was leading the way.

10          I have seen your definition which was not limited to

11   Aimee Hoffman.  If you want to call my attention to other

12   paragraphs other than the ones on Page 10 and 11, which I have

13   read, if you think there is something else in here limiting it,

14   what I am trying to do is get discovery done at the minimum

15   cost to you and, you know, let you all argue merits down the

16   road.

17          If I have to do it a different way, the result may be

18   that you will have to do it, quote-unquote, right, which I

19   assume will be a process not only that won't be finished by

20   November 5th, but won't be finished by November 14th.  That is

21   nothing in your interests or theirs because it may well result

22   in a movement to the December 14th discovery cutoff date.

23          So pick your poison.

24          MS. BLOOM:  Can I confer with my client for a minute?

25          THE COURT:  Sure.
```

1           (Off-the-record discussion)

2           MS. BLOOM:  I guess the question, your Honor -- and if

3    I misstate it, Mr. Bunin will help me -- is that if we give

4    them the report, does that then open up the discovery in this

5    case to that full list of people, full list of potential

6    custodians, and the custodians would be potentially not just

7    the interns to the extent we have discovery for them, but we

8    looked for Aimee Hoffman's companies.  There is between 150 and

9    200 possible custodians, and that is just for 10 companies.

10          THE COURT:  We are certainly not going anywhere near

11   that in a less than two month discovery period.  There is one

12   other thing that may help to limit this, and that is, is there

13   a way through the People Soft to tell which of them worked in

14   New York because while there is a production for Searchlight

15   which I assume has already been fully discovered that is a

16   California class action allegation as well, I think the FEG

17   program is limited to New York unless I missed something.

18          MS. BLOOM:  The FEG program is limited to Antalik as

19   the class representative.  So with regard to claims that

20   wouldn't be time-barred, Judge Pauley said it related-back,

21   which is something that we are actually filing a motion for

22   reconsideration on.

23          Assuming we lost that motion, then you're right, it

24   really would only implicate the New York class because as of

25   today, the three years would have already run for the FSLA.  As

1  you know, under Fair Labor Standards Act it is not a

2  relation-back statute, individually driven statute, of course,

3  driven by opt-in for any particular plaintiff.  Yes, I do think

4  it would only be New York.

5          THE COURT:  Agreed?

6          MS. WAGONER:  I don't agree it would only be New York,

7  your Honor, because there are FSLA collective members who

8  worked in California.

9          THE COURT:  Except?

10         MS. WAGONER:  Judge Pauley ruled --

11         THE COURT:  We'll help you about that if and when you

12  get collective action certification.

13         MS. WAGONER:  They're all witnesses, all of them.

14         THE COURT:  Life is short.  People Soft, limited to

15  people who worked in New York.

16         MS. WAGONER:  I really don't understand what the

17  distinction is here because --

18         THE COURT:  Give me a paragraph.  I am looking at

19  Paragraph 65, 66 that defines the New York production intern

20  class.  Give me --

21         MS. WAGONER:  Sure.  We can go to --

22         THE COURT:  Is it 91, Paragraph 91?

23         MS. WAGONER:  Yes, yes.

24         THE COURT:  This is a new claim?

25         MS. WAGONER:  No.  We also had a claim, FSLA claim in

1    the original complaint.

2              MS. BLOOM:  This isn't the FEG claim.  The FEG claim

3    is only brought on behalf of Eden Antalik.

4              THE COURT:  Paragraph 91?

5              MS. BLOOM:  91.

6              THE COURT:  Plaintiff Antalik brings FSLA claims on

7    behalf of herself and all unpaid interns who participated in

8    the FEG internship program between certain dates defined as the

9    corporate intern collective.

10             MS. BLOOM:  It is our position that the FSLA claim,

11   that it starts running from three years back, three years back

12   from the current complaint from today, actually.

13             THE COURT:  That means it is a nationwide possible

14   group, only a shorter time period.

15             MS. BLOOM:  That's right.

16             THE COURT:  From 2009, October 2009 or thereabouts.  I

17   don't think the one-year difference makes that much of a

18   difference yet.

19             MS. BLOOM:  It is actually significant because as the

20   plaintiffs know, the company started paying their interns in

21   2010, so it is a big difference.

22             THE COURT:  Not necessarily.  It may be a substantive

23   difference.  I am looking at the People Soft database issue

24   again, and I think I come back to you're doing People Soft, Pay

25   Group K, Job Title Credit Interns, no state limitation, or if

CANJGLAC                    Conference

```
1    you want to do a New York run separate from a rest of country

2    run, it seems that may be better in some ways and more work in

3    others.  What is your pleasure on that?

