CBLAGLAAps

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------x

3    ERIC GLATT
     on behalf of himself and all others
4    similarly situated, et al.,

5
                    Plaintiffs,
6
                 v.                          11 CV 6784 (WHP)(AJP)
7
     FOX SEARCHLIGHT PICTURES INC.,
8    et al.,

9                   Defendants.

10   ------------------------------------x

11                                           New York, N.Y.
                                             November 21, 2012
12                                           9:30 a.m.

13
     Before:
14
                          HON. ANDREW J. PECK
15
                                             Magistrate Judge
16

17
                            APPEARANCES
18
     OUTTEN & GOLDEN LLP
19        Attorneys for Plaintiffs
     BY:  ELIZABETH WAGONER, ESQ.
20        ADAM T. KLEIN, ESQ.

21   PROSKAUER ROSE LLP
          Attorneys for Defendants
22   BY:  ELISE M. BLOOM, ESQ.
          AMY F. MELICAN, ESQ.

23

24   Also Present:  NICHOLAS BUNIN
                    Vice President
25                  Legal Operations & Technology
                    Fox Entertainment Group, Inc.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                    (In open court)

2                    THE CLERK:  All right.  We have a lot to do today, and

3        as the New Yorkers know it's the Federal Bar Council

4        Thanksgiving lunch, or as now I think it should be called

5        brunch because it starts so early, so hopefully we can make a

6        lot of progress quickly.

7                    You should know that Judge Pauley just faxed down to

8        me the order he issued that you'll all find on your ECF

9        notifications denying the reconsideration motion and stating

10       that Antalik's FLSA claims did not relate back.  So that will

11       perhaps alleviate some of the discovery issues that you all

12       have raised.

13                   As to the timing of ESI production, obviously it's not

14       going to be produced by November 21 since you're here today, so

15       whatever I rule can't be done instantly by you.  And I guess my

16       question is this:  Have you finally worked out the final set of

17       keywords or not?

18                   MS. BLOOM:  Your Honor, Elise Bloom on behalf of the

19       defendants.  I believe that we have worked them out.  We worked

20       out the last custodian in Hoffman.  I just learned this morning

21       that there are about 22,000 hits, though.  But I think a lot of

22       them are images.  So our best estimate is that we'll be able to

23       produce the ESI by a week from Friday.

24                   THE COURT:  Does that work for the plaintiff?

25                   MS. WAGONER:  By a week from Friday, on November 30th?

CBLAGLAAps

1      Is that the date?

2                  MS. BLOOM:  Correct.

3                  MS. WAGONER:  As long as it's all produced by November

4      30th we can work within that time frame, your Honor.

5                  THE COURT:  OK.  Good.  That takes care of the first

6      item on your letter.  I'm just going through your letter.

7                  As to the complete list of all subsidiaries using

8      interns, etc., it seems to me you've got to figure out what

9      your universe is here.  And you keep having the same issue

10     repeating itself.  In any event -- and this may or may not help

11     you at all -- it would seem to me that the only subsidiaries

12     that would matter at this point would be those in New York or

13     California.  Is that correct or incorrect?  In other words,

14     it's really the state law claims where you have the possibility

15     of a class action.

16                 MS. WAGONER:  Well, we also have collective claims

17     under the Fair Labor Standards Act, your Honor.

18                 THE COURT:  The time to opt in has passed, hasn't it?

19                 MS. WAGONER:  No, it hasn't.  There is still a window

20     of time for people to opt in.

21                 THE COURT:  So when --

22                 MS. WAGONER:  Well, the opt-in phase hasn't started

23     yet, your Honor.  We haven't moved for collective certification

24     yet.

25                 THE COURT:  Well, you know, maybe the answer is we

1   stay discovery until you do.  It seems to me you can't have it

2   both ways.  "We may have plaintiffs who may have these claims"

3   doesn't make any sense.

4           MS. WAGONER:  Your Honor, in any event I'm not sure

5   that it matters because I don't believe there are subsidiaries

6   in other states, although Ms. Bloom could correct me about

7   that.

8           THE COURT:  All right.  That may moot the issue.  But

9   let's -- well, let me get the answer to that, but then let's

10  step back.  It's one thing with the class allegations.  It's

11  another to say there may be opt-ins and then we're going to

12  have to do discovery all over again.  This makes no sense.

13          MS. BLOOM:  Your Honor, there are subsidiaries in

14  other states, but there is no California state law claim that's

15  at play with this discovery.  The discovery goes to FEG and FEG

16  is only as to the FLSA, not as to the state law claim.

17          THE COURT:  OK.  So if we limit it to FEG New York

18  subsidiaries, does that help at all in this fight or not?

