**OUTTEN & GOLDEN LLP**
Adam Klein
Rachel Bien
Elizabeth Wagoner
Reena Arora
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ERIC GLATT, ALEXANDER FOOTMAN,
EDEN ANTALIK, and KANENE GRATTS, on
behalf of themselves and all others similarly
situated,

                Plaintiffs,

      v.

FOX SEARCHLIGHT PICTURES INC. and
FOX ENTERTAINMENT GROUP, INC.,

                Defendants.

No. 11 Civ. 6784 (WHP) (AJP)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................ 1

PROCEDURAL HISTORY............................................................................................... 2

STATEMENT OF FACTS ............................................................................................... 3

      I.     Plaintiffs Performed Productive Work for Searchlight Film Productions that
Displaced Paid Employees......................................................................................... 3

           A.     Eric Glatt ................................................................................................. 3

           B.     Alexander Footman.................................................................................. 4

           C.     Kanene Gratts.......................................................................................... 5

      II.    Searchlight Financed, Closely Monitored, and Set Employment Conditions on its
Film Productions ....................................................................................................... 6

           A.     Searchlight Had the Power to Hire and Approve Key Production Staff..... 6

           B.     Searchlight Closely Supervised the Work on the Productions on a Daily
Basis .......................................................................................................7

           C.     Searchlight Determined the Budgets Under Which the Productions
Operated .................................................................................................. 8

           D.     Searchlight Required Crew Members to Sign its Form Employment
Agreements .............................................................................................. 8

           E.     Searchlight Set and Expected the Productions to
Enforce its Intern Policy ......................................................................... 9

           F.     Searchlight Contracted with Single-Purpose Corporations to
Produce its Films..................................................................................... 9

STANDARD OF REVIEW ........................................................................................... 10

ARGUMENT ................................................................................................................ 11

      I.     Plaintiffs Are Covered Employees Under the FLSA and State Labor Laws........ 11

           A.     The FLSA's Remedial and Humanitarian Goals Require the Court to
Interpret its Coverage Expansively ......................................................... 11

B.     Plaintiffs Glatt, Footman, and Gratts Performed Work that Searchlight Suffered or Permitted ................................................................ 13

II.    Searchlight Cannot Show that Plaintiffs Were Trainees Who Were Part of a Bona Fide Internship Program ................................................................ 14

A.     *Walling*'s Narrow Exception for Trainees Does Not Apply to Plaintiffs ................................................................ 14

B.     Searchlight Cannot Satisfy the Department of Labor's Six-Factor Test for Unpaid Interns ................................................................ 17

1.     Plaintiffs' Internship Was Not Similar to Training Which Would Be Given in an Educational Environment and Benefited Searchlight ................................................................ 18

2.     Plaintiffs Performed the Same Work as Paid Employees and Were Supervised as if They Were Regular Employees ................ 20

3.     Plaintiffs Expected Compensation and Opportunities for Paid Employment in Exchange for Their Work .................................. 21

III.    Important Public Policies Support Paying Interns ................................. 21

IV.    Searchlight Employed Plaintiffs ................................................................ 24

A.     Searchlight Exercised Formal Control over Plaintiffs ............................ 24

B.     Searchlight Employed Interns Under the Functional Control Test.......... 27

CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alvarez v. IBP, Inc.,*
339 F.3d 894 (9th Cir. 2003) ............................................................12

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)............................................................10

*Archie v. Grand Central Partnership, Inc.,*
997 F. Supp 504 (S.D.N.Y. 1998)......................................*passim*

*Bailey v. Pilots' Ass'n for the Bay & River Delaware,*
406 F. Supp. 1302 (E.D. Pa. 1976) ......................................17

*Barfield v. New York City Health & Hosps. Corp.,*
537 F.3d 132 (2d Cir. 2008)......................................10, 11

*Brooklyn Sav. Bank v. O'Neil,*
324 U.S. 697 (1944)......................................11, 13

*Donovan v. New Floridian Hotel, Inc.,*
676 F.2d 468 (11th Cir. 1982). ......................................16

*Exxon Mobil Corp. v. C.I.R.,*
689 F.3d 191 (2d Cir. 2012)......................................18

*Gulf King Shrimp Co. v. Wirtz,*
407 F.2d 508 (5th Cir. 1969) ......................................13

*Herman v. RSR Sec. Servs., Ltd.,*
172 F.3d 132 (2d Cir. 1999)......................................24, 25, 30

*Martin v. Malcolm Pirnie, Inc.,*
949 F.2d 611 (2d Cir. 1991)......................................10

*Martinez v. Combs,*
49 Cal. 4th 35 (Cal. 2010)......................................12

*McLaughlin v. Ensley,*
877 F.2d 1207 (4th Cir. 1989) ......................................17

*Okoro v. Pyramid 4 Aegis,*
No. 11 Civ. 267, 2012 WL 1410025 (E.D. Wis. Apr. 23, 2012)......................................16, 19

*Pabst v. Oklahoma Gas & Elec. Co.*,
  228 F.3d 1128 (10th Cir. 2000) ...........................................................15

*Reich v. Parker Fire Prot. Dist.*,
  992 F.2d 1023 (10th Cir. 1993) ...........................................................17

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947)...........................................................................30

*Sandoz v. Cingular Wireless, LLC*,
  769 F. Supp. 2d 1047 (W.D. La. 2010)................................................13

*Singh v. City of New York*,
  524 F.3d 361 (2d Cir. 2008)................................................................15

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
  471 U.S. 299 (1985)......................................................................*passim*

*Torres v. Gristede's Operating Corp.*,
  No. 04 Civ. 3316, 2011 WL 4571792 (S.D.N.Y. Sept. 23, 2011)..........25

*U.S. v. Rosenwasser*,
  65 S. Ct. 295 (1945)...........................................................................11

*Walling v. Portland Terminal Co.*,
  330 U.S. 148 (1947)...............................................................10, 14, 15

*Wirtz v. Wardlaw*,
  39 F.2d 785 (4th Cir. 1964) ...........................................................16, 17

*Zheng v. Liberty Apparel Co.*,
  355 F.3d 61 (2003)......................................................................*passim*

**STATUTES**

29 U.S.C. § 202.....................................................................................12

29 U.S.C. § 203...............................................................................11, 12

29 U.S.C. § 214.....................................................................................14

N.Y. Lab. Law § 651..............................................................................12

**RULES AND REGULATIONS**

Fed. R. Civ. P. 56.................................................................................10

29 C.F.R. § 520.300...............................................................................14

29 C.F.R. § 520.404 ...................................................................................................14

29 C.F.R. § 520.408 ...................................................................................................14

29 C.F.R. § 785.13 .....................................................................................................12

**OTHER AUTHORITIES**

Andrew Mark Bennett, *Unpaid Internships & the Department of Labor: The Impact of Underenforcement of the Fair Labor Standards Act on Equal Opportunity*, 11 U. Md. L.J. Race, Religion, Gender & Class 293 (2011) .....................................23

David C. Yamada, *The Employment Law Rights of Student Interns*, 35 Conn. L. Rev. 215 (2002) .........................................................................................22

David L. Gregory, *The Problematic Employment Dynamics of Student Internships*, 12 Notre Dame J.L. Ethics & Pub. Pol'y 227 (1998) ............................................22

Economic News Release, Dep't of Labor (Feb. 1, 2013) .............................................21

Jessica L. Curiale, Note, *America's New Glass Ceiling: Unpaid Internships, the Fair Labor Standards Act, and the Urgent Need for Change*, 61 Hastings L. J. 1531 (2010) ........................................................................................22

Nantiya Ruan, *Same Law, Different Day: A Survey of the Last Thirty Years of Wage Litigation and Its Impact on Low Wage Workers,* Hofstra Lab. & Emp. J. (forthcoming 2013) ......................................................................................................22

