PROSKAUER ROSE LLP
Elise M. Bloom
Amy F. Melican
Eleven Times Square
New York, NY  10036
Ph: 212.969.3000/Fax: 212.969.2900
ebloom@proskauer.com
amelican@proskauer.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ERIC GLATT, ALEXANDER FOOTMAN,           :
EDEN ANTALIK, and KANENE GRATTS, on      :    Civil Action No. 11 CV 6784
behalf of themselves and all others similarly   :    (WHP)
situated,                                :
                                         :    ECF Case
                          Plaintiffs,    :
                                         :
              v.                         :
                                         :
                                         :
FOX SEARCHLIGHT PICTURES, INC., and      :
FOX ENTERTAINMENT GROUP, INC.,           :
                                         :
                          Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

I.     GRATTS' CLAIMS ARE TIME-BARRED .................................................................2

II.    THE PRODUCTION INTERNS' CLAIMS SHOULD BE DISMISSED
       BECAUSE, AS A MATTER OF LAW, THE PRODUCTION INTERNS WERE
       NEVER EMPLOYED BY SEARCHLIGHT ...................................................6

       A.     Footman and Glatt's Claims Based on Their Internships on *Black Swan*
              Should Be Dismissed ...................................................6

              1.     Applicable Tests to Determine "Joint Employer" Status Under the
                     Fair Labor Standards Act and New York Labor Law.................................6

              2.     Footman and Glatt Were Never Employed by Searchlight ........................9

       B.     Footman and Glatt, as a Matter of Law, Cannot Satisfy the "Formal
              Control" Test...................................................10

              1.     Searchlight Did Not Have the Power to Hire or Fire Footman or
                     Glatt...................................................10

              2.     Searchlight Did Not Supervise or Control Schedules or Conditions
                     of Footman or Glatt's Employment ...........................................12

              3.     Searchlight Did Not Determine Footman or Glatt's Rate of Pay or
                     Method of Payment...................................................14

              4.     Searchlight Did Not Maintain Employment Records for Footman
                     or Glatt ...................................................15

       C.     Footman and Glatt, As a Matter of Law, Cannot Satisfy the "Functional
              Control" Test...................................................15

              1.     Searchlight Did Not Provide Premises or Equipment to Footman or
                     Glatt...................................................16

              2.     Lake of Tears Did Not Shift as a Unit ...............................................16

              3.     Footman and Glatt Did Not Perform Discrete Jobs That Were
                     Integral to Searchlight...................................................17

              4.     Lake of Tears Is Not Fungible and Responsibility Could Not Pass
                     to Another Without Material Changes .......................................18

              5.     Searchlight Did Not Supervise Footman or Glatt's Activities..................19

6.   Exclusive or Predominant Engagement by Searchlight Is Not Enough to Satisfy the "Functional Control" Test ......................................19

7.   Additional Evidence Also Establishes That the "Functional Control" Test Is Not Satisfied....................................................................20

D.   Gratts was Engaged by Palmera Productions and was Never Employed by Searchlight ....................................................................................................21

E.   As a Matter of Law, There is No Basis for Finding that Any of the Production Interns on *Our Family Wedding*, *Cedar Rapids*, *The Savages*, *500 Days of Summer* or *Black Swan* Were Employed by Searchlight..................23

III.   ANTALIK WAS NEVER EMPLOYED BY FEG AND THE CLAIMS AGAINST FEG SHOULD BE DISMISSED. ...................................................25

A.   As a Matter of Law, FEG Was Not Antalik's Employer Because None of the Factors of the Formal Control Test Are Satisfied ...........................................26

B.   As a Matter of Law, FEG Was Not Antalik's Employer Because None of the Factors of the "Functional Control" Test Are Satisfied...................................27

# Table of Authorities

**Page(s)**

CASES

*Balut v. Loral Elec. Sys.*,
    988 F. Supp. 339 (S.D.N.Y. 1997)....................................................................26

*Barfield v. N.Y. City Health & Hosps. Corp.*,
    537 F.3d 132 (2d Cir. 2008)..................................................................6, 7, 8

*Cannon v. Douglas Ellisman, LLC*,
    No. 06 Civ. 7092, 2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007)...........................9

*Carter v. Dutchess Cmty. Coll.*,
    735 F.2d 8 (2d Cir. 1984) ....................................................................7

*DiStiso v. Cook*,
    691 F.3d 226 (2d Cir. 2012)..................................................................5

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
    862 F.Supp. 2d 322 (S.D.N.Y. 2012)..........................................................6

*Futrell v. Payday CA, Inc.*,
    190 Cal. App. 4th 1419 (Cal. App. 2d Dist. 2010) ........................................ passim

*Godlewska v. HDA*,
    No. 03-cv-3985, 2013 U.S. Dist. LEXIS 350 (Jan. 2, 2013, E.D.N.Y) ......................... passim

*Herman v. RSR Sec. Servs. Ltd.*,
    172 F.3d 132 (2d Cir. 1999)..................................................................7

*Jacobson v. Comcast Corp.*,
    740 F. Supp. 2d 683 (D. Md. 2010) ..........................................................15

*Jean-Louis v. Metro Cable Commcn's*,
    838 F. Supp. 2d 111 (S.D.N.Y. 2011).................................................... passim

*Johnson v. Killian*,
    680 F.3d 234 (2d Cir. 2012)..................................................................6

*Lee v. ABC Carpet & Home*,
    236 F.R.D. 193 (S.D.N.Y. 2006) .............................................................24

*Moreau v. Air France*,
    356 F.3d 942 (9th Cir. 2004) .................................................................13

*Northwestern Nat'l. Ins. Co. of Milwaukee, Wisconsin v. Alberts*,
  769 F.Supp. 498 (S.D.N.Y. 1991)............................................................3

*Paz v. Piedra*,
  No. 09-cv-03977, 2012 U.S. Dist LEXIS 4034 (S.D.N.Y. Jan. 12, 2012) ............................8, 9

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)............................................................2

*Tracy v. NVR, Inc.*,
  No. 04 Civ. 6541L, 2009 WL 3153150 (W.D.N.Y. Sept. 30, 2009) ................................7, 12

*Velu v. Velocity Express, Inc.*,
  666 F. Supp. 2d 300 (E.D.N.Y. 2009) ............................................................9

*Zheng v. Liberty Apparel Co. Inc.*,
  355 F.3d 61 (2d Cir. 2003)............................................................ passim

STATUTES

29 U.S.C. § 203(e)(1)............................................................6

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("CAUCL") ............................................................ passim

Cal. Bus. & Prof. Code § 17208 ............................................................2

*Cal. Code Regs., Title 8, § 11120* ............................................................21

Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA")............................................................ passim

New York Labor Law, Article 19 §§ 190, 650 *et. seq.* ("NYLL")............................................................ passim

OTHER AUTHORITIES

Civil Rule 56.1 ............................................................2

Industrial Welfare Commission Wage Order No. 12-2001 ............................................................21

## PRELIMINARY STATEMENT

The four named plaintiffs – Alexander Footman, Eric Glatt, Kanene Gratts and Eden Antalik – bring claims alleging that they were misclassified as unpaid interns and should have been compensated for their internships.  Glatt, Footman and Antalik bring claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*., ("FLSA")*,* and the New York Labor Law, Art. 19 §§ 190, 650 *et. seq*., ("NYLL").  Gratts brings claims only under the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("CAUCL").  They seek to represent two distinct groups of unpaid interns:  (i) Production Interns (who Footman, Glatt and Gratts seek to represent) who assert claims only against Defendant Fox Searchlight Pictures, Inc. ("Searchlight") based on allegedly being misclassified while engaged on one of 27 different, independent film productions released under Searchlight's name; and (ii) Corporate Interns (who Antalik seeks to represent), who assert claims against Searchlight and its parent, Defendant Fox Entertainment Group, Inc. ("FEG"), (collectively, Defendants) based on their having been engaged in one of Defendants' corporate offices.

