**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Elizabeth Wagoner
Reena Arora
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC GLATT, ALEXANDER FOOTMAN, EDEN ANTALIK, and KANENE GRATTS, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>FOX SEARCHLIGHT PICTURES INC. and FOX ENTERTAINMENT GROUP, INC.,<br><br>     Defendants. | No. 11 Civ. 6784 (WHP) (AJP) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND COURT-AUTHORIZED NOTICE

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY ..................................................................................... 2

FACTUAL BACKGROUND .................................................................................... 2

    I.      The Parties ............................................................................................ 2

          A.     Defendants ................................................................................ 2

          B.     Plaintiff and Opt-In Plaintiffs ................................................. 3

               1.     Eden Antalik ................................................................. 3

               2.     Brian Nichols ............................................................... 4

               3.     David Stevenson ........................................................... 4

    II.     All Interns Participated in FEG's Centralized Unpaid Internship Program ........... 5

          A.     A Small Team of Recruiters Oversaw the Internship Program and Implemented a Uniform Set of Internship Policies .................................... 5

          B.     Defendants Applied the Same Policies to FEG Interns ............................. 6

          C.     Defendants Applied the Same Compensation Policies to All FEG Interns .......................................................................................... 7

    III.    FEG Interns Uniformly Performed the Routine Work of the Company ................ 7

          A.     Interns Performed Administrative and Clerical Duties ............................. 8

          B.     Interns Maintained Records and Databases .............................................. 8

          C.     Interns Compiled Information and Did Research ...................................... 9

          D.     Interns Provided Feedback on Potential Projects ..................................... 10

          E.     Interns Performed Other Productive Work ............................................... 11

          F.     Defendants Relied on Interns to Get More Work Done ........................... 11

    IV.    FEG Structured its Internship Program Around its Actual Operations ............... 12

V.   FEG Treated Interns as Employees with Respect to Key Personnel Policies ................................................................................................ 13

 A.   Offer Letter ............................................................................ 14

 B.   Workers' Compensation Agreement .......................................... 14

 C.   Corporate Policy Acknowledgment ........................................... 15

 D.   Affirmative Action Self-Identification Form .............................. 15

VI.  FEG Changed its Internship Program from an Unpaid to a Paid Program in Response to the Risk that the Program Was Noncompliant ................................. 16

ARGUMENT ..................................................................................................... 17

I.   The FLSA and NYLL Protect Plaintiff and the Proposed Class .......................... 17

II.  Plaintiff Meets All of the Rule 23 Requirements ................................................ 19

 A.   Plaintiff Meets Each Rule 23(a) Requirement ........................................ 21

  1.   Numerosity ........................................................................... 21

  2.   Commonality ........................................................................ 21

   a.   Whether Defendants Derived an Immediate Advantage From Interns' Work ........................................ 22

   b.   Whether Interns Displaced Regular Employees .............. 23

   c.   Whether FEG Structured its Internship Program Around its Actual Operations as Opposed to a Classroom or Academic Experience ........................................ 23

   d.   Whether FEG's Internship Program Was for the Benefit of Interns ........................................................ 23

   e.   Whether Interns Were Employees as a Matter of "Economic Reality." ........................................... 24

  3.   Typicality ............................................................................. 25

  4.   Adequacy ............................................................................. 26

 B.   Plaintiff Meets Rule 23(b)(3) ................................................................ 26

       1.      Common Questions Predominate ................................................. 26

       2.      A Class Action Is the Superior Mechanism ................................. 27

III.    The Court Should Appoint Plaintiff's Counsel as Class Counsel........................ 28

IV.    Plaintiff Meets the Burden for Court-Authorized FLSA Notice ......................... 28

CONCLUSION ....................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alvarez v. IBP, Inc.,*
339 F.3d 894 (9th Cir. 2003) ................................................17

*Ansoumana v. Gristede's Operating Corp.,*
201 F.R.D. 81 (S.D.N.Y. 2001) ...........................................20

*Aponte v. Comprehensive Health Mgmt., Inc.,*
No. 10 Civ. 4825, 2011 WL 2207586 (S.D.N.Y. June 2, 2011)............................20

*Archie v. Grand Cent. P'ship, Inc.,*
997 F. Supp. 504 (S.D.N.Y. 1998)......................................18, 22, 23, 24

*Baffa v. Donaldson, Lufkin & Jenrett Sec. Corp.,*
222 F. 3d 52 (2d Cir. 2000)..................................................26

*Capsolas v. Pasta Res., Inc.,*
No. 10 Civ. 5595, 2012 WL 4760910 (S.D.N.Y. Oct. 5, 2012) ................26, 28

*Clougher v. Home Depot U.S.A., Inc.,*
696 F. Supp. 2d 285 (E.D.N.Y. 2010) ...................................18

*Consol. Rail Corp. v. Town of Hyde Park,*
47 F.3d 473 (2d Cir. 2005)..................................................21

*Cuevas v. Citizens Fin. Grp., Inc.,*
No. 10 Civ. 5582, 2012 WL 1865564 (E.D.N.Y. May 22, 2012)...........................20

*Cuzco v. Orion Builders, Inc.,*
477 F. Supp. 2d 628 (S.D.N.Y. 2007).......................................28

*Damassia v. Duane Reade Inc.,*
250 F.R.D. 152 (S.D.N.Y. 2008) ........................................20, 25, 26

*Donovan v. New Floridian Hotel, Inc.,*
676 F.2d 468 (11th Cir. 1982) ............................................22

*Han v. Sterling Nat'l Mortg. Co.,*
No. 09 Civ. 5589, 2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011)....................20, 28

*Hart v. Rick's Cabaret Int'l Inc.,*
No. 09 Civ. 3043, 2010 WL 5297221 (S.D.N.Y. Dec. 20, 2010)..........................20

*Herman v. RSR Sec. Servs., Ltd.*,
  172 F.3d 132 (2d Cir. 1999) ........................................................................24

*Iglesias-Mendoza v. La Belle Farm, Inc.*,
  239 F.R.D. 363 (S.D.N.Y. 2007) ..................................................................20

*In re Initial Pub. Offering Sec. Lit.*,
  471 F.3d 24 (2d Cir. 2006) ..........................................................................20

*Lee v. ABC Carpet & Home*,
  236 F.R.D. 193 (S.D.N.Y. 2006) ..................................................................20

*Marisol A. v. Guiliani*,
  126 F.3d 372 (2d Cir. 1997) .............................................................19, 21, 25

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) ......................................................................27

*Myers v. Hertz Corp.*,
  624 F.3d 539 (2d Cir. 2010) ...............................................19, 21, 27, 29

*Okoro v. Pyramid 4 Aegis*,
  No. 11 Civ. 267, 2012 WL 1410025 (E.D. Wis. Apr. 23, 2012) ..................22

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ........................................................................25

*Ruggles v. WellPoint, Inc.*,
  591 F. Supp. 2d 150 (N.D.N.Y. 2008) ..........................................................29

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
  659 F.3d 234 (2d Cir. 2011) ...................................................................20, 26

*Silverstein v. AllianceBernstein L.P.*,
  No. 09 Civ. 5904 (S.D.N.Y. Aug. 24, 2011) ................................................29

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
  471 U.S. 290 (1985) ................................................................................17, 18

*Torres v. Gristede's Operating Corp.*,
  No. 06 Civ. 3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) ....27, 28, 29, 30

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) .........................................................................19, 21, 22

*Walling v. Portland Terminal Co.*,
  330 U.S. 148 (1947) ...........................................................................18, 24, 27

*Wang v. Hearst Corp.*,
　　No. 12 Civ. 793, 2012 WL 2864524 (S.D.N.Y. July 12, 2012) ............................................20

*Wirtz v. Wardlaw*,
　　339 F.2d 785 (4th Cir. 1964) ...............................................................................................22

*In re WorldCom, Inc. Sec. Litig.*,
　　219 F.R.D. 267 (S.D.N.Y. 2003) ..........................................................................................28

*Zheng v. Liberty Apparel Co.*,
　　355 F.3d 61 (2d Cir. 2003)....................................................................................................17

### STATUTES

29 U.S.C. § 202..............................................................................................................................17

29 U.S.C. § 203..............................................................................................................................17

N.Y. Lab. Law § 651 .....................................................................................................................18

### RULES

Fed. R. Civ. P. 23 ...............................................................................................................21, 26, 27, 28

## PRELIMINARY STATEMENT

Plaintiff Eden Antalik ("Plaintiff") worked as an intern in the corporate offices of Defendants Fox Entertainment Group, Inc. ("FEG" or "the Company") and Fox Searchlight Pictures, Inc. ("Searchlight") compiling information, researching, assisting at screenings, and doing other work for free.  Plaintiff seeks to certify a class and collective of unpaid interns who also worked for no pay and whom FEG uniformly classified as non-employee "trainees" exempt from the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").

