PROSKAUER ROSE LLP
Elise M. Bloom
Amy F. Melican
Eleven Times Square
New York, NY  10036
Ph:  212.969.3000/Fax:  212.969.2900
ebloom@proskauer.com
amelican@proskauer.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| ERIC GLATT, ALEXANDER FOOTMAN, EDEN ANTALIK, and KANENE GRATTS, on behalf of themselves and all others similarly situated, | : : : : | Civil Action No. 11 CV 6784 (WHP) |
| | : | ECF Case |
| Plaintiffs, | : : | |
| v. | : : : | |
| FOX SEARCHLIGHT PICTURES, INC., and FOX ENTERTAINMENT GROUP, INC., | : : : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
STRIKE THE CLASS AND COLLECTIVE ACTION ALLEGATIONS/CLAIMS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

STATEMENT OF FACTS ......................................................................... 4

I.   FEG, SEARCHLIGHT AND EIGHT OTHER CORPORATE SUBSIDIARIES ....... 4

    **A.**   Fox Entertainment Group, Inc. ("FEG")........................................ 4

    **B.**   Fox Searchlight Pictures ("Searchlight")...................................... 4

II.   FACTS PERTAINING TO PLAINTIFF ANTALIK'S PUTATIVE NEW YORK
AND NATIONWIDE FLSA CORPORATE INTERN CLASSES........................... 5

    **A.**   Plaintiff Antalik's Corporate Internship .......................................... 5

    **B.**   Corporate Interns At Nine Separate FEG Subsidiaries.................................. 5

III. PLAINTIFFS GLATT, FOOTMAN, GRATTS' PUTATIVE PRODUCTION
INTERN CLASSES .................................................................................... 7

    **A.**   Glatt's New York Accounting And Post-Production Internships.................. 7

    **B.**   Footman's New York General Production Office Internship ........................ 8

    **C.**   Searchlight's Limited Role With Respect To Production Interns ............... 10

    **D.**   Gratts' California Production Internship ...................................... 11

IV. PLAINTIFFS' FLSA CLAIMS CANNOT BE CERTIFIED AND NOTICE
SHOULD NOT BE ISSUED ..................................................................... 11

    **A.**   The Factual And Employment Settings Vary ................................. 13

    **B.**   The Defenses Available Are Individual to Each Intern ............................. 15

    **C.**   Fairness and Procedural Considerations ...................................... 18

V.   PLAINTIFFS CANNOT ESTABLISH CLASS CERTIFICATION OF THEIR NEW
YORK AND CALIFORNIA CLAIMS ...................................................... 19

    **A.**   Plaintiff Cannot Satisfy The Commonality Requirement............................ 20

    **B.**   Plaintiffs Cannot Prove Predominance ........................................ 21

    **C.**   Plaintiffs Are Not Adequate Class/Collective Representatives .................. 22

CONCLUSION ........................................................................................ 25

i

## Table of Authorities

**Page(s)**

CASES

*Ahmad v. Old Republic Nat'l Title Ins. Co.*,
   690 F.3d 698 (5th Cir. 2012) ..............................................................21

*Balut v. Loral Elec. Sys.*,
   988 F.Supp. 339 (S.D.N.Y. 1997).........................................................3

*Barfield v. N.Y. City Health & Hosps. Corp.*,
   537 F.3d 132 (2d Cir. 2008).........................................................2, 18, 19

*Blank v. Jacobs*,
   No 03-cv-2111, 2009 WL 3233037 (E.D.N.Y 2009). ...........................24

*Brinker Restaurant Corp. v. Superior Court*,
   53 Cal. 4th 1004 (Cal. 2012)...............................................................22

*Cordes & Co. Fin. Servs. v. AG Edwards & Sons*,
   502 F. 3d 91 (2d Cir. 2007).................................................................22

*Damassia v. Duane Reade, Inc.*,
   No. 04-CV-8219, 2006 WL 2853971 (S.D.N.Y. 2006).........................13

*Dukes v. Wal-Mart, Inc.*,
   131 S. Ct. 2541(2011)..............................................................1, 20, 21

*Duncan v. Phoenix Supported Living, Inc.*,
   No. 2:05cv1, 2007 U.S. Dist. LEXIS 24649 (W.D.N.C. 2007)............17

*Ellis v. Costco Wholesale Corp.*
   657 F.3d 970 (9th Cir. 2011) ..............................................................21

*Eng-Hatcher v. Sprint Nextel Corp.*,
   No. 07-Civ.-7350, 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009)..........13

*Espenscheid v. Directsat USA, LLC*,
   No. 12-1943, 2013 WL 407446 (7th Cir. Feb. 4, 2013) ........................14

*Futrell v. Payday CA, Inc.*,
   190 Cal. App. 4th 1419 (Cal. App. 2d Dist. 2010) .................................2

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   903 F.2d 176 (2d Cir. 1990).............................................................24, 25

*Gen. Tel. Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982)......................................................................................21

*In re IPO Securities Litigation*,
    471 F.3d 24 (2d Cir. 2006)........................................................................ 21

*Jean-Louis v. Metro. Cable Comm'n., Inc.*,
    838 F. Supp. 2d 111 (S.D.N.Y. 2011)......................................................19

*Jonites v. Exelon Corp.*,
    522 F.3d 721 (7th Cir. Feb. 4, 2013) ........................................................14

*Johnson v. Big Lots Stores, Inc.*,
    561 F. Supp. 2d 567 (E.D La. 2008)..........................................................14

*Lugo v. Farmer's Pride Inc.*,
    737 F. Supp. 2d. 291 (E.D. Pa. 2010) .......................................................13

*Lusardi v. Xerox Corp.*,
    118 F.R.D. 351 (D. N. J. 1987)..............................................................1, 14

*Maddock v. KB Homes, Inc.*,
    248 F.R.D. 229 (C.D. Cal. 2007) ................................................................2

*Morisky v. Public Serv. Elec. & Gas Co.*,
    111 F. Supp. 2d 493 (D.N.J. 2000) ...........................................................13

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 368 ......................23

*Pacheco v. Boar's Head Provisions, Inc.*,
    671 F. Supp. 2d 957 (W.D. Mich. 2009) ...................................................13

*Reyes v. Texas Ezpawn, L.P.*,
    2007 WL 101808 (S.D. Tex. 2007) ...........................................................19

*Rothman v. Grego*,
    220 F.3d 81 (2d Cir. 2000)........................................................................26

*Tobacco II Cases*,
    46 Cal. 4 298 (2009) .................................................................................26