4              MS. BLOOM:  I would like to do a New York run separate

5    from a national run.  The national run would only go back three

6    years, to three years from when they filed their amended

7    complaint, which would have been Friday night.

8              The New York run, Judge Pauley did say the New York

9    labor law claim would relate-back.  I am representing to the

10   court we are filing a motion for reconsideration on that

11   because we think he misread the Cross Key decision and didn't

12   consider the substantive decision.

13             MS. WAGONER:  Judge Pauley ruled the claims related

14   back to the date of the original complaint.

15             THE COURT:  FSLA as well?

16             MS. WAGONER:  Yes, FSLA and the class, yes.

17             THE COURT:  What page of the October 9th transcript,

18   Folks?

19             MS. BLOOM:  On Page 12 where he said:

20             "Plaintiffs proposed claims against Fox Entertainment

21   relate-back to the filing of the original complaint."

22             An FSLA claim under the law can't relate-back.  I can

23   cite you to cases that hold that.

24             THE COURT:  Okay.

25             MS. WAGONER:  That is actually inaccurate.  We cited
```

 1   those cases in our brief.

 2              THE COURT:  I can't do all of Judge Pauley's work for

 3   him.

 4              MS. BLOOM:  We are moving for reconsideration on the

 5   New York labor law claim.

 6              THE COURT:  To the extent you get reconsideration

 7   before you have to produce the list, you can change the dates.

 8   Otherwise, run it.  Run it once or twice, but run it back to

 9   the September 28th, 2005 date.  That seems to be the broadest

10   it might possibly be, but I am warning the plaintiffs --

11              (Simultaneous voices)

12              THE COURT:  Stop!  Democracy ends at some point.  You

13   are not getting much follow-up on this.  Make sure you're

14   understanding that.  We are not doing a year's worth of

15   discovery in a month and a half.

16              MS. WAGONER:  Your Honor, I agree with you.  I want to

17   be very clear we want to ultimately find the group of people so

18   that we can certify a class.  We don't want to make it too

19   broad, so we have information so we have the right class.

20              THE COURT:  You get it.  You know enough.  You have

21   asked for these codes out of People Soft.  You are getting it.

22   If it doesn't have what you want or need, I am not going to

23   look kindly, or to put it even more bluntly, the odds of you

24   getting anything else of identifying class members than this is

25   slim to none.  You understand that, right?

1            MS. WAGONER:  Yes, I understand.

2            THE COURT:  Okay.

3            MS. BLOOM:  Your Honor, on the nationwide poll, you're

4     ordering us to --

5            THE COURT:  Judge Pauley said it relates-back.

6            Whether that was meant to cover both or meant to cover

7     just the New York labor law claim is not something I can

8     answer.  When you move for reconsideration, I assume Judge

9     Pauley will deal with that very quickly.  If he rules in your

10    favor before the due date for this, then you don't have to do

11    it any further back than he says what the case involves.

12           If he hasn't ruled, then it is what it is and again on

13    the assumption that once whatever programming is done to run

14    this, that the time of running it for back to 2009 versus 2005,

15    subject to Mr. Bunin or one of his colleagues or computer folks

16    coming in and telling me that I made an assumption that was

17    wrong, that it is going to be considerably extra cost to do

18    this, I am making no -- let me be clear, I am making no

19    decision as to whether this information is admissible, what

20    arguments you can make, and you can make.

21           You are free to do whatever you want.  I am not

22    implying in any way, shape or form that everybody or, indeed,

23    anybody that is produced on the Pay Group K, Job Title Credit

24    Intern list out of People Soft is a potential member of the

25    class or the collective action or anything else.  I am doing it

1   in a very simple approach under Rule 1 of the Federal Rules of

2   Civil Procedure, which is this gives them some information,

3   albeit inaccurate.

4           It satisfies the plaintiffs.  It is not burdensome on

5   the defendant; and, therefore, that is the court's ruling.  You

6   have the right, and I have no problem if you want to take it to

7   Judge Pauley since I am pinch-hitting here, so to speak, and he

8   has been involved in the case a lot longer, not only is it your

9   statutory right, but I have no problem.  You can ask him to

10  clarify, reconsider, file objections and get it in front of him