19          MS. BLOOM:  That helps a lot, because that would limit

20  it to -- the problem -- here's what our central problem is in

21  terms of trying to move this forward.  Other than this group of

22  companies that for a period of time Amy Hoffman was overseeing,

23  and putting aside the disagreement about what her role was or

24  was not, as to any of the other 500 subsidiaries, they were

25  individually run, so in order for me to know who had interns

1   and who did not, I would literally have to go to someone in

2   each of those companies and ask that question.

3         THE COURT:  Are there literally 500 Fox subsidiaries

4   in New York or FEG subsidiaries?

5         MS. BLOOM:  Oh, in New York?  I don't know the answer

6   to that.  I don't want to misspeak.  I don't know the answer to

7   that question.

8         THE COURT:  All right.  So with that as a thought,

9   we'll worry about it, but seriously, are we going to be doing

10  this twice, Ms. Wagoner, if not three times?  I understand

11  that, you know, class certification, the standard is such that

12  at times it makes sense to do the class motion once discovery

13  is done.  A collective action, which is a pretty low threshold,

14  I cannot believe that we're going to complete all this

15  discovery, move for, you know, summary judgment, and this and

16  that, and then depending on which way that all flies, that you

17  then may move for collective action certification, and then,

18  you know, if ten people opt in or a hundred opt in or whatever

19  it is, everyone is going to say, now we need discovery as to

20  these people because they are real individual plaintiffs.

21        MS. WAGONER:  Your Honor, let me clarify a point in

22  the discovery schedule, because the way we've got it set right

23  now it closes on December 14, and then in January we are moving

24  all at once for summary judgment as to the two production

25  interns and for class and collective certification.  That's all

1    happening at once.  And the way our discovery schedule has been

2    set, we're not -- the only discovery that happens after those

3    motions are ruled on is damages discovery.  Once we have the

4    policy discovery during this phase right now before December

5    14, we don't see why there would be any need for discovery as

6    to, if it's only ten opt-ins, those ten opt-ins.

7            THE COURT:  Or a thousand opt-ins, whatever it maybe.

8            MS. WAGONER:  That is already contemplated in the

9    discovery schedule.  Right now we're not seeking any individual

10   discovery about these interns.  We're just thinking

11   policy-level discovery that's necessary and we're requesting

12   class certification all at the same time.  So I don't think

13   that there's a risk that there would be a sort of broad

14   discovery after all of that, because it will be done now.

15           THE COURT:  Well, but, if nothing else, since you're

16   talking about subsidiaries here that are not defendants,

17   they're going to have to be sued.  I mean, it may well be, you

18   know, that the same lawyers from Proskauer and Mr. Bunin are

19   going to be here, but as a technical matter, indeed a due

20   process matters, if you're saying that, you know, Fox New York

21   Incorporated, if there is such an entity or, you know, Channel

22   5 WNEW New York, a Fox subsidiary, had unpaid interns, how are

23   you going to do anything about that without the corporate

24   entity being a defendant?

25           MS. WAGONER:  Your Honor, our position is that Fox

CBLAGLAAps

1    Entertainment Group is the employer of these interns, and to

2    the extent there is another joint employer, that that is not

3    relevant to whether Fox Entertainment Group is their employer.

4    And we will not need discovery into those various wholly owned

5    subsidiaries because our position is that it's Fox

6    Entertainment Group.  So, no, I don't anticipate that your

7    Honor at all.

8            THE COURT:  As I understood it, Fox Entertainment

9    Group is not an operating entity at all.  It's an umbrella

10    name.

11            MS. BLOOM:  Again, it is an umbrella name.

12            MR. BUNIN:  It is a term of art, for lack of a better

13    term, your Honor, that is used a lot of times by people, and I

14    have to admit myself included, when needing some kind of

15    catchall way to refer to different parts of the company, but it

16    is not to my knowledge an actual entity.

17            MS. BLOOM:  And that is why we have suggested -- we

18    have already had discovery for a year.  They have done all the

19    discovery on Searchlight.  They have done discovery on the

20    production as well as the Searchlight interns.  I mean for the

21    30(b)(6) if they want me to produce someone who's going to talk

22    about the fact that it's completely decentralized, I can do

23    that.  And that's why we've sort of suggested Amy Hoffman for

24    this.  We were trying to come up with something that made sense

25    that was doable.

1          MS. WAGONER:  Your Honor, I frankly am hearing for

2    the -- if it's not a functioning entity, that's news to me.

3          THE COURT:  We discussed this at the last conference,

4    unless my memory is totally wrong, which it could be, but I

5    have my doubts.

6          MS. BLOOM:  It's a legal entity, and it's the same

7    thing that we told Judge Pauley when the issue came up about

8    FEG, that suing FEG as the defendant is not going to do

9    anything really to streamline the case or to move the interns'

10   claims forward.