Ross Perlin, INTERN NATION: HOW TO EARN NOTHING AND LEARN LITTLE IN THE BRAVE NEW ECONOMY, Verso Publishers (2012). .......................................................................22

Steven Greenhouse, *Jobs Few, Grads Flock to Unpaid Internships*, N.Y. Times, May 5, 2012 .................................................................................................22

Steven Greenhouse, *The Unpaid Intern, Legal or Not*, N.Y. Times, Apr. 2, 2010.........................................................................................22

U.S. Dep't of Labor Op. Letter, 1994 WL 1004761 (Mar. 25, 1994) .........................17

U.S. Dep't of Labor Op. Letter, 2002 WL 32406599 (Oct. 7, 2002) .........................17

U.S. Dep't of Labor Op. Letter, 2006 WL 561849 (Jan. 27, 2006).............................24

## PRELIMINARY STATEMENT

Plaintiffs Eric Glatt, Alexander Footman, and Kanene Gratts ("Plaintiffs") worked as interns on Fox Searchlight Pictures, Inc. ("Searchlight") film productions building sets and performing administrative and accounting functions in the productions' offices.  Like the many other interns who worked for Searchlight and its parent, Defendant Fox Entertainment Group, Inc., Plaintiffs were not paid for the productive labor they contributed to Defendants' business of making motion pictures.

Plaintiffs respectfully move this Court for an order granting them partial summary judgment with respect to two issues.  First, they seek an order that they were "employees" as that term is broadly defined by the Fair Labor Standards Act ("FLSA") and the applicable state wage and hour laws.  The undisputed evidence demonstrates that Searchlight "suffered or permitted" Plaintiffs' labor by facilitating its productions and reducing its labor costs through the benefit of uncompensated work.  Searchlight also cannot raise a genuine issue of material fact that Plaintiffs fell under the narrow exception for "trainees" that the U.S. Supreme Court defined more than 65 years ago for participants in a short-term training program.  Here, there is no dispute that Plaintiffs did not participate in a training program but instead performed productive work alongside paid production assistants and construction crew members, providing an "immediate advantage" to Searchlight.

Second, Plaintiffs seek an order holding Searchlight liable as Plaintiffs' employer. Searchlight was closely involved in every aspect of the film productions on which Plaintiffs worked, including financing the films, determining their budgets, approving wage rates, monitoring their operations on a daily basis, hiring and approving the hire of the production personnel who supervised Plaintiffs, setting the terms and conditions of crew members'

employment, defining the films' intern hiring policy, taking over the production assets when filming finished, and much more. Searchlight's claim that the "single-purpose" corporations with which it contracted – legal fictions created for the sole purpose of producing each film – which lack assets and cease operations once the film is completed, were Plaintiffs' employers is comparable to arguments that garment manufacturers made in the early 20th century to avoid liability and that prompted Congress to adopt, in the FLSA, "'the broadest definition [of 'employ'] that has ever been included in any one act.'" *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 69 (2003) (quoting *U.S. v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945)). Since that time, courts in this Circuit, as well as the U.S. Supreme Court, have rejected such "subterfuge[s]" designed to "evade the FLSA or other labor laws" and have routinely held defendants that outsource work to a third party liable for unpaid wages owed to employees. *Id.* at 72.

## PROCEDURAL HISTORY

Plaintiffs Eric Glatt and Alexander Footman filed a Class Action Complaint on September 28, 2011, on behalf of themselves and all other unpaid interns who worked for Searchlight. ECF No. 1 (Compl.) ¶¶ 39, 50. On September 5, 2012, Plaintiffs sought leave to amend the Complaint, *inter alia*, to add Kanene Gratts as a named Plaintiff, to add Fox Entertainment Group, Inc. as a Defendant, and to expand the class and collective of unpaid interns to include all interns who worked in Defendants' corporate offices. ECF No. 27. The Court granted Plaintiffs' motion in large part, *see* ECF No. 46, and Plaintiffs filed a First Amended Complaint on October 19, 2012. ECF No. 58 (1st Am. Compl.).

To date, the parties have completed merits discovery, except with respect to damages and Defendants' good faith affirmative defense. *See* ECF No. 76. On February 15, 2013, Plaintiffs intend to file a motion for class and collective certification with respect to the interns who

worked in Defendants' corporate offices.  Following the completion of all discovery and

depending on the outcome of the class and collective certification motion, Plaintiffs anticipate

moving for summary judgment with respect to the corporate interns.

## STATEMENT OF FACTS

I.     **Plaintiffs Performed Productive Work for Searchlight Film Productions that Displaced Paid Employees.**

Plaintiffs performed work that directly contributed to the production of films that

Searchlight financed, produced, and later distributed.  They functioned as integral members of

the films' production teams, performing tasks alongside paid crew members and that otherwise

would have been performed by paid crew members.

A.     **Eric Glatt**

Eric Glatt worked for Searchlight in the Accounting Department of *Black Swan* from

approximately December 2009 through February 2010, five days a week from 9 a.m. to 7 p.m.

SOF[1] ¶ 188.   His responsibilities included tracking and reconciling purchase orders, invoices

and petty cash; reviewing personnel files for required paperwork; creating spreadsheets to track

personnel file documents; communicating with cast and crew members regarding their personnel

files; making deliveries to the film set and production payroll company; and scanning,

photocopying, filing, and emailing accounting documents.  *Id.* ¶¶ 190-91.  Glatt also worked in

the Post-Production Department two days a week from approximately March 2010 through

August 2010, from 11 a.m. to approximately 6 or 7 p.m.  *Id.* ¶ 194.   He did administrative work,

such as filing, photocopying, errands, and preparing binders of materials to be sent to

Searchlight.  *Id.* ¶¶ 195-98.  If Glatt had not performed this work during the production and post-

production of *Black Swan*, a paid crew member would have had to work more hours do it, or a

---

[1]     Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("SOF").

paid assistant would have had to have been hired.  *Id.* ¶ 192.

Glatt did not receive any training on *Black Swan*.  *Id.* ¶ 199.  The supervision that he received was the same as that provided to paid employees and consisted of on-the-job instructions about how to perform his tasks.  For example, his supervisors told him which personnel documents had to be maintained in employee personnel files so that he could properly maintain the files.  *Id.* ¶ 187.

Glatt hoped that his internship and the film credit he expected to receive would lead to paid employment in the film production industry.  *Id.* ¶¶ 201-02.  Even though he believed that he should have been paid wages for his work, he did not believe that he had the ability to bargain over the terms and conditions of his internship.  *Id.* ¶ 203.

## B.     Alexander Footman

Alexander Footman worked for Searchlight in the Production Office of *Black Swan* from approximately October 2009 through February 2010, between 25 to 50 hours a week, on a schedule set by his supervisor based on the needs of the Production Office.  *Id.* ¶¶ 214, 216.  Footman and approximately four other unpaid interns performed work similar to the work performed by the office's paid Production Assistant.  *Id.* ¶ 222.  Footman's responsibilities included picking up and setting up office furniture at the beginning of the production; arranging lodgings in hotels and apartments for the cast and crew; compiling lists of local vendors; taking out the trash; taking lunch orders; answering and transferring phone calls; watermarking scripts; drafting daily call sheets; photocopying; making coffee; making deliveries to and from the film production set, rental houses, and payroll services; receiving packages and deliveries to the office; admitting guests into the office; breaking down, removing, and selling office furniture and supplies at the end of the production; internet research; and sending invitations to the "wrap

4

party." *Id.* ¶¶ 223-25.

During his internship, Footman did not receive training or educational instruction. *Id.* ¶¶ 227, 230. His supervision was limited to instruction on how to perform his day-to-day tasks. *Id.* ¶ 228. For example, Footman's supervisor explained how to watermark documents using Adobe Acrobat, which enabled the production to print the names of cast and crew members on their scripts and to trace any scripts that were "leaked." *Id.* ¶¶ 228-29. Footman agreed to work for no financial compensation because he hoped that his internship would lead to paid employment in the film production industry. *Id.* ¶ 231.