Defendants now move for summary judgment as to plaintiffs' claims on the following bases:

> As to Gratts:  Her claims are time-barred under the four-year statute of limitations that applies to claims brought under the CAUCL;

> As to Footman, Glatt, on an alternative basis to Gratts, and as to all Production Interns:  Their claims must be dismissed because they were never employed by Searchlight.  They were employed by independent, third-parties and, as a matter of law, cannot establish that Searchlight was their employer under any of the applicable "joint employer" tests;

> As to Antalik:  Her claims must be dismissed because she was never employed by FEG.  Antalik was engaged solely by Searchlight and cannot establish the exceptional circumstances under which a parent/subsidiary relationship can create liability are present.  Because she is the only named plaintiff who asserts a claim against FEG, the action should be dismissed in its entirety as to FEG.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants respectfully refer the Court to their Arguments below, as well as their accompanying Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, for a complete recitation of the undisputed material facts.

## ARGUMENT

## I.   GRATTS' CLAIMS ARE TIME-BARRED

Gratts brings her claims under the CAUCL (Bloom Decl. Ex. A, Am. Compl. ¶¶ 146, 149), which has a four year statute of limitations.  (Cal. Bus. & Prof. Code § 17208).  She bases her claims on an unpaid internship she had on the film *500 Days of Summer*.  (Bloom Decl. Ex. A, Am. Compl. ¶¶ 146, 149).  Specifically, she alleges that she was an unpaid intern on that film from May 1, 2008 "through approximately August 2008." (Bloom Decl. Ex. A, Am. Compl. ¶¶ 146, 149; Gratts Tr. 61, 117).[1]  On September 5, 2012, Plaintiffs filed a motion for leave to file an amended complaint and assert a claim on behalf of Gratts.  (Pls. Mtn. Am. Compl., Doc. 27). On October 19, 2012, they filed the amended complaint. (Bloom Decl. Ex. A, Am. Compl., Doc. 58).  This Court has previously ruled that Gratts' claims in the amended complaint do not relate back to the filing of the original complaint.  (Order (10/9/12) Doc. 46).  Thus, the earliest relevant time for her CAUCL claims begins on or after September 5, 2008.  *See Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) ("[T]he date of the filing of the motion to amend

---

[1] Excerpts of relevant sections of the deposition transcripts (including referenced exhibits) are attached to the Declaration of Elise M. Bloom, dated February 15, 2013 ("Bloom Decl."), as follows:  Exhibit A is the deposition of Alexander Footman ("Footman Tr."); Exhibit B is the deposition of Eric Glatt ("Glatt Tr."); Exhibit C is the deposition of Eden Antalik ("Antalik Tr."); Exhibit D is the deposition of Kanene Gratts ("Gratts Tr."); Exhibit E is the deposition of Elizabeth Sayre ("Sayre Tr."); Exhibit F is the deposition of Aimee Hoffman ("Hoffman Tr."); Exhibit G is the deposition of John Maybee ("Maybee Tr."); Exhibit H is the deposition of Scott Franklin ("Franklin Tr."); Exhibit I is the deposition of Theodore Hope ("Hope Tr."); Exhibit J is the deposition of Lori Keith Douglas ("Douglas Tr."); Exhibit K is the deposition of David Johnson ("Johnson Tr.").

constitutes the date the action was commenced for statute of limitations purposes."); *see also Northwestern Nat'l. Ins. Co. of Milwaukee, Wisconsin v. Alberts*, 769 F.Supp. 498, 510 (S.D.N.Y. 1991) ("[T]he date of the filing of the motion to amend…constitutes the date the action was commenced for statute of limitations purposes.").  Accordingly, Gratts' claims are time-barred.

Gratts has suggested that her claim is not time-barred because an August 2012 date applies for limitations purposes, but this suggestion is without merit.  As noted above, Gratts did not file her motion for leave to amend the complaint until September 5, 2012, s*ee, supra*, at 2, and there is no basis for expanding the time beyond that date.  Moreover, the undisputed evidence establishes that *500 Days of Summer* and Gratts' role in that production ended *before* August 1, 2008, barring her claims *even if an August 2012 date applies*.

To the extent that Gratts asserts that she was engaged on *500 Days of Summer* in August 2008, the claim is speculative and without any foundation.  While Gratts alleged in the Amended Complaint that she had been engaged in "set design" and "building and decorating sets" (Bloom Decl. A, Am. Compl. ¶¶ 148, 151), during her deposition she testified that her role during the last days of her internship also involved dismantling sets. (Gratts Tr. 156).[2]  Gratts specifically recalled that shooting on the film lasted approximately six weeks (Gratts Tr. 93-94) and that there had then been a break of "like maybe two weeks" before she returned to the film to help dismantle the sets for approximately five days. (Gratts Tr. 95-96).

When asked to identify the specific date she ended her internship, Gratts could not provide one.  (Gratts Tr. 45).  She has no records showing she had a role in August 2008 (Gratts

---

[2] In addition, although in the Amended Complaint Gratts alleges she began her internship on "approximately April 2008" (Bloom Decl. A, Am. Compl. ¶¶ 149), during her deposition Gratts testified that she was first engaged on the film on May 1, 2008. (Gratts Tr. 61, 117; *see also* Gratts Ex. 4).

Tr. 45), and is "just going by what [she] remember[ed]." (Gratts Tr. at 45). Notably, Gratts acknowledges that the sole basis for her assertion that she was engaged on the film in August 2008 is her recollection that "the weather was really hot." (Gratts Tr. 45).

The call sheets for the film establish that *all* filming on *500 Days of Summer* ended on June 21, 2008. (Varga Decl. ¶ 5).[3] The wrap party celebrating the end of production was held the following day, on June 22, 2008. (Varga Decl. Ex. A, "Wrap Party" flyer). Thus, even if the Court credits Gratts' testimony about returning to work for a few days after a two-week break (Gratts Tr. 95-96), by her own admission her internship ended squarely in July 2008.

In addition, contemporaneously kept records establish that the set work on *500 Days of Summer* ended *before* August 2008. For example, Steven Fox, the Construction Foreman on the film who Gratts identified as supervising her activities during her internship, ended his role with the production in June 25, 2008, when he last submitted a time sheet. (Fox Decl. ¶ 9, Ex. A; Gratts Tr. 66, 68-69, 127, 158). Specifically, Mr. Fox oversaw the dismantling of the film sets and did not complete his role on the film until all of the sets had been dismantled. (Fox Decl. ¶ 9; *see also* Gratts Tr. 157 (testifying that Mr. Fox supervised the dismantling of the sets and provided her with direction)). Charles Varga, the Art Director on *500 Days of Summer*, recalls that he did not start another project until after the set work, including dismantling the sets, was completed. (Varga Decl. ¶ 7). Mr. Varga's records establish that following the completion of his work on *500 Days of Summer*, he started two new projects in July 2008, a Chevy commercial

---

[3] Declarations will be referred to by the individuals' last name: Declaration of Charles Varga, dated February 13, 2013 ("Varga Decl."); Declaration of Steven Fox, dated February 14, 2013 ("Fox Decl."); Declaration of Steven Wolfe, dated February 13, 2013 ("Wolfe Decl."); Declaration of David Johnson, dated February 13, 2013 ("Johnson Decl."); Declaration of Elizabeth Sayre, dated February 13, 2013 ("Sayre Decl."); Declaration of Jill Gwen, dated February 13, 2013 ("Gwen Decl."); Declaration of Scott Franklin, dated February 15, 2013 ("Franklin Decl.").

and public service announcement ("PSA") with actors from a television show called *Monk*. (Varga Decl. ¶ 7, Ex. B (Chevy), Ex. C ("Monk")).