Plaintiff and the proposed class and collective all participated in the same centrally administered "Fox Entertainment Group Internship Program."  They were all subject to the same internship policies implemented by a small team of intern recruiters.  They were all unpaid pursuant to the same policy not to pay them and received little training because FEG structured its internship program around its operations.  The nature of Interns' work, which included clerical duties, record and database maintenance, research, compiling information, providing feedback on projects, and other productive work, was beneficial to FEG.  FEG also accepted their work and relied on it to make up for "cost containment initiatives" that limited overtime, reduced FEG's temporary paid workforce, and increased the unpaid internship program twofold.

FEG also treated Plaintiff and class and collective members like employees in a number of significant ways.  FEG issued them offer letters, labeled them "at will" employees, checked their immigration status, required them to sign workers' compensation agreements, designated them as "special employees" under the Company's workers' compensation insurance policy, and required them to submit to personnel policies that applied to employees.

## PROCEDURAL HISTORY

Plaintiffs Eric Glatt and Alexander Footman filed a Class Action Complaint on September 28, 2011 on behalf of themselves and all other unpaid interns who worked for Searchlight.  ECF No. 1.  The Court granted Plaintiffs leave to amend their Complaint to add Eden Antalik as a named Plaintiff and Fox Entertainment Group, Inc. as a Defendant, and to expand the class of unpaid interns to include all interns who worked in Defendants' corporate offices, ECF No. 46, which Plaintiffs did on October 19, 2012.  ECF No. 58.

The parties have completed merits discovery, except with respect to damages and Defendants' good faith affirmative defense.  *See* ECF No. 27.  Plaintiffs have moved for summary judgment for Glatt, Footman, and Gratts.  Following the completion of discovery, Plaintiffs anticipate moving for summary judgment with respect to the corporate interns.

## FACTUAL BACKGROUND

I.      **The Parties**

        A.      **Defendants**

Defendant Fox Entertainment Group, Inc. ("FEG" or "the Company") is a wholly-owned subsidiary of News Corporation.[1]  FEG's subsidiaries include Fox's film and television studios, including Twentieth Century Fox Television and Twentieth Century Fox Film and its broadcast and cable networks.[2]  Defendant Fox Searchlight Pictures, Inc. ("Searchlight") is a FEG subsidiary that acquires, produces, markets, and distributes films.[3]

---

[1]      *See* ECF No. 62.

[2]      All exhibits are attached to the Declaration of Rachel Bien in Support of Class Certification and Court-Authorized Notice ("Bien Decl.").  Ex. 37 (News Corp. Press Release).

[3]      Ans. to 1st Am. Compl. ¶ 1, ECF No. 60.

### B.     Plaintiff and Opt-In Plaintiffs

#### 1.     Eden Antalik

Plaintiff, Eden Antalik, interned at Searchlight in the News Corp. building located in New York City from approximately May 2009 through August 2009.[4] Antalik worked approximately three days a week from approximately 8:30 a.m. to 5 p.m.[5] Her job duties included "doing breaks," which involving searching for mentions of Searchlight films on the internet and in other media and compiling the information into a document to be circulated to Searchlight executives;[6] assisting with film screenings in the News Corp. building, including set up, starting the screening, and directing journalists;[7] doing errands for supervisors;[8] doing online research;[9] doing mailings;[10] and making travel arrangements.[11]  Antalik sometimes performed tasks for another FEG subsidiary, Twentieth Century Fox Film Corporation, which was located in the same office building, including setting up and taking down the red carpet at film premieres, checking in attendees, and working in the theater.[12]  Antalik worked with four other interns who performed the same duties that she performed.[13]  During her internship, Antalik did not attend any formal training sessions and learned how to perform her duties on the job.[14]

---

[4]      Ex. 7 (Antalik Tr.) 36:13-23; 1st Am. Compl. ¶ 17.
[5]      Ex. 7 (Antalik Tr.) 204:9-17.
[6]      *Id*. at 89:4-24; 142:14-143:16.
[7]      *Id*. at 143:17-144:7.
[8]      *Id*. at 110:3-11; 112:17-113:2.
[9]      *Id*. at 145:2-146:4; 193:19-195:13.
[10]     *Id*. at 155:3-157:2.
[11]     *Id*. at 146:16-149:15; 150:21-151:12.
[12]     *Id*. at 98:10-20.
[13]     *Id*. at 69:22-70:6; 143:17-144:25; 148:21-149:15; 152:15-153:20.
[14]     *Id*. at 143:5-16; 145:18-146:15; 146:22-147:9; 157:13-16; 179:21-180:18; 197:23-198:5.

### 2.   Brian Nichols

Opt-In Plaintiff, Brian Nichols, interned at Fox Sports on the Fox Studios Lot in Century City, California from approximately January 11, 2010 through May 6, 2010.[15]  Nichols interned approximately two days a week from approximately 9 a.m. to 5 p.m.[16]  His job duties included reviewing video footage of sports events in Fox's video library to locate highlights and noting the time the highlights occurred on a spreadsheet.[17]  The spreadsheet was used to locate video clips for Fox Sports broadcasts.[18]  Nichols worked alongside three to four other interns who performed generally the same duties.[19]  Nichols also went on errands approximately every other day, including dropping off films.[20]

### 3.   David Stevenson

Opt-In Plaintiff, David Stevenson at Fox Television Studios from approximately August 2007 to approximately December 2007 and at Fox Networks Group from approximately December 2007 to approximately April 2008.[21]  During his first internship, Stevenson's duties included filing documents, inputting information into contracts, and research.[22]  He worked two full days a week during the first part of his internship and then one full day and two half days during the second part of his internship.[23]  Stevenson worked with other interns who did similar work.[24]  During his second internship, Stevenson's duties included filing, inputting information

---

[15]     Ex. 78 (Nichols Decl.) ¶ 2.
[16]     *Id*. ¶ 8.
[17]     *Id*. ¶ 9.
[18]     *Id*.
[19]     *Id*. ¶ 13.
[20]     *Id*. ¶ 11.
[21]     Ex. 8 (Stevenson Tr.) 12:11-13; 27:15-19.
[22]     *Id*. at 31:8-32:4.
[23]     *Id*. at 32:9-20.
[24]     *Id*. at 35:21-36:7; 36:20-37:3; 43:4-45:16.

4

about job applicants into the recruitment tracking system, creating new hire gift bags,[25] doing

mailings,[26] screening intern applicants by reviewing their resumes,[27] and sending intern resumes

to hiring managers.[28]  He worked two full days a week.[29]

## II.    All Interns Participated in FEG's Centralized Unpaid Internship Program.

Plaintiff, Opt-In Plaintiffs, and class and collective members were subject to the same

internship policies that were centrally administered by a small team of intern recruiters,

performed productive work that benefited Defendants, received little or no training other than

what they gained on the job, and were treated as employees under key personnel policies.

### A.    A Small Team of Recruiters Oversaw the Internship Program and Implemented a Uniform Set of Internship Policies.