*Tracy v. NVR, Inc.*,
    No. 04 Civ. 6541L, 2009 WL 3153150 (W.D.N.Y. Sept. 30, 2009) ........19

*Tri-State Emp't Servs., Inc. v. Mountbatten*,
    99 N.Y. 2d 476 (N.Y. 2003) .......................................................................2

*Turkman v. Ashcroft,*
    589 F.3d 542 (2d Cir. 2009)............................................................................24

*Walling v. Portland Terminal Co.,*
    330 U.S. 148 (1947) ....................................................................3, 17, 18

*Zavala v. Wal-Mart Stores, Inc.,*
    No. 03-cv-5309, 2010 WL 2652510 (D.N.J. Jun. 25, 2010) ..................................13

*Zheng v. Liberty Apparel Co., Inc.,*
    355 F.3d 61 (2d Cir. 2003).............................................................................2

*Zivali v. AT&T Mobility, LLC,*
    784 F. Supp. 2d 456 (S.D.N.Y. 2011).......................................................... passim

## INTRODUCTION

It is now the law that "[w]hat matters to class certification…is not raising of common 'questions'— but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes v. Wal-Mart, Inc.*, 564 U.S.__, 131 S. Ct. 2541, 2551 (2011). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims *in one stroke*." *Id.* (emphasis added). The same ideal holds true in the FLSA collective action context. *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 370-71 (D.N.J. 1987).

Four named Plaintiffs seek to certify *five* different classes of student interns some of whom may have interned on any one of *27* movie productions (putative Production Interns) *or* may have interned at any of over *500* corporate offices nationwide (putative Corporate Interns). Plaintiffs make *dozens* of wage and hour claims under a host of state and federal laws against Defendants Fox Searchlight Pictures, Inc. ("Searchlight") and its parent company Fox Entertainment Group, Inc. ("FEG," collectively "Defendants"), neither of whom employed much of the putative class.[1]

While Plaintiffs justify class and collective action status based on the mere fact they were all engaged as unpaid interns, the evidence adduced from almost a year and a half of merits discovery demonstrates that they cannot meet the stringent requirements for class certification under *Dukes*, or the standard for certification and notice that this Circuit utilizes after discovery in an FLSA case. *See Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011).

---

[1] Defendants had previously requested permission to file the instant motion and the Court indicated that it was premature prior to the close of discovery. (Bloom Decl. Ex. Q, Hearing Tr., 1-2 (6/4/12)). Now that discovery has closed, Defendants ask that it be heard on the merits.

Three of the Plaintiffs, Alexander Footman, Eric Glatt and Kanene Gratts, were interns on films produced by independent production companies and bring their claims against Searchlight. Eric Glatt and Alexander Footman were engaged as Production Interns by Lake of Tears on the film *Black Swan*. Kanene Gratts was a Production Intern on the film *500 Days of Summer* and was engaged by Palmera Pictures. Glatt and Footman bring claims under the FLSA and the New York Labor Law ("NYLL"). Gratts sues only under the California Unfair Competition Law ("CAUCL").

Their hurdles to class or collective treatment are insurmountable. First, in order to survive summary dismissal of their individual claims against Searchlight, they must establish a "joint employer" relationship between Searchlight and each independent production company. While Searchlight acted as a financier with respect to these films, this does not create an employment relationship. *Tri-State Emp't Servs., Inc. v. Mountbatten*, 99 N.Y. 2d 476, 483 (N.Y. 2003). The "joint employer" question is fact intensive and requires the Court to examine a multitude of individual facts, including, but not limited to, who had the power to hire or fire them, who supervised them and who determined their rate and method of pay.[2] Creation of a joint employer relationship is evaluated individually as to each intern, an issue which would predominate and make these claims not suitable for class determination. *Maddock v. KB Homes, Inc.,* 248 F.R.D. 229, 247 (C.D. Cal. 2007) (denying motion for certification because, *inter alia*, whether defendant was a "joint employer" of the putative class members was an individualized,

---

[2] There are a multitude of additional factors. *See e.g., Barfield v. N.Y. City Health & Hosps. Corp.,* 537 F.3d 132, 142-43 (2d Cir. 2008) (describing the "economic reality" test factors); *see also Zheng v. Liberty Apparel Co., Inc.,* 355 F.3d 61, 72 (2d Cir. 2003) (describing the "functional control" test factors). Plaintiff Gratts must satisfy a different test under California law. *See Futrell v. Payday CA, Inc.*, 190 Cal. App. 4th 1419 (Cal. App. 2d Dist. 2010). *See*, *infra*, at 17-18; *see also* Def.s' Mot. for Summary Judgment.

not a common issue that predominated).  If they could somehow overcome this hurdle, Plaintiff

Gratts has the additional problem of being time barred.

      Plaintiff Eden Antalik is the sole representative for Corporate Interns.  She brings claims

against Searchlight and FEG and FEG's hundreds of U.S. subsidiaries seeking to represent a

nationwide FLSA Corporate Intern Collective and a New York Corporate Intern Class.  Antalik

was engaged in Searchlight's New York Publicity Office, hired and supervised locally by

Searchlight employees in that office and performed intern responsibilities solely in that office.

Antalik is unable to show this is an "extraordinary circumstance" for which a parent (FEG)

should be liable for its subsidiary's (Searchlight's) acts as a "joint employer."  *See Balut v. Loral*

*Elec. Sys.,* 988 F.Supp. 339, 344 (S.D.N.Y. 1997).

      In addition to the "joint employer" hurdle, all of the Plaintiffs must then confront the

problem that unpaid internships are not unlawful *per se*.  The legality of an unpaid internship

program turns on a highly individualized multi-factor test and will turn on whether as to a

particular intern, the test was met.  *See, e.g., Walling v. Portland Terminal Co.,* 330 U.S. 148

(1947) (listing six factors, all of which must be met in order to determine whether an intern is

exempt from minimum wage coverage).  A balancing of benefits must be conducted as to each

intern based on what she did and what she got out of the experience.  This would necessarily

entail testimony and other evidence from each student, her supervisors and mentors, parents,

friends, academic advisors, and past and future employers to ascertain the student's motivation

for taking the internship, what each intern actually did while on a movie production or in a

corporate office, and the benefits he or she received.  The uniqueness of each intern's experience

is punctuated by the fact the three named plaintiff Production Interns had no knowledge as to the

experiences of any other Production Interns in different departments or different films, and the

Corporate Intern named plaintiff, Antalik, had no knowledge as to the experiences of anyone who had interned for Searchlight in Los Angeles or during a different semester, let alone at any other FEG subsidiary.