11  in that way, whatever you want, but at this point I think we

12  have talked about it enough.

13          That's the court's ruling.  Let's move on.

14          MS. BLOOM:  Sorry, but he ruled as to the California

15  claims, it did not relate-back.

16          THE COURT:  I think there is -- is there any

17  California corporate as opposed to Searchlight issue?

18          MS. WAGONER:  The only California corporate issue is

19  the FSLA claim.

20          MS. BLOOM:  That can't go back longer than three

21  years.  Even if it does relate-back, it shouldn't go back

22  longer than 2008.  There is a significant difference between

23  asking us to pull nationwide data to going back longer than

24  that.

25          MS. WAGONER:  Your Honor --

CANJGLAC                          Conference

1            THE COURT:  What is the difference?

2            MS. BLOOM:  Three years.

3            THE COURT:  Thank you for the math.  I thought I

4    already told you that absent some information that cost-wise it

5    is going to cost you any more to do it for three years versus

6    six years or whatever the difference is here, otherwise I think

7    you're saying as to the FSLA plaintiffs, say it relates-back.

8    You say it doesn't.  The California, you say, Judge Pauley said

9    clearly doesn't relate-back, but that's a California state law

10   claim.

11           Look, you want to do three different lists so you show

12   who is in California, who is in New York and who is in the rest

13   of the country but for the full period, I don't care, but that

14   sounds like you're just creating work for yourself, and

15   probably if this data is in the form that I think it is in, it

16   is going to show who was in what state, no?

17           MS. BLOOM:  I will let Mr. Bunin answer that.

18           MR. BUNIN:  It varies.  The database is only as the

19   information is put into it.  I believe designation of location

20   is subsumed in the department so that it can be -- that being

21   said, it is in many cases it is coded.  I need to double-check

22   that.  I certainly think we can certainly write a query to try

23   to cull that out and make that separation if that is necessary.

24           THE COURT:  I don't think it is necessary.  You're all

25   trying to do it.  As far as I am concerned, plaintiffs have

CANJGLAC                       Conference

1   asked you to query the People Soft database for all interns in

2   the Pay Group K, Job Title Credit Intern going back to

3   September 28th, 2005, and whatever information comes out of the

4   database based on that comes out.

5          Perhaps before you run it, if there is some columns or

6   whatever, some bits of information that may or may not be

7   picked up, depending on how you do the query, you could talk to

8   the plaintiffs so they don't have to do it twice, and that is

9   the best for the two of you.

10         Other than that, you know, and this is a warning to

11  the plaintiff, too, you know what this database looks like from

12  earlier in the case.  I don't.  You have said it is sufficient.

13  If they have codes in there that you don't already have the

14  explanation of, whether it this defendant's, you know, people

15  who worked in other other things, I am not going to look kindly

16  on anything that requires them to do much more work than give

17  you the printout or the electronic version of the printout.

18         Is that Clear?

19         MS. WAGONER:  Yes, your Honor.  We have only asked

20  them for the categories in a document they already produced to

21  us, and I have a copy of it here if you like to see it.

22         THE COURT:  Let me see it.  That will help.

23         MS. WAGONER:  Also I am going to pass up an e-mail

24  attached that shows it only takes an hour to run this report.

25         (Pause)

1        THE COURT:  Okay, this is helpful.  I note that it

2   doesn't give you address or phone number, so what you're going

3   to do with this I have no clue.

4        MS. WAGONER:  We have asked them to give us address

5   and phone number in addition.

6        THE COURT:  That is the point, counsel.

7        MS. WAGONER:  It is in the document request, your

8   Honor.

9        THE COURT:  I understand that.  You're about to lose

10   credibility.  I said based on the letters, this is all you

11   want.  Now, yes, your document request asks for a zillion other

12   things.  We are not doing that.

13        MS. WAGONER:  I think that is fine.  I already agreed

14   to narrow it.  I am not saying we need all of these fields.  I

15   bring it up just to show that the database --

16        THE COURT:  Either we are not speaking the same

17   language or I am not going to order them to do this, and then

18   when they object to Request 1 because it asks for last known

19   home address, phone number, e-mail, company number, unit name,