11         MS. WAGONER:  Your Honor, I think this illustrates a

12   problem here.  We're trying to get discovery about FEG and what

13   its role was.  It was our understanding from the very limited

14   discovery that we were able to obtain during the Searchlight

15   phase of the case is that it is the employer and it is the one

16   that sets the policies for these various subsidiaries.  Now, if

17   that's not right, then I think discovery would bear that out.

18   But we haven't had an opportunity to subpoena that discovery

19   yet.

20         MS. BLOOM:  They have a declar -- they have two

21   declarations which I thought clarified that, one from Veronica

22   Arroyo, one from Amy Hoffman, but if what would move this

23   forward would be for the 30(b)(6) to be on the central versus

24   decentralized issue, as long as there's no expectation that I'm

25   going to produce somebody who is going to be able to say this

1    subsidiary had interns, this subsidiary didn't, if that moves

2    it forward, I can do that.  I'm talking about the declaration

3    of Amy Hoffman, which is dated September 19, 2012, and the

4    declaration of Veronica Arroyo, which is dated September 19,

5    2012.  And I'm happy to give the Court a copy of them.

6              THE COURT:  I vaguely remember them.

7              MS. WAGONER:  Your Honor, I feel like -- we have asked

8    for very specific pieces of information in our discovery

9    requests.

10             THE COURT:  Right.  Which they have to go to 500

11   different companies to get.  It is inconsistent with the claim

12   that you made to Judge Pauley and me that in the remaining

13   discovery period, which is fast waning, that you need only,

14   quote/unquote, limited discovery.  To go to all these different

15   companies and figure out what they did with interns, even if I

16   limit it to the New York subsidiaries, and unknown number, it

17   seems to me -- you know, it took you a year to do Fox

18   Searchlight -- we can't do it in a month.

19             MS. WAGONER:  Well, your Honor, that's why we asked

20   for interrogatory responses about the larger group, to find out

21   which subsidiaries actually had interns.  Maybe only 30 of them

22   did.

23             THE COURT:  But to find that out, they have to go to

24   500.  That's the circular logic here.  So in general I am going

25   to limit this at this time, subject to a 30(b)(6) deposition

CBLAGLAAps

1   that gives you some other reason to say that there is a

2   centralized decision to the companies serviced, if that's the

3   right word, by Ms. Hoffman.

4        I believe that takes care of II in the letter.  Does

5   anyone has anything else to add before we move on to III?

6        MS. BLOOM:  We're talking about the FEG companies,

7   right?

8        THE COURT:  Yes.  Which you have said, I believe, are

9   seven, right?

10       MS. BLOOM:  Actually, there are nine of them.  And

11  they have a list.

12       THE COURT:  OK.  Good.  Anything else on no. II from

13  the plaintiffs?

14       MS. WAGONER:  No, your Honor.

15       THE COURT:  Ms. Wagoner?  OK.  No. III, PeopleSoft, is

16  this a difference between "and" and "or" that we're fighting

17  about?

18       MS. WAGONER:  Yes, your Honor.

19       THE COURT:  Had you been clear the first time, this

20  might not be an issue.  I assume whatever it took, and without

21  regard to relevance -- and we've been through this before --

22  but whatever it took to program it to do the "and" version of

23  group K and job title credit, you can do an "or" version, I

24  assume and just run the list again.

25       MS. BLOOM:  I'm going to let Mr. Bunin explain that,

CBLAGLAAps

 1    because it wasn't quite as simple as either of us thought the

 2    last time we were here.  The list that they have has

 3    800-and-some names on it, but I'll let him address the other.

 4              MR. BUNIN:  Yes, your Honor.  The short answer of

 5    course is that it certainly can be done.  I don't know what

 6    the -- want to be clear in terms of the running of the report

 7    and hope I was not too flip the last time.  I said we could run

 8    it just like that, not anticipating that the person who had

 9    originally run the report and knew the criteria that they had

10    used was in Singapore until November 14th.  That being said, I

11    believe now we have everything teed up.  Just for your

12    information, in terms of using your -- as we say, you're not

13    talking as to relevance -- the K group in question, K, that

14    seems to be at issue, just to be noted that it is not specific

15    only to interns, so an "or" will of course produce a lot of

16    information including, I've been informed, K group includes

17    Canadians.  I'm not exactly sure what the thinking was behind

18    that when they coded their work, but they will not be interns;

19    they just will happen to be Fox employees from Canada.