### C.    Kanene Gratts

Kanene Gratts worked for Searchlight in the Art Department of *500 Days of Summer* from approximately April 2008 through August 2008, approximately 20-25 hours a week, according to a set schedule. *Id.* ¶¶ 250-53. Gratts performed her work alongside paid members of the construction crew who performed the same tasks that she performed. *Id.* ¶ 239. Her responsibilities included constructing sets; preparing the sets for film shoots by arranging props and furniture; keeping the sets neat during shooting; and restoring the film location to its original, pre-production state once filming was complete. *Id.* ¶¶ 244-49. Gratts did not receive any training or educational instruction. The supervision that she received was limited to instruction from her supervisors about how to perform her day-to-day duties, such as how to use particular pieces of construction equipment to build set pieces. *Id.* ¶ 240.

Gratts expected to be paid for her internship because Steven Fox, the Construction Foreman on *500 Days of Summer*, told her that she would be paid when production concluded. *Id.* ¶¶ 257-58. Gratts continued to work for Searchlight with that understanding. *Id.* When she was not paid, she called the *500 Days of Summer* production office and left messages about her

paycheck.  *Id*. ¶ 259.  When she did not receive a response, she went to the Fox Studios lot in

Los Angeles to speak to someone in person about her unpaid wages, but the security guard did

not permit her to enter the premises.  *Id*.

## II.  Searchlight Financed, Closely Monitored, and Set Employment Conditions on its Film Productions.

### A.  Searchlight Had the Power to Hire and Approve Key Production Staff.

Searchlight entered into detailed Production-Finance-Distribution Agreements ("PFD

Agreements") with the single-purpose companies with which it contracted that set forth its right

to control significant aspects of the films' productions.  SOF ¶¶ 13-17, 24-27.  The PFD

Agreements gave Searchlight the power to hire and approve key production department heads,

including the Unit Production Manager, who supervised the entire production; the Production

Accountant, who supervised the Accounting Department; the Production Designer, who

supervised the Art Department (props, set dressing, and construction); the Cinematographer, who

supervised the camera crew, grips, and electrical crew; the Costume Designer, who supervised

the Costume Department; and the Editor, who supervised the post-production staff.  *Id*. ¶¶ 15,

25, 60, 63-64, 67-68.  These crew members hired and directly supervised Plaintiffs.  *Id*. ¶¶ 185,

208, 236.

Searchlight also exercised its hiring and approval authority.  For example, Searchlight

hired the *500 Days of Summer* Line Producer, chose that film's production department heads,

and checked their references before hiring them.  *Id*. ¶¶ 65-66.  Searchlight explicitly reserved

the right to replace any personnel on *Black Swan* and *500 Days of Summer* if, "in its sole

reasonable discretion," it decided to take over the production entirely.  *Id*. ¶¶ 17, 27.

**B.** **Searchlight Closely Supervised the Work on the Productions on a Daily Basis.**

Searchlight monitored the progress of its productions and the amounts spent on the productions on a daily basis. Searchlight required the productions to send it daily "call sheets," which contained information about the scenes that were to be filmed the next day and the time each employee was to arrive to work, and allowed Searchlight to monitor any changes to the production schedule. *Id.* ¶¶ 78-82. Production interns, including Glatt and Footman, were often copied on emails sent to Searchlight attaching call sheets. *Id.* ¶ 86. Searchlight also received and used "Crew Lists," containing contact information for all production personnel, including Plaintiffs and other interns. *Id.* ¶ 165. Searchlight required the productions to send it daily production reports and "wrap reports," which contained detailed information about where filming took place, which scenes were scheduled, which of those scenes were filmed or not filmed, and employees' hours of work. *Id.* ¶¶ 83-84. *500 Days of Summer* production reports included the names of interns who worked on the production. *Id.* ¶ 85. Searchlight's Executive Vice President of Production, Elizabeth Sayre, who was responsible for overseeing the physical production of its films, reviewed the call sheets, production reports, wrap reports, and cost reports on a daily or weekly basis to ensure that the productions were operating within the budget and production schedule that Searchlight had set. *Id.* ¶¶ 84, 89.

In addition, Searchlight required film production employees to call Sayre or a member of her staff each morning to tell them the time of the first film shot of the day, and each evening to tell them the time that shooting for the day had wrapped, to ensure that the production complied with the production schedule. *Id.* ¶ 90.

7

C.     **Searchlight Determined the Budgets Under Which the Productions Operated.**

Searchlight determined the overall amount allocated to each film's budget and approved how much would be allocated to each budget line item, including for labor. *Id*. ¶¶ 32-34, 36-37, 39.  Searchlight did not permit the production to incur overages, or cost overruns, without its prior approval. *Id*. ¶ 119.  Searchlight's control over the budget determined how many crew members could be hired and what their pay would be. *Id*. ¶¶ 50-51, 56-58, 124, 153. Searchlight also determined the reimbursement or "box rental" rates for employees who used their personal equipment, such as computers and cell phones, for work-related purposes. *Id*. ¶¶ 52, 163.  Searchlight required the productions to send it weekly cash flow schedules that showed the amount of money spent. *Id*. ¶¶ 101-04.  The productions were also required to submit weekly cost reports detailing how the production spent money with respect to each budget line item, including labor, so that Searchlight could monitor the production's expenditures on wages. *Id*. ¶¶ 105-110.  Searchlight also required the productions to sell props and other physical property that they did not return to Searchlight when filming concluded, and required purchasers sign a "Sale of Prop Assets Agreement" that listed Twentieth Century Fox Film Corporation as the seller. *Id*. ¶¶ 129-130.  Footman assisted with selling this property. *Id*. ¶ 129.

D.     **Searchlight Required Crew Members to Sign its Form Employment Agreements.**

Searchlight required crew members to sign form employment agreements or "deal memos" that it drafted, confidentiality agreements, and box rental reimbursement forms. *Id*. ¶¶ 146-156, 161-64.  Film production employees would not be paid until they provided signed deal memos to Searchlight. *Id*. ¶ 151.   On *Black Swan*, even though some employees had already signed deal memos before Searchlight became involved in the production, Searchlight required

them to sign new ones on its approved forms.  *Id*. ¶¶ 154-56.   One of Glatt's responsibilities was to collect deal memos from film production employees.  *Id*. ¶¶ 156-57.

### E.        Searchlight Set and Expected the Productions to Enforce its Intern Policy.

Searchlight expected the productions to follow its intern policy under which interns could only be hired without pay if they were able to obtain academic credit.  *Id*. ¶¶ 133-34.  Searchlight was aware that interns worked on its productions.  *Id*. ¶ 138.  Interns' names were listed on production reports, which set forth the names of individuals who were scheduled to work; interns received film credits, which Searchlight approved; and interns were listed on crew lists, which the productions submitted to Searchlight and which Searchlight used.  *Id*. ¶¶ 139-141, 172, 178.  Searchlight also heard about interns working on its productions from production crew members.  For example, *Black Swan*'s Line Producer copied Sayre on an email in which she alerted Sayre and others that a union representative had been on set and complained that an intern was doing work that should have been assigned to a "loader," a union position responsible for loading film in the movie camera.  *Id*. ¶ 142.  Searchlight also approved the inclusion of interns on the credits of *500 Day of Summer*.  *Id*. ¶ 178.  Glatt's supervisors told him that Searchlight had authorized his hire even though Glatt could not receive academic credit for his internship.  *Id*. ¶¶ 143-45.  Searchlight approved Glatt's request to list him in the *Black Swan* film credits as a "post-production assistant."  *Id*. ¶¶ 176-77.  Searchlight's current policy is that interns who work on its productions must be paid.  *Id*. ¶ 137.