Gratts' testimony about the location where she dismantled the sets also establishes that her activities on *500 Days of Summer* ended before August 1, 2008. (Gratts Tr. 75-76 (testifying she only constructed sets at one location and built cubicles, an apartment and offices for card design); 77 (testifying she only dismantled sets at the same location where she had assisted with construction); 154-55 (testifying she reported to a single location during her internship and describing it as an "abandoned," "historic landmark" in downtown Los Angeles, California that "may" have been on South Spring Street); 156-57 (testifying she had dismantled sets constructed to represent greeting card company offices and cubicles); *see also* Fox Decl. ¶ 7 (stating that he and his staff constructed sets on several different floors of the Fenton Building, creating an office environment for a greeting card company, an apartment and cubicles)). The historic building that Gratts describes reporting to when constructing and dismantling sets is known as the Fenton Building and was used for a total of five (5) days of filming, according to the call sheets (May 7-8, 15-17, 2008). (Bloom Decl. Ex. DD, *500 Days of Summer* Call Sheets; *see also* Fox Decl. ¶¶ 6, 7). In addition, the location rental agreement for the Fenton Building establishes that the building was returned to its owner in May 2008, well before August 2008. (Wolfe Decl. ¶4, Ex. A, Location Agreement, Fenton Building).

Thus, the undisputed evidence establishes that Gratts was not engaged on *500 Days of Summer* in August 2008, and that her suggestion that she was engaged in August 2008 is based on nothing more than speculation. Accordingly, even assuming the Court afforded her the benefit of an August 2012 filing date for statute of limitation purposes, Gratts' claims would be untimely and Defendants' motion for summary judgment should be granted. *See DiStiso v.*

*Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (holding that in deciding a summary judgment motion, a court cannot credit a party's "merely speculative or conclusory assertions"); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (same)).  Moreover, because Gratts' claims should be dismissed in their entirety, the CAUCL claims on behalf of the putative class of Production Interns she purports to represent must also be dismissed because she is the only Plaintiff who interned in California.  *See e.g., Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F.Supp. 2d 322, 331 (S.D.N.Y. 2012) (dismissing putative class claims for which there is no class representative with standing).

## II.   THE PRODUCTION INTERNS' CLAIMS SHOULD BE DISMISSED BECAUSE, AS A MATTER OF LAW, THE PRODUCTION INTERNS WERE NEVER EMPLOYED BY SEARCHLIGHT

Footman, Glatt, Gratts and the other Production Interns' claims against Searchlight are premised on their allegation that during the time they were engaged as interns by the various independent production companies responsible for producing the approximately 27 different films at issue in this case, they were actually "jointly employed" by Searchlight.  This suggestion is not supported by the applicable law and the undisputed evidence establishes that Searchlight was never their employer.

### A.   Footman and Glatt's Claims Based on Their Internships on *Black Swan* Should Be Dismissed

#### 1.   Applicable Tests to Determine "Joint Employer" Status Under the Fair Labor Standards Act and New York Labor Law

The FLSA does not define "joint employment."[4]  *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008) (noting federal regulations and courts recognize possibility of "joint employment").  The Second Circuit analyzes "joint employment" claims

---

[4] *See* 29 U.S.C. § 203(e)(1) (defining "employee" as "any individual employed by an employer"); *id.* § 203(g) (defining "employ" as including "to suffer or permit to work").

using both a "formal control" and a "functional control" test. *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) ("formal control" test); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 72 (2d Cir. 2003) ("functional control").

Under the "formal control" test, which is sometimes called the "economic realities" test, the courts look at whether the alleged employer:  (i) had the power to hire and fire the plaintiff; (ii) supervised and controlled the plaintiff's work schedules or conditions of employment; (iii) determined the plaintiff's rate and method of payment; and (iv) maintained employment records for the plaintiff.  *Carter*, 735 F.2d at 12; *see also Barfield*, 537 F.3d at 142-43.  No single factor in the "formal control" test is determinative, *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999), and the test must be determined on a "case-by-case basis." *Barfield*, 537 F.3d at 141-42; *see also Jean-Louis v. Metro Cable Commcn's*, 838 F. Supp. 2d 111, 119 (S.D.N.Y. 2011).  In applying the formal control test, courts have emphasized the importance of determining whether the alleged joint employer *in fact* exercised control over the plaintiff's work, as opposed to merely "having the power to" do so.  *See, e.g., Tracy v. NVR, Inc.*, No. 04 Civ. 6541L, 2009 WL 3153150, at *5 (W.D.N.Y. Sept. 30, 2009) (finding allegation new defendant "had the authority to make decisions" comprising the joint employer test was insufficient to establish claim), *adopted as modified (on other grounds)*, 667 F. Supp. 2d 244 (W.D.N.Y. 2009).

If evidence of "formal control" is not present, then the Second Circuit considers whether there is "functional control" by examining:

> (1) whether [the alleged joint employer's] premises and equipment were used for the plaintiff['s] work; (2) whether the [alleged contractor company] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiff[ ] performed a discrete line-job that was integral to [the alleged joint employer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [alleged

> joint employer] or [its] agents supervised plaintiff['s] work; and (6) whether plaintiff[ ]
> worked exclusively or predominately for the [alleged joint employer].

*Zheng*, 355 F.3d at 72; *see also Barfield*, 537 F.3d at 138.  A court can also consider other factors under this test that it deems relevant to its assessment.  *Zheng*, 355 F.3d at 71-72.  The test, however, is "manifestly not intended to bring normal, strategically-oriented schemes within the ambit of the FLSA."  *Id.* at 76.

In evaluating the question of "joint employment," this Court should examine the circumstances *of each individual unpaid internship* held by *each specific plaintiff* to determine whether the circumstances and conditions *present in that particular internship* are sufficient as a matter of law to create a "joint employer" relationship with Searchlight and that intern under the applicable standard.  *See, e.g., Barfield*, 537 F. 3d at 141-42 (noting employment under the FLSA is "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances").

The analysis in *Paz v. Piedra*, No. 09-cv-03977, 2012 U.S. Dist LEXIS 4034 (S.D.N.Y. Jan. 12, 2012) is instructive.  In that case, the plaintiffs were a class of restaurant workers who sought to bring claims under the FLSA and NYLL against four corporate defendants who they asserted had jointly employed them.  *Id.*  The corporate defendants moved for summary judgment.  *Id.*  In deciding the motion, the court undertook an individualized analysis as to each plaintiff and each corporate defendant, and granted the motion, in part, dismissing certain plaintiffs' claims because a joint employer relationship was not present with each of the corporate defendants.  *Id.*  The court found that only four of the plaintiffs were able to establish that they had a relationship with more than one of the corporate defendants.  *Id.*  The same individualized analysis – plaintiff by plaintiff and internship by internship – applies here.