Defendants' internship program was centrally administered by a small team of intern

recruiters.  The recruiters' duties included: (1) obtaining intern requests from employees who

needed interns; (2) reviewing and approving the requests; (3) screening applicants who had

applied through the "Fox Careers" website[30] and submitting screened applicants to employees to

review; (4) processing interns' new hire paperwork; and (5) overseeing the intern program.[31]

Aimee Hoffman and Laura Wiggins served as Defendants' primary intern recruiters

during the relevant class and collective periods.[32]  Aimee Hoffman recruited and oversaw interns

---

[25]     *Id.* at 47:17-48:5.
[26]     *Id.* at 50:17-51:5.
[27]     *Id.* at 53:8-19.
[28]     *Id.* at 55:25-56:16.
[29]     *Id.* at 41:11-13.
[30]     *See* Ex. 39 (Fox Careers Website).
[31]     Exs. 1 & 2 (Hoffman Tr.) 15:2-13, 22:6-17, 297:3-280:17, 281:7-18, 283:16-284:20, 285:14-286:12, 288:16-21; Ex. 4 (Wiggins Tr.) 19:6-18; 20:18-21:6; 21:24-22:4; 22:9-14; 22:23-23:1; 26:2-9; 32:16-33:14; 35:15-36:3; 36:22-37:3; 36:13-22; Ex. 47 (Wiggins Profile).
[32]     Ex. 2 (Hoffman Tr.) 265:14-266:6, 270:23-271:272:1, 308:20-5; Ex. 29 (Hoffman Resume); Ex. 4 (Wiggins Tr.) 57:22-58:5; Ex. 47 (Wiggins Profile).

for particular groups of FEG subsidiaries and Laura Wiggins had similar responsibilities with

respect to other groups of FEG subsidiaries.[33]   These subsidiaries included:

(1)      Film and television subsidiaries that the Company grouped under the heading,
         "Fox Filmed Entertainment" or "FFE;"[34]

(2)      Cable and broadcast subsidiaries that the Company grouped under the
         heading, "Fox Networks Group," or "FNG;"[35]

(3)      Corporate departments grouped under the heading, "Fox Group;"[36] and

(4)      FEG subsidiaries grouped under the heading "Fox Interactive Media" or
         "FIM," which is now called News Corp. Digital Media.[37]

Plaintiff and the members of the proposed class and collective interned for one or more of

the FEG subsidiaries that Hoffman and Wiggins oversaw ("FEG Interns").

### B.      Defendants Applied the Same Policies to FEG Interns.

FEG's internship program was tied to its "overall recruitment for the company."[38]

The program sought to "identify talent early and build a diverse and trained pipeline" of future

employees for the Company, as well as to provide students with "practical experience" related to

---

[33]   Ex. 2 (Hoffman Tr.) 265:14-266:6, 267:3-268:22, 308:20-5; Ex. 4 (Wiggins Tr.) 13:19-14:6.

[34]   Ex. 3 (Johnson Tr.) 18:5-7.  FFE included Defendant Fox Searchlight Pictures, Inc., Twentieth Century Fox Film Corporation, Twentieth Century Fox Home Entertainment, LLC, Fox Television Studios, Inc., TVM Productions, Inc., Fox 21, Inc., Fox International Productions, Inc., Fox Music, Inc., and Fox Atomic, Inc./Fox Digital Entertainment, Inc.  Ex. 2 (Hoffman Tr.) 272:2-11; Ex. 36 (FEG Entities); Ex. 3 (Johnson Tr.) 22:3-7.  A list of the subsidiaries and/or divisions of FFE that had interns between 2009 and 2010 is set forth in Ex. 38 (Email, dated Aug. 13, 2010) at D0093800-06.

[35]   Ex. 3 (Johnson Tr.) 47:5-9; Ex. 4 (Wiggins Tr.) 13:19-14:25; 72:1-16; Ex. 48 (FEG Organizational Charts).

[36]   Ex. 2 (Hoffman Tr.) 267:3-268:22; Ex. 43 (Intern Training), at D0094135.  *See* Ex. 5 (Johns Tr.) 40:19-25; 100:16-101:3.

[37]   Ex. 2 (Hoffman Tr.) 266:7-267:4; 268:5-11, 20-22.

[38]   Ex. 1 (Hoffman Tr.) 52:20-24; Ex. 31 (Email, dated Mar. 2, 2010) at D0093202 ("Our intern program is meant to build a pipeline of talent for full time openings.")

their education.[39]  FEG issued internship guidelines to all intern supervisors.[40]  It instructed

supervisors that interns should be: (1) "Fresh new energy to your team bringing new ideas and

different perspectives;" (2) "Useful assistance on key projects and day-to-day operations;" (3)

"Viewed as trainees here to learn more about the business;" (4) "Given professional feedback to

help him/her grow;" and (5) "Coached on do's and don'ts in your office."[41]

###### C.      Defendants Applied the Same Compensation Policies to All FEG Interns.

All FEG Interns were subject to the same policy not to pay them any wages.[42]  Beginning

in September 2010, FEG changed this policy and instituted a paid internship program.[43]  FEG

started paying undergraduate interns $8 per hour and graduate interns $10 per hour.[44]  FEG did

not pay backpay to interns who interned prior to September 2010 even though there were no

changes made to the program other than making it a paid program.[45]

### III.    FEG Interns Uniformly Performed the Routine Work of the Company.

FEG expected interns to be "immersed in . . . day-to-day operations[.]"[46]  FEG's Intern

Request Forms that listed the projects and tasks that interns performed,[47] and other Company

documents, demonstrate that interns regularly performed productive work for FEG.

---

[39]      Ex. 30 (Email, dated Feb. 8, 2010) at D0093190.
[40]      Ex. 2 (Hoffman Tr.) 291:5-8; Ex. 30 (Email, dated Feb. 8, 2010) at D0093190; Ex. 4 (Wiggins Tr.) 64:6-18; 66:6-10; 78:11-79:13.
[41]      Ex. 2 (Hoffman Tr.) 292:9-23; Ex. 30 (Email, dated Feb. 8, 2010, attaching Intern Supervisor Guidelines) at D0093190.
[42]      Exs. 1 & 2 (Hoffman Tr.) 28:1-4, 275:5-9, 277:21-278:6-279:2, 304:10-20; Ex. 4 (Wiggins Tr.) 23:9-20; 24:4-6.
[43]      Ex. 2 (Hoffman Tr.) 278:21:24; 303:4-304:20; Ex. 3 (Johnson Tr.) 119:4-17.
[44]      *See* Ex. 1 (Hoffman Tr.) 90:2-7.
[45]      Ex. 3 (Johnson Tr.) 180:23-182:10.
[46]      Ex. 1 (Hoffman Tr.) 54:11-15.
[47]      Ex. 2 (Hoffman Tr.) 331:24-332:20.  The Intern Request Forms are admissible under the Federal Rules of Evidence as business records under Rule 803(6) and as statements of an opposing party under Rule 801(d)(2)(D).

### A.    Interns Performed Administrative and Clerical Duties.

Defendants regularly assigned interns administrative tasks.  These tasks included: answering phones;[48] calling messengers;[49] making coffee runs;[50] general office work, such as making copies, shredding, and doing mailings;[51] opening mail;[52] making travel arrangements;[53] restocking the office refrigerator;[54] and running errands.[55]

### B.    Interns Maintained Records and Databases.

Interns' duties regularly included maintaining Company records and keeping them up to date.  Examples of such tasks included:

- Tracking information, such as studio and network information;[56] box office performance;[57] film festivals, actors, directors, and other "talent,"[58] and cable programming;[59]

---

[48]    Ex. 50 (TV Music Production and Admin. Internship); Ex. 52 (Publicity – Photo Department Internship); Ex. 62 (Post Production Service Internship); Ex. 1 (Hoffman Tr.) 64:16-24; Ex. 70 (In Theatre Marking Internship).

[49]    Ex. 52 (Publicity – Photo Department Internship).

[50]    Ex. 62 (Post Production Service Internship); Ex. 25 (Email, dated June 19, 2010).

[51]    Ex. 63 (International Theatrical Sales Internship); Ex. 14 (Searchlight Production Internship); Ex. 19 (Searchlight New York Publicity Internship); Ex. 18 (Intern Responsibilities); Ex. 25 (Email, dated June 19, 2010); Ex. 57 (Fox 2000); Ex. 65 (Fox International Productions Internship); Ex. 80 (Home Entertainment Publicity Internship); Ex. 70 (In Theatre Marking Internship).