The proposed class members share nothing more than the fact that they were engaged as unpaid interns and no class can be certified under either the FLSA or Fed. Rule Civ. P. 23. Accordingly, this Court should strike the class and collective allegations.

## STATEMENT OF FACTS

### I.    FEG, SEARCHLIGHT AND EIGHT OTHER CORPORATE SUBSIDIARIES

#### A.    Fox Entertainment Group, Inc. ("FEG")

FEG is the parent corporation of more than 800 separately incorporated subsidiaries, 500 of which are in the U.S., which operate diverse media industries. (Bloom Decl. Ex. O, 10K Report).  Although Plaintiff Antalik asserts class/collective action claims on behalf of all interns in "FEG's internship program" (Am. Compl. ¶ 65, 91), there is no evidence that FEG has ever had such a program.

#### B.    Fox Searchlight Pictures ("Searchlight")

Searchlight is one of FEG's separately incorporated subsidiaries.  (Bloom Decl. Ex. O, 10K Report).  Searchlight does not produce motion pictures.  (Sayre Tr. 190).  Rather, it finances, distributes and markets films produced by separately incorporated production companies.  (Sayre Tr. 188).  Searchlight's role can vary dramatically depending on the project. (Sayre Tr. 31, 40).  Searchlight may provide financing, either alone or with partners, prior to the formation of the production corporation, may not become involved with financing until after production has begun and decisions about key cast and crew have been made or may never be involved in financing.  (Sayre Tr. 23-24, 26).  In other instances, Searchlight may acquire a

completed film.  (Sayre Tr. 67).  Searchlight does not employ crew members on productions.

(Sayre Tr. 196).

## II.   FACTS PERTAINING TO PLAINTIFF ANTALIK'S PUTATIVE NEW YORK AND NATIONWIDE FLSA CORPORATE INTERN CLASSES

### A.   Plaintiff Antalik's Corporate Internship

Antalik was a Corporate Intern in Searchlight's NY Publicity Office during the summer

of 2009. (Antalik Tr. 43)  Antalik applied for the position by submitting her resume to

Searchlight.  (Antalik Tr. 70).  She was interviewed by Searchlight employees who ultimately

engaged her. (Antalik Tr. 72).

Antalik understood that the internship was unpaid.  (Antalik Tr. 73).  Although Antalik

believed she would receive credit for the internship, her school later declined to provide the

credit because she failed to provide the school with a letter from her supervisor detailing her

experience.  (Antalik Tr. 44, 51-52).  During her internship, Antalik was given assignments by

John Maybee (Junior Publicist) and other Searchlight employees.  (Antalik Tr. 175).

Antalik seeks to represent Corporate Interns within the state of New York for purported

violations of New York State Labor Law and also nationwide for purported violations of the

FLSA.  (Am. Compl. ¶ 64, 90).  Despite seeking to represent such a vast group, Antalik admits

that she has no knowledge of any experience or process that applied to other interns, particularly

those engaged by other legal entities (most of which were located more than 2,500 miles away in

California). (Antalik Tr. 69, 75, 96-97, 163-65).  She similarly has no idea what other

departments, if any, had interns.  (Antalik Tr. 207-08).

### B.   Corporate Interns At Nine Separate FEG Subsidiaries

Arguing that Antalik's class was overbroad, Defendants persuaded the Court to limit

discovery with respect to FEG to Searchlight and eight corporate subsidiaries that received

administrative support for their unpaid internship programs from Aimee Hoffman, Recruitment Manager.[3]  (Johnson Ex. 2).

Each of the nine corporations, including Searchlight,[4] operated its own internship program, as it was up to the individual supervisors at each entity whether they would request an intern(s) for their department and the number of interns could vary in departments from semester to semester and year to year.  (Johnson Tr. 92-93; Hoffman Tr. 32-33).  Corporate Interns who were selected were required to provide proof that an accredited educational institution had found their planned internship experience would be eligible for academic credit.  (Johnson Tr. 75-76).

Hoffman provided only logistical assistance to select intern supervisors. (Hoffman Tr. 272-74, 280-84).  She provided assistance recruiting interns, who would apply directly to an internship for a specific company.  (Hoffman Tr. 281-82).  Although Hoffman contacted interns during their engagement, her role was limited to distributing and collecting on-boarding paperwork (i.e., paperwork relating to new individuals retained at the entity) and assisting coordination of several educational, networking-focused, non-mandatory events for the interns engaged in Searchlight's Los Angeles office.  (Hoffman Tr. 107-09, 286-87, 317).  In some instances Hoffman reached out to prospective students to ensure they would receive academic credit and in other instances, she would not.  (Hoffman Tr. 285).

---

[3] Plaintiffs allege that Hoffman's involvement as an intern recruiter is the proverbial "glue" tying a few (i.e., 9 out of over 500 U.S. subsidiaries) FEG subsidiaries together into a purported "FEG internship program."  (Pls. Mtn. Amend, 8-9, Doc. #28).  Specifically, Plaintiffs argued in their Motion to Amend that the putative Corporate Intern class and collective should be broader than just Searchlight because Hoffman's recruitment responsibilities applied to Searchlight and other FEG subsidiaries and the policies she applied to Searchlight also applied to a "handful of FEG's corporate subsidiaries." Id.  Judge Peck ruled that any additional discovery would be limited to the eight other FEG subsidiaries which Hoffman administratively supported.  (Bloom Decl. Ex. L, Hearing Tr. 8-9 (11/21/12)).

[4] Searchlight engaged unpaid interns in its Los Angeles and New York offices until the Fall 2010 semester, when it began paying all of its interns.  (Hoffman Tr. 28).

Hoffman administratively supported Searchlight's California-based internship program beginning in 2006. (Hoffman Tr. 14-15, 335).  She had no contact with Searchlight's New York internship program until April 2009, when she learned of the existence of one intern and then again in July 2009, when she learned of several other unpaid interns, including Antalik.  (Bloom Decl. Ex. P).  The first semester Hoffman was involved in Searchlight New York's on-boarding of interns was Fall 2009.[5]  *Id.*  *Hoffman had no role with respect to on-boarding Plaintiff Antalik because Antalik was engaged before Hoffman provided such support in New York.*  (Maybee Tr. 60).