20   all the stuff some of which is on this chart, a lot of which

21   like address, phone number and e-mail certainly isn't, I am not

22   going to have them then going into personnel records or

23   querying the computer or other things.

24        Either this list of names is sufficient and you'll go

25   on the internet and try to figure out where the plaintiff used

1   a fictitious name, Sherlock Holmes, whether it is when you find

2   five addresses for Sherlock Holmes in Los Angeles, whether it

3   is the one you want or you don't want, but if you want a lot

4   more, not only aren't you getting it fast, and let me rephrase

5   it, if you want anything more than the columns on the People

6   Soft printout bearing Bates Stamp DOO53986 through 93, speak

7   now because I thought I was very clear, but obviously I wasn't,

8   that if you want to do this as a simple and fast way to get the

9   information, that is all you're getting.

10        MS. WAGONER:  That is exactly right, we just want what

11   the database has spit out.

12        THE COURT:  Now, counsel, come on, please.  With all

13   due respect, I don't like double-talk.  A computer can spit out

14   a gazillion things.  Are you satisfied with getting the Intern

15   Category K, et cetera, in exactly, exactly the format on

16   Document DOO93986, yes or no?

17        MS. WAGONER:  That in addition to e-mail addresses and

18   phone numbers.

19        THE COURT:  That request is denied.  When lawyers

20   don't answer my question particularly 45 minutes or an hour

21   into a conference, it does not do well for them.  The request

22   is denied.

23        MS. WAGONER:  Your Honor --

24        THE COURT:  No.  The request is denied based on your

25   prior representation to the court this is all you want, period.

1    Take it up to Judge Pauley.

2              MR. SWARTZ:  Your Honor --

3              THE COURT:  I am done.  I am done.  Thank you.  You

4    have blown it, counsel.  That is it.

5              MR. SWARTZ:  We requested Request No. 1, and that is a

6    request we were going on in this entire conversation.

7              THE COURT:  No.  I specifically asked your colleague

8    if you got this People Soft printout, is that it?

9              MR. SWARTZ:  Based on Request No. 1, your Honor.

10             THE COURT:  That is not what was said and that is not

11   what I am giving you.

12             MS. WAGONER:  We would even limit it to just the

13   addresses and phone numbers.  I guess I really honestly don't

14   know where the confusion was because I think I am asking for

15   exactly what -- I am not asking for any more than your Honor

16   already ordered.  I give this to you as an example of what the

17   database can do.  I want the contact information.  I am not

18   trying to get any more than that.

19             MR. SWARTZ:  The purpose of the request --

20             THE COURT:  You also asked for a gazillion other

21   things in Document Request No. 1.

22             MR. SWARTZ:  We are willing to limit it in here

23   because of what the court just stated.  The purpose, the real

24   purpose is to get the contact information, the last known

25   address, last known telephone number and last known e-mail

1   address which is in the database and couldn't cost a penny more

2   to spit out.  That is the purpose of the questions.  We both

3   are sitting here today talking, we thought, about Request No. 1

4   the entire time.

5        THE COURT:  I don't think I am speaking Greek.  So I

6   suggest you all listen a lot more carefully, and also when I

7   ask a question, you answer the question.  It is not a political

8   debate you get to answer whatever you want when the moderator

9   asked the question.  If you had to pick one of those three

10  identifiers, address, e-mail or phone, which do you want?

11       MS. WAGONER:  Phone number, your Honor.

12       THE COURT:  Can that be added to the query without any

13  special programming?

14       MR. BUNIN:  It would need to be broken out, but it

15  would not be terribly difficult to do.

16       THE COURT:  All right, phone number and that is it.

17       MS. WAGONER:  Thank your Honor.

18       THE COURT:  Okay.  That, I believe, takes care of

19  that.  Now we get into the depositions.  These are all

20  third-party depositions.  My inclination, again based on Judge

21  Pauley's ruling, is to allow them to occur.  I am relying on

22  his statement at the October 19th conference.  Now I have to

23  find a page again.

24       Page 15 line 5, "For the foregoing reasons,

25  plaintiff's motion to amend is granted.  Plaintiff shall file a

1    first amended complaint conforming to this Court's ruling by

2    October 16th, 2012.  In view of this amendment, this Court

3    extends the discovery deadline until December 7th, 2012.  No