20              MS. WAGONER:  Your Honor, obviously we don't want

21    that.  But I think in that case --

22              THE COURT:  Stop, stop.  If this list is 800 names and

23    we're not dealing with damages and 800 is certainly more than

24    the 40-plus required for class certification -- and I told you

25    last time, you don't get any follow-up to this report -- do you

CBLAGLAAps

1    really need to run it as an "or," particularly when, by adding

2    the "or," you are going to clearly get Canadians, who for tax

3    reasons or otherwise were included in code K.

4              MS. WAGONER:  Your Honor, there are 800 names on it.

5    Not all of those are New York interns, which is the class.

6              THE COURT:  Are there more employees?

7              MS. WAGONER:  We don't have an Excel version of the

8    spreadsheet, which is also something that we need, so I haven't

9    had a chance to filter it to find out.  So I'm not sure that

10   there are, your Honor, which is why I think that it would be

11   very helpful to us.  If not the K category, then the intern

12   category that is not -- wherever K is not listed.  So just that

13   category, where there's nothing else, would be helpful.

14             THE COURT:  All right.  So what you're saying is you

15   have the current list, you now want a new list that is only

16   those under the job title credit report?

17             MS. WAGONER:  Yes, your Honor.

18             THE COURT:  OK.  Then that's what you'll get.  And

19   Mr. Bunin was shaking his head in a sort of "yes."  And you

20   don't have to run it against what you've already done, the

21   supplement, unless that's easier.  Just one the category, job

22   title credit.  And some of those names will have already been

23   on the 800 list, and there may be a few extra.

24             MS. BLOOM:  Just for New York?  The list that they

25   have right now is for the FEG companies all over the place.

CBLAGLAAps

1   Are we now talking just New York?

2        THE COURT:  No.  Keep it consistent with what you did

3   the first time, and without regard to whether this is the least

4   bit useful to anybody, it just seems it's simpler to do it than

5   to play with it.  Unless you all think that it's not too hard

6   for you to run it limited to New York and that that's more

7   relevant.

8        MS. BLOOM:  My only question -- I guess my question is

9   more on the time frame now that Judge Pauley has clarified that

10   the FLSA claim doesn't go back, doesn't relate back, then, I

11   guess, for outside of New York, the time frame would be

12   limited.  I don't know if that makes a difference or not.

13   Mr. Bunin will have to answer that.

14        MR. BUNIN:  In terms of the -- just to clarify the

15   complexity, the differences of time we're talking about here,

16   you're talking about one set of differences for New York and

17   the other.

18        MS. BLOOM:  Right.

19        MR. BUNIN:  That would take a little more programming,

20   but it is certainly doable.  I can certainly speak to the

21   SoftPeople crew about running such a query.  Just so that I'm

22   clear now, are we talking about re-running that with this time

23   limitation that I just -- to be determined, since I only know

24   the current time limitation, as well as using an "or" between

25   the K group and --

CBLAGLAAps

| | |
|---|---|
| 1 | THE COURT:  No, no, no. |
| 2 | MR. BUNIN:  No, not using "or." |
| 3 | THE COURT:  Job title credit without regard to K |
| 4 | group. |
| 5 | MR. BUNIN:  Oh, without regard.  That certainly can be |
| 6 | done. |
| 7 | THE COURT:  All right.  I guess we'll get to the time |
| 8 | period in IV. |
| 9 | MS. WAGONER:  Your Honor, just one last, can we just |
| 10 | clarify that we are entitled to an Excel version of the |
| 11 | spreadsheet? |
| 12 | MS. BLOOM:  I will provide an Excel version. |
| 13 | MS. WAGONER:  Thank you. |
| 14 | THE COURT:  OK.  IV, the time period? |
| 15 | MS. BLOOM:  It would seem that if Judge Pauley did |
| 16 | rule on the FLSA piece, that that hopefully should help solve |
| 17 | the problem, because it was our position that, with regard to |
| 18 | anything that was produced that was not applicable to New York, |
| 19 | that the operative time frame would be documents which were in |
| 20 | effect from September of 2009 forward.  And just to be clear, |
| 21 | if it's a document that was drafted in 2000 but it's still in |
| 22 | effect and applicable in 2009, September of 2009 forward, |
| 23 | then -- I'm sorry, October of 2009 forward -- then clearly it |
| 24 | would be produced.  But if it's a document that was not in |
| 25 | effect from October 19, 2009 forward, then it has no |

CBLAGLAAps

1    applicability to the FLSA claim and we would object on the

2    basis that why are we using this precious time to do discovery

3    for time-barred claims.

4         MS. WAGONER:  Your Honor, with that clarification I

5    don't think that we have a problem with that.  I'm not sure if

6    October 2009 is what Judge Pauley ordered or not, but I think

7    it's right that as long as policy documents are being searched

8    for that may go back prior to that date, then we have no

9    dispute about that.

10        THE COURT:  Good.  And as to the going-forward date,

11   which may be under this bullet or not, there's got to be a

12   cutoff.