### F.        Searchlight Contracted with Single-Purpose Corporations to Produce its Films.

Searchlight contracted with "single-purpose" corporations to produce its films.  *Id*. ¶¶ 10-11, 13, 20, 24.  "Single-purpose" corporations, which are common in the film industry, are legal fictions created solely to facilitate the production of a particular film, do not have any

9

independent purpose other than the making of the film, and cease operations after the film is completed. *Id*. ¶¶ 11, 18-20, 28, 129-32. The "single-purpose" companies that produced *Black Swan* and *500 Days of Summer*, Lake of Tears, Inc. and 500DS Films Corp., respectively, did not retain any assets, maintain employment records, keep any physical property, or conduct any other business after production ended and were required to transmit all of their assets to Searchlight. *Id*. ¶¶ 18-19, 28, 129-32.

## STANDARD OF REVIEW

A party is entitled to summary judgment where it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Zheng*, 355 F.3d at 76-77. "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Although Plaintiffs bear the initial burden of establishing that they were "employees" within the meaning of the FLSA and state laws, once they have made this prima facie showing, Searchlight bears the burden of establishing its defense that they fell under the narrow exception for "trainees" set forth in *Walling v. Portland Terminal Co*., 330 U.S. 148 (1947). *See Martin v. Malcolm Pirnie, Inc*., 949 F.2d 611, 614 (2d Cir. 1991) (noting that, because the FLSA is a remedial act, the employer bears the burden of proving that employees fall within an exempted category).

The Court must determine whether Searchlight employed Plaintiffs based on the "totality of the circumstances," and in light of "the 'economic reality' of [the] particular employment situation" and "the factual challenges posed by [the] particular case[]." *Barfield v. New York*

10

*City Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008).  Summary judgment is appropriate when "the record as a whole compel[s] the conclusion" that an employment relationship existed even if "isolated factors point against [it]."  *Zheng*, 355 F.3d at 77; *Barfield*, 537 F.3d at 143-44 (acknowledging the "fact-intensive character of a determination of joint employment," but holding that summary judgment for plaintiffs is appropriate where the defendant's status as an employer "is established as a matter of law").

## ARGUMENT

I.   **Plaintiffs Are Covered Employees Under the FLSA and State Labor Laws.**

   A.   **The FLSA's Remedial and Humanitarian Goals Require the Court to Interpret its Coverage Expansively.**

The FLSA seeks to combat unemployment and protect workers from abusive working conditions.  *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1944).  The Act's coverage is necessarily broad, to ensure that it "aid[s] the unprotected, unorganized and lowest paid of the nation's working population . . . who lack[] sufficient bargaining power to secure for themselves a minimum subsistence wage."  *Id*.  "A broader or more comprehensive coverage of employees . . . would be difficult to frame" and there is "no doubt as to the Congressional intention to include all employees within the scope of the Act unless specifically excluded."  *U.S. v. Rosenwasser*, 65 S. Ct. 295, 296 (1945).

To further its remedial and humanitarian goals, the FLSA broadly defines "employ" as "to suffer or permit to work" and defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(d), (e)(1); *Zheng*, 355 F.3d at 66.  "Employer" is also defined expansively as "any person acting directly or indirectly in the interest of an employer in relation

to an employee[.]"² 29 U.S.C. § 203(d). "Work" is any "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *Alvarez v. IBP, Inc.,* 339 F.3d 894, 902 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005). Moreover, work is compensable under the FLSA even if the employer does not request it, is unaware of it, or turns a blind eye to it, because it is the employer's duty "to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits [of workers' labor] without compensating [] them." 29 C.F.R. § 785.13.

The FLSA's broad definitions of employ, employee, and employer are meant to ensure that commercial businesses do not obtain an unfair competitive advantage in the marketplace by employing individuals who voluntarily work for no wage. *See* 29 U.S.C. § 202(a)(3) (declaring Congress's intention to correct "detrimental" labor conditions that create "an unfair method of competition in commerce" through passage of the FLSA); *see also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 299, 301 (1985) ("*Alamo Found.*") ("exceptions to [FLSA] coverage . . . exert a general downward pressure on wages in competing businesses"). "If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." *Alamo Found.*, 471 U.S. at 302. Broad, non-waivable coverage ensures that employers pay their workers lawful wages without "fear that

---

² The New York Labor Law's definition of employee is nearly identical to the FLSA's definition. *See* N.Y. Lab. Law § 651(5) (an employee is "any individual employed or permitted to work by an employer in any occupation"). Similarly, the definition of "employ" under the California Labor Code is substantially similar to the FLSA. *See Martinez v. Combs*, 49 Cal. 4th 35, 63-64 (Cal. 2010) ("employ" means "to exercise control over the wages, hours or working conditions," "to suffer or permit to work," or "to engage, thereby creating a common law employment relationship").

[they] will be required by law to observe wage and hour standards higher than those applicable to [their] competitors." *Brooklyn Savs. Bank*, 324 U.S. at 710 n.7.

**B.     Plaintiffs Glatt, Footman, and Gratts Performed Work that Searchlight Suffered or Permitted.**

Plaintiffs Glatt, Footman, and Gratts fall comfortably within the broad definition of "employee" under the FLSA. Searchlight "suffered or permitted" the work that Plaintiffs performed on its film productions, which included accounting and administrative work and set-building and decorating. SOF ¶¶ 190-91, 195-98, 222-25, 244-49. Moreover, Searchlight cannot turn a blind eye to the work that Plaintiffs performed because it knew that interns were working on its films without pay, or had reason to know that they were, because interns, including Plaintiffs, were listed on crew lists and call sheets that the productions sent to Searchlight and that Searchlight reviewed, were given film credits that Searchlight approved, and were supervised by film crew members that Searchlight approved and/or hired and with whom it regularly communicated. SOF ¶¶ 47, 138-145, 172, 176-78, 185, 208, 236. *See Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 512-13 (5th Cir. 1969) (employer "suffered or permitted" labor of underage workers because it had the "opportunity to acquire knowledge" of them); *Sandoz v. Cingular Wireless, LLC*, 769 F. Supp. 2d 1047, 1056-57 (W.D. La. 2010) (employer has a duty "to inquire into the conditions prevailing in his business" and may not "rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates") (internal quotation marks omitted).

Furthermore, the fact that Plaintiffs lacked film production experience does not deprive them of protection under the FLSA. In fact, the FLSA specifically provides a mechanism for employers to apply to the Secretary of Labor for a certificate authorizing them to pay "learners" who are "being trained for an occupation" and "who, when initially employed produce[] little or

nothing of value" at 95% of the minimum wage for up to 240 hours of work.[3]  *See* 29 U.S.C. §

214(a); 29 C.F.R. § 520.300; 29 C.F.R. § 520.408(a).  Section 214 appropriately balances the

need for inexperienced workers who would otherwise be unemployable to gain job experience

while preventing the "wholesale evasions" of the minimum wage laws that would result from "a

blanket exemption" for inexperienced workers.  *See Walling*, 330 U.S. at 151.  Nothing in the

FLSA allows employers to do what Searchlight has done here – employ entry-level workers for

no wages at all.  This is exactly the kind of "wholesale evasion" that Congress sought to prevent

by enacting Section 214.  *See id*. at 151-52.

## II.    Searchlight Cannot Show that Plaintiffs Were Trainees Who Were Part of a Bona Fide Internship Program.

### A.    *Walling*'s Narrow Exception for Trainees Does Not Apply to Plaintiffs.

The FLSA does not define the word "intern" and there is no exception for "interns"

anywhere in the statute.  In 1947, the U.S. Supreme Court in *Walling* carved out a narrow

exception to the definition of an employee for "trainees" to whom railroad companies provided

seven to eight days of "the same kind of instruction" offered by a "public or private vocational

school."  330 U.S. at 152-53.  Central to the Court's decision, it was "undisputed" that "the

railroads receive[d] *no* 'immediate advantage' from any work done by the trainees," the trainees

worked "*solely* for [their own] personal purpose or pleasure," and their "work serve[d] *only*

[their] own interest."  *Id*. at 152-53 (emphasis added).