The "formal control" and "functional control" tests apply regardless of whether a court is evaluating an FLSA or NYLL claim. *See*, *e.g.*, *Paz*, 2012 U.S. Dist. LEXIS 4034, *16-17; *Cannon v. Douglas Ellisman, LLC*, No. 06 Civ. 7092, 2007 WL 4358456, at *4 (S.D.N.Y. Dec. 10, 2007). Courts within the Second Circuit have granted summary judgment dismissing claims of joint employment when the facts establish that the factors of the tests are not satisfied. *See, e.g., Godlewska v. HDA*, No. 03-cv-3985, 2013 U.S. Dist. LEXIS 350 (Jan. 2, 2013, E.D.N.Y) (granting summary judgment for City defendant and denying plaintiffs' cross motion for summary judgment on FLSA claims, finding that as a matter of law home attendants employed by non-profit were not jointly employed by the City defendant); *Paz*, 2012 U.S. Dist LEXIS 4034 (granting summary judgment and dismissing claims against four corporate defendants who owned and managed several restaurants as to certain plaintiffs, holding that the corporate defendants were not the those plaintiffs' joint employers for purposes of the FLSA and NYLL); *Jean-Louis*, 838 F. Supp. 2d 111 (granting summary judgment to defendant, finding, as a matter of law, defendant was not a joint employer for purposes of unpaid overtime claims under the FLSA brought by telecommunications technicians); *Velu v. Velocity Express, Inc.*, 666 F. Supp. 2d 300 (E.D.N.Y. 2009) (granting defendant's motion for summary judgment and finding defendant was not a joint employer for FLSA and NYLL purposes of  pick up and delivery workers).

### 2.   Footman and Glatt Were Never Employed by Searchlight

Footman's claims are based on the unpaid internship he had on *Black Swan* from October 2009 through February 2010, which was supervised by Lindsay Feldman (Production Office Coordinator, *Black Swan*) and Jodi Arneson (Assistant Production Office Coordinator, *Black Swan*). (Bloom Decl. Ex. A, Am. Compl. ¶¶ 13, 129, 131; Bloom Decl. Ex. V, *Black Swan* Crew List).  On the other hand, Glatt's allegations are based on *three* separate internships he had on the

9

film: (i) a single day in October 2009 when he assisted Joe Reidy (Assistant Director, *Black Swan*) (Bloom Decl. Ex. A, Amend. Compl. ¶ 108); (ii) December 2009 through February 2010 when he was engaged in the Accounting Department and supervised by Theodore Au (Production Accountant, *Black Swan*) and David Farr (First Assistant Accountant, *Black Swan*) (Bloom Decl. A, Am. Compl. ¶¶ 109, 110); and (iii) from approximately March 2010 through August 2010 when he asserts he was engaged in post production and supervised by Jeff Robinson (Post Production Supervisor, *Black Swan*) (Bloom Decl. A, Am. Compl. ¶¶ 119, 120). As discussed below, each of Footman and Glatt's internships had its own hiring process and supervisors and should be analyzed separately. *See, infra* at 10-20. None of their internships satisfies the "formal control" or "functional control" test and the undisputed facts establish that neither Footman nor Glatt were employed by Searchlight.

**B.    Footman and Glatt, as a Matter of Law, Cannot Satisfy the "Formal Control" Test**

1.    <u>Searchlight Did Not Have the Power to Hire or Fire Footman or Glatt</u>

There is no evidence that any representative of Searchlight was involved in Lake of Tears' decision to engage Footman or Glatt as unpaid interns. Footman applied for, interviewed, was offered, accepted and began his internship in the Production Department after meeting with Jennifer Roth (Executive Producer/Unit Production Manager ("UPM"), *Black Swan*) <u>*before*</u> Searchlight had a role in that film. (Footman Tr. 127 (testifying that Searchlight's role in *Black Swan* began in November 2009 *while* he was serving as an unpaid intern); *see also* Footman Tr. 121-22, 189-90). The same is true of Glatt's first two internships on the film. Roth interviewed and engaged Glatt for his one-day internship in October 2009 and *he completed that entire* internship <u>*before*</u> Searchlight was involved in the film. (Glatt Tr. 73 (testifying that he interviewed with Roth in September 2009); *see also* Glatt Tr. 50-51 (testifying that on October 5,

2009 Roth engaged him as an intern for the following day)).  Glatt interviewed with Roth, Au and Farr and was engaged as an unpaid intern in the Accounting Department *before* Searchlight was involved in *Black Swan.*  (Glatt Ex. 1; Au Decl. ¶14; Bloom Decl. Ex. W (email after Glatt had accepted the position, noting that production "will likely become a [ ] Searchlight production")). With respect to the post production internship, Glatt spoke to Roth (UPM, *Black Swan*) and Robinson (Post Production Supervisor, *Black Swan*) – neither of whom was a Searchlight employee – about the internship and interviewed with and was engaged by Robinson. (Glatt Tr. 179; *see also* Glatt Tr. 96, 183-184; Franklin Tr. 72).

Each of the individuals involved in engaging Footman and Glatt - Roth, Au, Farr and Robinson - was hired by Lake of Tears *before* Lake of Tears even approached Searchlight about financing the film.  (*See* Bloom Decl. Ex. Q, S; *Black Swan* "Crew Deal Memos"; Franklin Decl. Exs. E-H, *Black Swan*  "Crew Deal Memos"; *see also* Sayre Tr.182 (testifying that Searchlight did not have any involvement in the selection or hiring of department heads); Franklin Tr. 75 (testifying that department heads were not employed by Searchlight)); Au Decl. ¶4 (noting he was hired by Roth in August 2009); Franklin Decl. Ex. A,  "New York State Tax Credit Form" from September 2009 *prior* to Searchlight's involvement)).  It is axiomatic that Searchlight could not be a joint employer during the period where it is undisputed they were not even involved with the film.

There is also no evidence that Searchlight had the power to fire Footman or Glatt during any of their internships.  Indeed, the evidence in the record is just the opposite.  (Bloom Decl. Ex. A, Am. Comp. ¶ 112) (asserting Searchlight agreed to "overlook" the fact that they were not paid and had graduated)).  *See*, *e.g.*, *Godlewska*, 2013 U.S. Dist. LEXIS 350, at *25 (finding power to fire was not established where "[t]here is no evidence . . . that [City defendant] has

11

power, let alone ever exercised power, to require HDA to fire a home attendant entirely); *Jean-Louis*, 838 F. Supp. 2d at 118 (finding defendant cable company did not have power to fire plaintiff technicians where "the record does not contain any evidence that [defendant cable company] has ever instructed [vendor] to discipline . . . any individual technician"); *Tracy*, 2009 WL 3153150, at *5 (finding allegation defendant "had the authority to take the actions" comprising the joint employer test was insufficient to establish claim).

>    2.    Searchlight Did Not Supervise or Control Schedules or Conditions of Footman or Glatt's Employment

It is undisputed that Footman and Glatt received their assignments related to *Black Swan* from their supervisors (who were employed by Lake of Tears) on the production and that Searchlight and its representatives did not supervise or control their schedules or the conditions during any of their internships.  During his internship, Footman was supervised by Feldman (Production Office Coordinator, *Black Swan*) and Arneson (Assistant Production Office Coordinator, *Black Swan*), who assigned him tasks, set his schedule and provided him with feedback. (Footman Tr. 91, 92; *see also* Footman Tr. 108-09 (noting he sought schedule change from Feldman)).  Significantly, during his deposition, Footman could not specifically identify *anyone* working on the production who was controlled by a Searchlight employee.  (Footman Tr. 129).