[52]    Ex. 67 (Fox Music Internship).

[53]    Ex. 19 (Searchlight New York Publicity Internship).

[54]    Ex. 1 (Hoffman Tr.) 124:1-11; Ex. 25 (Email, dated June 19, 2010); Ex. 20 (Email, dated July 7, 2010).

[55]    Ex. 3 (Johnson Tr.) 159:2-22; Ex. 45 (Email, dated May 13, 2009) at D0051511; Ex. 25 (Email, dated June 19, 2010); Ex. 1 (Hoffman Tr.) 122:19-24.

[56]    Ex. 34 (TCFTV Comedy Development Internship).

[57]    Ex. 13 (Searchlight Finance & Operations Internship).

[58]    Ex. 35 (MPD Feature Production Internship) at D0093979.

[59]    Ex. 64 (Research & Marketing Internship).

- Organizing information, such as music department files and deal memos;[60] photos;[61] marketing materials;[62] books and DVDs;[63] and press clippings;[64]

- Updating information, including status reports;[65] publicity materials;[66] contact lists;[67] calendars of key dates and events;[68]

- Populating databases;[69] and

- Reviewing and logging videos.[70]

### C.   Interns Compiled Information and Did Research.

Interns' duties routinely included compiling and researching various types of information for Defendants' use.  For example, Twentieth Century Fox Television interns helped compile information for executives in multiple departments.[71]  Fox Television Studios interns created lists of online platforms and digital production companies and scoured the Internet for new talent and ideas.[72]  Interns in Twentieth Century Fox Television's Brand Management and Strategy Department researched online marketing and distribution opportunities and assisted in compiling reports and presentations on these opportunities.[73]  Interns in Fox's Retail Marketing Department

---

[60]   Ex. 50 (TV Music Production and Admin. Internship); Ex. 51 (Fox TV Music Internship).
[61]   Ex. 52 (Publicity – Photo Department Internship).
[62]   Ex. 58 (TCFTVD Photography Internship).
[63]   Ex. 61 (Research Library Internship).
[64]   Ex. 69 (Marketing, Publicity & Promotions Internship).
[65]   Ex. 19 (Searchlight New York Publicity Internship).
[66]   Ex. 35 (TCF Publicity Internship) at D0093983.
[67]   Ex. 19 (Searchlight New York Publicity Internship); Ex. 70 (In Theatre Marking Internship).
[68]   Ex. 71 (TCFTV Brand Management & Strategy Internship); Ex. 17 (Searchlight Marketing Internship); Ex. 69 (Marketing, Publicity & Promotions Internship).
[69]   Ex. 58 (TCFTVD Photography Internship); Ex. 64 (Research & Marketing Internship).
[70]   Ex. 59 (FTVS Internship); Ex. 67 (Fox Music Internship).
[71]   Ex. 34 (TCFTV Comedy Development Internship).
[72]   Ex. 59 (FTVS Internship).
[73]   Ex. 71 (TCFTV Brand Management & Strategy Internship).

compiled retail price and other sales information for sales presentations.[74]  Fox Searchlight

interns researched and analyzed changes in market trends,[75] charted press coverage of

Searchlight films,[76] conducted research on event venues and sponsors,[77] and compiled and

circulated "breaks" (newspaper and online press clippings of Searchlight films).[78]  Interns in

FEG's Research & Marketing department "research[ed] television blogs and wr[o]te reports

based on the feedback from fans."[79]

### D.    Interns Provided Feedback on Potential Projects.

FEG frequently asked interns to provide feedback on its ongoing or potential projects.

This included reading scripts and other creative materials and providing feedback;[80]

brainstorming new ideas;[81] evaluating the effectiveness of strategies;[82] assisting in

conceptualizing projects;[83] researching and coming up with presentations;[84] updating executives

on trends;[85] and helping to develop better systems for cataloging and coordinating projects.[86]

---

[74]    Ex. 72 (Retail Marketing Internship).
[75]    Ex. 15 (Searchlight Distribution Internship).
[76]    Ex. 16 (Searchlight Publicity Internship).
[77]    Ex. 17 (Searchlight Marketing Internship).
[78]    Ex. 19 (Searchlight New York Publicity Internship).
[79]    Ex. 64 (Research & Marketing Internship).
[80]    Ex. 19 (Searchlight New York Publicity Internship); Ex. 65 (Fox International Productions Internship); Ex. 67 (Fox Music Internship); Ex. 14 (Searchlight Production Internship); Ex. 68 (Fox Digital Studio Internship); Ex. 70 (In Theatre Marking Internship).
[81]    Ex. 54 (Digital Marketing Internship); Ex. 71 (TCFTV Brand Management & Strategy Internship); Ex. 19 (Searchlight New York Publicity Internship); Ex. 35 (TCF Publicity Internship); Ex. 66 (Promotions Internship); Ex. 70 (In Theatre Marking Internship).
[82]    Ex. 54 (Digital Marketing Internship).
[83]    Ex. 53 (TVD/MPP/Creative Department Internship).
[84]    Ex. 59 (FTVS Internship).
[85]    *See* Ex. 59 (FTVS Internship); Ex. 53 (TVD/MPP/Creative Department Internship); Ex. 54 (Digital Marketing Internship); Ex. 63 (International Theatrical Sales Internship).
[86]    Ex. 71 (TCFTV Brand Management & Strategy Internship).

### E.   Interns Performed Other Productive Work.

Interns performed other duties that helped the Company operate.   For example, interns in Fox's Publicity – Photo Department placed orders with the Studio's photo labs.[87]  Interns in Fox's Television Distribution department assisted in designing web page content and print material.[88]  Interns in Fox Television Studio's Business and Legal Affairs Department worked on legal rights and clearance and drafted agreements relating to the production of television shows.[89]  Interns in Fox Television Studio's Post Production department created DVDs of television "dailies" and helped distribute them.[90]  Interns in Fox's Network Finance Department reconciled balance sheets, ran reports, and recorded information in personnel software.[91]  Interns in FEG's Human Resources department assisted in evaluating employee training materials, helped conduct trainings, and helped set up the Company's internal SharePoint website.[92]

### F.   Defendants Relied on Interns to Get More Work Done.

Defendants used interns to fill gaps that resulted from their "cost containment initiatives" in or around 2008.  FEG ordered a hiring freeze and limited the amount of overtime that employees could work.[93]  Paid internships were eliminated and temporary workers were "significantly scaled back."[94]  "As a result, the number of [unpaid] internships increased and the

---

[87]     Ex. 52 (Publicity – Photo Department Internship).
[88]     Ex. 53 (TVD/MPP/Creative Department Internship).
[89]     Ex. 55 (Business and Legal Affairs Internship).
[90]     Ex. 56 (FTVS Post Production Internship).
[91]     Ex. 60 (Network Finance Internship).
[92]     Ex. 35 (TCFFC Human Resources Internship) at D0093983; Ex. 4 (Wiggins Tr.) 81:17-23.
[93]     Ex. 3 (Johnson Tr.) 123:22-124:3; Ex. 42 (Email, dated Jan. 26, 2009).
[94]     Ex. 38 (Email, dated Aug. 13, 2010) at D0093799; Ex. 44 (Email, dated July 9, 2013) at D0093818.

size of [FEG's] intern program more than doubled."[95]

FEG believed that the tasks and projects that interns performed benefitted it.[96]  FEG

typically hired interns based on each department's "needs" – the more projects a department had,

the more interns it hired.[97]  When a department was not busy, it typically would not have a need

to hire many interns.[98]  When a department was busier, more interns were requested.[99]  More

interns were needed because employees relied on interns to assist them with their work.[100]

## IV.    FEG Structured its Internship Program Around its Actual Operations.

FEG provided interns with little or no classroom training and structured its internship

program around its actual operations.  The only formal training FEG provided were periodic

"lunch & learns" and networking events that focused on how to get a job.[101]

FEG's on-the-job approach is reflected in the "learning objectives" of its internships as

set forth in Intern Request Forms.  For example, Eden Antalik's supervisor stated that the

"learning objectives" of an internship in Searchlight's Publicity Department in New York were:

"To receive a hands-on, real world experience working in a film studio's national publicity

office, and understanding the details that go in to preparing and executing a successful film

---

[95]     *Id*.