Irrespective of Hoffman's involvement with Searchlight's New York and California internships, Antalik *never* participated in any of the California-based events coordinated by Hoffman, such as "Lunch and Learns." (Antalik Tr. 198).  Interns in Searchlight's NY Publicity Office and California offices received individualized experiences based on their department, the activities occurring in their office and an individual supervisor(s)' decisions about training, supervision, shadowing, assignments and other educational requirements.  (Hoffman Tr. 207-08).

## III. PLAINTIFFS GLATT, FOOTMAN, GRATTS' PUTATIVE PRODUCTION INTERN CLASSES

Plaintiffs Glatt and Footman interned solely in New York in the *Black Swan* film production offices during several weeks in 2009/2010.  (Glatt Tr. 43-44, 78-79; Footman Tr. 15).

### A.    Glatt's New York Accounting And Post-Production Internships

Glatt interned in the accounting and post production offices of the *Black Swan* film. (Glatt Tr. 43-44, 93).  He was retained as an Intern after responding to a posting for an unpaid internship on an upcoming Darren Aronofsky film and being interviewed for the position.  (Glatt

---

[5] Prior to Fall 2009, intern supervisors in Searchlight's New York office handled their own recruiting and on-boarding.  (Maybee Tr. 60).

Tr. 45).  He exchanged e-mails with Jeremy Powell (Assistant to the CEO, Protozoa Pictures) and was interviewed by Jennifer Roth (Unit Production Manager, Lake of Tears), Teddy Au (Production Accountant, Lake of Tears) and David Farr (First Assistant Accountant, Lake of Tears) at the offices of Protozoa Pictures in Williamsburg, Brooklyn and once in the midtown Manhattan production offices of *Black Swan*.  (Glatt Tr. 46, 49).  Neither Protozoa Pictures nor Lake of Tears, a subsidiary, is owned in whole or in part by FEG or Searchlight.  (Franklin Tr. 16 (noting that Searchlight was not yet involved when Lake of Tears was formed)).

At the time he was hired, Glatt understood that the internship was unpaid. (Glatt Tr. 45). Glatt was supervised by individuals hired by Lake of Tears, the production company that produced *Black Swan*.  (Glatt Tr. 46, 49).  Glatt reported to David Farr and Teddy Au.  (Glatt Tr. 83).  Glatt had no contact with or personal knowledge of any Production Interns that may have been engaged on any of the other four films about which discovery was conducted in this action. (Glatt Tr. 41-44).

**B.    Footman's New York General Production Office Internship**

Footman interned in the *Black Swan* production office. (Footman Tr. 41-42).  Footman also states that he performed work in the Art Department area of the office but was never credited as an Art Department intern.  (Footman Tr. 47).  Art Department tasks were assigned to him by the Art Director, possibly David Stein.  (Footman Tr. 47-48).

Footman interviewed with Jennifer Roth (Unit Production Manager ("UPM"), *Black Swan*).  (Footman Tr. 88-89).  He was looking for general experience and to learn about different departments. *Id*.  At the time he was hired, he understood that the internship was unpaid. (Footman Tr. 20-21).  Footman was hired prior to Searchlight's involvement, and there is no evidence that the terms and conditions of his internship changed after Searchlight became involved.  (Footman Tr. 121-22, 127, 189-90).  Footman primarily reported to Roth, Lindsay

Feldman (Production Office Coordinator, *Black Swan*) and Jodi Arneson (Assistant Production Office Coordinator, *Black Swan*), although others might give him assignments from time to time. (Footman Tr. 28).  Footman did not perform services for any of the other sample films nor does he have any personal knowledge of any of the experiences of the Production Interns engaged on those films, if any.  (Footman Tr. 21, 55).

The *Black Swan* production had many other departments - ***each*** with its own interns. (Footman Tr. 142-143).  For example, the Locations Department had interns who worked primarily on set, the Art Department had its own interns located in temporary offices and the Wardrobe Department had interns who worked in trailers on set, as did the Hair and Makeup and Set Departments.  (Glatt Tr. 85-87).

Glatt and Footman bring class and collective claims on behalf Production Interns engaged on other films in New York and nationwide and distributed by Searchlight.  (Am. Compl. ¶ 64, 90.)[6]  The parties have identified 27 nationwide film productions at issue.[7]  (Bloom Decl. ¶ 2). These productions were filmed at different time periods, in different locations and were produced by 27 different, independent film production companies, each of which hired its own cast and crew who supervised the alleged interns on that production.  (Franklin Tr. 16 (creating separate independent production companies is a "standard procedure in the film industry")).  Glatt admits that the interns he worked with on *Black Swan* did not work on other Searchlight films at issue, such as *500 Days of Summer, The Savages*, or *Cedar Rapids*.  (Glatt Tr. 44).

---

[6] Glatt and Footman have not made claims against FEG.

[7] Pursuant to Judge Pauley's Order, discovery has been conducted for five film productions: *Black Swan; Cedar Rapids; 500 Days of Summer*; *The Savages*; and *Our Family Wedding*.

### C.     Searchlight's Limited Role With Respect To Production Interns

Searchlight maintains that it was not an employer with respect to these films as it operates at arms' length pursuant to a written contract with each production company.  (Sayre Tr. 122-23, 131-33).  When Searchlight has a role in financing a film, Searchlight and the production company's roles and responsibilities are set forth in a Production Financing Distribution Agreement ("PFD").  (Sayre Tr. 122-23, 131-33).  The PFD Agreement represents an arms' length transaction between Searchlight and a production company – entities which have no common ownership.  (Bloom Decl. Ex. U, *Black Swan* PFD Agreement; Franklin Tr. 16).

While Searchlight may have input into certain key cast and crew decisions, it does *not* become involved in the day-to-day personnel decisions or hiring of non-key cast and crew. (Sayre Tr. 186, 189).  Instead, the production company on each film has responsibility for hiring of non-key personnel, including interns.  *Id*.

There was little, if any, consistency among the production companies.  (Sayre Tr. 183, 189).  For example, on *Black Swan* where Glatt and Footman were engaged, Searchlight did not have ***any*** involvement in the selection of unpaid interns, their schedules or the nature of the assignments they received. (Footman Tr. 121-22, 127, 189-90; Glatt Tr. 47, 130, 137-38, 177). Rather, those decisions were controlled by Lake of Tears, Inc., the production company which produced *Black Swan*.  *Id*.[8]  On the other hand, Ted Hope (Producer, *The Savages*) had his own policy of paying interns a ten dollar per day travel allowance (Hope Tr. 75-77), and there is no evidence that the other production companies offered similar compensation

---

[8] Indeed, Glatt and Footman were both retained by Lake of Tears to intern on *Black Swan* before Searchlight became involved in the project.  (Footman Tr. 121-22, 127, 189-90; Glatt Tr. 130).