4    further extensions will be granted."

5              It does not seem to limit it to new matters, and since

6    they're third parties, while obviously Fox will be attending

7    the deposition, it does not seem that if this is the only three

8    that are -- and let's be clear on that -- if these are the only

9    three that relate to old as opposed to new issues, I would be

10   inclined to let them go forward.  Are they the only three?

11             MS. WAGONER:  Yes, your Honor.

12             THE COURT:  Is there any further argument from the

13   defense?

14             MS. BLOOM:  No, your Honor.

15             THE COURT:  All right.  You all on whichever side can

16   notify those witnesses and get them scheduled on a date

17   convenient for the witness and the parties, and let's get that

18   done sooner rather than later in terms of getting fixed dates

19   because we don't want the deadline to come up and you have

20   scheduled for December 6th and somebody gets sick or whatever.

21             Also is it December 7th or the 14th?  There seems --

22             MS. BLOOM:  I think it is the 14th, actually.  On the

23   deposition scheduling, and of course subject to the witness's

24   convenience, my client is from California and he would like to

25   attend, so he asks if, assuming it works for the witnesses, we

1   can schedule them on consecutive days, we can --

2              THE COURT:  Any problem?

3              MS. WAGONER:  Sure, we are happy to work with them.

4              THE COURT:  The hardest thing would be probably to be

5   working with the non-parties, but I suspect there may be some

6   prior business relationship with Fox so that you can use that

7   to at least get the scheduling satisfactory.

8              Otherwise, there are ways to do a video hookup or

9   something, but it is not as good, let's put it that way.  Let

10  me give you each your material back, although I will keep the

11  first amended complaint, but the printout and the briefs go

12  back to each of you.

13             What else else, if anything, we need to deal with

14  today?  Anything from either side?

15             MS. WAGONER:  Plaintiffs don't have anything else.

16             MR. BUNIN:  Your Honor, I just wanted to be clear just

17  to make sure I understand the terms of what is being done in

18  the last part of discovery since my team will be doing it.  We

19  talked about the People Soft report.  That is fine.

20             What I was hoping was not the case, and I wanted to

21  articulate clearly we have identified there are a number of

22  things coming up here whether there is an expectation that full

23  and complete discovery is going to be needed to be done on all

24  of these people when those names appear.  That is a different

25  kettle of fish.

1          THE COURT:  Fortunately, Ms. Wagoner is shaking her

2     head in the "no" direction, which is the same direction my head

3     would have been going if she hadn't gotten there first.

4          I do suggest that as soon as possible you sit down and

5     deal with that.  Indeed, why don't in the first instance, do

6     you have in mind who's e-mails you want searched for the like?

7          MS. WAGONER:  Yes, your Honor.  We sent Fox a letter

8     on October 10th listing the seven custodians we think are most

9     likely to have responsive information, and we had already

10    agreed on search terms to run on those custodian e-mail

11    accounts months ago during the first discovery phase.  We ask

12    Fox to talk to us about that and let us know if they're right

13    with it.  I hope we have those conversations quickly to get

14    that moving.

15         THE COURT:  This is the Goldilocks, is seven too much

16    or too little or just right?

17         MR. BUNIN:  Seven will not break the bank, your Honor.

18    Thank you.

19         MS. BLOOM:  On the seven, two are, two are lawyers

20    that we have an issue with doing e-mail searches on.  I just

21    want to be clear so that we don't have a problem later on.

22         When they say we agreed on search terms, we had search

23    terms that we did for Searchlight, but when we did the search

24    terms that they're talking about, it generated -- and Mr. Bunin

25    can speak to it -- an unimaginable amount of e-mail.  I think

1   it was around eight million or something.  We had to go in and

2   refine the search terms by using the interns' names and using

3   the names of their supervisors, the e-mail addresses.  In order

4   to get all of that information, it actually took a substantial

5   amount of additional work.  So when we say that we're just

6   talking about five or seven custodians with the search terms, I

7   don't think --

8              THE COURT:  Let's deal with the lawyers first.  These

9   are in-house Fox lawyers, I assume?