13        MS. BLOOM:  I was going to suggest, we started paying

14   interns at a certain point in time, in 2010, and it's our

15   position that once -- this case is about unpaid interns, what

16   they were doing while they were unpaid, whether they were

17   misclassified during that time period, so it's our position

18   that anything that wasn't applicable to unpaid interns wouldn't

19   be relevant in this case.

20        MS. WAGONER:  Your Honor, our position is that the

21   classification division of interns as employees and whether or

22   not they should be paid is at the heart of this case and policy

23   documents that talk about why Fox decided to preclassify

24   interns as being --

25        THE COURT:  If the only issue is policy documents,

CBLAGLAAps

1   then by going somewhat longer than the changeover, you'll get

2   the reasoning behind the changeover, but -- and I forget which

3   bullet point it is in this, there's some argument about whether

4   it goes to November 1, 2012 or even goes beyond that or cuts

5   off earlier.  I guess it depends on what document requests

6   you're dealing with.  So are we both in agreement that you cut

7   it off within -- when did you say the decision to pay was made?

8           MS. BLOOM:  It was made sometime in 2010, I think the

9   fall of 2010.

10          THE COURT:  All right.  So why don't you run through

11   December 31, 2010.

12          MS. WAGONER:  That's fine with us.

13          MS. BLOOM:  Again we're talking about with the Amy

14   Hoffman overlay on that.

15          THE COURT:  Yes, with the Amy Hoffman overlay on

16   everything.

17          MS. BLOOM:  OK.

18          THE COURT:  OK.  So I think we're now at V.

19          MS. BLOOM:  I would think that, other than the

20   question about whether interns were to be paid going forward,

21   that your rulings up to this point have clarified and should

22   have resolved all of the issues with those.  But we still would

23   like to discuss whether or not information about why interns

24   became paid is relevant to whether or not the interns that were

25   unpaid were properly classified.

CBLAGLAAps

1          THE COURT:  All right.  It's relevant because if

2    there's a smoking gun that's not a lawyer document that's not

3    privileged that says now that we realize we've violated the law

4    for the last ten years in not paying them we're going to start

5    paying them, you know, that sort of goes under the thought

6    principle.  Other than what, I'm not sure what else would be

7    relevant in terms of the changeover of the policy.  If you all

8    want to tell me what particular interrogatory or document

9    requests we're now fighting over -- because mostly we've been

10   working off of the letter, but I know I do have the

11   interrogatories and responses here, both of them here.

12          MS. WAGONER:  Your Honor, I'm looking at bullet point

13   2 of the letter of interrogatory no. 8, might be a place to

14   start.

15          MS. BLOOM:  And document request 15.

16          THE COURT:  All right.  Let's limit it to who at FEG

17   was involved in this decision.  That's the named defendant,

18   FEG, Inc.  Whether it's all individuals and whether you want to

19   convert this to a 30(b)(6) type issue, I leave it up to all of

20   you.  "All" could be, you know, everybody including the

21   accounting department who let it create new PeopleSoft codes or

22   whatever.  I'm sure we're talking about the policy decision,

23   how many people were involved in that.

24          MS. BLOOM:  For the Amy Hoffman employees.

25          THE COURT:  Well, on this, somebody at -- look, the

CBLAGLAAps

1    issue on Amy Hoffman was, you don't know where to go with the

2    other 500 subsidiaries.  On this one, if there is such a thing

3    as FEG personnel besides Ms. Hoffman, who made a decision to

4    start paying interns, that's what we're looking for.

5              MS. BLOOM:  OK.

6              THE COURT:  OK?  So that's the Court's ruling on

7    interrogatory no. 8.

8              MS. WAGONER:  And your Honor, just to clarify the

9    point about the Amy Hoffman subsidiaries, depending on who the

10   individuals identified are, if we depose that person, if this

11   ruling about Amy Hoffman doesn't mean that we can't have that

12   person --

13             THE COURT:  Anyone being deposed, you can ask them

14   almost anything you want.  If they don't know the answer they

15   don't know the answer.  If they do know the answer that's fine.

16   I'm assuming the answer is going to be either, we made a

17   corporate policy to start paying interns at any and every

18   subsidiary, prior to that individual subsidiaries made their

19   own decisions -- that's one possible answer, and if I had to

20   guess the most likely one.  Or it could be, you know, we made

21   this decision only as to FEG subsidiary 1, 2, and 3 and don't

22   have a clue as to what other people did or any other variation

23   on all of this.  We'll see.  But you're running out of time

24   prior to December 14.  So let's just get this done.

25             What else from this area do you need me to rule on?

CBLAGLAAps

1          MS. WAGONER:  Interrogatory no. 9 is similar to

2     interrogatory no. 8, but just to clarify that the Court's

3     ruling is the same as to no. 9.