*Walling*'s outcome would have been different if the railroads had obtained an immediate

advantage from the trainees because the test that the Court purported to apply was the FLSA's

---

[3]    To obtain such a permit, the employer must demonstrate that "[r]easonable efforts [] have been made to recruit workers paid at least the minimum wage in those occupations in which certificates to employ learners at subminimum wages have been requested."  29 C.F.R. § 520.404(e).

"suffer or permit" standard.  *See id*. at 152.  Under that standard, when an employer "suffer[s] or permit[s]" work, it obtains a direct or immediate benefit from the work and must compensate the worker for it.[4]  *See id*.  The Court cautioned future courts to be wary of circumstances where "an employer has evasively accepted the services of beginners at pay less than the legal minimum[.]" *Walling*, 330 U.S. at 153.  Heeding *Walling*, courts and the U.S. Department of Labor have refused to extend the trainee exception beyond *Walling*'s narrow circumstances to excuse employers from paying workers whose work benefits them.

In *Alamo Foundation*, the U.S. Supreme Court held that individuals who themselves claimed to be "volunteers" with no expectation of compensation were employees and unlike the trainees in *Walling*.  471 U.S. at 300-01.  The volunteers were unlike trainees because they actually staffed the Foundation's commercial businesses from which it derived most of its income.  *Id*. at 292.  The fact that the volunteers "vehemently protest[ed]" any expectation of compensation was not dispositive because "the purposes of the [FLSA] require that it be applied even to those who would decline its protections."  *Id*. at 302.

In *Archie v. Grand Central Partnership, Inc.*, a court in this district found that homeless individuals participating in a "Pathways to Employment" employment training program who performed outreach, food service, maintenance, and administrative tasks for a social services agency were employees because they "d[id] work that had a direct economic benefit for the defendants."  997 F. Supp. 504, 507, 533 (S.D.N.Y. 1998).  In addition to performing productive work, the plaintiffs also benefited the defendants by providing them with services "at below market rates," thereby giving them a competitive advantage over businesses that paid minimum

---

[4]     In fact, an employer can "suffer" work even where the employee does not affirmatively perform any tasks, such as when an employer requires an employee to be "on call" in case the need for work arises.  *Singh v. City of New York*, 524 F.3d 361, 368 (2d Cir. 2008); *Pabst v. Oklahoma Gas & Elec. Co.*, 228 F.3d 1128, 1134-35 (10th Cir. 2000).

wages.  *Id.* at 507, 533.  The court held that the "trainee" exception did not apply *even though* the plaintiffs "benefitted enormously from the work opportunities provided by the defendants" by, for example, gaining "basic job skills and the ability to create an employment history."  *Id.* at 533-35.

In *Okoro v. Pyramid 4 Aegis*, although the plaintiff "wanted to learn and indeed did learn" about the defendant's business, that did not transform her into a trainee because "the nature of the work that she performed, such as cleaning, picking up prescriptions, appearing in court on behalf of clients at the facility, and calling in hours for caregivers to Paychex, was undeniably of substantial assistance to [the company]."  No. 11 Civ. 267, 2012 WL 1410025, at *10 (E.D. Wis. Apr. 23, 2012).

In *Donovan v. New Floridian Hotel, Inc.*, the Eleventh Circuit held that former mental patients who performed assigned tasks during a post-release placement in a retirement home were covered employees under the FLSA.  676 F.2d 468, 471 (11th Cir. 1982).  Although the defendants claimed that the tasks were merely "to keep [the plaintiffs] occupied," the Circuit court held that the plaintiffs were employees because their work "was of economic benefit" to the defendants.  *Id.* at 470-71.  The fact that the plaintiffs may have performed their tasks poorly did not matter because "the evidence indicate[d] that the[y] perform[ed] meaningful work" that was compensable even if "someone else could have performed the duties better or in less time." *Id.* at 475 n.3.

In *Wirtz v. Wardlaw*, the Fourth Circuit held that high school students who performed office tasks in an insurance company were employees despite the defendant's claim that the purpose of the work was to help them "determine whether they would be interested in preparing for careers in the insurance business after completion of their high school courses."  339 F.2d

785, 787 (4th Cir. 1964).  The Circuit court held that the students' work, which included preparing and mailing newspaper clippings, monthly newsletters, and business cards to customers benefited the defendant "no less than [the students] themselves," in that their work furthered the company's promotional activities.  *Id.* at 787-88.[5]

Here, the work that Plaintiffs performed during their internships provided an immediate advantage to Searchlight because it contributed to the day-to-day running of the productions' operations and would have been performed by paid crew members if Plaintiffs did not do it.  *See* SOF ¶¶ 187-88, 190-92, 194-98, 214, 222-25, 227-230, 239-40, 244-253.

**B.    Searchlight Cannot Satisfy the Department of Labor's Six-Factor Test for Unpaid Interns.**

Searchlight cannot show that the U.S. Department of Labor's ("DOL's") six-factor test, which sets forth the circumstances under which *Walling*'s trainee exception applies to interns, is met.[6]  *See* Ex. 34 (U.S. Dep't of Labor Fact Sheet #71) ("DOL Factors").[7]  Following *Walling*,

---

[5]    *See also McLaughlin v. Ensley*, 877 F.2d 1207, 1209-10 (4th Cir. 1989) (snack food distribution "trainees," who accompanied and assisted full-time employees during a week-long orientation period, were employees; even though they learned on the job, their work driving trucks, loading and unloading trucks, restocking retail store shelves and vending machines, and performing simple paperwork benefited the defendant); *Bailey v. Pilots' Ass'n for the Bay & River Delaware*, 406 F. Supp. 1302, 1305, 1307 (E.D. Pa. 1976) (although apprentice river boat driver obtained "some educational benefit" from his apprenticeship and "did not contemplate compensation for the apprenticeship period," he performed the duties of a regular crew member and thus should have been paid); U.S. Dep't of Labor Op. Letter, 2002 WL 32406599, at *2-3 (Oct. 7, 2002) (students who bagged groceries for tips and donations were employees of a supermarket); U.S. Dep't of Labor Op. Letter, 1994 WL 1004761 , at *1-2 (Mar. 25, 1994) (interns who worked at a youth hostel assisting in its daily operations were employees).

[6]    A version of the test, replacing the word "intern" for "trainee" and "internship" for "training period" "has appeared in Wage and Hour Administrator opinions since at least 1967." *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1026 (10th Cir. 1993).  *See, e.g.*, *Archie*, 997 F. Supp. at 531-32 (citing 1980 U.S. DOL Wage & Hour Manual).

[7]    California follows the DOL Factors.  *See* Ex. 36 (Cal. DLSE Op. Letter, Apr. 7, 2011). The New York Department of Labor's internship criteria ("NYSDOL Factors") incorporate the DOL Factors and add others.  *See* Ex. 35 (N.Y. Dep't of Labor, Wage Requirements for Interns in For-Profit Businesses).

the DOL's exception is "narrow" and presumes that internships in the "'for-profit' private sector

will most often be viewed as employment[.]"  *See id.* at 1.  Courts have held that the DOL

Factors are entitled to deference as a reasonable application of the FLSA and *Walling*.  *See*

*Archie*, 997 F. Supp. at 532.  The DOL's commentary on the factors, as set forth in Fact Sheet

#71, also reasonably interprets the FLSA and *Walling* and similarly warrants deference.  *See*

*Exxon Mobil Corp. v. C.I.R.*, 689 F.3d 191, 200 n.13 (2d Cir. 2012).