Similarly, Glatt's Lake of Tears' supervisors set his schedule and assignments on each of his three internships.  During his one-day October 2009 internship, his schedule and activities were set by Roth (UPM, *Black Swan*) and Reidy (Post Production Supervisor, *Black Swan*) and he reported back to them after completing his assignment at the rehearsal space rented by Lake of Tears – again, this was all *before* Searchlight even became involved with the film.  (Glatt Tr. 50-51, 55, 58).  During his Accounting Department internship, Glatt primarily reported to, and

was supervised by, Au (Production Accountant, *Black Swan*) and Farr (1st Production

Accountant, *Black Swan*), although he also received assignments from others in the Accounting

Department.  (Glatt Tr. 80-81; *see* Glatt Tr. 137-38 (testifying he did not receive instructions

from anyone at Searchlight)).  During his post-production internship, Glatt was supervised by

Robinson (Post Production Supervisor, *Black Swan*); on occasions when Robinson was not

present or did not leave him an assignment, Glatt testified he would not have anything to do.

(Glatt Tr. 301-02).  *Significantly, neither Footman and Glatt is able to identify a single*

*Searchlight employee who they claim supervised or controlled their activities on Black Swan*.

(*See, e.g.,* Bloom Decl. Ex. AA and EE, Footman & Glatt's Responses and Objections to

Defendant's First Set of Interrogatory Nos. 7, 8, 10, 11).

     As a matter of law, Searchlight's role as a financier and distributor of *Black Swan (*and

Searchlight and Lake of Tears' related interests in keeping the production on schedule and within

budget) cannot serve as a basis for finding that Searchlight exerted sufficient control over

Footman or Glatt's schedules or activities during their internships to create a joint employer

relationship.  Notably, the courts have recognized that there is a difference between an alleged

joint employer having the ability to "affect" an individual's work and actually "controlling" or

"supervising" that work.  *See Jean-Louis*, 838 F. Supp. 2d at 126 (finding no joint employment

and granting summary judgment where alleged joint employer sent work orders but did not

provide instructions on how plaintiffs should be assigned to perform the work orders); *see also*

*Moreau v. Air France*, 356 F.3d 942, 950 n.5 (9th Cir. 2004) (finding no joint employment and

granting summary judgment where alleged joint employer did not control schedules of contract

personnel servicing planes on the tarmac where Air France "schedule[d] its flight . . . which

necessarily indicated when the services were to be performed" but contractors "remained responsible for designating which employees would report to service the aircraft.").

Accordingly, this Motion should be granted and summary judgment should be entered in Searchlight's favor against Glatt and Footman.

> 3.      Searchlight Did Not Determine Footman or Glatt's Rate of Pay or Method of Payment

Additionally, it is undisputed that Glatt and Footman's terms and conditions of employment, including their rates of pay as unpaid interns, were set by Lake of Tears. Indeed, the unpaid status of Footman's internship was in place *before* Searchlight was involved with the film. *See, supra,* at 9-10. Similarly, the unpaid status of Glatt's first two internships – the one day in October 2009 and his Accounting Department internship – was also established *before* Searchlight became involved with the film. *See, supra,* at 10. Simply put, there is no factual basis for finding that Searchlight determined Footman and Glatt's rates or method of payment as to these internships.

Although Footman and Glatt speculate that *after* they had been offered and accepted their Production and Accounting Department internships, a Searchlight executive "approved" the unpaid nature of the internships (Bloom Decl. Ex. A, Am. Compl. ¶ 112), that allegation does not create an issue of fact. First, there is no evidence that Footman's internship was ever known to Searchlight or that it was discussed in the email they reference. (*See, e.g.* Sayre Tr. 45, 51). Second, even accepting the unfounded assertion that Searchlight maintained the status quo by approving the already unpaid nature of their internships, all that the allegation does is confirm that their rate and method of payment had already been set by *Lake of Tears.* Indeed, during the post production internship, Au paid Glatt for a single day of work, again without any evidence of involvement or approval by Searchlight. (Bloom Decl. Ex. A, Am. Compl. ¶117-18).

With respect to Glatt's third internship in post production, the evidence establishes that Glatt knew Robinson (Production Supervisor, *Black Swan*) was offering him an unpaid internship at the time he interviewed and accepted the position. (Glatt Tr. 182-83). There is no evidence that Searchlight was aware that Glatt was being considered by Robinson for a post production internship or was consulted about whether Glatt could be unpaid (Sayre Tr. 183, 195 (noting that no one from Searchlight was involved in engaging interns on *Black Swan*)).

        4.    <u>Searchlight Did Not Maintain Employment Records for Footman or Glatt</u>

It is undisputed that Searchlight did not maintain employment documents or files for Footman or Glatt. Indeed, Plaintiffs have produced a declaration from Au (Production Accountant, *Black Swan*) stating that the Lake of Tears Accounting Department was responsible for "collecting and maintaining" deal memos and employment agreements for members of the cast and crew and for submitting payroll information to Cast & Crew, the production's designated payroll agent. (Bloom Decl. Ex. O, Au Decl. ¶ 7). To the extent they try to argue that Searchlight received lists of the cast and crew on the production, which were sent to, and reviewed in, Searchlight's capacity as a financial investor and distributor, this fact alone does not create a question of fact. *See, e.g., Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 692 (D. Md. 2010) (granting summary judgment where there was no evidence "to indicate the maintenance of [information about technicians' assignments] [wa]s used to control a technician's day-to-day employment, or that [the defendant] retain[ed] records for any purpose beyond quality control").

**C.    Footman and Glatt, As a Matter of Law, Cannot Satisfy the "Functional Control" Test.**

Since Footman and Glatt cannot establish that Searchlight had "formal control" with respect to any of their internships, the Court will then analyze Searchlight's relationship with

Footman and Glatt during *each* of their internships under the six-factor "functional control" test. The evidence, once again, compels the conclusion Searchlight was not a joint employer as a matter of law.

        1.      <u>Searchlight Did Not Provide Premises or Equipment to Footman or Glatt</u>

During his one-day October 2009 internship, which occurred before Searchlight was involved in the film, Glatt was based in the Lincoln Center space obtained by Lake of Tears. (Glatt Tr. 50-51).  Footman's and the remainder of Glatt's internships were based at Lake of Tears' Production Offices, which had been obtained and used by Lake of Tears *before* Searchlight ever became involved in the production.  (Footman Tr. 197-98 (testifying that Production Office space did not change when Searchlight became involved in the film)).  There is no evidence that either Footman or Glatt ever visited Searchlight's offices in New York or elsewhere.  (Footman Tr. 49; Glatt Tr. 44.).  Thus, the first "functional control" factor is not satisfied.

        2.      <u>Lake of Tears Did Not Shift as a Unit</u>

The second factor relevant to "functional control" is "whether [Lake of Tears] had a business that could or did shift as a unit from one putative joint employer to another."  *Zheng*, 355 F.3d at 72.  In looking at this factor, the Second Circuit has cautioned that "the absence of a broad client base" is not "anything close to a perfect proxy for joint employment. . . ."  *Id*.

Moreover, any concern about a "subterfuge arrangement" that may exist where a subcontractor serves a single client, *see id.*, is not present here.  First, Lake of Tears and Searchlight did not have a subcontractor arrangement.  (Bloom Decl. Ex. T, *Black Swan* PFD Agreement).  Second, prior to Searchlight becoming involved in the project, Lake of Tears was close to entering into a financing agreement with another entity.  (Franklin Tr. 17-18).  When that investor fell through, Lake of Tears kept its employees and looked for new investors,

ultimately entering an agreement with Searchlight.  (Bloom Decl. T; Franklin Tr. 17-20).  Had Searchlight backed out, "[s]omeone else might have gotten involved" to finance the film. (Franklin Tr. 48).  Thus, far from being a subterfuge, the relationship in this case simply reflects the fact that while Lake of Tears had the script, employees, knowledge and equipment to move forward with the production, it lacked the funding to complete the project on its own.