[96]     Ex. 1 (Hoffman Tr.) 75:16-76:10; 139:7-13; 210:19-21; 212:19-213:16; 213:19-23; 215:4-13; 217:19-218:7.

[97]     Ex. 1 (Hoffman Tr.) 31:17-32:13.

[98]     *Id*. 32:14-33:3.

[99]     *Id*. 63:12-16; *see* Ex. 16 (Intern Request Form) ("I would like someone interested in going above and beyond and learning in a real work environment as we're going to have a busy Spring!"); Ex. 28 (Email, dated Apr. 9, 2010) ("If we could even have two interns per day, this would be a big help as we are often understaffed the busier it becomes.") at D0050906; Ex. 73 (Email, dated Dec. 11, 2009) at D0093183 ("We are in need of an intern over here in the Publicity department.").

[100]    Ex. 1 (Hoffman Tr.) 63:24-64:11; 239:2-18.

[101]    Ex. 1 (Hoffman Tr.) 107:6-110:13; Ex. 4 (Wiggins Tr.) 47:2-9; 52:4-54:15; Ex. 33 (Orientation Agenda).

publicity campaign."[102]  An intern supervisor in the Comedy Development department of

Twentieth Century Fox Television stated that interns would "come away with an understanding

of how our department functions within the larger company and how we contribute to the

television process.[103]  An intern supervisor in the Publicity – Photo department stated that interns

would "have a better understanding of how a still photography department works" and a "better

understanding of a professional environment and how a marketing department is structured[.]"[104]

An intern supervisor in the Fox Television Studio Postproduction department stated that interns

would learn to "understand the post production work flow[,]" "[i]dentify the post production

personnel and vendors[,]" and "[e]xperience firsthand, how the post department is involved . . .

on a show."[105]  An intern supervisor in Fox 2000 stated that interns would "witness[] the synergy

between departments" and "become creatively linked and bonded with our projects."[106]  An

intern supervisor in Network Finance stated that interns would "apply[] accounting concepts

learned in school to 'real world' work experience."[107]

V.      **FEG Treated Interns as Employees with Respect to Key Personnel Policies.**

        Although FEG uniformly classified interns as non-employees for purposes of its wage

and hour obligations, it treated interns as employees when it benefited from doing so.

---

[102]     Ex. 49 (Searchlight New York Publicity Internship).
[103]     Ex. 34 (TCFTV Comedy Development Internship).
[104]     Ex. 52 (Publicity – Photo Department Internship).
[105]     Ex. 56 (FTVS Post Production Internship).
[106]     Ex. 57 (Fox 2000 Internship).
[107]     Ex. 60 (Network Finance Internship).

## A.     Offer Letter

FEG issued offer letters to new interns.[108]  Offer letters informed interns that their offers were "contingent" on background checks and proof of eligibility to work in the United States.[109] FEG required interns to fill out I-9 Employment Eligibility Verification forms.[110]  Offer letters explained that if "any of these contingencies [were] not satisfied[,] the Company reserve[d] its right to revoke the offer of employment."[111]  Offer letters also advised interns that their "employment" with the Company was "at will," and that, therefore, both the intern and "the Company ha[d] the right to terminate the employment relationship at any time[.]"[112]

## B.     Workers' Compensation Agreement

FEG required interns to sign Workers' Compensation agreements.[113]  The agreements provided that interns would "be considered employee[s], as defined by Labor Code Section 3351, for the purposes of worker's compensation coverage" and that the "Company's Workers' Compensation Insurance w[ould] be the sole remedy if [sic] Intern sustains an injury arising out of and in the course of Intern's employment."[114]

A News Corporation worker's compensation insurance policy applied to all FEG employees and interns.[115]  Interns were called "special employees," who "in every way other

---

[108]    Ex. 11 (Offer Letter); Ex. 3 (Johnson Tr.) 79:6-9; Ex. 4 (Wiggins Tr.) 45:10-19; Ex. 77 (Offer Letters).

[109]    Ex. 11 (Offer Letter); Ex. 77 (Offer Letters).

[110]    Ex. 1 & 2 (Hoffman Tr.) 79:1-13; 286:13-24; Ex. 3 (Johnson Tr.) 79:10-13; Ex. 4 (Wiggins Tr.) 39:14-40:11.

[111]    Exs. 1 & 2 (Hoffman Tr.) 79:1-13; 286:13-24; Ex. 3 (Johnson Tr.) 79:10-13; Ex. 11 (Offer Letter); Ex. 77 (Offer Letters).

[112]    Ex. 11 (Offer Letter); Ex. 77 (Offer Letters).

[113]    Exs. 1 & 2 (Hoffman Tr.) 79:11-17, 286:13-24; Ex. 3 (Johnson Tr.) 80:11-15; Ex. 4 (Wiggins Tr.) 41:16-42:6; Ex. 12 (Worker's Compensation Agreement).

[114]    *Id*.

[115]    Ex. 6 (Karn Tr.) 14:23-25; 17:7-13; 18-24-19:7; 21:3-10.

14

than the fact they are not issued a paycheck, are employees of the company."[116]

### C.    Corporate Policy Acknowledgment

FEG required interns to sign a form acknowledging that they had reviewed and would adhere to FEG's corporate personnel policies.[117]  In particular, FEG required interns to sign a confidentiality agreement that acknowledged that they would "become aware of or have access to proprietary information," and prohibited them from disclosing such information both during their internships and after their internships had ended.[118]  The confidentiality agreement also required interns to agree that, "in consideration of [their] continued employment with and compensation by the Company," they agreed that "the Company [would be] entitled to not less than $10,000 in liquidated damages per breach of th[e] Policy[.]"[119]

FEG also required interns to acknowledge that they had read and adhered to unlawful harassment and discrimination policies and policies on electronic communications, insider trading, standards of business conduct, conflicts of interest, security, and records management.[120]

### D.    Affirmative Action Self-Identification Form

FEG asked interns to self-identify by race, gender, and other protected categories as part of its Affirmative Action Plan and to meet its obligations to maintain information regarding the number of protected individuals who applied for positions at the Company.[121]

---

[116]     *Id*. at 19:9-22; 21:3-22:19; 23:14-18; 25:2-7.
[117]     Ex. 1 (Hoffman Tr.) 78:5-16; Ex. 3 (Johnson Tr.) 79:14-80:3; 102:22-103:7; Ex. 41 (Intern Personnel File) at D0091079.
[118]     Ex. 10 (Confidentiality Obligations of Employees Policy) ¶¶ 1-2, 4.
[119]     *Id*. ¶ 5.
[120]     Ex. 3 (Johnson Tr.) 79:14-80:3; Ex. 41 (Intern Personnel File) at D0091079.
[121]     Ex. 1 (Hoffman Tr.) 77:8-15; 80:21-81:5; Ex. 9 (Self-Identification Form).

**VI.    FEG Changed its Internship Program from an Unpaid to a Paid Program in Response to the Risk that the Program Was Noncompliant.**

FEG changed from an unpaid to paid program in or about September 2010 in response to the U.S. Department of Labor's Fact Sheet #71: Internship Programs Under the Fair Labor Standards Act ("DOL Factors"), which sets forth six factors that private sector employers must meet in order to maintain a lawful unpaid internship program.[122]  In particular, there was concern that the fourth factor – which prohibits employers from deriving an "immediate advantage from the activities of the intern" – "creat[ed] a lot more risk going forward."[123]  According to FEG's corporate representative on its internship policies, before the program changed, interns "may have" provided value to the Company.[124]  For example, after reviewing the DOL Factors, which FEG circulated to intern supervisors before the program changed to a paid program, one supervisor noted that, "the 'suggested' guidelines and the former reality differ quite drastically."[125]  Another stated that the DOL Factors "indicate[] that [interns'] duties and participation here may change substantially."[126]  Antalik's supervisor asked Ms. Hoffman, "Why would an office have an intern that provides no immediate advantage from said intern's activities?"[127]  An intern supervisor told Ms. Hoffman that she did not believe that her department should participate in the program until it became paid.[128]  In response to the DOL

---

[122]    Ex. 1 (Hoffman Tr.) 190:14-191:3; Ex. 27 (Email, dated July 14, 2010); Ex. 3 (Johnson Tr.) 171:18-172:2; 173:18-25; Ex. 46 (Email, dated July 15, 2010) at D0053834.