### D.      Gratts' California Production Internship

Gratts interned in California on the *500 Days of Summer* film production.  (Gratts Tr. 40).
She testified that she was responsible for constructing and dismantling sets during the filming of
the movie.  (Gratts. Tr. 75-76, 80-81, 88, 56-57, 171-72).  She was supervised by Steven Fox,
who set her hours.  (Gratts Tr. 65, 158).

While Gratts alleges that she interned some time between "approximately April 2008"
and "approximately August 2008" (Am Compl. ¶ 21), the evidence is clear that she did not intern
after August 1, 2008, which renders her claims as untimely.  *See, generally,* Def.s' Mot. for
Summary Judgment.  Gratts admits that she has no recollection of any of the other Production
Interns from *500 Days of Summer* and only recalled interacting with Production Interns in set
design.  (Gratts Tr. 199-201).  Gratts did not know what tasks or experiences were common to
her and other Production Interns on *500 Days of Summer* or on any other production.  *Id.*

Gratts' testimony also establishes that her claims and experience as an intern on *500 Days
of Summer* were unique.  Gratts applied for and accepted the internship, *and* performed services
for the production company during the entire term of the internship, with the expectation that she
would be paid minimum wage.  (Gratts Tr. 61, 147).  In addition, she believed the production
company would allow her to use photographs of the sets she created for her portfolio.  *Id.*  She
states she only realized after she completed her internship that would not be paid or receive the
photographs.  *Id.*

### ARGUMENT

## IV.    PLAINTIFFS' FLSA CLAIMS CANNOT BE CERTIFIED AND NOTICE
SHOULD NOT BE ISSUED

Under the FLSA, employees may maintain an action "for and on behalf of ... themselves
and other employees similarly situated." 29 U.S.C. § 216(b).  Employees, however, do not have a

right to proceed in a collective manner.  To demonstrate the propriety of collective treatment,

Plaintiffs must factually establish their similarity to each other and the putative class.  *Damassia*

*v. Duane Reade, Inc.*, No. 04-CV-8219, 2006 WL 2853971, at * 3 (S.D.N.Y. 2006).

Merits discovery in this action has closed.[9]  Thus, Plaintiffs must establish that they are

"similarly situated" using a "more stringent standard of proof."  *Pacheco v. Boar's Head*

*Provisions, Inc.*, 671 F. Supp. 2d 957, 959 (W.D. Mich. 2009) (noting that "[a]t the close of

discovery, [the Court] make[s] a second determination, using a more rigorous standard, as to

whether the lead plaintiffs and the opt-in plaintiffs are similarly situated"); *Zivali v. AT&T*

*Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011); *Zavala v. Wal-Mart Stores, Inc.*,

No. 03-cv-5309, 2010 WL 2652510, *5 (D.N.J. Jun. 25, 2010).  This stringent standard requires

a specific factual analysis.  *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 299 (E.D. Pa.

2010) (finding the second-stage of the collective action analysis calls for a "specific factual

analysis"); *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000);

*Eng-Hatcher v. Sprint Nextel Corp.*, No. 07-Civ.-7350, 2009 WL 7311383 (S.D.N.Y. Nov. 13,

2009).

To satisfy this strict standard, courts examine the proposed class using the following three

factors:  (1) disparate factual and employment settings of the individual plaintiffs; (2) defenses

available which appear to be individual to each plaintiff; and (3) fairness and procedural

considerations.  When analyzing these factors, Courts must protect against the parties' due

process rights by permitting collective treatment only where liability can be established as to the

entire class.  *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 370-71 (D.N.J. 1987).  While Defendants

---

[9] The parties agreed to conduct full merits discovery *prior* to certification motions.  (Bloom
Decl. Ex. L, Hearing Tr. 5-6 (11/21/12)).  Indeed, the parties have produced extensive
documents, including ESI, and conducted more than 14 depositions in this action.

are the movants at this stage, the burden remains on the Plaintiffs to establish that they are similarly situated to the putative collective. *Zivali*, 784 F. Supp. 2d at 460.

A.   **The Factual And Employment Settings Vary**

With respect to the first factor, when a defendant's policies are lawful, a plaintiff cannot support certification based solely on those policies. *Zivali*, 784 F. Supp. 2d at 461-63. Rather, Plaintiffs must demonstrate that their job experiences are "sufficiently uniform and pervasive to warrant class treatment." *Id.* at 463. "The more dissimilar plaintiffs' job experiences are from one another and the more individuated an employers' defenses are, the less appropriate the matter is for collective treatment." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567 (E.D. La. 2008). Where the claims at issue are "hopelessly heterogeneous," the use of the collective action mechanism in §216(b) is "egregious." *Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008); *Espenscheid v. Directsat USA, LLC*, No. 12-1943, 2013 WL 407446, at *3 (7th Cir. Feb. 4, 2013) (certification inappropriate where individuals worked at different work locations, did different work and different amounts of work).

With respect to the Corporate Intern Collective, Antalik improperly claims that FEG uniformly misclassified Corporate Interns and that the decision to pay the Corporate Interns in the Fall of 2010 was made in a centralized manner, affecting many, if not all, alleged interns of the FEG subsidiaries. She further asserts that since previously unpaid interns were uniformly classified as exempt from wage and hour laws, such an allegedly common misclassification policy is enough to define all former unpaid interns as "similarly situated" for collective certification purposes.

The evidence establishes, however, that each Corporate Intern had a unique experience, driven by, among other things, the individual supervisor(s) who provided assignments and day-to-day supervision during the internship, the department and the nature of assignments available

13

and the time period in which he or she interned.  (Hoffman Tr. 206-08; 219-22; 226-27).  These unique experiences inevitably require the Court to individually assess whether each Corporate Intern was properly classified as an unpaid intern.

This is particularly true where, almost without exception, each Corporate Intern provided proof to Defendants establishing that his or her college or university had found him or her eligible to receive academic credit for the experiences to be provided during the internship.[10] (Hoffman Tr. 27; Hoffman Ex. 2; Hoffman Ex. 3).  Thus, it is clear that each Corporate Intern's college or university believed that the internship at Defendants would be educational and that each intern benefited from the experience at least by the receipt of academic credit.