10             MS. BLOOM:  Two are in-house Fox lawyers, and my

11   understanding is that they want their e-mail with regard to the

12   good-faith defense for the FSLA claim, and I believe --

13   although I need to confirm with my client -- that we will not

14   be pressing that defense.  So that should obviate the need for

15   the e-mails from those two lawyers.

16             THE COURT:  All right.  If there is no quote-unquote

17   good-faith defense, you don't need the lawyers?

18             MS. WAGONER:  That's right.

19             THE COURT:  Try to figure that out sooner rather than

20   later.  As to the other five custodians, the names of interns

21   clearly are not going to work as a limitation now and we are

22   talking certainly not eight million e-mails are going to be

23   looked at now.  So you all have some suggestion?

24             MS. WAGONER:  Yes, your Honor.  Our letter actually

25   didn't propose running that type of search.  There were about

1   four different sets of strings, and one in the original

2   strings, one of those, a couple of those four sets of strings

3   were names and supervisor names and that kind of thing.

4        We had proposed not running those extra strings and

5   just running the strings for particular terms.  It is

6   unfortunate.  We should have had this conversation among

7   ourselves.  It sounds like there is confusion.  We were just

8   seeking particular word searches.  Of course, if that is

9   generating an enormous amount of hits, we'll refine that.

10       THE COURT:  Does it pay for me to go into this any

11  further or just say that you all need to sit down and work this

12  out, but we are going to be doing a very limited ESI search

13  here because of the timing?

14       Otherwise you're going to wind up getting the

15  responses, if at all, on midnight on December 13th.

16       MS. WAGONER:  Absolutely.  We don't want something

17  broad.  It want it to be targeted.  We have no interest in

18  doing anything voluminous here.

19       MS. BLOOM:  We are happy to sit down and talk about

20  it.

21       THE COURT:  Sooner rather than later.  Certainly I

22  will expect this issue to be either resolved or teed-up for me

23  on November 9th.  If you haven't resolved it much earlier than

24  that so you can actually start doing the work, somebody's

25  Thanksgiving and other holiday period is likely to be severely

1    ruined.  So try very hard to come up with an agreement, and I

2    also strongly suggest that in light of this conference,

3    plaintiffs take a look at their document requests and

4    interrogatories and see which of them are dropped either

5    automatically as a result of this Court's ruling, meaning that

6    you are getting People Soft with phone numbers and not all the

7    other things in Request 1 which probably carries over to a lot

8    of other requests, and notify the defendants which requests are

9    withdrawn or narrowed.

10           I put you all on notice, 26 (g)(1), the certification

11   which is the Rule 11 equivalent for discovery is applicable.  I

12   invite you all to read Mancia against Mayflower, Judge Grimm's

13   decision in the District of Maryland dealing with 26 (g)(1),

14   and you don't want to be in a position where you come back and

15   say we have 20 requests that we're disagreeing on, and as I

16   start going through them, I will not be shy about imposing

17   sanctions payable either to opposing side, or if it winds up

18   that it looks like it is just going to be a wash and you're

19   taking up a lot of my time, a per-request sanction on the

20   losing party payable under 26 (g) to the Clerk of Court.

21           So let's try, it is late in the case, whatever has

22   gone on before, let's try to get through this last phase

23   cooperatively.  Is there anything else from either side?

24           MS. WAGONER:  No, your Honor.

25           MS. BLOOM:  No, your Honor.

CANJGLAC                        Conference

1            THE COURT:  All right.  Both sides are ordered to

2    purchase the transcript.  I'll say this at this conference so I

3    don't have to say it at future conferences.  You have under the

4    rule, 26 U.S. Code 636, Federal Rule of Civil Procedure 72, 14

5    calendar days to file objections to any of my rulings with

6    Judge Pauley.  Failure to do so within that time period

7    constitutes a waiver.

8            Filing objections does not give you a stay.  If you

9    want a stay, you have to ask me and/or Judge Pauley for it.

10   Since you have heard the rulings from the Bench, your 14 days

11   starts immediately at this or any other conference where it

12   applies regardless of how quickly you decide to purchase the

13   transcript from the Court Reporter.

14           I will see you on November 9th.

15           (Court adjourned)

16

17

18

19

20

21

22

23

24

25