4          MS. BLOOM:  I think 9 is covered by your ruling on the

5     Hoffman issue.

6          THE COURT:  Again, since this is just "identify a

7     person" --

8          MS. BLOOM:  Oh, I'm sorry.

9          THE COURT:  -- if there was somebody else besides Amy

10    Hoffman who previously decided for the corporate interns,

11    whatever that really means, that they would not be paid, not

12    just that they would carry on the policy that somebody else

13    made and be involved in the hiring of these people.  If someone

14    made a decision, a determination that employees were not going

15    to be paid and who are part of the, quote/unquote, FEG, Inc.

16    group, that's to be answered for no. 9.

17         MS. BLOOM:  OK.  Thank you.

18         THE COURT:  Do we need to look at 10 and 11 or is this

19    all the same?

20         MS. BLOOM:  Well, 10, we're just going to give them

21    our workers' compensation policy and if they want to -- in

22    their 30(b)(6) they want someone to talk about the workers'

23    comp policy, I'm prepared to produce somebody.  I think it's a

24    legal issue, in terms of what the workers' comp laws say.  I'm

25    not sure it has any particular applicability here, but if

CBLAGLAAps

1        that's what they want I'm prepared to do that.

2                THE COURT:  OK, good.

3                MS. WAGONER:  Your Honor, I would just ask that to the

4        extent there's a different individual who decided that interns

5        should be classified as employees for workers' comp purposes

6        and not for purposes of wages --

7                MS. BLOOM:  There's no person like that.  We have a

8        person that does our workers' comp policy.  There are all kinds

9        of reasons why people are or are not covered under the policy,

10       and that's the person that I'm prepared to produce.

11               THE COURT:  All right, good.

12               MS. WAGONER:  OK.

13               THE COURT:  I have no idea what the seventh

14       determinative defense is.

15               MS. BLOOM:  That's the good-faith one, and I think we

16       now have all agreed that damages are being taken care of later.

17               THE COURT:  All right.  So now we go to VI.

18               MS. BLOOM:  I think you've taken care of that as well.

19               MS. WAGONER:  I don't think so, your Honor, because we

20       had only asked for documents related to the Hoffman Corporation

21       here, which defendants no longer agree to provide, policy

22       documents about what interns do.

23               MS. BLOOM:  I understand what the issue is.  In order

24       to produce every potentially responsive document to this

25       request, what we would need to do is go not just to every

CBLAGLAAps

1    supervisor, like on the -- if you look at the PeopleSoft list

2    and you pull out the Amy Hoffman interns, and then you go to

3    the supervisors that are listed on that list, in order get

4    every responsive document.  You don't just go to that

5    supervisor.  Then you have to ask that supervisor, who were the

6    people underneath you who had responsibility for supervising

7    interns in your office.  And it took us a long time in terms of

8    just doing the Searchlight piece to get all that information

9    and get all those documents.  So that was our -- we were going

10   to give her as much as we could, but going to that second-level

11   supervisor was burdensome.  That was my objection.

12          MS. WAGONER:  Your Honor, defendants haven't produced

13   anything at all in response to that.  So to first state that

14   they would give us as much as they could seems disingenuous.

15          THE COURT:  Let's cut this back.  Are there any

16   corporate-level manuals, guidelines, forms, or memoranda, as

17   opposed to what a particular person who used an Amy Hoffman

18   intern may have done or subbed out to someone even more junior

19   to them to do with the intern?

20          MS. BLOOM:  My understanding is that Ms. Hoffman's ESI

21   might have a few additional documents.  I don't know precisely

22   what's already been given to them.  And we're producing that.

23          THE COURT:  Hard copy.  Besides ESI, does Ms. Hoffman

24   or anyone --

25          MS. BLOOM:  We're looking and to the extent we have

CBLAGLAAps

1    them we will provide them.

2              THE COURT:  OK.  That's the Court's ruling.

3              MS. WAGONER:  Your Honor, could I just add something

4    on this?

5              THE COURT:  Yes.

6              MS. WAGONER:  During the Searchlight discovery there

7    were only, I believe, two binders listing what interns' duties

8    are, and those documents, from what we understood from

9    defendants at the time, were not hard to find because all it

10   involved is shooting e-mails to the office and saying, all

11   right, could you please give us the orientation documents that

12   you give to interns when they start their internship so they

13   know what they're supposed to do every day.  I don't think it's

14   very burdensome at all to make that request of a limited number

15   of nine subsidiaries.

16             THE COURT:  Nine subsidiaries, eight managers, ten

17   submanagers.  That list starts becoming hundreds of people.