According to the DOL, an employer must meet all of the factors to show that an intern is

a "trainee" outside the protections of the FLSA:

(1)  The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

(2)  The internship experience is for the benefit of the intern;

(3)  The intern does not displace regular employees, but works under close supervision of existing staff;

(4)  The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

(5)  The intern is not necessarily entitled to a job at the conclusion of the internship; and

(6)  The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

Ex. 34 (DOL Factors) at 1.

### 1. Plaintiffs' Internship Was Not Similar to Training Which Would Be Given in an Educational Environment and Benefited Searchlight.

Searchlight cannot satisfy the first, second, and fourth factors because Plaintiffs'

internships were not structured around a classroom or academic experience and were entirely

structured to benefit the productions' actual operations.  *See* Ex. 34 (DOL Factors) at 2 ("The

more that an internship program is structured around a classroom or academic experience as

opposed to the employer's actual operations, the more likely the internship will be viewed as an extension of the individual's educational experience"); *Archie*, 997 F. Supp. at 507 (defendant did not "structure a training program as that concept is understood in case law and regulatory interpretations but instead structured a program that required the plaintiffs to do work that had a direct economic benefit for the defendants").  Plaintiffs worked alongside paid employees, often performing the same work that their paid co-workers performed and doing assignments that were integral to the production's operations.  SOF ¶¶ 190-92, 195-98, 217, 222-25, 239, 244-49. Moreover, their work facilitated the production and in no way impeded it.  *Id*.  Where, as here, interns perform "the routine work of the business on a regular and recurring basis" by "engag[ing] in the operations of the employer or  . . . performing productive work (for example, filing, performing other clerical work, or assisting customers)," the interns are not trainees and must be paid.  Ex. 34 (DOL Factors) at 2; *see Archie*, 997 F. Supp. at 532-33.

The fact that Plaintiffs may have learned some skills on-the-job during their internships is not sufficient to satisfy the first and second factors because on-the-job learning is not similar to that provided by an educational environment and because the fruits of any on-the-job learning benefited Searchlight.  Ex. 34 (DOL Factors) at 2 ("[T]he fact that [interns] may be receiving some benefits in the form of a new skill or improved work habits will not exclude them from the FLSA's minimum wage and overtime requirements because the employer benefits from the interns' work"); *see Archie*, 997 F. Supp. at 533 (although trainees gained basic job skills that might help them in the job market, such on-the-job training was not similar to that which would be provided in a vocational school and benefited the defendant by allowing it to offer its services at below market rate); *Okoro*, 2012 WL 1410025, at *10 ("the nature of the work that [the trainee] performed, such as cleaning, picking up prescriptions, appearing in court on behalf of

clients at the facility, and calling in hours for caregivers to Paychex," was not akin to the "course

of practical training" that the railroad trainees in *Walling* received, because "one hardly needs to

be trained in how to clean a facility, how to pick up prescriptions, and how to call in hours for

caregivers" and "was undeniably of substantial assistance to [the company]").[8]

### 2.    Plaintiffs Performed the Same Work as Paid Employees and Were Supervised as if They Were Regular Employees.

Searchlight also cannot satisfy the third factor because Plaintiffs performed the work that

paid employees would otherwise have performed.  In fact, Plaintiffs worked alongside paid

employees who performed the same or similar duties that they performed.  SOF ¶¶ 190-92, 195-

98, 217, 222-25, 239, 244-49.  Interns must be paid if employers use them as substitutes for

regular workers or to augment their existing workforce.  *See* Ex. 34 (DOL Factors) at 2.  If an

employer "would have hired additional employees or required existing staff to work additional

hours had interns not performed the work, then the interns will be viewed as employees and

entitled to compensation under the FLSA."  *Id*.  *See also Archie*, 997 F. Supp. at 533 (where

defendant used the services provided by the alleged trainees and avoided having to pay others at

market rates, alleged trainees were employees covered by the FLSA).

Plaintiffs also did not "shadow[]" their supervisors or train under their "close and

constant" supervision.  Ex. 34 (DOL Factors) at 2.  To the extent that they were supervised at all,

Plaintiffs "received the same level of supervision as [the production's] regular workforce."  *Id*.;

---

[8]       Because Searchlight did not operate an educational training program, *see* SOF ¶¶ 199, 227, 230, 240, it also cannot meet the additional NYSDOL Factors.  *See, e.g.*, Factor 7 (persons providing "clinical training" must be competent to "fulfill the educational goals and requirements of the training program"); Factor 9 ("training that is specific to the employer and its operations is conclusive evidence that an employment relationship exists").  Searchlight's internship postings also did not "discuss education or training" (Factor 11), and Searchlight "mix[ed] recruiting of employees and interns") (Factor 10).  *See* SOF ¶¶ 179-83, 204-06, 232-34.

20

*see also Archie*, 997 F. Supp. at 516-17 (plaintiffs did not receive "close supervision" where they were left to perform their tasks alone after receiving initial instruction).

> **3.   Plaintiffs Expected Compensation and Opportunities for Paid Employment in Exchange for Their Work.**

Searchlight cannot satisfy the fifth and sixth factors because Plaintiffs had an expectation that they would be paid for their work, even if the pay that they expected was in the form of in-kind compensation. *See Alamo Found.*, 471 U.S. at 292, 301 (a compensation agreement can be "implied" or "express" and could involve the payment of in-kind benefits, such as housing or food, rather than money) (citing *Walling*, 330 U.S. at 152). Plaintiffs Glatt and Footman each expected compensation in the form of film credits and job references in exchange for their work and expected that the connections that they made would lead to paid employment. SOF ¶¶ 201-203, 231. Plaintiff Gratts expected to be paid money in exchange for her work, based on her supervisor's promise at the outset of the internship. *Id.* ¶ 257-59.[9]

## III.   Important Public Policies Support Paying Interns.

There are important public policy justifications that support paying interns for their labor, including many of the same reasons that led to the FLSA's passage many years ago. Young workers face unprecedented unemployment. Unemployment for young adults aged 20-24 is close to double that of the national average.[10] Despite record unemployment, a significant number of young people are actually working in unpaid internships in corporate America, which

---

[9]   The FLSA does not permit an employer to choose an alternate in-kind method of compensation in lieu of wages. *Alamo Found.*, 471 U.S. at 301.

[10]   ECONOMIC NEWS RELEASE, DEP'T OF LABOR (Feb. 1, 2013), *available at*: http://www.bls.gov/news.release/empsit.t15.htm and UNEMPLOYMENT RATES BY AGE http://www.demos.org/data-byte/unemployment-rates-age-december-2012 (last visited Feb.13, 2013).

have exploded in the last three decades.[11]  In 2008, a study found that 50 percent of graduating

students that year had held internships, up from 17 percent sixteen years before.[12]  Of these

internships, experts approximate that half are unpaid.[13]  Commentators and scholars have dubbed

this phenomenon, the "Intern Economy."[14]

      The prevalence of unpaid internships has resulted in detrimental social costs.[15]

First, as companies hire more interns for free, they hire fewer paid workers, especially entry-

level workers.[16]  "Paid workers are thereby indirectly replaced, or not hired in the first place.

These displaced workers then have to find other jobs, and they may draw on unemployment

insurance or even welfare benefits."[17]  Second, hiring interns to work for free undermines

minimum wage laws to the detriment of the labor market and social welfare policy because it

---

[11]      Nantiya Ruan, *Same Law, Different Day: A Survey of the Last Thirty Years of Wage Litigation and Its Impact on Low Wage Workers,* Hofstra Lab. & Emp. J. (forthcoming 2013) (Ex. 47); *see also* Steven Greenhouse, *Jobs Few, Grads Flock to Unpaid Internships*, N.Y. Times, May 5, 2012, *available at:* http://www.nytimes.com/2012/05/06/business/unpaid-internships-dont-always-deliver.html?pagewanted=all&_r=0 ("[w]hile unpaid internships have long existed in the film and nonprofit worlds, they have recently spread to fashion houses, book and magazine publishers, marketing companies, public relations firms, art galleries, talent agencies – even to some law firms") (last viewed Feb. 13, 2013).