Third, it is undisputed that during the period at issue in this action, Lake of Tears employees performed work only on *Black Swan;* however, nothing in the contractual agreement between Searchlight and Lake of Tears preclude Lake of Tears from working on other projects. (*See generally,* Bloom Decl. Ex. T, *Black Swan* PFD Agreement).  Thus, Lake of Tears could have contracted with other entities and Searchlight did not limit Lake of Tears' ability to seek other projects in the future.  *See Zheng*, 355 F.3d at 75 n.2 (noting that "factor (6) *but not factor (2)*, would weigh in favor of joint employment if a subcontractor worked solely for a single client but had the ability to seek at other clients at any time).  Indeed, Franklin testified that Lake of Tears remained in existence as of November 2012 long after Black Swan had been completed and released. (Franklin Tr. 23).  Accordingly, the second "functional control" factor does not weigh in favor of finding that Searchlight jointly employed Glatt and Footman.

3.     Footman and Glatt Did Not Perform Discrete Jobs That Were Integral to Searchlight

With respect to this factor, the Second Circuit had recognized a spectrum spanning from "piece-work on a producer's premises that requires minimal training or equipment, and which constitutes an essential step in the producer's integrated manufacturing process" to "work that is not part of an integrated production unit, that is not performed in a predictable schedule, and that requires specialized skills or expensive technology."  *Id.*

17

In this case, none of the internship roles that Footman and Glatt held was integral to Searchlight's (or even Lake of Tears') business. For example, Footman's role as an intern in the Production Office was not integral to the completion of the film or Searchlight's business in financing and distributing the film. Similarly, Glatt's activities on the Lincoln Center set or his accounting or post production roles were not integral, as those departments were only a small piece of completing the film. Courts have held that to the extent this factor applies, "both industry custom and historical practice should be consulted." *Zheng*, 355 F.3d at 72 (noting that "insofar as the practice . . . is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws"). That is exactly the circumstance here. Movies across the country are produced in much the same way that Searchlight contracted with Lake of Tears. (Franklin Tr. 16 (describing the Lake of Tears' arrangement as a "standard procedure in the film industry")). Thus, this factor is not satisfied with respect to any of Footman or Glatt's internships.

    4.    Lake of Tears Is Not Fungible and Responsibility Could Not Pass to Another Without Material Changes

"[W]here employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employment relationship exists." *Jean-Louis*, 838 F. Supp.2d at 134 (quoting *Zheng*, 355 F.3d at 72) (internal quotations omitted). "The factor asks not whether all of the putative joint employer's contactors do the same work but whether, if the putative joint employer hired one contactor rather than another, the *same* employees could continue to do the *same* work in the *same* place." *Godlewska*, 2013 U.S. Dist. LEXIS 350, at *41 (internal quotations omitted) (emphasis in original). Notably, courts have found that where "plaintiffs were tied to [the alleged joint employer] rather than to the contractors that hired them," the

fourth "functional control" factor weighed in favor of finding "joint employment." *Zheng*, 364 F. Supp. 2d at 256.

This factor is not present here. Lake of Tears identified the individuals with the expertise needed for the *Black Swan* project and, to the extent Searchlight wanted to contract with another production company to produce the film, that company would not possess the script, creative input, cast and expertise that Searchlight was obtaining as part of the PFD Agreement. Furthermore, there is no evidence that the individuals hired by Aronofsky (Director, *Black Swan*), Franklin (Producer, *Black Swan*) and Roth (UPM, *Black Swan*) had relationships with or alliances to Searchlight as opposed to their employer, Lake of Tears. Notably, most of the employees hired before October 14, 2009 remained with Lake of Tears when the prior financier left the project. *See*, *supra*, at 10. Moreover, Glatt and Footman were clearly interested in the project prior to Searchlight's involvement. (Glatt Tr. 45 (testifying he was interested in the project because of Aronofsky's involvement, not because he thought Searchlight might become involved in the future). Thus, this factor is not satisfied.

### 5.   Searchlight Did Not Supervise Footman or Glatt's Activities

As set forth above in Section II.B.2., *supra*, at 12-13, even considering all of the facts in the light most favorable to plaintiffs, there is no basis for finding that Searchlight supervised Glatt or Footman's activities with respect any of their internships on *Black Swan*.

### 6.   Exclusive or Predominant Engagement by Searchlight Is Not Enough to Satisfy the "Functional Control" Test

Searchlight does not dispute that during their unpaid internships, Glatt and Footman's activities were related to *Black Swan*. However, this fact alone does not create a joint employer relationship as a matter of law. *See Jean-Louis*, 838 F. Supp. 2d at 137 (granting summary judgment where the only relevant factor was that Metro works for Time Warner and citing

19

cases); *see also Zheng*, 355 F3d at 76 (holding that "by itself, the absence of a single client base is not a proxy for joint employment").

       7.   <u>Additional Evidence Also Establishes That the "Functional Control" Test Is Not Satisfied</u>

As part of the "functional control" test, a "court is also free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng*, 335 F. 3d at 72. Significantly, here, Glatt viewed himself as being employed by Lake of Tears when performing his internship in the Accounting Department and communicating with other employees. (Glatt Ex. 5, P0003709 (listing Lake of Tears, not Searchlight, in his e-mail signature block); Glatt Ex. 6, P0003682 (same); Glatt Tr. 161).

Considering the factors of the "functional control" test, this Court should find, as a matter of law, that Searchlight did not employ Footman or Glatt during any of their internships. Notably, to be entitled to summary judgment on the joint employer issue, Searchlight does not need to establish that Footman and Glatt cannot satisfy every factor of the "functional control" test. *See*, e.g., *Zheng*, 355 F.3d at 76-77 ("[T]he Court need not decide that *every* factor weighs against joint employment") (emphasis in original); *Godlewska*, 213 U.S. Dist. LEXIS 350 (granting alleged joint employer summary judgment dismissing claims where first, third and fifth "functional control" factors were not satisfied and the second, fourth and sixth factors were satisfied); *Jean-Louis*, 838 F. Supp. 2d 111 (granting alleged "joint employer" summary judgment dismissing claims where first through fifth factors were not satisfied, but sixth factor weighed in favor of finding joint employment). Here, Footman and Glatt cannot establish <u>any</u> of the factors and thus, this Court should find that Searchlight is not their "employer" as a matter of law with respect to any of their internships.

**D.     Gratts was Engaged by Palmera Productions and was Never Employed by Searchlight**

Assuming Gratts' claims are not dismissed as untimely, *see, supra,* at 2-6, her claims should be dismissed because, as a matter of law, she was never employed by Searchlight.

Because Gratts asserts claims only under the CAUCL, the "joint employer" question must be analyzed under California law, which applies a different standard than the Second Circuit applies under the FLSA and NYLL.  *See Futrell v. Payday CA, Inc.*, 190 Cal. App. 4th 1419 (Cal. App. 2d Dist. 2010) (noting that the FLSA applies a "slightly different test than California law").

As applicable to Gratts' CAUCL claims, in determining whether a "joint employer relationship" exists under California law, a court must consider three definitions of employment: (i) to exercise control over the wages, hours or working conditions; (ii) to suffer or permit to work; or (iii) to engage, thereby creating a common law employment relationship.  *Id.* (applying Industrial Welfare Commission Wage Order No. 12-2001, codified as *Cal. Code Regs., tit. 8, § 11120*, which regulates wages, hours, and working conditions in the motion picture industry).  Courts grant summary judgment when these factors are not met.  *Id.*  The undisputed evidence establishes as a matter of law that Gratts was never employed by Searchlight.