[123]    Ex. 3 (Johnson Tr.) 171:18-173:13; Ex. 46 (Email, dated July 15, 2010) at D0053834.

[124]    Ex. 3 (Johnson Tr.) 174:1-13; *see also* Ex. 1 (Hoffman Tr.) 139:7-13 (A: "Did the interns ever do work that provided immediate advantage?  I would say: Yes, that could have happened. Q: Do you think what the interns did provided the company with value? A: I think in some cases, yes, they did contribute and add value.")

[125]    Ex. 21 (Email, dated May 19, 2010) at D0059390.

[126]    Ex. 24 (Email, dated June 18, 2010) at D0075177.

[127]    Ex. 22 (Hoffman Email, dated May 19, 2010).

[128]    Ex. 32 (Email, dated May 27, 2010).

16

Factors, FEG attempted to "tighten[] up [its] guidelines" before ultimately changing its program from an unpaid to paid program.[129]  FEG had no policy preventing interns from doing work that provided value to the Company during the period when it had an unpaid program.[130]

## ARGUMENT

I.      **The FLSA and NYLL Protect Plaintiff and the Proposed Class.**

The FLSA requires employers to pay for all work they "suffer or permit."  29 U.S.C. § 203(g).  To further its remedial and humanitarian goals, the FLSA broadly defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003).  "Employer" is also defined expansively as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d).  "Work" is any "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer."  *Alvarez v. IBP, Inc.,* 339 F.3d 894, 902 (9th Cir. 2003) (internal quotation marks omitted), *aff'd*, 546 U.S. 21 (2005).

The FLSA's broad definitions of employ, employee, and employer are meant to ensure that commercial businesses do not obtain an unfair competitive advantage in the marketplace by employing individuals who voluntarily work for no wage.  *See* 29 U.S.C. § 202(a)(3) (declaring Congress's intention to correct "detrimental" labor conditions that create "an unfair method of competition in commerce" through passage of the FLSA); *see also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985) ("[E]xceptions to [FLSA] coverage . . . exert a general downward pressure on wages in competing businesses[.]").  "If an exception to the Act

---

[129]    Ex. 26 (Email, dated July 13, 2013).
[130]    Ex. 3 (Johnson Tr.) 174:14-19; *see* Ex. 4 (Wiggins Tr.) 30:8-13; Ex. 1 (Hoffman Tr.) 75:2-15; 137:7-10.

were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act."  *Alamo Found.*, 471 U.S. at 302.

The NYLL is an equally protective "remedial" statute.  *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 289 n.4 (E.D.N.Y. 2010).  Its definitions of "employee" and "employer" are nearly identical to the FLSA's.  *See* N.Y. Lab. Law § 651(5) (an employee is "any individual employed or permitted to work by an employer in any occupation"); § 651(6) (an employer "includes any individual, partnership, association, corporation, limited liability company . . . or any organized group of persons acting as employer").

Although the FLSA does not define the word "intern" and there is no exception for "interns" anywhere in the statute, in 1947, the U.S. Supreme Court carved out a narrow exception to the definition of an employee for "trainees" participating in short-term training programs that provide "the same kind of instruction" offered by a "public or private vocational school."  *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152-53 (1947).  Where it is undisputed that the alleged employer "receive[d] *no* 'immediate advantage' from any work done by the trainees," the trainees worked "*solely* for [their own] personal purpose or pleasure," and their "work serve[d] *only* [their] own interest," it has not "suffered or permitted" work and therefore does not owe the trainees compensation.  *Id.* (emphasis added).  The U.S. Department of Labor ("DOL") later developed a six-factor test intended to codify *Walling*, which courts have applied to workers alleged to be trainees,[131] and which the DOL recently adapted, with little change, to interns who work for private sector employers, like Defendants.  *See* U.S. Dep't of

---

[131]    *See, e.g., Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 531-32 (S.D.N.Y. 1998).

Labor, Fact Sheet #71: Internship Programs Under the FLSA (Ex. 75).[132]

## II.   Plaintiff Meets All of the Rule 23 Requirements.

Plaintiff's minimum wage claim is well suited for class certification.  All of the members of the proposed class worked in New York as unpaid interns, participated in FEG's centralized internship program, performed productive work, were classified as employees under the same FEG personnel policies, and were uniformly classified as non-employees with respect to Defendants' wage and hour policies.  These circumstances, which were the same across the class, will drive the resolution of the key questions in this case: whether interns were covered "employees" or fell under *Walling*'s narrow exception for "trainees."  *See Myers v. Hertz Corp.*, 624 F.3d 539, 549 (2d Cir. 2010) (class certification is appropriate where "evidence generally applicable to the class" may answer the key issues in the case); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (certification is warranted where the evidence is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation").

Plaintiff Eden Antalik seeks to certify the following class under Rule 23 for violations of Article 19 of the NYLL:

> All individuals who had unpaid internships in New York between September 28, 2005 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

Courts in this Circuit give Rule 23 a "liberal rather than restrictive construction," and "adopt a standard of flexibility" when they apply it.  *Marisol A. v. Guiliani*, 126 F.3d 372, 377 (2d Cir. 1997) (internal quotation marks omitted).  The Court "must receive enough evidence, by

---

[132]     The New York Department of Labor has adopted the DOL's test and added more factors. *See* N.Y. Dep't of Labor, Fact Sheet, Wage Requirements for Interns in For-Profit Businesses (Ex. 76).

affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *In re Initial Pub. Offering Sec. Lit.*, 471 F.3d 24, 41 (2d Cir. 2006).  "[I]n making such determinations, [the Court] should not assess any aspect of the merits unrelated to a Rule 23 requirement;" however, where a Rule 23 requirement and a merits issue overlap, the Court must resolve those disputes that are necessary to determining whether Rule 23 has been met. *Shahriar v. Smith & Wollensky Rest. Grp.*, *Inc.*, 659 F.3d 234, 251 (2d Cir. 2011).

 Although this is the first case in which a court has been asked to certify a class of interns, the Honorable Harold Baer, Jr. granted conditional certification of an intern collective under 29 U.S.C. § 216(b) last year based on evidence that the defendant "made a uniform determination that interns were not employees," "required interns to submit college credit letters," and "used interns to performed entry-level work with little supervision."  *Wang v. Hearst Corp.*, No. 12 Civ. 793, 2012 WL 2864524, at *2 (S.D.N.Y. July 12, 2012).  Courts in this Circuit routinely certify cases involving the uniform classification of workers as "exempt" from wage and hour requirements,[133] or as non-employee "independent contractors,"[134] which raise comparable issues and rely on similar types of proof, such as uniform compensation policies and job descriptions. *See, e.g., Damassia*, 250 F.R.D. at 159-64 (certifying class based on uniform classification policy and evidence of "centrally derived" business practices that governed the duties and responsibilities of class members) (internal quotation marks omitted); *Iglesias-Mendoza*, 239

---

[133]  *See Cuevas v. Citizens Fin. Grp., Inc.*, No. 10 Civ. 5582, 2012 WL 1865564, at *3 (E.D.N.Y. May 22, 2012); *Aponte v. Comprehensive Health Mgmt., Inc.*, No. 10 Civ. 4825, 2011 WL 2207586, at *9-12 (S.D.N.Y. June 2, 2011); *Han v. Sterling Nat'l Mortg. Co.*, No. 09 Civ. 5589, 2011 WL 4344235, at *4 (E.D.N.Y. Sept. 14, 2011); *Damassia v. Duane Reade Inc.*, 250 F.R.D. 152, 159-64 (S.D.N.Y. 2008).

[134]  *See Hart v. Rick's Cabaret Int'l Inc.*, No. 09 Civ. 3043, 2010 WL 5297221, at *6-7 (S.D.N.Y. Dec. 20, 2010); *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 370-73 (S.D.N.Y. 2007); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 203-05 (S.D.N.Y. 2006); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85-88 (S.D.N.Y. 2001).