Even assuming that Antalik can point to certain interns who failed to follow through and obtain academic credit or identify individuals who were dissatisfied with their internship experiences (which she has not done to date), this only supports the necessity of looking at each individual's experience.  Any dissatisfaction that was due, for example, to the nature of the assignments an intern received must be examined and compared to the reason(s) why other Corporate Interns may have been dissatisfied (or completely satisfied with their experience).

Importantly, since Antalik has chosen to broaden the scope of the putative collective to include hundreds of FEG subsidiaries, one cannot simply assume that each Corporate Intern had the same or similar experiences or assignments.  This is particularly true here, where the Corporate Interns worked for a variety of individual supervisors, in different departments at different time periods and in different work locations.

Not only will each inquiry differ, but so too will each answer based on the corporate entity that engaged the intern (including the department where he or she interned, their

---

[10] While Defendants did not track whether each intern followed up with her institution to actually obtain the academic credit, it is believed that almost all did and were awarded academic credit.

supervisor(s), projects, shadowing experiences, learning opportunities available to them), as well as the experience, education and initiative each intern took to take advantage of his or her internship – separate analyses are required.

Similar reasoning applies to the Production Intern Collective (comprised of a nationwide group of former Production Interns employed by individual production companies) who Glatt and Footman seek to represent. Even assuming, *arguendo*, that Plaintiffs can establish all Production Interns were employed by Searchlight, the experience of each Production Intern is very diverse. For instance, Ted Hope, of *The Savages,* paid his interns a $10 per day allowance to cover travel expenses, which was not discussed with Searchlight (Hope Tr. 75), while Lake of Tears, Inc. (*Black Swan*) engaged unpaid interns with no supplementary compensation. Some interns were engaged in the production office, like Glatt and Footman, with very different responsibilities and opportunities than interns who were engaged on production sets (like Gratts).

### B.      The Defenses Available Are Individual to Each Intern

When the potential defenses will be highly fact specific, as they are here, the second factor of the similarly situated analysis "weighs heavily against" certifying a collective action. *Zivali*, 784 F. Supp. 2d at 467-68. This second factor measures whether defendants' defenses could be applied across the board to plaintiffs' claims or whether many and perhaps disparate defenses could be raised. *Duncan v. Phoenix Supported Living, Inc.*, No. 2:05cv1, 2007 U.S. Dist. LEXIS 24649, *3 (W.D.N.C. 2007).

With respect to both the Corporate and Production Intern Collectives, Defendants are entitled to show, on a student-by-student basis, that the practical training and intangible benefits received by each student was significant and outweighed any benefit to a particular production company. For example, for each Intern, the parties must litigate the following factors:

15

(1) the internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

(2) the internship experience is for the benefit of the intern;

(3) the intern does not displace regular employees, but works under close supervision of existing staff;

(4) the employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

(5) the intern is not necessarily entitled to a job at the conclusion of the internship; and

(6) the employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.[11]

Here, a balancing of benefits must be conducted as to each intern based on what she did and what she got out of the experience. This would necessarily entail testimony and other evidence from each student, her supervisors and mentors, parents, friends, academic advisors, and past and future employers to ascertain the student's motivation for taking the internship (made relevant by *Walling*), what each intern actually did while on a movie production or in a corporate office, and the benefits he or she received.

For example, did a *Black Swan*'s intern's semester-end project give him unique insight into some aspect of movie production? Did the *500 Days of Summer* intern who worked with the Director's assistant get something of value from that experience? What was the quality of the speakers at a Corporate Intern's weekly lunches? Did internships at *Black Swan* suffer from the lack of a formal training program, or was the experience nevertheless useful?

---

[11] *See* Bloom Decl. Ex. S, United States Department of Labor, Wage and Hour Division, FACT SHEET #71: INTERNSHIP PROGRAMS UNDER THE FAIR LABOR STANDARDS ACT (April 2010) relying on the United States Supreme Court's decision in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947). In *Summa v. Hofstra Univ.*, the Eastern District of New York applied the *Walling* factors and noted "that *all* six factors [must] be met for a student to be classified as not an employee." (emphasis in original). 715 F. Supp. 2d 378, 389 (E.D.N.Y. 2010). In *Archie v. Grand Central Partnership*, the Southern District of New York approved the WHD six-factor test, but only in conjunction with the *Walling* opinion to the extent the factors were "not exhaustive" and "requires consideration of all the circumstances." 997 F. Supp. 504, 531-32 (S.D.N.Y. 1998).

Some interns undoubtedly had very useful training experiences while a particular production/office received no benefit; other interns might testify that the internship was less helpful, or be able to show that a production/office received more substantially useful work product than is usually the case.  Regardless of what the facts might eventually show, it is unavoidable that the facts will differ from intern to intern and must be examined individually.

Searchlight and FEG are also entitled to challenge Plaintiffs' allegations that they are joint employers of each other (with respect to the Corporate Interns) and the allegation that Searchlight jointly employed the Production Interns by being a mere financier on certain movie productions. Like the *Wallace* analysis, the joint employer test must be litigated for each and every Intern with respect to each and every movie production in which that Intern worked.

For example, should the Court utilize the "formal control" or "economic realities" test which might apply to the Production Interns,[12] it must for each Intern determine whether Searchlight (i) had the power to hire and fire the employees; (ii) supervised and controlled work schedule or conditions of employment; (iii) determined the rate and method of payment; and (iv) maintained employment records.  *Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132, 142 (2nd Cir. 2008).  The test must be determined on a "case-by-case basis." *Id.* at 141-42; *Jean-Louis v. Metro. Cable Comm'n., Inc.*, 838 F. Supp. 2d 111, 119 (S.D.N.Y. 2011).[13]  As a matter of law, Searchlight did not employ the putative Production Intern Classes/Collectives

---

[12] A similar multi-factor test must also be utilized against the Searchlight Corporate Intern class who claim that FEG jointly employed them.

[13] Courts have emphasized the importance of determining whether the alleged employer *in fact* exercised control over the plaintiff's work, as opposed to merely "having the power to" do so. *See, e.g., Tracy v. NVR, Inc.*, No. 04 Civ. 6541L, 2009 WL 3153150, at *5 (W.D.N.Y. Sept. 30, 2009) (finding allegation new defendant  "had the authority to take the actions" comprising the joint employer test was insufficient to establish claim), *adopted as modified (on other grounds)*, 667 F. Supp. 2d 244 (W.D.N.Y. 2009).

(specifically Glatt, Footman and Gratts) and FEG did not employ the putative Corporate Intern

Class/Collective (specifically Antalik).  *See*, *generally*, Def.s' Mot. for Summary Judgment.