18   And then the question is, are you just asking them to send the

19   e-mail, no follow-up, whatever comes back from that is fine,

20   or, à la a litigation hold, are you going to say you now have

21   to go talk to each one of those in my hypothetical 720 people?

22   And if by the time you get to person no. 720 they have got an

23   intern manual for the people who worked in the advertising

24   department of Fox Sport Network New York or something and did

25   not apply to any other intern other than their two interns, how

1   does that help you with the class action in any way?

2          MS. WAGONER:  I think that would -- first of all I

3   think there are not going to be that many people.  And even

4   looking at the PeopleSoft list, I don't think it's so

5   extensive, you know, who the group of supervisors are.  And I

6   think it would be helpful to class certification because this

7   is sort the cleanest way, in one document, to see, here are the

8   tasks that interns do.

9          THE COURT:  It won't be one document.  It will be

10  numerous.  That's why I'm saying if there is a central policy

11  document, you can get that, that's a class.  Once you're

12  getting below that, maybe you have eight subclasses or nine

13  subclasses for each of the companies Ms. Hoffman dealt with,

14  and if we can go to that level only -- I assume Ms. Hoffman

15  knows who her contact was at each of those companies.

16         MS. BLOOM:  Yes.

17         THE COURT:  So at that level.

18         MS. BLOOM:  Sure.

19         THE COURT:  Ms. Hoffman and the people she dealt with

20  immediately, any manuals and the like, get that in hard copy

21  and move on.

22         MS. BLOOM:  Great.

23         THE COURT:  OK.  The good-faith affirmative defense,

24  which is VII, we are deferring to damage discovery.  VIII, the

25  location of depositions, which only seems to be an issue as to

CBLAGLAAps

1    Ms. Gratts --

2         MS. BLOOM:  Could I talk about that for a minute,

3    please?

4         THE COURT:  Yes.

5         MS. BLOOM:  As of today, I have not one piece of paper

6    from Ms. Gratts, and I have made it known a long time ago that

7    I wanted to take her deposition and I wanted to get her

8    discovery first, but then I wanted to take her deposition, and

9    that I thought it should be in New York, because she is the

10   only class representative for this California class.  She

11   elected to be part of this lawsuit.  She certainly could have

12   sued in California.

13        THE COURT:  Let's stop one minute.  I assume you've

14   issued interrogatories and/or document requests.

15        MS. BLOOM:  Yes.  Supposedly by sometime at the end of

16   the day today I will have documents from her.

17        THE COURT:  That is correct?

18        MS. WAGONER:  That's right, your Honor.  She has very,

19   very few documents, but we are producing them all the.

20        THE COURT:  If there were interrogatories, they are

21   being answered?

22        MS. WAGONER:  They have already been answered, your

23   Honor.

24        THE COURT:  All right.  So now we just come to the

25   decision of where to do it.  And I guess the question is purely

CBLAGLAAps

```
 1    one of timing.  If there is a way to work it out while you're

 2    all in Los Angeles, I would prefer that to happen.  If that is

 3    going to leave defense counsel with either no time to do it or

 4    dead days because if we do it after the depositions of the Fox

 5    people I assume you're going to say you want a day in between

 6    to prep Ms. Gratts, which isn't fair to them, and if we do it

 7    before, unless you don't care about the gap, we're taking away

 8    time that they're going to be prepping their witnesses for your

 9    deposition.

10         MS. BLOOM:  And I'd like to do her deposition -- I had

11    suggested -- we had suggested back in October, December the

12    4th.  I understand she has a job.  If Tuesday don't work I'm

13    happy to do it on Monday the 3rd.  But I'd like to have some

14    time after that because there may be stuff that comes out of

15    her deposition that means there's some discovery that we want

16    to do.  I mean, she is a named plaintiff, and in terms of the

17    beginning of next week, neither Ms. Melican nor I can be in Los

18    Angeles then.

19         MS. WAGONER:  Your Honor, I think as far as additional

20    discovery, it seems hard to imagine what that would be because

21    we've produced everything that had any relationship to that

22    job, we are going to produce.  And I think that we can work out

23    a schedule.  I think that -- I guess I don't understand why we

24    can't just find dates that we're all available in Los Angeles.

25         THE COURT:  Because apparently you can't.
```

CBLAGLAAps

1          MS. BLOOM:  We didn't come up with the two months.

2     The deposi -- we can't.  The answer is, we can't find dates

3     within the same week.  And if Ms. Gratts' deposition takes

4     place in Los Angeles, it will necessitate two trips.  Plus, I

5     want to take her deposition sooner rather than later because

6     that's my only -- she is a named plaintiff.

7          THE COURT:  When are the LA depositions scheduled for?

8          MS. BLOOM:  Right now -- and again this might change

9     because it depends on who the 30(b)(6) is, but we were looking

10    at the 13th or the 14th of December.