[12]      *See* Steven Greenhouse, *The Unpaid Intern, Legal or Not*, N.Y. Times, Apr. 2, 2010, *available at*: http://www.nytimes.com/2010/04/03/business/03intern.html?pagewanted=all (last viewed Feb. 13, 2013).

[13]      David C. Yamada, *The Employment Law Rights of Student Interns*, 35 Conn. L. Rev. 215, 218 (2002) (citing authorities).

[14]      *Id.* (citing Jim Frederick, *Internment Camp: The Intern Economy and the Culture Trust*, THE BAFFLER, 1997, No. 9, at 51-58) (discussing the exploitation of unpaid interns and restructuring of the labor market by unpaid internships).

[15]      *See, e.g.*, Ross Perlin, INTERN NATION: HOW TO EARN NOTHING AND LEARN LITTLE IN THE BRAVE NEW ECONOMY, Verso Publishers (2012).

[16]      *See* David L. Gregory, *The Problematic Employment Dynamics of Student Internships*, 12 Notre Dame J.L. Ethics & Pub. Pol'y 227, 242 (1998).

[17]      Jessica L. Curiale, Note, *America's New Glass Ceiling: Unpaid Internships, the Fair Labor Standards Act, and the Urgent Need for Change*, 61 Hastings L. J. 1531, 1537 (2010) (citing authorities).

prevents "the best people [from] finding the jobs best suited for their talents."[18]  Third, heavy reliance on unpaid internships has led to "an ideal system for perpetuating and increasing inequality" among the economically advantaged and disadvantaged jobseekers in our society.[19] Young people who cannot afford to work for free or bear the additional costs associated with most internships, including purchasing academic credit, transportation, and housing, are left out in the cold.

"Slippery slope" arguments advanced to shield employers from their minimum wage obligations to interns are also meritless.  Requiring employers to pay interns will not end internships.  To the contrary, there are employers who pay interns at or above the minimum wage, including Fox itself, which now compensates interns who work in its corporate offices at $8 an hour.[20]  There is also no reason to fear that paying interns who work in the private sector will require charitable, humanitarian, and religious not-for-profits to pay their volunteers because volunteer "work" is generally not covered by the FLSA.  *See Alamo Found.*, 471 U.S. at 302 (rejecting this argument and holding that individuals whose work benefited a nonprofit religious organization's "business activities" – *not* its religious activities – were not volunteers who fell under the FLSA's volunteer exception).[21]

---

[18]     Andrew Mark Bennett, *Unpaid Internships & the Department of Labor: The Impact of Underenforcement of the Fair Labor Standards Act on Equal Opportunity*, 11 U. Md. L.J. Race, Religion, Gender & Class 293, 299 (2011) (quoting Anya Kamenetz, Op-Ed., *Take This Internship and Shove It*, N.Y. Times, May 30, 2006, at A19).

[19]     *Id.* at 297 (quoting Daniel Akst, Op-Ed., *Unpaid Internships?  File Under "Hypocrisy,"* L.A. Times, Jun. 15, 2010, at A15, available at http://articles.latimes.com/2010/jun/15/opinion/la-oe-akst-internships-20100615; *see also* Curiale, *supra* note 17, at 1537; Yamada, *supra* note 13, at 218-19.

[20]     *See* Bennett, *supra* note 18, at 309-10 (noting that some companies have converted their unpaid internship programs to paid programs in the face of greater scrutiny by the Department of Labor and the media).

[21]     The U.S. Department of Labor takes the position that individuals who volunteer their time on a short-term basis to religious, charitable, civic, humanitarian, or similar non-profit

**IV.    Searchlight Employed Plaintiffs.**

The Second Circuit employs a "non-exclusive" multi-factor test "based on the circumstances of the whole activity" and "viewed in light of economic reality" to determine whether an employment relationship exists. *Zheng*, 355 F.3d at 71, 75 (internal quotation marks and citation omitted). An employment relationship can exist both where the alleged employer exercises "formal control" over working conditions and where it exercises "functional control" but does not physically control the performance of the work. *See id.* at 72. In every case, the ultimate question is whether the alleged employer "possessed the power to control" the workers in question. *Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). Here, under either a formal or functional analysis, Searchlight "possessed the power to control" Plaintiffs' working conditions and exercised its power through its control over the films' budgets, by setting the terms and conditions of work on the films, and by regularly monitoring employees' work as the film productions progressed on a daily basis. *See id.*

**A.    Searchlight Exercised Formal Control over Plaintiffs.**

The formal control factors all weigh in favor of a finding that Searchlight employed Plaintiffs. These non-exhaustive factors include whether the alleged employer: (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See Herman*, 172 F.3d at 139. Courts consider any additional factors if

---

organizations as a public service are not covered by the FLSA, so long as they volunteer freely without contemplation or receipt of compensation and do not displace paid workers or perform work that would otherwise be performed by employees. *See* U.S. Dep't of Labor Op. Letter, 2006 WL 561849, at *1 (Jan. 27, 2006).

they are relevant to understanding the economic reality of the employment situation.  *Id.*

Plaintiffs satisfy the first factor because Searchlight had the right to hire and fire production personnel and exercised this power.  For example, Searchlight hired the *500 Days of Summer* Line Producer, and chose that film's production department heads.  SOF ¶¶ 65-66.  Searchlight also approved the hire of the *Black Swan* Director's assistant.  *Id.* ¶ 124.  Moreover, the production crew members whom Searchlight hired or whose employment Searchlight approved directly supervised Plaintiffs.  *Id.* ¶¶ 47, 185, 208, 236.  Although Searchlight's hiring "involved mainly managerial staff, the fact that [it] hired individuals who were in charge of [Plaintiffs] is a strong indication of control."  *Herman*, 172 F.3d at 140; *see also Torres v. Gristede's Operating Corp.* No. 04 Civ. 3316, 2011 WL 4571792, at *2 (S.D.N.Y. Sept. 23, 2011) (that defendant hired managerial employees and delegated his supervisory powers to them supported finding of employer status).

Plaintiffs satisfy the second factor because Searchlight supervised and controlled employee work schedules and conditions of employment on a daily basis.  Searchlight required the productions to send it daily call sheets, production reports, and wrap reports, all of which informed Searchlight of the daily on-goings of the production and workers' schedules.  SOF ¶¶ 78-84, 87, 89, 90, 165.  Searchlight's Executive Vice President of Production, Elizabeth Sayre, who was responsible for overseeing the physical production of Searchlight's films, reviewed the reports sent by the productions on a daily basis to see whether work was completed on schedule and within budget.  *Id.* ¶¶ 81, 84, 89.  Searchlight also required productions to send it weekly cost reports detailing how the production spent money with respect to each budget line item, including labor, so that it could monitor the production's expenditures on wages.  *Id.* ¶¶ 101-24.  The productions were also required to call Sayre or a member of her staff each morning to tell

them what time the first film shot was taken, and each evening to tell them when shooting for the day wrapped.  *Id*. ¶ 90.

Plaintiffs satisfy the third factor because Searchlight set and expected the productions to enforce its policy that interns who were hired need not be paid if they obtained academic credit for their internships.  *Id*. ¶¶ 143-45.  It also "de facto" set wages for production workers, including Plaintiffs, through its control over the films' budgets.  *Zheng*, 355 F.3d at 72 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 726, 730 (1947)).  In particular, Searchlight decided how much money to allocate to each budget line item, including wages.  SOF ¶¶ 32-34, 36-37, 39.  It also decided how many crew members could be hired into particular positions within the allocated budget.  *Id*.  In addition to wages, Searchlight determined the reimbursement or "box rental" rates available to workers who provided their own computers, cell phones, and other equipment to perform their jobs.  *Id*. ¶ 52.