Searchlight did not exercise control over Gratts' wages, hours or working conditions.  "[T]o [exert] 'control over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay. . . . The employer [ ] is the party who hires the employee and benefits from the employee's work, and thus it is the employer to whom liability should be affixed for any unpaid wages."  *Futrell*, 190 Cal. App. 4th at 1422.  Here, the undisputed facts establish that Palmera Productions, Inc., through its Construction Foreman

Steven Fox, was the sole entity with control over Gratts' wages, hours and the other conditions

of her internship.  (Gratts Tr. 148; Fox Decl. ¶ 3).  In connection with her initial engagement,

Gratts testified that she met with Steven Fox and completed employment paperwork he provided

and returned it to him.  (Gratts. Tr. 63, 64-65).  She described Steven Fox as the individual who

provided her with breaks and lunch and who was "over" her during her internship. (Gratts Tr. 63,

64-65; *see also* Gratts Tr. 66, 68-69, 127, 158).  Steven Fox would also tell her when to arrive,

write down her hours and provide her with her assignments each day.  (Gratts Tr. 91-92; *see*

Gratts Tr. 158, 173-75, 181-82).

According to Gratts, Steven Fox also told her that she would be paid minimum wage at

the conclusion of the production, although she asserts she never received the payment.  (Gratts

Tr. 64-65, 66, 69).  Steven Fox also provided Gratts with the tools and materials she needed

during her internship, such as hammers, saws, nails and drills.  (Gratts Tr. 188-89).  Moreover,

during her internship, Gratts reported to the building in downtown Los Angeles, California

(Gratts Tr. 74-75, 155), where space had been rented by Palmera (Fox Decl. ¶¶ 6, 7; Wolfe Decl.

¶ 4, Ex. A; *see* Gratts Tr. 75, 76; *see also* Gratts Tr. 80-81, 88, 156-57, 171-72).  Thus,

Searchlight did not exert control over Gratts' wages, hours or working conditions.

Nor did Searchlight "suffer or permit" Gratts to work.  Under this factor, liability turns on

the alleged joint employer's "knowledge of and failure to prevent the work from occurring."

*Futrell*, 190 Cal. App. 4th 1422.  As noted above, Palmera, through Steven Fox, was responsible

for Gratts' internship activities.  *See, supra,* at 21.  Elizabeth Sayre, Executive Vice President of

Production at Searchlight, testified that no one from Searchlight was involved in engaging

interns on *500 Days of Summer*. (Sayre Tr. 183).  Indeed, Sayre did not even know whether

interns had been engaged on that film. (Sayre Tr. 63).  Thus, there is no basis for finding that

Searchlight suffered or permitted Gratts to work.

Finally, Searchlight did not have a common law employment relationship with Gratts.

"The essence of the common law test of employment is in the 'control of details.'"  *Futrell*, 190

Cal. App. 4th at 1434.  The California Court of Appeal has noted that a number of factors must

be considered when evaluating this "control," including:

> (1) whether the worker is engaged in a distinct occupation or business; (2) whether,
> considering the kind of occupation and locality, the work is usually done under the
> alleged employer's direction or without supervision; (3) the skill required; (4) whether the
> alleged employer or worker supplies the instrumentalities, tools, and place of work;
> (5) the length of time the services are to be performed; (6) the method of payment,
> whether by time or by job; (7) whether the work is part of the alleged employer's regular
> business; and (8) whether the parties believe they are creating an employer-employee
> relationship.

*Futrell*, 190 Cal. App. 4th at 1434.

Searchlight did not direct or supervise Gratts in connection with her internship. *See,*

*supra,* at 21-22.  Rather, Palmera, through Steven Fox, supervised Gratts and provided her with

the tools she needed.  *Id.*  The building where Gratts reported was rented by Palmera and

Searchlight never set Gratts' rate of pay.  *Id.*  The construction and demolition activities

performed by Gratts were not directly for Searchlight's benefit and the tasks she performed were

not integral to Searchlight's regular business operations.  *Id.*

### E. As a Matter of Law, There is No Basis for Finding that Any of the Production Interns on *Our Family Wedding*, *Cedar Rapids*, *The Savages*, *500 Days of Summer* or *Black Swan* Were Employed by Searchlight.

Given the undisputed facts adduced with respect to the named plaintiffs during their

internships at *Black Swan* and *500 Days of Summer* (*see, supra,* at 6-22), as a matter of law,

Searchlight is entitled to summary judgment with respect to claims by other Production Interns

on those films.  In addition, as a matter of law, Searchlight did not exercise the requisite control

over the Production Interns, if any, on the other three films for which sample discovery was

conducted – *Our Family Wedding, Cedar Rapids* and *The Savages*.

     With regard to *Our Family Wedding,* which was filmed in California in 2009, the

California "joint employer" test set forth in *Futrell* (*see, supra*, at 21) applies.[5]  Searchlight did

not "exercise control over the wages, hours or working conditions" of the Production Interns that

may have been engaged by the production company on this film.  Sayre (EVP, Searchlight)

testified that Searchlight merely reviewed the budgets and daily/weekly cost reports, while the

individual production companies solely set the rate of pay for the employees. (Sayre Tr. 51).

This a common practice for a studio/financier.  (Sayre Tr. 51).  Searchlight could also not have

"suffered or permitted" the Production Interns to "work," since it had no knowledge of any

unpaid interns who may have been engaged on this film and was not involved in engaging or

retaining them, to the extent there were any.  (Sayre Tr. 65).  Finally, there is no genuine issue of

fact with regard to whether a "common law employment" relationship was present.  While

Searchlight was involved in the hiring of line producers, accountants and exercised creative input

and financial oversight over its investment with respect to this film (Sayre Tr. 22, 64, 202), there

is no evidence that Searchlight exercised sufficient control over the recruitment, hiring or day-to-

day supervision of any of the Production Interns who might have been engaged on the film.

(Sayre Tr. 183, 189).

     With respect to *The Savages*, which was filmed in Arizona and New York (Buffalo and

New York City) in 2006 (Hope Ex. 3), Searchlight became involved only *after* Ted Hope

---

[5] Because no Production Interns have opted-in with respect to this film and the FSLA claims
calculated from today would be untimely (*see e.g., Lee v. ABC Carpet & Home*, 236 F.R.D. 193
(S.D.N.Y. 2006) (opt-in plaintiff's consent to join forms do not relate back), we have not
analyzed the "formal control" and "functional control" joint employer tests that apply to FLSA
claims with respect to this production.

(Producer) and his separate production company, This Is That (Hope Tr. 13-14), had prepared a script, shooting schedule, budget and had hired the Line Producer and department heads on the film – considerably late in the process and relatively similar to *Black Swan.* (Sayre Tr. 60). Given Searchlight's limited involvement in the film and the timing of its involvement when so much was in place (Sayre Tr. 61-62), it is clear that, as a matter of law, under the applicable "formal control" and "functional control" tests, Searchlight was not a joint employer with respect to any Production Interns engaged on the film.[6]

Searchlight's role in *The Savages* was as a co-financier. (Sayre Tr. 24, 26, 60-62). Sayre and Hope testified that no one from Searchlight was involved in engaging unpaid interns. (Sayre Tr. 183; Hope Tr. 77). Indeed, Hope had his *own* "policy" (*not* Searchlight's) that unpaid interns engaged on this film would be paid a daily ten dollar travel allowance. (Hope Tr. 75). Hope did not discuss the engagement with, or seek approval from, Searchlight. (Hope Tr. 75-77). In addition, supervision of the interns, on a daily basis, was done at a low level, with no involvement from Searchlight – or even Hope. (Hope Tr. 91; *see also* Sayre Tr. 189). Searchlight did not maintain employment records for the interns, as none existed – except for the call sheets, which listed all individuals on set on a given day. (Hope Tr. 86). As to the "functional control" test, there is no evidence that Searchlight's premises or equipment were used for the production. (Hope Tr. 99).