F.R.D. at 373 ("common question[] of . . . whether [alleged independent contractors] were supposed to be paid the minimum wage as a matter of law" is "about the most perfect question[] for class treatment"). This case should be treated no differently. Defendants classified all interns in one fell swoop regardless of the particular tasks they were assigned, the office or division in which they worked, and what they gained from their internships. The proof that will drive the merits – the nature of Defendants' internship program, including its immersion of interns in day-to-day operations, the classification of interns as employees under personnel policies, and the reliance on interns to perform productive work and fill gaps resulting from employee cut-backs – is "generally applicable to the class" and capable of generating common answers to the merits questions. *See Myers*, 624 F.3d at 549.

### A. Plaintiff Meets Each Rule 23(a) Requirement.

#### 1. <u>Numerosity</u>

Rule 23(a)(1) requires Plaintiff to show that "the class is so numerous that joinder of all members if impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 2005). There are over forty members of the proposed Class. Bien Decl. ¶ 12.

#### 2. <u>Commonality</u>

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A single common question of law or fact will suffice. *Marisol A.*, 126 F.3d at 376; *accord Wal-Mart*, 131 S. Ct. at 2556. The commonality requirement is met where a common question of fact or law is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original) (internal quotation marks omitted). Here, there are several common questions:

a.      Whether Defendants Derived an Immediate Advantage From
Interns' Work.

Whether Defendants derived an immediate advantage from Plaintiff's and the class

members' work is a common question that will generate a common answer.  *See Archie*, 997 F.

Supp. at 534 ("If a defendant gains an immediate advantage from a plaintiff's labor, courts have

held that the plaintiff is an employe[e] for purposes of the FLSA."); Ex. 75 (DOL Fact Sheet).

This question is appropriate for classwide resolution because it looks to *the nature of the work*

*performed* – not the specific tasks.  *Archie*, 997 F. Supp. at 535 (plaintiffs were employees

because they "performed productive work for the defendants"); *Okoro v. Pyramid 4 Aegis*, No.

11 Civ. 267, 2012 WL 1410025, at *10 (E.D. Wis. Apr. 23, 2012) (individual whose duties were

"undeniably of substantial assistance to [the company]" was an employee); *Donovan v. New*

*Floridian Hotel, Inc.*, 676 F.2d 468, 471 (11th Cir. 1982) (mental patients who "did work which

was of economic benefit" to defendant were employees); *Wirtz v. Wardlaw*, 339 F.2d 785, 786-

88 (4th Cir. 1964) (high school students who helped to perform office tasks were employees).

The answer to this question will not vary from intern to intern and "will resolve an issue that is

central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 131 S. Ct. at 2551.

The proof capable of generating a common answer this question includes, but is not

limited to: (1) internship guidelines FEG issued to all intern supervisors; (2) descriptions of

interns' productive work in FEG's Intern Request Forms and other Company documents; (3)

testimony of the intern recruiters charged with overseeing the FEG intern program; (4) testimony

from interns, including Plaintiff and Opt-In Plaintiffs, regarding the productive work they

performed; and (5) FEG's decision to change its program to a paid program because of the

"value" that interns provided.  *See* Factual Background, *supra* Sections I.B., III, IV.

b.      Whether Interns Displaced Regular Employees.

A second common question is whether Plaintiff and class members displaced regular employees by performing work that paid employees typically perform or by augmenting Defendants' existing workforce.  *See* Ex. 75 (DOL Fact Sheet); *Archie*, 997 F. Supp. at 533 (where defendant used services provided by alleged trainees and avoided having to pay others at market rates, alleged trainees were employees covered by the FLSA).  Much of the proof discussed above will generate a common answer to this question.  In addition, Defendants' own corporate representatives and documents demonstrate that they used interns to fill gaps resulting from "cost containment initiatives."  *See* Factual Background, *supra* Section III.F.

c.      Whether FEG Structured its Internship Program Around its Actual Operations as Opposed to a Classroom or Academic Experience.

A third common question is whether FEG structured its internship program around a classroom or academic experience as opposed to its actual operations.  *See* Ex. 75 (DOL Fact Sheet); *Archie*, 997 F. Supp. at 507 (finding plaintiffs were not trainees where the defendant did not "structure a training program as that concept is understood in case law and regulatory interpretations but instead structured a program that required the plaintiffs to do work that had a direct economic benefit for the defendants").  Evidence that Defendants provided interns with little classroom training, consisting of periodic "lunch & learns" and networking events, and instead structured their program around "key projects and day-to-day operations" will be common to Plaintiff and all class members.  *See* Factual Background, *supra* Section IV.

d.      Whether FEG's Internship Program Was for the Benefit of Interns.

A fourth common question is whether FEG's internship program was for the "for the benefit" of the interns or whether Defendants benefited from the program.  "If the interns are engaged in the operations of the employer or are performing productive work (for example,

filing, performing other clerical work, or assisting customers), then the fact that they may be receiving some benefits in the form of a new skill or improved work habits will not exclude [interns] from . . . minimum wage . . . requirements because the employer benefits from the interns' work."  *See* Ex. 75 (DOL Fact Sheet); *Walling*, 330 U.S. at 152-53 (citing undisputed evidence that training was "solely for [plaintiffs'] personal purposes or pleasure," and that the "work serve[d] only [plaintiffs'] own interest"); *Archie*, 997 F. Supp. at 533 (although plaintiffs gained basic job skills that might help them in the job market, they were not trainees because their work benefited defendant by allowing it to offer services at below market rate).

In addition to evidence discussed above, FEG's internship guidelines provide common evidence of the benefits that it obtained from interns.  Benefits of interns to Defendants included: their "[f]resh new energy . . . new ideas and different perspectives" and "[u]seful assistance on key projects and day-to-day operations."  *See* Factual Background, *supra* Section II.B.  The guidelines and other Company documents also demonstrate that Defendants sought to use their internship program to "identify talent early and build a diverse and trained pipeline" of future employees and for "overall recruitment for the company."  *Id*.  This common evidence is relevant to whether Defendants used their internship program to try out potential employees before hiring them.  *See* Ex. 75 (DOL Fact Sheet) ("[U]npaid internships generally should not be used by the employer as a trial period for individuals seeking employment . . . ").

      e.    <u>Whether Interns Were Employees as a Matter of "Economic Reality."</u>

A fifth common question is whether interns were Defendants' employees as a matter of "economic reality."  *See Herman v. RSR Sec. Servs., Ltd*., 172 F.3d 132, 139 (2d Cir. 1999). Where a key issue is the existence of an employer-employee relationship, courts consider "any relevant evidence" that may aide in evaluating the economic relationship.  *Id*.  Here, there is

common evidence that FEG treated interns as employees.  FEG: (1) classified all interns as "at will" employees in form offer letters, enabling them to "terminate" their "employment" at any time; (2) classified interns as "special employees" for purposes of their worker's compensation insurance policy and required them to forgo bringing legal claims; (3) required interns to agree to Company policies that applied to employees, including confidentiality restrictions; and (4) used intern demographic information to satisfy their Equal Employment Opportunity obligations.  *See* Factual Background, *supra* Section V.

### 3. Typicality

Rule 23(a)(3) is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Marisol A.*, 126 F.3d at 376 (internal quotation marks omitted).  "[M]inor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendant directs "the same unlawful conduct" at the named plaintiff and the class.  *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).  The claims of the plaintiff and the class "only need to share the same essential characteristics, and need not be identical."  *Damassia*, 250 F.R.D. at 158 (internal quotation marks omitted).  The typicality requirement is not "highly demanding."  *Id.*

Here, Plaintiff is typical of the class she seeks to represent.  She participated in FEG's internship program, was not paid, performed productive work, including compiling information, researching, doing errands, doing mailings, and assisting at film screenings, received only on-the-job training and minimal "classroom" training, and was subject to the same personnel policies that Defendants imposed on other interns.  *See* Factual Background, *supra* Section I.B.1.