Defendants also intend to raise any applicable statute of limitations defenses as to each

intern and have already litigated these defenses as to Plaintiffs Antalik and Gratts.  (Order,

11/21/12, Doc. #71).  As a matter of law, Gratts is time-barred and all claims brought on her

behalf should be dismissed.  *See*, *generally*, Def.s' Mot. for Summary Judgment.

### C.    Fairness and Procedural Considerations

The final factor – fairness and procedural considerations – requires the Court to consider

and balance the procedural impact and fairness of collective treatment.  The Court should review

"the primary objectives of the FLSA collective action to:  (1) lower the costs to plaintiffs through

the pooling of resources, and (2) limit the controversy to one proceeding which efficiently

resolves common issues of law and fact that arise from the same alleged activity.  *Reyes v. Texas

Ezpawn, L.P.*, 2007 WL 101808, at *6 (S.D. Tex. 2007).  The Court must also consider whether

it can coherently manage the class in a manner that will not prejudice any party or be particularly

burdensome on a jury.  *Id.*

Instead of proceeding in a manner where evidence and proofs can be presented on

collectively, the fractured nature of Plaintiffs' claims and theories necessitate separate mini-trials

for each and every member of each putative class.  These mini-trials will require separate and

voluminous documents for each participant and will require testimony from each plaintiff and

from each plaintiff's immediate supervisors and managers.  Thus, considerations of judicial

economy, docket management, and fairness are actually better served by denying certification

than by permitting this action to proceed collectively.

"Resolution of the many fact-specific issues in this case would essentially require . . .

mini-trials in which each individual plaintiff could present evidence that" his or her internship

experience in fact ran afoul of the FLSA – "evidence that would then be subject to cross-examination and similar challenge by the defendant." *See Zivali*, 784 F. Supp. 2d at 468. As the *Zivali* court concluded, "[s]uch a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." *Id*. (internal quotation marks and citation omitted).

For all of these reasons, the FLSA collective allegations should be stricken.

## V.    PLAINTIFFS CANNOT ESTABLISH CLASS CERTIFICATION OF THEIR NEW YORK AND CALIFORNIA CLAIMS

Plaintiffs Glatt, Footman, Antalik and Gratts seek to certify the following Rule 23 classes: New York Production Interns (Glatt and Footman), New York Corporate Interns (Antalik) and California Production Interns (Gratts).

The legal standard governing Plaintiffs' state law claims largely mirrors the FLSA, but is even more fact-intensive. Plaintiffs must "affirmative[ly] demonstrate," by a preponderance of the evidence, that the requirements of Fed. R. Civ. P. 23(a) are met: numerosity, commonality, typicality and adequacy of representation. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-51 (2011). The court cannot certify a class unless a "rigorous analysis" shows that each of these four factors is established. Fed. R. Civ. P. 23(b)(3); *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982).

Further, in applying that "rigorous analysis," the district court must "resolve[ ] factual disputes relevant to each Rule 23 requirement and find[ ] that whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *In re IPO Securities Litigation*, 471 F.3d 24, 41 (2d Cir. 2006). This requires the trial court to consider the factual and legal issues associated with the merits of plaintiffs' underlying, substantive claims. *Dukes*, 131 S. Ct. at 2551 52; *see also id.* at 2552, n.6 (explaining that putative class plaintiffs must

convince the court of the merits of their substantive claims at the class certification stage, even though (should they prevail there), they also must prove the merits of their claims again at trial). *See also, e.g., Ahmad v. Old Republic Nat'l Title Ins. Co.*, 690 F.3d 698, 702 (5th Cir. 2012) ("A court *must* consider how the case will be tried on the merits if the class is certified, identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.") (emphasis added; quotation and citation omitted); *Ellis v. Costco Wholesale Corp.* 657 F.3d 970, 981 (9th Cir. 2011).

### A.    Plaintiff Cannot Satisfy The Commonality Requirement

Rule 23 does not merely require Plaintiffs to show that their claims assert the same violations or share common questions; the key to certification is proof that a class-wide trial will "generate common answers" – that the "determination of [the common claim's] truth or falsity will resolve an issue that is central to the validity of each one of the claims *in one stroke*." *Dukes*, 131 S. Ct. at 2551 (emphasis added).  The common question Plaintiff poses here – whether interns were unlawfully misclassified – has no common answer.

The legality of unpaid corporate and production internships will all turn on a *state- law* analysis of whether each intern was the primary beneficiary of his or her internship on the production.  While the federal internship analysis (which *may* also apply in California)[14] turns on the six factors discussed above, New York uses an eleven-factor analysis, adding five more individualized inquiries to the DOL's list.[15]

---

[14] No California Court has adopted a definitive test determining whether an intern is properly classified.  While the California Department of Labor Standards Enforcement ("DLSE") has recently adopted the DOL's six factor test (Bloom Decl. Ex. M), abandoning its own prior application of an 11-factor test, it is unclear whether courts will follow the recent opinion.  *See e.g., Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004 (Cal. 2012).

[15] *See* Bloom Decl. Ex. N, NYSDOL Fact Sheet P725 (4/11) for the additional New York factors.

Plaintiffs Gratts, Footman and Antalik (who seek to represent New York Corporate and Production Interns) cannot possibly satisfy the commonality element of Rule 23(a)(2) nor the predominance or superiority elements of Rule 23(b)(3).  As noted in Sections I.1 and I. above, this analysis depends entirely on individualized testimony and other particular evidence concerning each student's motivation for pursuing the internship, his or her experience, and the education, training and intangible benefits he or she received.  On these facts, resolution of the factors as to one student will say nothing about how the balance should be resolved for another. The analysis is simply too fact-dependent for class treatment.

### B.    **Plaintiffs Cannot Prove Predominance**

More demanding than the commonality requirement, Rule 23(b)(3) requires Plaintiffs to show not merely that there are common questions that could be answered once but rather that such common issues so dominate any individual questions that a class trial would "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Cordes & Co. Fin. Servs. v. AG Edwards & Sons*, 502 F. 3d 91, 104 (2d Cir. 2007).