11         THE COURT:  All right.  Bring her to New York for the

12    week after the week after Thanksgiving, that is, the week of

13    December 3 early in the week.  If a weekend makes a difference

14    in terms of her missing or not missing work, would you be

15    amenable to doing it on Saturday or Sunday?

16         MS. BLOOM:  Yes.

17         MS. WAGONER:  Your Honor, I can give you the 3rd or

18    4th.  Those dates will be difficult for her at this point

19    because she's got to request time off work.

20         THE COURT:  No.  I have to stop.  So you're now

21    forcing me to do the it will take place no later than December

22    4th?  If you want to do it the weekend of December 12, that's

23    fine.  If you want to do next week, that's fine too.  Don't

24    give me she has to give work notice or something like this.

25              Any other issues?  From the letter.  I assume that

CBLAGLAAps

1   finishes the letter.  So the next question is, any issues that,

2   despite the length of the letter, were not in the letter that

3   you need me to rule on?

4          MS. BLOOM:  On the 30(b)(6), your Honor, it sounds

5   like we're going to be producing maybe three people: someone

6   for the workers' comp, somebody on the corporate entity, and

7   then somebody on the Amy Hoffman piece.  Can we agree to one

8   day of seven hours for all three of those people, as opposed to

9   three days of seven hours?

10          THE COURT:  No, because 30(b)(6) depositions, each

11   count as seven hours each.  Obviously none of you want to waste

12   time, because time is tight.  So you all figure out your

13   scheduling.  If you can assume that two can get done in one

14   day, I can't imagine frankly that the workers' comp person will

15   take very long.  But I'm not setting any arbitrary time limit

16   on it at the moment, other than I expect everyone to act in

17   good faith and to coordinate scheduling in such a way that

18   makes sense.  And if that means starting the workers' comp

19   person at 9:30 and having the second witness available to start

20   at 2 and if the workers' comp for some unforeseen reason goes

21   past 2 just pushing off the other person, that's fine too.

22          MS. BLOOM:  Yes.  If we can pick a location for the

23   deposition -- I think it was downtown -- if you wanted to do it

24   in the Proskauer LA office that's across the street from Fox,

25   that would make it easier.

CBLAGLAAps

1          MS. WAGONER:  We can work it out outside of here.

2     We'll certainly work to make it convenient for the witnesses to

3     get there as quickly as they need to.

4          THE COURT:  Knowing Los Angeles traffic nowadays --

5          MS. WAGONER:  Right.

6          THE COURT:  -- if we're trying to do multiple in a

7     day and they're on call, OK, we've finished the deposition,

8     come over, if that's not nearby to where they're working, that

9     may take the rest of the day for them to get there.

10         All right.  Do we need another status conference date,

11    or, since you know what you have to do and you have a lot of

12    work to do and very little time, should I leave you on the

13    honor system, meaning you'll write and/or call if there are any

14    problems?

15         MS. BLOOM:  I think that would be satisfactory to us.

16         MS. WAGONER:  I agree, your Honor.

17         THE COURT:  All right.  And I guess finally I should

18    make sure not to forget to ask, are you talking settlement?  Is

19    there anything the Court can do to help?  Or because of the

20    class action ramifications or whatever that it's unsettleable?

21         MS. WAGONER:  Your Honor, we have reached out to

22    defendants and we're open to having this discussion.

23         THE COURT:  Have you reached out with a number

24    attached or just said, hi, we're willing to talk if you are?

25         MS. WAGONER:  We were told that that wouldn't be

CBLAGLAAps

1   helpful.

2              MS. BLOOM:  Yes, I --

3              THE COURT:  OK.

4              MS. BLOOM:  In the current posture of the case, I

5   don't think that settlement discussions would be productive.

6   Sorry.

7              THE COURT:  "Current posture" meaning that we're not

8   just talking about these named plaintiffs but the possibility

9   of others --

10             MS. BLOOM:  Correct.

11             THE COURT:  -- or something else?

12             MS. BLOOM:  Right, exactly.  Until the class issue is

13  resolved, I think it would be difficult.

14             THE COURT:  All right.  And do plaintiffs have any

15  interest in settling individually and letting someone else

16  worry about the class or collective action since nothing has

17  been moved for certification at this point?

18             MS. WAGONER:  Your Honor, we don't -- we think it's

19  very important to these clients.

20             THE COURT:  Or the law firm.

21             MS. WAGONER:  We can't divulge their names.  It's very

22  important to them too.

23             THE COURT:  Very good, then.  I have tried.

24             MS. BLOOM:  Thank you.

25             THE COURT:  All right.  Happy Thanksgiving, all.