Plaintiffs satisfy the fourth factor because Searchlight maintained employment records.  It required crew members to sign form employment agreements that it drafted, including "deal memos," confidentiality agreements, and box rental reimbursement forms.  *Id*. ¶¶ 146-56, 161-64.  The productions were required to send crew deal memos to Sayre, who reviewed and approved them.  *Id*. ¶¶ 151, 153.  Searchlight also set and enforced a policy that film production employees would not be paid until they completed and returned Searchlight's deal memos.  *Id*. ¶ 151.  On *Black Swan*, even though some employees had already signed deal memos before Searchlight acquired the film, Searchlight required them to sign new ones on its approved forms.  *Id*. ¶¶ 154-56.  In fact, one of Glatt's responsibilities was to collect deal memos from film production employees.  *Id*. ¶ 157.

**B.       Searchlight Employed Interns Under the Functional Control Test.**

Searchlight also exercised functional control over Plaintiffs.  The functional control test looks beyond "an entity's formal right to control the physical performance of another's work" to "give[] content to the broad 'suffer or permit' language in the statute."  *Zheng*, 355 F.3d at 69, 76.  Under this broad test, "an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them."  *Zheng*, 355 F.3d at 70 (citing *Rutherford*, 331 U.S. at 724-25).  Courts consider the following relevant factors: (1) whether the alleged joint employer's premises and equipment are used for the work; (2) whether the business to which the work was subcontracted is one that could or did shift as a unit from one alleged joint employer to another; (3) whether the workers perform a discrete line-job integral to the alleged joint employer's process of production; (4) whether responsibility under the alleged joint employer's contracts could pass from one subcontractor to another without material changes; (5) the degree to which the alleged joint employer or its agents supervises the work; and (6) whether the workers work exclusively or predominantly for the alleged joint employer.  *See Zheng*, 355 F.3d at 72 (citing *Rutherford*, 331 U.S. at 724-25).

The factors address circumstances, like those here, where an alleged employer creates a business relationship with a third party and then attempts to obscure its obligations under the FLSA to avoid liability.  *See Zheng*, 355 F.3d at 72.  Here, Searchlight contracted with "single-purpose" production entities to produce its films.  *See* SOF ¶¶ 10-11, 13, 20, 24.  These entities are legal fictions that are created solely to facilitate the production of a particular film, do not have any independent purpose other than the making of the film, and cease operations after the film is completed.  *Id*. ¶¶ 11, 18-20, 28, 129-32.  The entities that produced *Black Swan* and *500 Days of Summer*, Lake of Tears, Inc. and 500DS Films Corp., respectively, did not retain any

assets, maintain employment records, or keep any physical property after production ended and, in fact, were required to transmit all of their assets to Searchlight. *Id.* ¶¶ 18-19, 28, 129-32. They are the film-industry equivalents of the fly-by-night sub-contractors that Congress had in mind when it broadly defined an "employer" to cover both (judgment-proof) subcontractors and the wealthier contractors that principally benefited from the work. *See Zheng*, 355 F.3d at 72, 76 ("the 'economic reality test' [] is intended to expose outsourcing relationships that lack a substantial economic purpose" because they are actually "a subterfuge meant to evade the FLSA or other labor laws").

Plaintiffs meet each factor here. First, all expenses incurred for the films were funded by Searchlight and within the budget it set. SOF ¶¶ 32-34, 36-37, 39. Searchlight did not permit the productions to incur overages, or cost overruns, without its prior approval. *Id.* ¶ 119. A putative employer's provision of "premises and equipment may support the inference that [it] has functional control over the plaintiffs' work." *Zheng*, 355 F.3d at 72. In addition to providing funding for equipment and work locations, Searchlight exercised control over these assets by requiring production employees to send it detailed weekly cash flow schedules, cost reports of expenditures made on equipment and locations, and to confer with it about spending decisions that would impact the budget. SOF ¶¶ 95-96, 101-110. Searchlight also required the productions to resell or return all physical property to it when filming concluded, which was one of Footman's responsibilities at the end of his internship. *Id.* ¶¶ 129-32.

Second, the single-purpose corporations did not shift from one joint employer to another. Instead, each was formed to create a single film and ceased operations after that film was completed. SOF ¶¶ 10-11, 18-19, 20, 28. *See Zheng*, 355 F.3d at 72 ("a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a

28

subcontractor that serves a single client").

Third, the work that Plaintiffs performed was integral to the creation of Searchlight's product – motion pictures. Under *Zheng* and *Rutherford*, work "integral to the putative joint employer's process of production" includes that "which constitutes an essential step in the producer's integrated manufacturing process." *Zheng* 355 F.3d at 73 (citing *Rutherford*, 331 U.S. at 729-30). Here, the production of Searchlight's films was integral to its business and Plaintiffs' work as fully-integrated members of their departments contributed to the films' production.

The fourth factor – whether responsibility under the alleged joint employer's contracts could pass from one subcontractor to another without material changes – derives from the Supreme Court's observation in *Rutherford* that, "even when [the subcontractor's] supervisor abandoned his position and another supervisor took his place, [] the same employees would continue to do the *same* work in the *same* place." *Zheng*, 355 F.3d at 74 (citing *Rutherford*, 331 U.S. at 725, 730). Under these circumstances, "it is difficult *not* to draw the inference that a subterfuge arrangement exists" because the "employees are tied to [the putative joint employer] rather than to an ostensible direct employer such as the [subcontractor]." *Zheng*, 355 F.3d at 74. Here, Searchlight explicitly reserved the right to approve or replace key production personnel, such as the Line Producer, the Production Accountant, the Production Designer, the Director of Photography, the Costume Designer, and the Editor, and to replace any personnel if, "in its sole reasonable discretion," it decided to take over the production entirely. SOF ¶¶ 15-17, 25-27. This shows that the production workers, including Plaintiffs, were at least as closely tied to Searchlight as they were to their direct supervisors. *See id.*

The fifth factor – the degree to which Searchlight supervised the work – also favors Plaintiffs.  As discussed above, Searchlight closely supervised the film production through weekly cost reports, daily call sheets, production reports, crew lists, and wrap reports.  SOF ¶¶ 78-84, 86, 89, 90, 125, 165.  This supervision weighs in favor of joint employment because "it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Zheng*, 355 F.3d at 75; *see also Rutherford*, 331 U.S. at 730 ("[t]he managing official of the [putative employer] kept close touch on the operation").  Searchlight's control over production schedules directly impacted the hours that Plaintiffs worked.  Searchlight also hired the individuals who directly supervised Plaintiffs, gave them assignments, set their schedules, and reported to Searchlight on a daily basis.  SOF ¶¶ 47, 71, 95, 185, 208, 236; *see Herman*, 172 F.3d at 140.

As to the sixth factor, whether the purported joint employees worked exclusively or predominantly for the putative joint employer, each Plaintiff worked exclusively for one Searchlight production during his or her internship according to a set schedule of between 25 and 50 hours a week.  SOF ¶¶ 188, 194, 214, 250-53.  The single-purpose corporations also did not perform work for any other film production.  *See id.* ¶¶ 10-11, 20.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Motion for Partial Summary Judgment.

Dated: New York, New York
      February 15, 2013

Respectfully submitted,

 /s/ Rachel Bien
Rachel Bien

Adam T. Klein
Rachel Bien
Elizabeth Wagoner
Reena Arora
**Outten & Golden LLP**
3 Park Avenue, 29th Floor
New York, NY  10016
Telephone:  (212) 245-1000
Facsimile:  (212) 977-4005

31