Finally, with respect to *Cedar Rapids*, the evidence obtained by plaintiffs establishes that unpaid interns were *never* engaged on that production. (Bell Decl. ¶ 3).

## III.   ANTALIK WAS NEVER EMPLOYED BY FEG AND THE CLAIMS AGAINST FEG SHOULD BE DISMISSED.

---

[6]  Because the film was produced in 2006, only the NYLL claim could be timely and Production Interns engaged on the film outside New York (i.e., those with a FLSA claim) would be time barred.

Antalik was engaged as an unpaid intern in Searchlight's New York Publicity Office from May through August 2009. (Antalik Tr. 36). She brings her claims under the FLSA and NYLL on behalf of herself and Corporate Interns against Searchlight and FEG, as Searchlight's parent corporation. (*See* Bloom Decl. Ex. A, Amend. Compl. ¶¶ 64-65, 90-91). Antalik's claims against FEG appear to be based on the fact that it is the parent corporation of Searchlight, the subsidiary that engaged her. "[A] parent is liable for the act of its subsidiary *only* under *extraordinary circumstances [and there is] a strong presumption that a parent is not the employer of its subsidiary's employees.*" *Balut v. Loral Elec. Sys.*, 988 F. Supp. 339, 344 (S.D.N.Y. 1997) (emphasis added). Since, as discussed below, the undisputed evidence establishes that FEG was never Antalik's employer, as a matter of law, her claims fail. Moreover, because Antalik is the *only* plaintiff who asserts a claim against FEG, <u>all</u> of the claims against FEG should be dismissed in their entirety.

### A.      As a Matter of Law, FEG Was Not Antalik's Employer Because None of the Factors of the Formal Control Test Are Satisfied

Applying the factors of the "formal control" test set forth above (*see, supra,* at 6), the evidence establishes that Searchlight's New York office operated independently from FEG with respect to Antalik and, thus, the "economic reality" of FEG's relationship is insufficient to establish an employer relationship. Specifically John Maybee, Junior Publicist (from 2009-2011) in Searchlight's NY Publicity Office (Maybee Tr. 9), independently engaged Antalik without consulting *anyone* at FEG. (Antalik Tr. 70-74). Antalik applied online for the unpaid internship in Searchlight's NY Publicity Office, and her application went directly to Maybee. (Bloom Decl. Ex. II). Maybee and several of his colleagues in Searchlight's NY Publicity Office, including Kacey Hagler (Publicist, Searchlight) and Michelle Matalon (Publicity

Coordinator, Searchlight), interviewed and ultimately engaged Antalik. (Antalik Tr. 72). Again, there was no involvement by FEG. (Maybee Tr. 61-62).

During her internship, Antalik was supervised by personnel in Searchlight's NY Publicity Office. (Maybee Tr. 212). Only Maybee and his colleagues in the NY Publicity Office provided Antalik with training, set her schedule and coordinated her activities during the internship. (Antalik Tr. 72, 75, 107-08). Searchlight determined Antalik's "rate and method of payment," consistent with the NY Publicity Office's own internal policy, which provided that interns would receive academic credit. (Maybee Tr. 71-72).

Furthermore, to the extent plaintiffs seek to try to establish a link to FEG by asserting that in July 2009 Aimee Hoffman (Manager of Talent Acquisitions) became aware of Antalik's internship and provided her with certain paperwork, such evidence is insufficient as a matter of law to support a joint employer relationship. First, Hoffman was employed by Fox Group, New America Inc., *not* FEG. (Hoffman Tr. 335-36). Second, the evidence establishes that even after Hoffman learned on July 21, 2009 that Antalik was interning in Searchlight's NY Publicity Office, the terms of Antalik's internship, which had been underway since May 2009 (Antalik Tr. 36), were not affected.

Simply put, there is no evidence that FEG or anyone employed by FEG had any involvement or knowledge concerning Antalik or a role with respect to her application, engagement, scheduling, rate of pay or any other aspect of her internship. Thus, none of the factors relevant under the "formal control" test can be satisfied.

**B.    As a Matter of Law, FEG Was Not Antalik's Employer Because None of the Factors of the "Functional Control" Test Are Satisfied**

Antalik also does not satisfy any of the factors of the "functional control" test with respect to FEG. *See, supra,* at 7-8. Her internship was based in Searchlight's NY Publicity

Office and, at times, on Twentieth Century Film Corporation's premises.  (Antalik, Tr. 75, 254).

Antalik used Searchlight's equipment, such as office computers and email address (Antalik Tr.

206), and there is no evidence that she ever used FEG's premises or equipment.  In addition,

Searchlight's business in which Antalik was engaged did not shift from one entity to another, and

she did not perform a discrete line-job that was integral to FEG.  Notably, there is no evidence

that FEG employed any unpaid interns.

Assuming *arguendo*, that Ms. Hoffman's involvement on July 21, 2009 (more than two-

thirds after Antalik's internship began) requiring the interns to complete *pro forma* on-boarding

paperwork would somehow link FEG to Antalik (which it does not); such involvement could not

have caused Antalik to have been engaged "exclusively or predominately" for FEG.  In addition,

Antalik was supervised directly by Maybee and other Searchlight employees in the NY Publicity

Office and there is no evidence she communicated with FEG or anyone employed by FEG at any

time.  *See, supra,* at 27.

Since a "court is also free to consider any other factors it deems relevant to its assessment

of the economic realities," *Zheng*, 335 F. 3d at 72, it is notable that Searchlight employees do not

work for or share their services with FEG (or other Fox entities).  (Johnson Decl. ¶ 4).

Searchlight also does not share equipment, employment records or corporate offices, nor does it

co-mingle bank accounts with FEG.  (Johnson Decl. ¶ 5; Gwen Decl. ¶ 4).   In addition,

Searchlight is the legal entity identified on the paychecks issued to Searchlight employees (i.e.,

Maybee and the others in the NY Publicity Office).  (Johnson Decl. ¶ 7).  FEG does not issue

paychecks or tax form W2s to Searchlight employees.  (Johnson Decl. ¶ 7).  FEG does not own

the bank account from which Searchlight employees are paid.  (Johnson Decl. ¶ 8).  Searchlight's

financial books are maintained by Twentieth Century Fox Film Corp. employees  (Gwen Decl. ¶

7).  Thus, the evidence is clear that, as a matter of law, FEG has not exercised sufficient

"functional control" to be deemed a joint employer.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants' Motion for Summary

Judgment and dismiss the Plaintiff Footman, Glatt and Gratts' claims in their entirety and

dismiss Plaintiffs Antalik's claims against Defendant FEG in their entirety.

Dated:      New York, New York
            February 15,  2013

                                        PROSKAUER ROSE LLP

                                        By: *s/ Elise M. Bloom*
                                            Elise M. Bloom
                                            Amy F. Melican
                                        Eleven Times Square
                                        New York, NY  10036-8299
                                        Phone: (212) 969-3000
                                        Fax: (212) 969-2900
                                        ebloom@proskauer.com
                                        *Attorneys for Defendant*