Plaintiff's claim is based on the same legal theory as the members of the Class – that Defendants' misclassified her as a non-employee and failed to pay her minimum wages under the

25

NYLL.  *See Damassia*, 250 F.R.D. at 158 ("all class members' claims . . . are based on the same

course of events and legal theory, namely that [defendant]'s decision to classify [them] . . . is

inconsistent with the requirements of the NYLL").

### 4. Adequacy

Rule 23(a)(4) tests whether the class representative will fairly and adequately protect the

interests of the class.  Fed. R. Civ. P. 23(a)(4).  Where the "class representative[] [is] prepared to

prosecute fully the action and ha[s] no known conflicts with any class member," the adequacy

requirement is met.  *Shahriar*, 659 F.3d at 253.  "The fact that plaintiffs' claims are typical of the

class is strong evidence that their interests are not antagonistic to those of the class; the same

strategies that will vindicate plaintiffs' claims will vindicate those of the class."  *Damassia*, 250

F.R.D. at 158.  Plaintiff has no conflicts with the class.  In furtherance of her duties as class

representative, she sat for a full-day deposition and produced documents.  Bien Decl. ¶ 9.

Plaintiffs' counsel are "qualified, experienced and able to conduct the litigation."  *Baffa*

*v. Donaldson, Lufkin & Jenrett Sec. Corp.*, 222 F. 3d 52, 60 (2d Cir. 2000).  Outten & Golden

LLP ("O&G") has substantial experience prosecuting wage and hour class and collective actions

and has a very good reputation in the field of employment law.  *See, e.g., Capsolas v. Pasta Res.,*

*Inc.*, No. 10 Civ. 5595, 2012 WL 4760910, at *3 (S.D.N.Y. Oct. 5, 2012).

### B. Plaintiff Meets Rule 23(b)(3).

#### 1. Common Questions Predominate.

Rule 23(b)(3) requires that "questions of law or fact common to class members

predominate over any questions affecting only individual members[.]"  Fed. R. Civ. P. 23(b)(3).

A common question predominates when "resolution of some of the legal or factual questions that

qualify each class member's case as a genuine controversy can be achieved through generalized

proof, and if these particular issues are more substantial than the issues subject to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

As discussed above, generalized proof will "tend to show" that Plaintiff and class members were similar in ways that are material to the principal issue in this case: whether interns were employees or trainees. *See Myers*, 624 F.3d at 549. The common questions Plaintiff has identified, which generalized proof can answer, are substantial and predominate over any individual questions because they will be determinative of the merits issue. *See Walling*, 330 U.S. at 152-53 (decisive issues are whether the employer "receive[d] [an] 'immediate advantage' from any work done by the trainees," whether the trainees worked "solely for [their own] personal purpose or pleasure," and whether their "work serve[d] only [their] own interest"); *see also Torres v. Gristede's Operating Corp.*, No. 06 Civ. 3316, 2006 WL 2819730, at *14-16 (S.D.N.Y. Sept. 29, 2006) (where an issue is "outcome determinative," it predominates).

## 2.  A Class Action Is the Superior Mechanism.

Rule 23(b)(3) requires the Court to determine "that a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether superiority is met, the Court may consider the following:

> (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

Plaintiff satisfies each of the four factors. First, class members' interests would not be served by individually controlling the prosecution of the action because most lack the resources to even "contemplate proceeding with this litigation in any context other than through their

participation in a class action, given the expense and burden that such litigation would entail." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003). "[A] class action will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses." *Han*, 2011 WL 4344235, at *11. Second, there is no other litigation of which Plaintiff is aware raising the issues raised here. Third, the litigation should be concentrated in this forum because Plaintiff and the proposed Class all worked in New York City. Bien Decl. ¶ 12. Fourth, this case is unlikely to present manageability problems because the proposed Class is relatively small. *See Torres*, 2006 WL 2819730, at *16 (finding "little reason to expect" manageability problems for class action of 300 New York City grocery workers).

### III.   The Court Should Appoint Plaintiff's Counsel as Class Counsel.

The Court should appoint O&G as Class Counsel because they satisfy the requirements of Rule 23(g). *See* Fed. R. Civ. P. 23(g)(1)(A). O&G has performed significant litigation and discovery work. Bien Decl. ¶ 7. O&G has committed significant resources to representing the proposed class and will continue to do so. *Id.* Courts have recognized O&G's "substantial experience prosecuting and settling . . . wage and hour class actions," and found them to be "well-versed in wage and hour and class action law." *See Capsolas*, 2012 WL 4760910, at *3.

### IV.   Plaintiff Meets the Burden for Court-Authorized FLSA Notice.

The Court should authorize Plaintiff to send notice of this lawsuit to:

> All individuals who had unpaid internships between September 28, 2008 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

In an FLSA collective action, employees must receive timely notice in order for the "intended benefits of the collective action . . . to accrue." *Cuzco v. Orion Builders, Inc.*, 477 F.

Supp. 2d 628, 635 (S.D.N.Y. 2007).  Without timely notice, workers' rights will diminish each day, *see Ruggles v. WellPoint, Inc.*, 591 F. Supp. 2d 150, 162 n.12 (N.D.N.Y. 2008), because the FLSA's statute of limitations runs until a worker files a written consent form.

To be entitled to notice, a plaintiff must establish that she and potential plaintiffs "together were victims of a common policy or plan that violated the law."  *Myers*, 624 F.3d at 555 (internal quotation marks omitted).  This threshold is "fairly lenient," even if "slightly higher scrutiny should apply" after discovery.  *Silverstein v. AllianceBernstein L.P.*, No. 09 Civ. 5904 (S.D.N.Y. Aug. 24, 2011), ECF No. 41, at 2 (attached as Ex. 79 to Bien Decl.) (internal quotation marks omitted).  Here, all interns were subject to the same policy of not being paid.

When a plaintiff moves for notice at this stage of a case, after substantial discovery, courts evaluate three additional factors: (1) whether disparate factual and employment settings of the individual plaintiffs exist; (2) whether any individualized defenses exist; and (3) fairness and procedural considerations.  *Torres*, 2006 WL 2819730, at *9.  All three factors favor Plaintiff.

All interns' relevant factual settings and employment settings are the same.  FEG subjects all interns to policies that were centrally administered by a small team of intern recruiters.  All interns performed productive work that benefited FEG, and received little or no formal training. FEG treated all interns as employees for other purposes.  *See* Factual Background, *supra*.

Any other aspects of interns' employment settings are not material.  Disparate facts "do not defeat Plaintiffs' valid basis for moving forward with collective action" where plaintiffs are "subject to a common practice or scheme."  *See Torres*, 2006 WL 2819730, at *10 (internal quotation marks omitted).

No individualized defenses exist because the issue here is simple – whether FEG's interns were covered by the FLSA.  If they are, there are no defenses to the FLSA's minimum

wage provisions that could apply to individual interns, nor has FEG raised any. *See id.* at *11 (individual defenses do not preclude Court-authorized notice where "the standard of proof and required evidence . . . is . . . one based on policy, practice, and conduct").

Finally, fairness and procedural considerations favor prompt notice, which will allow interns to decide whether to join the case and protect their rights. "[T]he policy objectives of reducing cost and increasing efficiency are best furthered by" notice. *Id*.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court: (1) certify the proposed Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (2) appoint Plaintiffs' Counsel as Class Counsel; (3) approve Plaintiff's proposed class action notice, Bien Decl. Ex. 81; (4) conditionally certify the proposed Collective pursuant to 29 U.S.C. § 216(b) and authorize Plaintiff's proposed notice, Bien Decl. Ex. 82; (5) order Defendants to undertake a thorough search for the contact information and certify the steps that they have taken to the Court; and (6) order Defendants to produce a computer-readable data file containing the names, last known mailing addresses, last known telephone numbers, last known email addresses, internship location, and internship dates for all Class and Collective members.

Dated:        February 15, 2013
              New York, New York

                              Respectfully submitted,

                              **OUTTEN & GOLDEN LLP**
                              By:

                              /s/ Rachel Bien
                              Rachel Bien

                              Adam T. Klein
                              Rachel Bien
                              Elizabeth Wagoner
                              Reena Arora

3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

*Attorneys for Plaintiffs*