The Second Circuit's decision in *Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 368 (2011), shows why common issues do not predominate here.  *Myers* requires that a district court examine whether the duties that the putative class members actually performed are so uniform that their exempt status can be determined on an aggregate basis. Complexity arises in misclassification cases because an individual's exempt status, and, therefore, her entitlement to minimum wage or overtime, depends not on an abstract job

description, but on "examination of the 'dut[ies] that the employee' actually 'performs.'"  *Id*. at 549 (quoting 29 C.F.R. §541.700(a)).[16]

The determination of whether each putative class member was appropriately classified as an unpaid intern turns on individualized, fact-specific considerations that must be applied to a multi-part test.  This includes, *inter alia*, looking at the nature of the training received, the benefits the intern received, the degree of supervision, the nature of the intern's tasks and their benefit, if any, to the employer, and the intern's understanding about any entitlement to wages. There is no common question which can replace this individualized analysis.  Individualized issues predominate, and the class allegations must be stricken.

### C.    <u>Plaintiffs Are Not Adequate Class/Collective Representatives</u>

Even leaving aside the overwhelming individuality of the issues, it is already clear that the proposed state-law classes fails the requirements of Rule 23(a)(3), which require that the class be represented by an individual whose claims are "typical" and who will be an "adequate" class representative.  Some courts hold that these requirements tend to merge, ensuring that the named class representative will adequately protect the interests of absent class members and that a trial focusing on the representative will be fair.  *See, e.g.*, *Blank v. Jacobs*, No 03-cv-2111, 2009 WL 3233037, at *4 (E.D.N.Y. 2009) (internal citations omitted).  As explained below, the facts before the Court concerning each of the named Plaintiffs demonstrate that each cannot serve in their respective roles rendering the respective class claims moot.  *Turkman v. Ashcroft*, 589 F.3d 542, 545 (2d Cir. 2009).[17]

---

[16] The Department of Labor also confirms that whether an employee is exempt or not depends on what work the employee actually does from day to day.  The Department, for example, has long emphasized the importance of actual job duties over written descriptions or broad categories.

[17] *See*, *supra*, at 4-5, 7-9, 10-11 (for the facts concerning each Plaintiff).

Here there is no "typical" case; the detailed circumstances of each internship are critically material to the claims presented because the Court must determine the primary beneficiary of each internship.  The prerequisite established by Rule 23(a)(3) is not met.  The proposed class representatives also fail the adequacy and typicality tests because Defendants have fact-specific defenses that threaten their individual claim.  *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 903 F.2d 176, 180 (2d Cir. 1990).

### 1.    Eden Antalik Was Not Engaged By FEG or Aimee Hoffman

Antalik was a Corporate Intern in Searchlight's New York office.  (Antalik Tr. 36).  She did not provide services to FEG, but relies on Aimee Hoffman, who provided recruiting, on-boarding services and administrative support to several FEG subsidiaries, as the lynchpin, purportedly tying Searchlight to FEG's hundreds of subsidiaries and their corporate internship programs (if any).  However, Antalik did not participate in Hoffman's recruiting process – the only alleged link holding a few FEG entities together.  (Maybee Tr. 60).  Instead, Antalik was interviewed and hired by her supervisor John Maybee – after she applied with Searchlight directly for the internship in New York. (Antalik Tr. 70-73).  Indeed, Hoffman had no connection with Antalik until the midpoint of the summer of 2009.  (Bloom Decl. Ex. P).  And, even then, Hoffman's involvement did not impact Antalik's experiences as a New York Intern because Antalik was already engaged when Hoffman's involvement began.[18]

### 2.    Eric Glatt and Alexander Footman Did Not Intern on The Production Set

As discussed above, Glatt was engaged in the accounting and post-production departments on *Black Swan* and Footman was engaged in the general production department.

---

[18] This necessarily undercuts Plaintiffs' theory that Hoffman's involvement in FEG's nine subsidiaries demonstrates a common scheme or practice.  Even if it did, individualized issues would still predominate as to who was impacted by Hoffman's on-boarding procedures.

(Footman Tr. 87; Glatt Tr. 254, 301).  Neither Glatt nor Footman was engaged as Interns on the physical set of production, such as in the Art, Wardrobe, Hair and Make-up and/or Set Departments of *Black Swan* which, the evidence shows, engaged their own Interns.  (Footman Tr. 87-89, 142-43; Glatt Tr. 74, 80). Neither Glatt nor Footman worked on any other Searchlight film and Glatt confirmed that the Interns he was engaged with similarly did not Intern on any other Searchlight film.  (Footman Tr. 54-56; Glatt Tr. 41-45).

Not only are Glatt and Footman's experiences atypical from each other, but they are also atypical from the Interns who worked in the other *Black Swan* departments and on other Searchlight films (who also had separate departments and engaged their own Interns).  (Footman Tr. 54-56; Glatt Tr. 41-43).  As discussed above, these differences in work experiences will lead to individualized defenses as to these two plaintiffs which render them atypical.  *Gary Plastic Packaging Corp.* 903 F.2d at 180.

### 3.   Kanene Gratts Is Time-Barred And Thought She Would Be Paid

Gratts seeks restitution for alleged unpaid minimum wages under California's Unfair Competition Law ("UCL"), which carries a four-year statute of limitations.  Cal. Gov't Code § 17208.  The Court has determined that this statute does not relate back to the date of the filing of the lawsuit (Order, 10/9/12, Doc. 46), and thus, the only relevant time period for the California Production Intern Class begins on September 5, 2008 until the present (i.e., 4 years prior to the Plaintiffs' filing of the Motion to Amend The Complaint on September 5, 2008).[19]  Gratts, by her own admission, did not intern after September 5, 2008.  (Gratts Tr. 39).  Accordingly, she has no

---

[19] *See Rothman v. Grego*, 220 F.3d 81, 96 (2d Cir. 2000) ("[T]he date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes.").

claim and thus, cannot represent any putative Intern who may have a claim and the Court should dismiss the putative class of Production Interns brought on her behalf.[20]

Even if she had a claim, Gratts is inadequate because unlike the other Production Interns who have asserted claims with respect to other productions, Gratts testified that she took the position with the knowledge that she would be paid and did not intend to be an unpaid intern. (Gratts Tr. 62, 66). Thus, she cannot meet the *Wallace* test above. Without passing the *Wallace* test herself, Gratts cannot represent other who can.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be granted.

Dated:     New York, New York
           February 15, 2013

                              PROSKAUER ROSE LLP


                              By: *s/ Elise M. Bloom*
                                   Elise M. Bloom
                                   Amy F. Melican
                              Eleven Times Square
                              New York, NY  10036-8299
                              Phone:  (212) 969-3000
                              Fax:  (212) 969-2900
                              ebloom@proskauer.com
                              *Attorneys for Defendants*

---

[20] *See In re Tobacco II Cases*, 46 Cal. 4 298, 312 (2009).