UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ERIC GLATT, ALEXANDER FOOTMAN,
EDEN ANTALIK, and KANENE GRATTS, on
behalf of themselves and all others similarly
situated,

                          Plaintiffs,

                        v.

FOX SEARCHLIGHT PICTURES, INC., and
FOX ENTERTAINMENT GROUP, INC.,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No. 11 CV 6784
(WHP)

ECF Case

## MEMORANDUM OF LAW IN OPPOSITION TO PLANITIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF DEFENDANT FOX SEARCLIGHT PICTURES, INC.'S MOTION FOR SUMMARY JUDGMENT DISMISSING ALEXANDER FOOTMAN, ERIC GLATT AND KANENE GRATTS' CLAIMS

Dated:     New York, New York
            March 29, 2013

PROSKAUER ROSE LLP

By: /s/ Elise M. Bloom
    Elise M. Bloom
    Amy F. Melican
Eleven Times Square
New York, NY 10036-8299
Phone: (212) 969-3000
Fax: (212) 969-2900
ebloom@proskauer.com
*Attorneys for Defendants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................ 4

ARGUMENT ................................................................................................... 4

I.   PLAINTIFFS' MOTION SHOULD BE DENIED AS TO FOOTMAN AND
     GLATT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
     SHOULD BE GRANTED AND THEIR CLAIMS BE DISMISSED ........................... 4

     A.   Neither Footman nor Glatt Was Jointly Employed by Searchlight ...................... 4

          1.   Plaintiffs' Analysis Must Be Rejected Because It Mixes
               Allegations Concerning Different Productions, People and Internships
               and Does Not Individually Analyze Footman or Glatt's Relationship
               with Searchlight ................................................................................ 6

          2.   Footman and Glatt Were *Never* Employed by Searchlight During
               Any of Their Internships ...................................................................... 8

               a.   Searchlight *Never* Exercised Formal Control Over Footman
                    or Glatt ...................................................................................... 8

                    i.    Searchlight Did Not Have the "Power" to Hire or Fire
                          Footman or Glatt .................................................................. 8

                    ii.   Searchlight Did Not Supervise or Control the
                          Schedules or Conditions of Footman or Glatt's
                          Employment ........................................................................ 12

                    iii.  Searchlight Did Not Determine Footman or Glatt's
                          Rate of Pay or Method of Payment ...................................... 15

                    iv.   Searchlight Did Not Maintain Employment Records
                          for Footman or Glatt ........................................................... 17

               b.   Searchlight Never Exercised Functional Control Over
                    Footman and Glatt ...................................................................... 18

                    i.    Searchlight Did Not Provide Premises or Equipment
                          to Footman or Glatt ........................................................... 19

|  |  | ii. | Lake of Tears Shifted from One Financier to Another | 20 |

| | | iii. | Footman and Glatt Did Not Perform Discrete Jobs That Were Integral to Searchlight | 20 |

| | | iv. | Lake of Tears Is Not Fungible and Responsibility Could Not Pass to Another Without Material Changes | 21 |

| | | v. | Searchlight Did Not Supervise Footman or Glatt's Activities | 21 |

| | | vi. | Exclusive or Predominant Engagement by Searchlight Is Not Enough to Satisfy the "Functional Control" Test | 22 |

B.   Even Assuming Searchlight Was Footman or Glatt's Joint Employer, Footman and Glatt Were Always Properly Classified as Unpaid Interns.............22

    1.   The Court Should Apply the Primary Benefit Test and Find That Plaintiffs Were Properly Classified as Exempt from the Wage and Hour Requirements Under the "Intern" / "Trainee" Exemption...............23

    2.   Footman and Glatt Were the "Primary Beneficiaries" of Their Internships.............................................................................................26

    3.   Issues of Fact Exist Regarding the DOL Six-Factor Test As Applied to Footman and Glatt...............................................................29

II.   PLAINTIFFS' MOTION SHOULD BE DENIED AS TO GRATTS AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT GRANTED.....................32

  A.   Gratts' Claim Is Time-Barred............................................................................32

  B.   Gratts Was Never Employed by Searchlight......................................................34

  C.   Even Assuming Searchlight Employed Gratts, Gratts Was Always Properly Classified As an Unpaid Intern...........................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Archie v. Central Partnership,*
  997 F. Supp. 504 (S.D.N.Y. 1998) ...........................................................25, 26, 30

*Barfield v. N.Y. City Health & Hospital Corp.,*
  537 F. 3d 132 (2d Cir. 2008).................................................................6, 17, 24

*Blair v. Wills,*
  420 F.3d 823 (8th Cir. 2005) ...........................................................................23

*Brinker Restaurant Corp. v. Superior Ct.,*
  53 Cal. 4th 1004 (Cal. 2012)............................................................................36

*Carter v. Dutchess Community College,*
  735 F.2d 8 (2d Cir. 1984).............................................................................5, 6

*Carter v. Mayor of Baltimore City,*
  2010 U.S. Dist. LEXIS 18477 (D. Md. Mar. 2, 2010).........................................30

*Copantitla v. Fiskardo Estiatorio, Inc.,*
  788 F.Supp. 2d 253 (S.D.N.Y. 2011)................................................................19

*Demayo v. Palms West Hospital Ltd. P'ship,*
  2013 U.S. Dist. LEXIS 14891 (S.D. Fla. Jan. 23, 2013) .................................29, 31

*Futrell v. Payday California Inc.,*
  190 Cal. App. 4th 1419 (Cal. App. 2d Dist. 2010) ..............................................34

*Gattuso v. Harte-Hanks Shoppers, Inc.,*
  42 Cal. 4th 554 (2007) ...................................................................................36

*Godlewska v. HDA,*
  2013 U.S. Dist. LEXIS 350, at *25 (E.D.N.Y. Jan. 2, 2013) ................11, 14, 21, 22

*Goldberg v. Whitaker House Coop.,*
  Inc. 366 U.S. 28 (1961).....................................................................................5

*Gorey v. Manheim Servs. Corp.,*
  788 F.Supp. 2d 200 (S.D.N.Y. 2011).................................................................12

*Grutter v. Bollinger,*
  539 U.S. 306 (2003).........................................................................................26

*Gulf King Shrimp Co. v. Wirtz,*
    407 F.2d 508, 515 (5th Cir. 1969) ................................................................5, 35

*Hallissey v. America Online, Inc.,*
    2006 U.S. Dist. LEXIS 12964 (S.D.N.Y. Mar. 10, 2006) .....................................30

*Herman v. RSR Security Servs.,*
    172 F. 3d 132 (2d Cir. 1999)..................................................................6, 9, 11

*Hernandez v. La Cazuela de Mari Restaurant Inc.,*
    538 F. Supp. 2d 528 (E.D.N.Y. 2007) ................................................................19

*Howard v. Securitas Security Servs.,*
    2008 U.S. Dist. LEXIS 106690 (N.D. Ill. Oct. 20, 2008).....................................30

*Jacobson v. Comcast Corp.,*
    740 F. Supp. 2d 683 (D. Md. 2010) ...................................................................15

*Jean-Louis v. Metropolitan Cable Communications Inc.,*
    838 F. Supp. 2d 111 (S.D.N.Y. 2011)............................................................ *passim*

*Joseph v. Nichell's Caribbean Cuisine, Inc.,*
    862 F. Supp. 2d 1309 (S.D. Fla. 2012) ...........................................................24, 25

*Kaplan v. Code Blue Billing & Coding, Inc.,*
    2013 U.S. App. LEXIS 1433 (11th Cir. Jan. 22, 2013).......................................29

*Lawrence v. Adderley Industries,*
    2011 U.S. Dist. LEXIS 14386 (E.D.N.Y. Feb. 11, 2011).....................................11

*Lopez v. Acme American Environmental Co.,*
    2012 U.S. Dist. LEXIS 173290 (S.D.N.Y. Dec. 6, 2012) ....................................4, 7

*Maddock v. KB Homes, Inc.,*
    631 F.Supp. 2d 1226 (C.D. Cal. 2007) ..............................................................17

*Marshall v. Regis Educational Corp.,*
    666 F.2d 1324 (10th Cir. 1981) .......................................................................26

*McLaughlin v. Ensley,*
    877 F.2d 1207 (4th Cir. 1989) .....................................................................23, 26

*Moreau v. Air France,*
    356 F.3d 942 (9th Cir. 2004) ......................................................................14, 21

*Okoro v. Pyramid 4 Aegis,*
    2012 U.S. Dist. LEXIS 56277 (E.D. Wis. Apr. 23, 2012).....................................30

*Paz v. Piedra,*
  2012 U.S. Dist. LEXIS 4034 (S.D.N.Y. Jan. 12, 2012)....................................5, 7, 20

*Reich v. Parker Fire Protection Dist.*
  992 F.2d 1023. 1027 ...............................................................................24, 25, 28

*Rojas v. Roman Catholic Diocese of Rochester,*
  660 F.3d 98 (2d Cir. 2011).....................................................................................33

*Rothman v. Gregor,*
  220 F.3d 81 (2d Cir. 2000).....................................................................................32

*Sandoz v. Cingular Wireless, LLC,*
  769 F. Supp. 2d 1047(W.D.LA. 2010) ..................................................................35

*Scott v. Harris,*
  550 U.S. 372 (2007)...............................................................................................33

*Solis v. Laurelbrook Sanitarium & Sch., Inc.,*
  642 F.3d 518 (6th Cir. 2011) ....................................................................23, 24, 28

*Todaro v. Township of Union,*
  27 F.Supp. 2d 517 (D.N.J. 1998) ..........................................................................32

*Torres v. Gristede's Operating Corp.,*
  2011 WL 4571792 (S.D.N.Y. 23, 2011).............................................................9, 11

*Tracy v. NVR,*
  2009 WL 3153150 (W.D.N.Y. Sept. 30, 2009) .....................................................12

*Ulrich v. Alaska Airlines, Inc.,*
  2009 WL 364056 (W.D. Wash. Feb. 9, 2009) .......................................................29

*Velez v. Sanchez,*
  693 F.3d 308 (2d Cir. 2012)...................................................................................24

*Walling v. Portland Terminal Co.,*
  330 U.S. 148 (1947)...................................................................................23, 24, 30

*William v. Strickland,*
  87 F.3d 1064 (9th Cir. 1996) .................................................................................30

*Zheng v. Liberty Apparel Co.,*
  355 F.3d 61 (2d Cir. 2003)............................................................................ passim

## STATUTES AND OTHER AUTHORITIES

29 U.S.C. § 207(a)(1)..................................................................................................4

29 C.F.R. § 553.......................................................................................................30

Fair Labor Standards Act ("FLSA") ................................................................. *passim*

Cal. Bus. & Prof. Code § 17208 ............................................................................32

Janet Eyler, *The Power of Experiential Education* .................................................26

Joseph Aoun, "*Protect Unpaid Internships*," *Inside Higher Ed* ............................26

New York Labor Law ("NYLL") ...................................................................... *passim*

U.S. Dep't of Labor Op. Letter,
    1995 WL 1032473, at *1 (Mar. 13, 1995) ......................................................25

U.S. Department of Labor, Wage and Hour Division, Fact Sheet #71 .............25, 28

DLSE Op. 1998.11.12..............................................................................................36

DLSE Op. 2010.04.07.........................................................................................36, 37

## PRELIMINARY STATEMENT

Plaintiffs' motion for partial summary judgment seeks to hold Defendant Fox Searchlight

Pictures, Inc. ("Searchlight") liable as:

(i)    Alexander Footman's employer under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") from October 2009 through February 2010 in connection with activities supervised by Lake of Tears, Inc. employees Lindsay Feldman (Production Office Coordinator) and Jodi Arenson (Production Office Assistant) while he was engaged in the Lake of Tears' Production Office as an intern during the *Black Swan* film production;

(ii)   Eric Glatt's employer under the FLSA and NYLL from December 2009 through February 2010 in connection with activities supervised by Lake of Tears employees Theodore Au (Production Accountant) and David Farr (1st Production Accountant) while he was engaged in the Lake of Tears' Production Office Accounting Department (a position he interviewed for and accepted in October 2009) *and* from March 2010 through August 2010 in connection with the activities supervised by Lake of Tears employee Jeff Robinson (Post Production Supervisor) during the *Black Swan* production;[1] and

(iii)  Kanene Gratts' employer under the California Unfair Competition Law ("CAUCL") from April 2008 through approximately August 2008 in connection with the activities supervised by Palmera Production, Inc. employee Steven Fox (Construction Foreman) while she was an intern in the Art Department during the *500 Days of Summer* film production.

Plaintiffs' motion should be denied in its entirety, and the Court should grant Defendant's

motion for summary judgment as to Footman, Glatt and Gratts, and dismiss all of their claims.

Plaintiffs' arguments in support of their motion are flawed for many reasons; however,

the overarching flaw is the fact they ignore that claims of "joint employment" require a case-by-

case, individualized analysis. Instead, Footman, Glatt and Gratts each improperly seek to prop-

up his/her assertion that he/she was employed by Searchlight by relying on a *shared* base of

allegations, which are manufactured by combining alleged facts pulled from (i) other internships

---

[1] In the Amended Complaint, Glatt asserts he was engaged for one unpaid day in October 2009; however, plaintiffs do not discuss that alleged internship in their motion. Notably, Searchlight could not have been Glatt's employer during the October 2009 alleged internship because Searchlight did not have any role with respect to *Black Swan* at that time. *See, infra*, 3.

(e.g., Footman improperly seeks to rely on facts relating to Glatt and Gratts' internships), (ii) film productions on which he/she was never involved (e.g., Footman seeks to rely on alleged facts relating to *500 Days of Summer*); and (iii)  Searchlight's alleged relationship with individuals who were never unpaid interns and whose relationships with Searchlight are factually distinct from its alleged relationships with plaintiffs  (i.e., Footman seeks to rely on Searchlight's alleged relationship with the *Black Swan* Director's paid assistant, whose employment was contractually-mandated).

Moreover, as noted in Defendant's Motion for Summary Judgment, the economic realities with respect to Footman's internship establish, as a matter of law, that Searchlight was never his "joint employer."  Among other things, it is undisputed that Lake of Tears –  the independent production company that produced *Black Swan* – was formed in September 2009 (DSOF ¶ 27)[2] and, thereafter, developed the film's script and – relying on a financing commitment from another entity (not Searchlight) – established a budget, selected shooting locations, set a production schedule, hired key cast and crew (as well as most of the other production staff), retained a payroll service company and obtained office space and equipment for the film – all *before* Searchlight ever got involved with the film.  *Id.* ¶¶ 37-41.  It is incredible for Footman to assert that he had a "joint employer" relationship with Searchlight when it is undisputed that he:  was engaged, and began his internship in October 2009 – *before* Searchlight had any role in the film *(Id.* ¶ 73); was supervised by Lake of Tears' employees hired *before*

---

[2] Defendant's brief in support of its Motion for Summary Judgment is cited as ("DSJ Br.") and its Rule 56.1 Statement of Facts is cited as ("DSOF ¶ __").  Plaintiffs' brief in support of their summary judgment motion is cited as ("PSJ Br.") and their Statement of Facts is cited as "PSOF ¶ __."  All cited sources are attached to Elise M. Bloom, Esq.'s Declaration, sworn to on February 15, 2013, in Support of Defendant's Motion for Summary Judgment ("Bloom SJ Decl.") or her declaration, sworn to on March 29, 2013, in Opposition to plaintiffs' summary judgment motion ("Bloom II Decl.").  Depositions ("Tr.") and declarations ("Decl.") and their exhibits, are cited by the individual's name and the page or paragraph number.

Searchlight had a role in the film (*Id.* ¶¶ 37-41); and cannot identify a single Searchlight employee who directed his employment at any time. *Id.* ¶ 78. Moreover, Footman's supervisors, office space and schedule did not change in November 2009 after Searchlight became involved in the film. *Id.* ¶ 79. As a matter law, Footman was never employed by Searchlight and his claims should be dismissed.

It is similarly undisputed that in connection with his Accounting Department internship, Glatt interviewed with and was engaged by Lake of Tears in October 2009, *before* Searchlight had a role in *Black Swan. Id.* ¶¶ 97-100. He was supervised by Lake of Tears' employees hired *before* Searchlight's involvement (*Id.* ¶¶ 37-41), and cannot identify anyone at Searchlight who gave him instructions. *Id.* ¶ 105. Glatt identified himself as associated with Lake of Tears (with no mention of Searchlight) in the signature block he used during this internship. *Id.* ¶ 107. Thus, Glatt's claims concerning his Accounting Department internship should also be dismissed.

With respect to Glatt's post production internship, the facts establish that he interviewed with, and was engaged and supervised, by Lake of Tears employees who were hired *before* Searchlight had a role in *Black Swan* (*Id.* ¶ 44), and he admitted that did not receive any assignments or documents from Searchlight. *Id.* ¶ 113. Thus, the undisputed evidence also establishes that Glatt was never jointly employed by Searchlight during his post production internship.

Even if Footman or Glatt could clear the threshold hurdle of establishing that Searchlight was his "joint employer" during one of his internships, Plaintiffs' motion should be denied and Defendant's granted because, as a matter of law, neither Footman nor Glatt was misclassified as an unpaid intern. This Court should apply the "primary benefit" test and refuse to adopt the rigid, all-or-nothing test Plaintiffs posit. As explained below, the facts before the Court establish

that Footman and Glatt – *not* Searchlight – received the "primary benefit" of each internship. Accordingly, even if Searchlight was found to a joint employer as to either of them, the Court should find they were not misclassified and dismiss their claims for this independent reason.

Plaintiffs' motion should also be denied with respect to Gratts because it is clear that her claims are time-barred under the four-year statute of limitations that applies to claims brought under the California Unfair Competition Law ("CAUCL"). That time-bar is dispositive, and this Court need not even reach the joint employment question. However, even if the Court did consider Gratts' claim on the merits it should find – as a matter of law – that she was never employed by Searchlight and was not misclassified as an unpaid intern.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants refer the Court to the facts set forth in this brief and in their Motion for Summary Judgment, including the Memorandum of Law and Rule 56.1 Statement submitted in connection with that motion. Dkt. 93-102, 109. Defendants also refer the Court to the Counter Statement of Facts they are submitting with respect to plaintiffs' Rule 56.1 Statement.

## ARGUMENT

**I. PLAINTIFFS' MOTION SHOULD BE DENIED AS TO FOOTMAN AND GLATT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED AND THEIR CLAIMS BE DISMISSED.**

### A. Neither Footman nor Glatt Was Jointly Employed by Searchlight.

To succeed on their FLSA and NYLL claims, Footman and Glatt must each establish, *inter alia*, that he was employed by Searchlight. *See* 29 U.S.C. § 207(a)(1) (FLSA); *Lopez v. Acme Am. Envtl. Co.*, 2012 U.S. Dist. LEXIS 173290, at *6 (S.D.N.Y. Dec. 6, 2012) ("To be liable under the FLSA and NYLL, a person must be an 'employer'") (citation omitted).

In an effort to satisfy the threshold issue of "joint employment," plaintiffs rely on the broad definitions of "employ" in the FLSA and argue that Footman and Glatt were employed by

Searchlight because Searchlight "suffered or permitted" their work on the *Black Swan* film production. PSJ Br. 11-14. This simplistic application of the "suffer and permit" language should be rejected because it ignores the well-established U.S. Supreme Court and Second Circuit precedent requiring courts faced with "joint employer" claims to evaluate the "economic realities" of each plaintiff's alleged relationship with the alleged employer.[3]

Indeed, the Supreme Court has instructed that for purposes of the FLSA, a determination that an employee-employer relationship exists must be grounded in "economic reality." *Goldberg v. Whitaker House Coop., Inc.* 366 U.S. 28, 33 (1961); *see also Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003) ("An entity 'suffers or permits' an individual to work if, as a matter of 'economic reality,' the entity functions as the individual's employer"); *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) ("It is common ground that courts, in determining whether an employment relationship exists for purposes of the FLSA, must evaluate the 'economic reality' of the relationship"). Among other things, the economic reality test is "intended to expose outsourcing relationships that lack a substantial economic purpose, *but it is manifestly not* intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA." *Zheng*, 355 F.3d at 76 (emphasis added); *see Jean-Louis v. Metro. Cable Communs., Inc.*, 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011) (limiting liability to "cases in which defendants, based on the totality of the circumstances, function as employers of the plaintiffs *rather than mere business partners* of plaintiffs' direct employer") (emphasis added) (quoting *Zheng,* 355 F.3d at 72); *see also Paz v. Piedra*, 2012 U.S. Dist. LEXIS 4034, at

---

[3] In fact, the cases cited by plaintiffs in their "suffer and permit analysis" recognize the need to look at  the economic realities. For example, in *Gulf King Shrimp Co. v. Wirtz,* in upholding the injunction issued after trial to prevent Gulf King from allowing minor children to work in its facility, the court relied on the district court's findings, which had "carefully enumerated the *'economic realities'* of the relationship subsisting between the under-aged workers" and Gulf King. 407 F.2d 508, 515 (5th Cir. 1969) (emphasis added).

*2 (S.D.N.Y. Jan. 12, 2012) ("a 'mere business partner[s] of [a worker's] direct employer is not

also that worker's employer") (citation omitted).

To evaluate the economic reality of an alleged "joint employer" relationship for purposes

of the FLSA, the Second Circuit has adopted non-exhaustive formal and functional control tests.[4]

*See Carter*, 735 F.2d at 12; *Zheng*, 355 F.3d at 72; *see also* DSJ Br. 7-8 (identifying formal and

functional control factors).  Thus, those tests must be the *starting point* for this Court's review

with respect to Footman and Glatts' claims.[5]  An analysis of those tests establishes, as a matter of

law, that Searchlight's decision to become Lake of Tears' business partner[6] – and its role as a co-

financier on *Black Swan* and the future distributor of the completed film – did not transform it

into Footman or Glatt's joint employer.

### 1. Plaintiffs' Analysis Must Be Rejected Because It Mixes Allegations Concerning Different Productions, People and Internships and Does Not Individually Analyze Footman or Glatt's Relationship with Searchlight.

It is well-established under both the FLSA and NYLL that the economic realities must be

"determined on a case-by-case basis." *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F. 3d

132, 141-42 (2d Cir. 2008); *Carter*, 735 F.2d at 12 n.1 (noting a "case by case analysis is

required" when evaluating the "economic reality" of an alleged employer-employee

relationship); *Jean-Louis*, 838 F. Supp. 2d at 119.  This is because the presence of an

employment relationship turns on the "economic realities" of each individual plaintiff's

---

[4] Footman and Glatt's claims are brought under the FLSA and NYLL, which apply the same standards in the joint employer context. *See Zheng*, 355 F.3d at 78.

[5] Plaintiffs do not address the economic realities until the last point of their brief.  *See* PSJ Br. 24-30.  They also fail to recognize that the Second Circuit's formal and functional control tests do not apply to Gratts, whose claims are brought under the CAUCL.  *See, supra*, 3-4.

[6] Indeed, Lake of Tears had significant assets when Searchlight became one of its business partners, including, for example, a script, an experienced and successful Director (Darren Aronofsky) and Producer (Scott Franklin) and key cast (including Natalie Portman) and crew with creative and professional expertise.  Bloom SJ Decl. Ex. T (PFD Agreement).

relationship with the alleged employer. *See, supra,* at 5-6; *Herman v. RSR Security Servs.,* 172 F. 3d 132, 139 (2d Cir. 1999) (noting that the court must look at the alleged employer's control with respect to "*the workers in question* . . . with an eye to the 'economic reality' presented by *the facts of each case*") (emphasis added and citations omitted); *Paz,* 2012 U.S. Dist. LEXIS 4034, at *16 (noting that the analysis concerns "whether two entities jointly employ *a particular worker*" and undertaking an individualized analysis as to each plaintiff and defendant and granting summary judgment, in part, dismissing claims against certain corporate defendants because a joint employer relationship was not present for each). This Court's decision in *Lopez,* 2012 U.S. Dist. LEXIS 173290, at *14, is instructive. In evaluating the "economic reality" to determine whether a joint employment relationship was present for purposes of a motion to dismiss, this Court applied a case-by-case, individualized analysis with respect to the allegations of *each* plaintiff concerning *each* alleged employer. *Id.* (finding that while defendant Acme Group may have been alleged to have functional control over certain employees, three of the corporate defendants were not alleged to have had such control and that certain employees' relationships with defendants "provide[d] a foil" to the plaintiffs).

In analyzing the economic realities of their alleged joint employment relationship with Searchlight, both Footman and Glatt fail to perform the required case-by-case, individualized analysis. Instead, they both improperly seek to prop up their formal and functional control analyses with a blend of facts they pull together from different sources. For example, they each seek to rely on facts related to:

- the *500 Days of Summer* film production, including the way *500 Days of Summer's* Line Producer (Jenny Hinkey) was allegedly hired (PSJ Br. 25), despite the fact that (i) neither Footman nor Glatt ever interned on that production (DSOF ¶¶ 86, 115); (ii) Searchlight's involvement in that film was based on a separately negotiated contract from the one that governed its involvement with *Black Swan* (*Id.* ¶ 48, 121); (iii) Hinkey was not the line producer on *Black Swan* (*Id.* ¶ 31) (listing Roth as line producer); and (iv) neither Footman

nor Glatt claims Hinkey engaged him or supervised his internships (*Id.* ¶¶ 76, 103, 112);

- Searchlight's alleged approval of *Black Swan* Director Darren Aronofksy's paid assistant (PSJ Br. 25); despite the fact that (i) the assistant's relationship is factually distinct from Footman and Glatts' roles as unpaid interns (Franklin Tr. 59 (testifying that a *paid* assistant was part of Aronofsky's *contract*); (Sayre Tr. 197 (explaining approval for Aronofsky's assistant was needed during post production because his paid role had not been budgeted to continue, and would affect the overall total budget.))

Plaintiffs' blended approach attempting to manufacture a set of facts that supports a "joint employer" analysis should be rejected. Rather, joint employment must be examined on a case-by-case – plaintiff-by-plaintiff, internship-by-internship – basis. *See, supra,* 6-7.

### 2. Footman and Glatt Were *Never* Employed by Searchlight During *Any* of Their Internships.

*None* of Footman or Glatt's internships can satisfy the "formal control" or "functional control" tests that apply to FLSA and NYLL joint employment claims. Thus, each of their claims must be dismissed as a matter of law. *See, generally*, DSJ Br. 6-20 (setting forth and analyzing formal and functional control test factors).

#### a. Searchlight *Never* Exercised Formal Control Over Footman or Glatt.

##### i. *Searchlight Did Not Have the "Power" to Hire or Fire Footman or Glatt*

As discussed above, Footman and Glatt's attempt to rely on evidence concerning Searchlight's alleged role with respect to the *500 Days of Summer* film production and the *500 Days of Summer* Line Producer (PSJ Br. 25), must be rejected. *See, supra,* 7. *500 Days of Summer* was a separate film, produced in Summer 2008 in California (more than a year earlier and 2,500 miles away from the *Black Swan* production). DSOF ¶¶ 12-24. It was produced by a different production company (500 DS Films, Inc.) (*Id.* ¶ 121) using its own production staff (Bloom SJ Decl. Ex. FF (Crew List)), pursuant to a distinct contractual arrangement with

Searchlight. DSOF ¶ 121. Thus, facts related to that (or any other) production have no relevance to Footman or Glatt's claims, which concern their alleged roles on *Black Swan*.

Footman and Glatt's reliance on Searchlight's alleged approval of the *Black Swan* Director's assistant during post production (PSJ Br. 25) is similarly misplaced. The assistant was contractually mandated, paid, would affect the overall budget because his employment had been scheduled to end, and was Aronofsky's assistant, making approval "a bigger issue." Sayre Tr. 197; Franklin Tr. 59. In contrast, Footman and Glatt were unpaid, did not have a contract, did not affect the budget and were not supervised by Aronofsky or an employee of his stature.

In addition, while plaintiffs' attempt to rely on *Herman*, 172 F3d. at 140, and *Torres v. Gristede's Operating Corp.*, 2011 WL 4571792, at *2 (S.D.N.Y. 23, 2011), for the proposition that a alleged employer's hiring of managerial staff and subsequent delegation of responsibility can be indicative of control (PSJ Br. 25), those cases are not relevant here. Each of Footman and Glatt's supervisors was hired by Lake of Tears and had an established role on *Black Swan* – which included selecting his/her *own* staff for his/her department  (DSOF ¶ 34) – *before* Searchlight ever got involved with the film. *Id.* ¶¶ 31, 42-6. This renders plaintiffs' unsupported assertion about Searchlight's alleged delegation irrelevant.

With respect to Footman, the undisputed evidence establishes that Footman applied, interviewed, accepted and began his internship *before* Searchlight had a role in the film. Footman Tr. 127 (testifying that Searchlight's role in *Black Swan* began in November 2009 *while* he was serving as an unpaid intern). Moreover, each of the individuals Footman identifies as having engaged and supervised him – Roth (UPM), Feldman (Production Office Coordinator) and Arenson (Production Office Assistant) - was hired by Lake of Tears *before* Lake of Tears approached Searchlight about the film. DSOF ¶¶ 31, 43; Franklin Decl. Ex. J. Indeed the

undisputed evidence establishes that Franklin (Producer) and Lake of Tears hired Roth (UPM) *before* Searchlight was involved in *Black Swan. Id.* ¶ 31. Roth then worked with Aronofsky and Franklin to hire the department heads, who were in place on *Black Swan before* Searchlight became involved. *Id.* ¶¶ 32-3, 38-9. This included Feldman (Production Office Coordinator) (*Id.* SOF ¶43) and Arenson (Production Office Assistant). *See* Franklin Decl. Exs. D, J.

The evidence also establishes that Glatt was engaged on *Black Swan* without any involvement by Searchlight. With respect to his Accounting Department internship, the evidence establishes that Roth interviewed Glatt *before* Searchlight was involved in the film. (Glatt Tr. 73) (testifying he interviewed with Roth in September 2009). On October 6, 2009 Glatt interviewed with Au (Production Accountant) and Farr (1st Assistant Accountant) and on October 26, 2009 he was engaged in the Accounting Department – all *before* Searchlight became involved. DSOF ¶¶ 97, 99, 200. In addition to Roth (*Id.* ¶ 31), all of Glatts' supervisors – Au (*Id.* ¶ 42), Farr (*Id.* ¶ 46), Deidre Cook Donohue (2nd Assistant Accountant) (*Id.* ¶ 104) and Kerry Roberts (Payroll Accountant) (*Id.* ¶ 104) – were hired by Lake of Tears *before* any involvement by Searchlight. *See* Franklin Decl. Ex. D.

With respect to his post production internship, the evidence establishes that Glatt spoke to Roth (UPM) and Robinson (Post Production Supervisor) and was interviewed and engaged by Robinson. DSOF ¶¶ 44, 110-12. Both Roth (*Id.* ¶ 31) and Robinson (*Id.* ¶ 44) were hired by Lake of Tears *before* Searchlight became involved. *See* Franklin Decl. Ex. D. Thus, the undisputed evidence establishes that Searchlight did not engage Footman or Glatt, and there is no evidence that it had the power to engage either of them.

Footman and Glatts' assertion that Searchlight had the power to fire them is also unsupported. Neither Footman nor Glatt was fired from the *Black Swan* production. DSOF ¶ 83.

Moreover, neither has produced evidence that *anyone* on the production – much less someone who was a below-the-line, unpaid intern like them – was fired by Searchlight.  Footman and Glatt attempt to rely on Searchlight's contractual PFD Agreement with Lake of Tears to support their claim, asserting that, pursuant to that agreement, Searchlight had the power to "fire production personnel." PSJ Br. 25.  This assertion must also be rejected.

The PFD Agreement did *not* specifically provide Searchlight with any right to fire Footman or Glatt (or any other intern).  Bloom Decl. Ex. T.  To the extent plaintiffs rely on Searchlight's purported generalized right to replace personnel based on contractual language in the PFD Agreement, Searchlight had a right, but not the obligation, to make such decisions but *only* if certain conditions were met.  Bloom Decl. Ex. T at DS0004756; PSOF ¶ 17.[7]  Indeed, courts in this Circuit have held that a contractual agreement evidencing an alleged employer's authority to fire *even the worker in question* is insufficient to establish the first factor of the formal control test if the defendant has not actually exercised the authority.  *See Jean-Louis*, 838 F.Supp. 2d at 124-25 (rejecting plaintiffs' reliance on contractual authority, noting plaintiffs' assertion of power "ha[d] more to do with theory than reality"); *Lawrence v. Adderley Indus*, 2011 U.S. Dist. LEXIS 14386, at *9 (E.D.N.Y. Feb. 11, 2011).

Footman and Glatt's assertion that Searchlight had the power to fire them is further undercut by the undisputed evidence establishing  that Searchlight did *not* have any role with respect to *interns* engaged on *Black Swan*.  Sayre Tr. 194-95 (noting production company, and *not* Searchlight, was responsible for recruiting, hiring, assigning tasks to, training and supervising interns).  There simply is no evidence that Searchlight had, much less exercised, any

---

[7] In both *Herman* and *Torres*, the courts' findings that the first factor was present were based on each alleged employer's *actual* exercise of the power. *See Herman*, 172 F.3d at 140; *Torres*, 2011 WL 4571792, at *2.

power to hire or fire Footman or Glatt (or any other unpaid intern); thus, the first formal control factor has *not* been established. *See Godlewska* v. *HDA*, 2013 U.S. Dist. LEXIS 350, at *25 (E.D.N.Y. Jan. 2, 2013) (finding power to fire was not established where "[t]here is no evidence . . . that [City defendant] has power, let alone ever exercised power, to require HDA to fire a home attendant entirely as opposed to reassigning the attendant to another position"); *Gorey v. Manheim Servs. Corp.*, 788 F.Supp. 2d 200, 210 (S.D.N.Y. 2011) (finding no evidence that defendants *actually* hired or fired any of the plaintiffs and, therefore, did not "possess[] the power to control the workers in question"); *see also Jean-Louis*, 838 F. Supp. 2d at 124 (finding defendant cable company did not have power to fire plaintiff technicians where "the record does not contain any evidence that [defendant cable company] has ever instructed [vendor] to discipline . . . any individual technician" and that the cable company "ever asked, let alone demanded" that technicians be terminated); *Tracy v. NVR*, 2009 WL 3153150, at *5 (W.D.N.Y. Sept. 30, 2009) (finding allegation defendant "had the authority to take the actions" comprising the joint employer test insufficient to establish claim).  Accordingly, the first formal control factor is not satisfied.

> ii. *Searchlight Did Not Supervise or Control the Schedules or Conditions of Footman or Glatt's Employment*

As noted above,  the undisputed facts establish that Footman received his assignments related to *Black Swan* from Roth (UPM), Feldman (Production Office Coordinator) and Arenson (Production Office Assistant), who were all employed by Lake of Tears (not Searchlight).  *See, supra*, 9-10; DSJ Br. 12-14.  In fact, when Footman wanted to change his schedule from five to two days a week, he sought and received approval from Feldman.  DSOF ¶ 75.

Similarly, with respect to Glatt, the undisputed facts establish that he received his Accounting Department assignments from Roth, Au (Production Accountant) and Farr (1st

Assistant Accountant), each of whom was employed by Lake of Tears (and not Searchlight). *See, supra*, 10; DSJ Br. 12-14. Indeed, it was Au who approved paying Glatt for a day of work in January 2009. AC ¶ 117-18. During his Post Production internship, the facts establish that Glatt was supervised by Robinson (Post Production Supervisor), who also was a Lake of Tears employee. (DSJ Br.12-14). When Robinson was not present or did not leave him assignment, Glatt testified he had nothing to do. (Glatt Tr. 301-02).

Ignoring the record evidence – including their own testimony – Footman and Glatt now claim that Searchlight allegedly "supervised and controlled employee work schedules and conditions of employment on a daily basis." PSJ Br. 25. However, Footman and Glatt do not identify the Searchlight "employee" who they contend exerted the alleged control. *Id.* Nor were they able to do so during discovery. During his deposition, Footman could not identify *anyone* working on the *Black Swan* production who was controlled by a Searchlight employee. Footman Tr. 129. Moreover, in responding to interrogatories served by Defendants, neither Footman nor Glatt identified a single Searchlight employee allegedly who exerted control. *See* Bloom SJ Decl. Ex. AA and EE.

Instead of identifying an individual with control, Footman and Glatt rely generally on Searchlight's *receipt* of call sheets, production reports and wrap reports, which they claim "*informed* Searchlight of daily on-goings of the production and worker's schedules." PSJ Br. 25 (emphasis added). Notably, the evidence plaintiffs offer, arguably, establishes that Searchlight was "informed," "reviewed" and "monitored" various general information. PSJ Br. 25. Significantly, Glatt and Footman provide no evidence that shows that after receiving such documents any employee at Searchlight actually exercised control with respect to Footman or Glatt (or anyone else on the production). Indeed, Footman and Glatt's names are not even listed

on the *Black Swan* call sheets and production reports. *See,* e.g., Bien SJ Decl. Ex. 38, at

D002739-40, D002763-64. [8]

Courts recognize that there is a difference between an alleged joint employer having the

ability to "affect" an individual's work and actually "controlling" or "supervising" that work. *See*

*Godlewska*, 2013 U.S. Dist. LEXIS 350, at *27 (finding no joint employment and granting

alleged employer summary judgment finding that "[e]xercising quality control by having strict

standards and monitoring compliance with those standards does not constitute supervising and

controlling employees' work conditions"); *Jean-Louis*, 838 F. Supp. 2d at 126 (finding no joint

employment and granting summary judgment where alleged employer sent work orders, but did

not provide instructions on how plaintiffs should be assigned to perform the work).[9]

The undisputed evidence in this case establishes that Searchlight – even if it was involved

in the film's finances – did not control or supervise Footman or Glatt's activities or schedules.

Rather, Searchlight's role was that of co-financier and distributor of the completed film – not

producer.  DSOF ¶¶ 49, 51-52.  Searchlight was simply tracking its financial investment in the

film and its desire to ensure that the production and film were completed on-time, within budget

and following the creative representations that had been part of its decision to become Lake of

Tears' business partner.[10]  DSOF ¶ 67; *see also* Sayre Tr. 17 (discussing process of working with

---

[8] Similarly, the wrap reports simply list the shooting and call times for each day.  Sayre Tr. 83.

[9] *See also Moreau v. Air France*, 356 F.3d 942, 950 n.5 (9th Cir. 2004) (finding no joint
employment and granting summary judgment as Air France did not control schedules of
contractors servicing planes despite Air France "schedul[ing] its flight . . . which necessarily
indicated when the services were to be performed" but contractors "remained responsible for
designating which employees would report to service the aircraft").

[10] Film Finances, the completion bond company on *Black Swan*, received similar documents from
Lake of Tears, as did Cross Creek, a co-investor sharing the burden of financing the film with
Searchlight.  *See, e.g.,* Sayre Tr. 151, 173-4; SF 46-47; Franklin Tr. 11, 21.

creative executives from script to film), 50-51 (describing reason for receiving production reports and call sheets as ensuring budget is being followed).

Searchlight's receipt of call sheets, production reports and wrap reports and the like is a common practice within the industry (DSOF ¶ 66) and its review of them was *not* used to exert control over Footman or Glatt's daily schedules or conditions of employment. *Id.* ¶¶ 55, 60, 66-67 (noting that Searchlight did not get involved in day-to-day supervision of the film's interns); *see also* Sayre Tr. 193-95 (noting Searchlight was not aware of the interns' activities).  Thus, receipt of these documents cannot establish this formal control factor.  *See, e.g., Zheng,* 355 F.3d at 74-75 (finding that "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement"); *Jacobson v. Comcast Corp.,* 740 F. Supp. 2d 683, 692 (D. Md. 2010) (granting summary judgment where there was no evidence "to indicate [defendant's] maintenance of [information about technicians' assignments] [wa]s used to control a technician's day-to-day employment, or that [defendant] retain[ed] records for any purpose beyond quality control").

Even if budgetary approval alone could satisfy this formal control factor (which it cannot), such control is not present here because the undisputed evidence establishes that Lake of Tears had autonomy with respect to budget issues on a daily and weekly basis and at the line-item level. DSOF ¶¶ 63, 64.  Lake of Tears had "the right and ability to manage the budget [and] move money around as [it] saw fit" *without* clearing the changes with Searchlight.  *Id.* ¶ 63. Lake of Tears had established the budget (*Id.* ¶¶ 61, 62) and needed to clear changes with Searchlight only if the *total* overall budget amount would be affected.  *Id.* ¶ 64.  As a matter of law, Searchlight's role as a co-financier and the distributor of *Black Swan* (and its interest in

keeping the production within the budget it was helping to finance) cannot transform

Searchlight's role from business partner into Footman or Glatt's joint employer.

   iii. *Searchlight Did Not Determine Footman or Glatt's Rate of Pay or*
     *Method of Payment*

  The decision not to pay Footman and Glatt was made by Lake of Tears' employees

*before* Searchlight was even involved with the film. *See*, *supra*, at 9-10. Plaintiffs assert,

however, that Searchlight had a general "policy" that production interns must either be paid or

receive academic credit, and that as a result of this alleged policy it "de facto" set Footman and

Glatt's wages. PSJ Br. 26. This argument should be rejected.

  First, neither Footman nor Glatt offers any evidence that the alleged policy ever applied

to him. Indeed, the evidence they proffer establishes that their internships – which were unpaid

and without academic credit – *violated* the alleged policy on which they seek to rely.

Second, Searchlight did not "de facto" set Footman and Glatt's unpaid status through its alleged

control over the film's budget. Indeed, it is undisputed that at the time Searchlight became

involved in the *Black Swan* project, Footman and Glatt had both been engaged and the unpaid

nature of their internships set. *See*, *supra*, 9-10. Because Footman and Glatt were both unpaid,

there is no basis for finding that their internships were part of, or affected by, any personnel

expenses that were included in the final budget Searchlight approved.

  Further, Footman and Glatt's conclusory assertion that Searchlight "decided how many

crew members could be hired into particular positions within the allocated budget" (PSJ Br. 26)

is inconsistent with the undisputed evidence, which establishes that the budget was prepared by

Lake of Tears (DSOF ¶¶ 61, 62) and that the hiring decisions were made by Lake of Tears

without Searchlight's involvement and, in many cases, before Searchlight became involved in

the production. DSOF ¶¶ 36-39; *see also* Sayre Tr. 21 (testifying that the line producer "hires

the crew…and basically is the boss of most of the crew on the film"); *see, supra*, 9-10. Finally, even assuming, *arguendo*, Searchlight might have affected the wages and benefits in other productions, there is no evidence before the Court that it did so with respect to *Black Swan*. Sayre Tr. 35 (noting while she sometimes suggested changes to the fringes of the budget, which could affect wages and benefits paid to the crew, she did _not_ do so on the *Black Swan* film). Thus, the third formal control factor has not been established either.

> iv. *Searchlight Did Not Maintain Employment Records for Footman or Glatt*

The undisputed evidence establishes that Footman did not sign any production paperwork from Searchlight. DSOF ¶ 80. Moreover, all the paperwork Glatt signed – in connection with his one paid day in January 2010 – identifies Lake of Tears (not Searchlight) as the producer/employer. *See* Bloom II Decl. Ex. C, at DS0002325-9.

In addition, Lake of Tears was the entity that engaged a third-party payroll service, "Cast and Crew," to handle the payroll services for the film. DSOF ¶ 40. Furthermore, Au (Production Accountant) acknowledged that the Lake of Tears' Accounting Department (not Searchlight) was responsible for "collecting and maintaining" deal memos and employment agreements of the cast and crew and submitting payroll information to Cast and Crew. Au Decl. ¶ 7.

Moreover, all the employment-related documentation Glatt signed, including a "Cast & Crew" payroll record and I-9 Form for a day in January 2010 (when Au decided he should be paid) (AC ¶ 117), identifies *Lake of Tears* as the employer; Searchlight is not mentioned. *See, supra*, at 17; *see, e.g., Jean-Louis*, 838 F. Supp. 2d at 130 (*citing Barfield*, noting that relevant inquiry is whether putative employer maintained employment records _concerning hours worked_ by the individual technicians) (emphasis added); *see also Maddock v. KB Homes, Inc.*, 631

F.Supp. 2d 1226, 1234 (C.D. Cal. 2007) (holding that maintenance of employee records via shared payroll services and joint database alone is insufficient as a matter of law to meet the economic reality test). Thus, the fourth formal control factor is not satisfied, either.

As a matter of law, neither Footman nor Glatt can establish _any_ of the four formal control factors. Accordingly, Defendant's motion for summary judgment should be granted, Plaintiffs' motion denied, and their claims dismissed.

> b. Searchlight _Never_ Exercised Functional Control Over Footman and Glatt.

Footman and Glatt cannot satisfy any of the elements of the functional control test, either. _See_ DSJ Br. 7-8 (identifying and analyzing factors). Significantly, Plaintiffs' assertion that Lake of Tears was created as an attempt to obscure Searchlight's obligations under the FLSA or that it is the type of "fly-by-night sub-contractor[] that Congress had in mind when it broadly defined an 'employer' to cover both (judgment-proof) subcontractors and the wealthier contractors that principally benefited from their work" (PSJ Br. 27-8) is completely disproved by the undisputed evidence.

For example, the evidence shows that Franklin and Aronofsky incorporated Lake of Tears on September 11, 2009 to protect their projects as they looked for investors for _Black Swan_. Franklin Tr. 16. At the time, Lake of Tears had significant assets, including a script and an experienced Director (Aronofsky) and Producer (Franklin) committed to producing the film. DSOF ¶¶ 25-27. It is also undisputed that by the time Searchlight became involved, Lake of Tears also had a production plan, budget, shooting schedule, payroll service firm, key cast members and crew and many other employees. _Id._ ¶¶ 37-8, 40. There was nothing "fly-by-night" associated with Lake of Tears.

Moreover, the creation of Lake of Tears could _not_ have been motivated by a desire to protect Searchlight, because Searchlight had no involvement with _Black Swan_ at that point! _Id._

¶¶ 27, 47-8.  Furthermore, Lake of Tears continues to exist (at least as of Franklin's November 2012 deposition), more than two years *after* the *Black Swan* production wrapped.[11]  Franklin Tr. 23.

> i.  *Searchlight Did Not Provide Premises or Equipment to Footman or Glatt*

In evaluating this factor, courts in this Circuit consider whether the plaintiff used the alleged employer's offices, facilities or equipment. *See e.g., Copantitla v. Fiskardo Estiatorio, Inc.,* 788 F.Supp. 2d 253, 312 (S.D.N.Y. 2011).  Here, Footman and Glatt interned at Lake of Tears' offices, which were obtained <u>*before*</u> Searchlight was involved with the film.  DSOF ¶ 41.  There is no evidence that Footman or Glatt were ever engaged in – or even visited – Searchlight's offices in New York or elsewhere. DSJ Br. 16.

There is also no evidence that Footman or Glatt ever used Searchlight's equipment.  Rather, by the time Searchlight got involved, Lake of Tears had established production offices and filming was about to begin.  DSOF ¶¶ 36, 41.  Footman and Glatt's attempt to rely on the sale of the film's "props" to establish that Searchlight provided "equipment" (PSJ Br. 28) must be rejected.  First, given Footman's role in the Production Office and description of his responsibilities, he had little to no contact with props.  As to Glatt, there is simply no evidence to suggest he had any contact with props during his Accounting Department and post production internships.  Second, there is no evidence showing that Searchlight ever received money from the sale of any item.  Nor is there any basis for crediting plaintiffs' unsupported claim that the items "became" Searchlight equipment because – allegedly –  some portion of the proceeds went to Searchlight as one of the film's investors.

---

[11] Indeed, there is no evidence that Lake of Tears lacks assets or that Footman or Glatt would be unable to recover from Lake of Tears.

Plaintiffs cite no authority for their claim that funding, alone, is evidence of "functional control." Indeed, adopting plaintiffs' argument would have a chilling effect on all investors (whether in the film or another industry), by bringing in exactly the type of business partners the Second Circuit has said should be excluded. Thus, the second functional control factor has not been established. *See, e.g., Zheng*, 355 F.3d at 76 (noting economic realities test for joint employment was *not* intend to create joint employer FLSA liability with respect to "*mere business partners of plaintiffs' direct employer*") (emphasis added); *see also Paz*, 2012 U.S. Dist. LEXIS 4034, at *24.

### ii. *Lake of Tears Shifted from One Financier to Another*

There is no evidence that Lake of Tears could not shift as a unit from Searchlight. Indeed, Lake of Tears had previously made such a shift, when it, along with the employees it had hired, began working with Searchlight and Cross Creek after its prior financing partner withdrew. DSOF ¶ 47. Moreover, had Searchlight backed out, Lake of Tears would have looked for a new investor to finance *Black Swan*. DSOF ¶ 50. As previously noted, the evidence establishes that Lake of Tears was far from being a subterfuge. *See, supra*, 17-18. Rather, Lake of Tears had the script, the production employees, the knowledge, expertise and equipment to move forward with producing the film; it simply lacked the funding. *See, supra,* 18.

Furthermore, there is no evidence that the PFD Agreement with Searchlight, or any other contractual agreement, precluded Lake of Tears from working on other projects. *See generally* Bloom Decl. Ex. T (PFD Agreement). Had Lake of Tears chosen to do so, it could have produced another film or worked on other projects. The fact that Lake of Tears has not done so is *not* the result of any contractual prohibitions established by Searchlight. *See Zheng*, 355 F.3d at 75 n.2 (noting that factor (6) *but not factor* (2), would weigh in favor of joint employment if a subcontractor worked solely for a single client but had the ability to seek other clients).

### iii. *Footman and Glatt Did Not Perform Discrete Jobs That Were Integral to Searchlight*

Footman's role as an intern in the Production Office and Glatt's activities in the Accounting Department and during post production were small pieces of the film production process. They were not integral to Searchlight's (or even Lake of Tears') business. Notably, Searchlight does not produce films and was not the producer of *Black Swan*. (DSOF ¶¶ 4, 52, 53). Nor does Searchlight rely on financing productions as its only source for the films it distributes. Sayre Tr. 66-67 (noting Searchlight obtains films from a variety of sources, including the purchase of completed films). Neither Footman nor Glatt performed piece work or a discrete line-job. Thus, there is no basis for plaintiffs' unsupported assertion that Footman and Glatt were responsible for "production of Searchlight's films" or that production of films was "integral" to Searchlight's business. Accordingly, this factor is not satisfied. *See Godleweska*, 2013 U.S. Dist. LEXIS 350, at *40; *Moreau*, 356 F.3d at 952.

### iv. *Lake of Tears Is Not Fungible and Responsibility Could Not Pass to Another Without Material Changes*

Where "plaintiffs were tied to [the alleged joint employer] rather than to the contractors that hired them," the fourth "functional control" factor weighs in favor of finding "joint employment." *Godlewska*, 2013 U.S. Dist. LEXIS 350, at *41 (citations omitted); *see also* DSJ 18-19. This factor is not present with respect to Footman or Glatt. Notably, Footman and Glatt were engaged by Lake of Tears at a time when Searchlight was not involved in the film. *See, supra*, 2-3. Indeed, Glatt testified at his deposition he was interested in *Black Swan* because of *Aronofsky's* involvement (Glatt Tr. 45) – not Searchlight's *theoretical* involvement in the future.[12]

---

[12] When Glatt (and Footman) applied, another entity was providing the financing for the film and there was no reason to believe that Searchlight would ever be associated with *Black Swan*.

There is no evidence that the individuals hired by Lake of Tears, particularly the many employees hired before Searchlight became involved in the production (DSOF ¶ 38), had relationships with or alliances to Searchlight as opposed to their employer, Lake of Tears. DSJ Br. 18-9. Indeed, Lake of Tears and its employees had already shifted from a prior investor. DSOF ¶ 47. Thus, this factor is not satisfied.

### v. Searchlight Did Not Supervise Footman or Glatt's Activities

As explained above, there is no basis for finding that Searchlight supervised Glatt or Footman's activities on *Black Swan*. *See, supra*, 8-15; *see also* DSJ Br. 19.

### vi. Exclusive or Predominant Engagement by Searchlight Is Not Enough to Satisfy the "Functional Control" Test

The fact that Footman and Glatt's activities during their internships were related to *Black Swan*, does not, by itself, create a joint employer relationship. DSJ Br. 19-20; *see Jean-Louis*, 838 F. Supp. 2d at 137 (finding no joint employment and granting summary judgment to defendant Time Warner where the only relevant factor was that Metro works for Time Warner); *see also Godlewska*, 2013 U.S. Dist. LEXIS 350, at *44 (finding no joint employer relationship and granting defendants' summary judgment where plaintiffs established they had worked for defendant for several months-long stretches "albeit by [their] own choice").

As a matter of law, *none* of the factors that comprise the functional control test are present. *See also* DSJ Br. 10-20. Accordingly, the Court should deny Plaintiffs' motion and grant Defendant's motion for summary judgment, dismissing Footman and Glatt's claims.

### B.   Even Assuming Searchlight Was Footman or Glatt's Joint Employer, Footman and Glatt Were Always Properly Classified as Unpaid Interns

Even assuming, *arguendo*, that Footman and Glatt could establish that Searchlight was their joint employer, plaintiffs' motion must still be denied because plaintiffs were properly classified as unpaid interns. Plaintiffs' statement of the law that should apply when analyzing

their internships is incomplete and misleading.  Rather, contrary to plaintiffs' assertions (PSJ Br.

18), this Court should look at the totality of circumstances surrounding each internship and

determine whether the intern or the engaging entity (in this case, Searchlight) was the primary

beneficiary of the relationship (hereinafter the "primary benefit test").  A rigid, all-or-nothing

application of the six-factors identified in the DOL Fact Sheet is *not* the applicable standard.

> **1. The Court Should Apply the Primary Benefit Test and Find That Plaintiffs Were Properly Classified as Exempt from the Wage and Hour Requirements Under the "Intern" / "Trainee" Exemption**

The U.S. Supreme Court has held that a for-profit employer may hire "trainees" who are

exempt from the FLSA's minimum wage requirements. *Walling v. Portland Terminal Co.*, 330

U.S. 148 (1947).  Although the Second Circuit has not yet applied the *Walling* test to interns,

almost every circuit court that has done so has applied a primary benefit test and held that if,

after viewing the totality of circumstances, the internship's benefits to the intern outweigh the

benefits to the engaging entity, the internship is properly classified as exempt from FLSA wage

requirements.  *See, e.g., Solis v. Laurelbrook Sanitarium and Sch., Inc. ("Laurelbrook")*, 642

F.3d 518, 525-29 (6th Cir. 2011) (focusing on relative benefits of the internship to the intern as

compared to the engaging entity and considering whether the intern or the engaging entity

received the "primary benefit"); *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005) (finding

requirement that plaintiffs "do chores" was *not* tantamount to treating plaintiffs as "employees,"

"because 'the chores were intended to instill in each student a sense of team-work, responsibility,

accomplishment, and pride,' and thus ultimately *benefited* the student") (emphasis added);

*McLaughlin v. Ensley,* 877 F.2d 1207, 1209-10, n.2 (4th Cir. 1989) (holding that test to assess

lawfulness of unpaid internship should be "whether the employee or the employer is the *primary*

*beneficiary* of the trainees' labor") (emphasis added).

This Court should adopt and apply a primary benefit test when evaluating an intern's claim that he or she was misclassified. The Sixth Circuit's application of the primary benefit test is particularly instructive.  In *Laurelbrook*, that Court focused on the internship and its relative benefits to the intern versus the engaging entity and considered which received the "primary benefit." *Laurelbrook*, 642 F.3d at 525-29.  Such a test effectively "captures the distinction the FLSA attempts to make between trainees and employees." *Id.*  Indeed, other courts, including the Second Circuit, have noted that a primary benefit test provides a court with the flexibility to consider, in the context of the totality of circumstances, the individualized economic realities and benefits the relationship provides to the intern and the engaging entity.  *See Velez v. Sanchez*, 693 F.3d 308 (2d Cir. 2012); *see also Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023. 1027 (comparing analysis of "trainee" exemption to that of "independent contractor" and noting that "determinations of employee status under FLSA in other contexts are not subject to rigid tests but rather consideration of a number of criteria in their totality").

As other courts have done, this Court should reject the rigid test offered by plaintiffs.[13] *See, e.g., Reich,* 992 F.2d at 1027 (surveying circuit and district court decisions and noting that DOL criteria were "relevant but *not conclusive*") (emphasis added).  Indeed, the Sixth Circuit has even found that a strict application of the six-factors from the DOL Fact Sheet is inconsistent with the U.S. Supreme Court's decision in *Walling*.  *See Laurelbrook*, 642 F.3d at 522-29. (surveying circuit court decisions and finding that the majority rejected strict application of the requirements of the DOL Fact Sheet, particularly the idea that all six factors *must* be satisfied).

---

[13] This Court should also refuse to strictly apply the 11-factor N.Y. Department of Labor criteria (Bloom II Decl. Ex. M) for the same reasons.

The DOL Fact Sheet, which was issued in April 2010, is not binding authority and does not require deference.[14] *Joseph v. Nichell's Caribbean Cuisine, Inc.*, 862 F. Supp. 2d 1309, 1316, n.1 (S.D. Fla. 2012) ("[A] U.S. Department of Labor Fact Sheet is not binding law.")  The DOL Fact Sheet is not an "opinion letter"; rather, by its *own* terms, is a "general information" publication.  Bloom II Decl. Ex. L (DOL Fact Sheet), at 2 (emphasis added).  Moreover, the express limitations of the Fact Sheet, itself, make strict adherence inappropriate.  According to its own language, the Fact Sheet is merely meant to provide "*general information to help* determine whether interns must be paid [the FLSA] minimum wage…for the[ir] services." *Id.* 1 (emphasis added).  It "is not to be considered in the same light as official statements of position contained in the regulations." *Id.* 2.

Moreover, over the years, the DOL has inconsistently applied the six-factors, and at least one DOL Opinion Letter supports applying a primary benefit test, rather than the "all criteria must be met" test plaintiffs espouse.  *See, e.g., U.S. Dep't of Labor Op. Letter*, 1995 WL 1032473, at *1 (Mar. 13, 1995) ("If, in fact, this internship program is *predominately for the benefit* of the college students, we would not assert an employment relationship") (emphasis added); *see also Reich*, 992 F.2d at 1027 (*quoting* Op. Wage-Hour Adm'r No. 638 (July 18, 1967) ("The Court has made it clear that there is no single rule or test for determining whether an individual is an employee, but that *the total situation* controls. The Court has indicated a number of factors which help to determine whether an employment relationship exists").

Furthermore, *Archie v. Grand Cent. P'ship*, 997 F. Supp. 504 (S.D.N.Y. 1998), the single decision Plaintiffs cite in support of their argument (*see* PSJ Br. 18 n.13), does *not* require that

---

[14] In this Circuit, "[s]tatutory interpretations contained in DOL *opinion letters*, which do not stem from "formal agency adjudication or notice-and-comment rulemaking, are *not* binding authority." *Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132, 149 (2d Cir. 2008) (citation omitted) (emphasis added).

all six DOL Fact Sheet elements must be satisfied to have a lawful internship. *See Archie*, 997 F.

Supp. at 532, 535. Instead, the *Archie* court examined the "economic reality" of the putative

employment relationship, and did *not* defer to the DOL Fact Sheet factors except to the extent

they stood for a "consideration of all of the circumstances" test.[15] *Id.* 532, 535. Thus, *Archie*

actually supports the application of the primary benefit test and consideration of the economic

realities.

The primary benefit test recognizes the valuable role that unpaid internships can serve,[16]

while still adhering to the remedial intentions of the FLSA. Adopting the rigid, all-or-nothing

test plaintiffs' assert will preclude a wide range of internships without consideration of their

educational and other value and the economic realities of the relationship.[17] *See also Marshall v.*

*Regis Educ. Corp.*, 666 F.2d 1324, 1327 n.5 (10th Cir. 1981) (noting that if the court determined

resident-hall assistants ("RA") were employees, the college would likely eliminate the RA

program and "the RA's who were to have benefited by becoming 'employees'…might well be

without employment"). *See* Joseph Aoun, "Protect Unpaid Internships," *Inside Higher Ed* (July

13, 2010) (finding that inflexible test "could have a chilling effect on the willingness of

[15] In so holding, the *Archie* court relied on the Fourth Circuit's decision in *McLaughlin*, which applied a "primary beneficiary" analysis, and found that the plaintiffs had been misclassified only because the court found, in a lengthy bench trial, that those plaintiffs had met *their* burden of proving the defendant had "benefited more" than the plaintiffs in the parties' relationship. *Archie*, 997 F. Supp. 2d at 534, 535.

[16] Experiential education can be valuable. *See* Janet Eyler, *The Power of Experiential Education*, Liberal Education, Fall 2009, at 26, published by The Association of American Colleges and Universities, available at http://www.aacu.org/liberaleducation/le-fa09/documents/LEFall09_Eyler.pdf, last visited March 20, 2013; *see also* Aoun, "*Protect Unpaid Internships*," *Inside Higher Ed* (July 13, 2010) (noting 75 percent of employers prefer applicants with relevant experience).

[17] Academic institutions often encourage students to participate in unpaid internships and offer academic credit for approved programs, and rigid application of the DOL Fact Sheet factors has the potential to usurp academic discretion. *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003) (noting "tradition of giving a degree of deference to a university's academic decisions").

employers to offer internships – paid or unpaid. With experiential learning on the rise…the country cannot afford to create disincentives for employers to play a valuable role in the educational enterprise").

### 2.   Footman and Glatt Were the "Primary Beneficiaries" of Their Internships

Considering the totality of circumstances and applying the primary benefit test to Footman and Glatt, on an individualized basis, it is clear that – as a matter of law - neither can establish he was misclassified.  Indeed, both Footman and Glatt received the primary benefit from their internships on *Black Swan*.

*Black Swan's* Producer ensured that Lake of Tears provided its unpaid interns with training.  Franklin Tr. 68-69 (testifying he "absolutely made sure we [Lake of Tears] were providing formal training" for interns on *Black Swan*, noting that he and Roth (UPM) and the department heads discussed the "need to train the interns [and that t]he interns are there to learn").  In addition, Footman and Glatt also both acknowledged the value of the experiential learning provided during their internships.  *See* PSJ Br. 19.

The evidence establishes, as a matter of law, that Footman received the primary benefit during his Production Office internship.  First, the internship met his goals of a "general experience," where he could "learn more about different departments," have "contact with producers" and create "contacts" in the film industry.   Footman Tr. 88-89.  Roth (UPM) recommended the Production Office internship to Footman based on his stated interests *before* Searchlight became involved with the film.  *Id.* 87.  Although Footman had previously worked or interned on documentaries, *Black Swan* was his first involvement with a feature film, "which is something that [he] wanted to do" *Id.* 64, and was "positive" for his career.  *Id.* 213.

Similarly, the facts with respect to Glatt's Accounting Department and Post Production internships establish that he was the primary beneficiary of those internships.  *Black Swan* was

the first "major feature film" on which Glatt had worked.  Glatt Tr. 128-29.  Glatt was attracted

to the internship, particularly knowing it was an Aronofsky film and would likely help his career.

*Id.* 56-57.  In addition, Glatt believed that his "responsibilities in the accounting department of a

bigger production tha[n he] worked on previously looked appealing in that sense" to his resume.

*Id.* 76.  Indeed, shortly before becoming involved in the Accounting Department internship, Glatt

*voluntarily* left an approximately $90,000 a year job that he had held for approximately two

years. *Id.* 202-03; Bloom II Decl. Ex. D, at AIG00007 (W2).  Glatt found the internship in the

Accounting Department "appealing" and chose it from among several other options.  Glatt Tr.

74.  "[He] thought that to have experience working so closely with the cash flow of a production

would be a good experience" and that the experience would develop his skill to become a

producer one day. *Id.*   Moreover, when the Accounting Department internship ended, Glatt

searched out another unpaid internship experience in post production, rather than ending his

involvement with *Black Swan*.  DSOF ¶ 109-10.

Plaintiffs' assertion that "Searchlight did not operate an educational training program"

(PSJ Br. 20, n. 8) and, therefore, cannot meet the DOL (*and* NYSDOL) Factors must be rejected.

"A training program that emphasizes the prospective employer's particular policies is

nonetheless comparable to vocational school if the program teaches skills that are fungible

within the industry." *Reich*, 992 F.2d at 1028; *see also Solis*, 642 F.3d at 531 (noting "training

portion of the education teaches students about responsibility and the dignity of manual labor"

and served as a valid intangible benefit).

Footman and Glatt benefitted from the experiential learning throughout their internships,

and the knowledge, skills and contacts they obtained could be applied to future opportunities in

the film industry.[18]  As a result of Footman's internship and his "observation," he "learned what the function of the production office was through [his] experience."  Footman Tr. 93, 95-96 (noting he had never seen all of production tasks put together).  Similarly, Glatt testified that "I gained more insight than I'd already developed in the production of films."  Glatt Tr. 128.

Footman and Glatt also benefited from being able to add the internships to their resumes – a valuable asset in a competitive field.  *See* Footman Tr. 102, 211-212, 227; Footman Dep. Ex. 5 (listing *Black Swan* under the "Known For" section of his Internet Movie Database "IMDB" webpage, the only non-documentary on it; noting the experience on his resume and in an email looking for a personal assistant position and characterizing this as a learning experience on his resume); Glatt Tr. 101, 185-86 (noting *Black Swan* helped on his interviews and he "thought it would make a favorable impression").

Footman and Glatt each received the primary benefit from their internships, which exceeded any purported benefit Searchlight received from them.

### 3.  Issues of Fact Exist Regarding the DOL Six-Factor Test As Applied to Footman and Glatt

Even if the Court evaluated each of Plaintiff's internships under an "all-or-nothing" six-factor DOL Fact Sheet approach, plaintiffs still cannot establish, as a matter of law, that they were misclassified.  Construing the "evidence in a light most favorable to the non-moving party," there are a number of material issues of fact which preclude granting plaintiffs' motion.  Indeed, intern/trainee exemption cases are particularly ill-suited for resolution in an *intern's* favor on summary judgment.[19]  *See, e.g., Ulrich v. Alaska Airlines, Inc.,* 2009 WL 364056 (W.D. Wash.

---

[18] *See* Bloom II Decl. Ex. L (DOL Fact Sheet) ("The more the internship provides the individual with skills that can be used in multiple employment settings, as opposed to skills particular to one employer's operation, the more likely the intern would be viewed as receiving training.").

[19] In fact, the evidence establishes that the Court should grant *Defendant's* motion for summary

Feb. 9, 2009) (denying plaintiffs' summary judgment cross-motion, and granting defendant's motion, holding that plaintiffs were trainees and not employees).   Indeed, _none_ of the cases plaintiffs cite involving the "intern" or "trainee" exemption for the plaintiff-interns was decided on summary judgment.[20]   *Archie*, the main case upon which Plaintiffs' rely – in addition to applying a totality of the circumstances test to the "trainee" analysis – was decided after a full trial on the merits and does not support granting summary judgment.  997 F. Supp. 504.

Furthermore, while plaintiffs assert that Searchlight is unable to satisfy the first, second and fourth factors of the six-DOL Factors because the "internships were not structured around a classroom or academic experience and were entirely structured to benefit the productions' actual operations" (PSJ Br. 18), the Fact Sheet does not contain such a requirement.  *See* Bloom II Decl. Ex. L (DOL Fact Sheet).  Nor does the Fact Sheet require that interns receive academic credit.  Rather, the first factor of the DOL Fact Sheet requires only that the internship be "similar" to training given in an educational environment.  *Id.*  Here, plaintiffs' internships were each extensions of his prior academic experiences, providing opportunities for experiential

---

judgment with respect to the intern exemption. *See, also, Kaplan v. Code Blue Billing & Coding, Inc.,* 2013 U.S. App. LEXIS 1433 (11th Cir. Jan. 22, 2013) (affirming grant of summary judgment in favor of defendants regarding students completing an externship); *Demayo v. Palms West Hosp., Ltd. P'ship,* 2013 U.S. Dist. LEXIS 14891, *13-14 (S.D. Fla. Jan. 23, 2013) (granting summary judgment in favor of defendant, holding that medical student externs were *not* employees ); *Carter v. Mayor of Balt. City,* WMN-07-CV-3117, 2010 U.S. Dist. LEXIS 18477 (D. Md. Mar. 2, 2010) (granting defendant's motion for summary judgment, finding that initial training period was not compensable); *see also William v. Strickland,* 87 F.3d 1064 (9th Cir. 1996) (affirming grant of summary judgment in favor of defendant and finding individual who participated in six-month training program was not an "employee" for FLSA purposes).

[20] Plaintiffs cite a single case decided on summary judgment. *Okoro v. Pyramid 4 Aegis,* 2012 U.S. Dist. LEXIS 56277, at *17 (E.D. Wis. Apr. 23, 2012).  Because that case involved a "volunteer" analysis, it is not probative concerning the "intern/trainee" exception. *See* 29 C.F.R. § 553 (defining volunteer); *see also Hallissey v. Am. Online, Inc.,* 99-CIV-3785 (KTD), 2006 U.S. Dist. LEXIS 12964, at *15 (S.D.N.Y. Mar. 10, 2006) (rejecting idea that volunteer exception can be decided as a matter of law).

knowledge.  For example, Glatt offered to enroll in a course in conjunction with the Accounting

Department internship.  Glatt Tr. 147.   The plaintiffs' own contemporaneous testimony

establishes the value of that knowledge.  *See* Bloom II Decl. Ex. E (acknowledging "value of

academic experience" on *Black Swan* in an email with NYU intern coordinator); Bloom II Decl.

Ex. A (email from former Wesleyan professor stating "[n]ice going scoring that internship – I

hope you're learning a lot"; Footman replying things had "been going well so far"); Footman Tr.

223-24 (noting supervisor (Feldman) hoped he "learned a lot"  and that "the experience has

given you a solid foundation"); *id.* 220 (thanking supervisor Feldman for "especially being

flexible and patient" with him).

　　　　To the extent Footman or Glatt performed some administrative work (PSJ Br. 3-5), the

tasks were part of the experiential learning process consistent with the central purpose of each

internship – to gain experience with a feature film – and does not preclude the exemption. *See,*

*e.g., Demayo v. Palms West Hosp., Ltd. P'ship*, 2013 U.S. Dist. LEXIS 14891, at *14-15 (S.D.

Fla. Jan. 23, 2013) (noting value that medical student extern gained from general sense of

"responsibility, knowledge, and experience earned from the less glamorous parts of her work,"

which included "non-surgical work," including "stocking instruments and supplies, organizing

files and taking out the garbage," which "may, generally, be the type of work covered by the

FLSA").

　　　　Because they were engaged only for *Black* Swan, Footman and Glatt knew they would

not be entitled to a paid opportunity with Searchlight at the conclusion of their internships.  In

addition, both Footman and Glatt knew they were applying for, and accepting, unpaid

internships.  Glatt Tr. 77, 108-09; Footman Tr. 20-21, 89.  Plaintiffs present no evidence that

references or credits were discussed during their hiring process.  Even if plaintiffs hoped to

receive these things, equating film credits and job references as some form of "in-kind" consideration in exchange for their internships should be rejected.   PSJ Br. 21.   Broadening the definition of "wages" to include job references or expectations concerning credit will have a sweeping, chilling effect for *every employee-employer relationship*, not just internships, and has been rejected in similar circumstances.   *See e.g., Todaro v. Township of Union*, 27 F.Supp. 2d 517, 539 (D.N.J. 1998) (declining to "extend the commonsense definition of 'compensation' to incorporate…intangible benefits [such] as the eligibility to accept potential paid employment").

## II.   PLAINTIFFS' MOTION SHOULD BE DENIED AS TO GRATTS AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT GRANTED

### A.   Gratts' Claim Is Time-Barred.

This Court should deny Gratts' motion for summary judgment, grant Defendant's summary judgment motion, and dismiss Gratts' CAUCL claim as untimely. Gratts brings her claim solely under the CAUCL, which has a four year statute of limitations. Cal. Bus. & Prof. Code § 17208.  Her claim is based on her assertion that she was misclassified as an intern in connection with her activities on the *500 Days of Summer* film production from May 1, 2008 "through approximately August 2008." AC ¶¶ 146, 149; Gratts Tr. 61, 117.  Plaintiffs filed a motion seeking leave to file the amended complaint on September 5, 2012. Dkt. 27. Thus, pursuant to Second Circuit precedent, September 5, 2008 (four years prior to the date plaintiffs filed their motion for leave to file an amended complaint) is the operative date for statute of limitations purposes.[21] *See Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) ("[T]he date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes").  Accordingly, Gratts' claim is time-barred, as she presents no evidence that she was engaged as an intern after September 5, 2008.

---

[21] This Court has ruled that Gratts' claim does *not* relate back to the filing of the original Complaint. *See* Dkt. 46.

Gratts' suggestion that her claims should be deemed timely because an August 2012 date should apply for statute of limitations purposes lacks merit.   DSJ Br. 3-5.  Regardless, the undisputed evidence establishes that Gratts ended her internship on *500 Days of Summer before* August 1, 2008.  DSJ Br. 3-5.  In contrast to Gratts' speculation about the date her internship ended and her reliance on the fact the weather was "hot" to pinpoint the last date she was engaged as an intern on the film (Gratts Tr. 45), Searchlight has provided extensive, and at times contemporaneous, evidence establishing her end date was *before* August 2008:

- Gratts' own calculation of the her activities on the film places the end of her internship squarely in July 2008 (Gratts Tr. 93-94, 95-96);
- call sheets establish that *all* filming ended on June 21, 2008 (Varga Decl. ¶ 5);
- the wrap party celebrating the end of production was held on June 22, 2008 (Varga Decl. Ex. A, "Wrap Party" flyer);
- testimony and records maintained by Gratts' supervisors, Steven Fox and Charles Varga, establish that all the set work on the film ended *before* August 2008 (Fox Decl. ¶ 9, Ex. A; Varga Decl. ¶ 7, Ex. B (Chevy), Ex. C ("Monk"));
- documents and testimony establish Gratts was *only* engaged in the Fenton Building, which was *not* used by the production in August 2008 (*see* Gratts Tr.75-76, 77, 154-55, 156-57; Bloom SJ Decl. Ex. DD, *500 Days of Summer* Call Sheets; Fox Decl. ¶¶ 6, 7).

*See generally* DSJ Br. 2-6.  The Court should reject Gratts' self-serving and speculative testimony about when her internship ended since it is contradicted by extensive, unchallenged record evidence.  *Id.*; *see also Scott v. Harris,* 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (affirming summary judgment to defendants where plaintiff "relied almost entirely on her own testimony," which was contradicted by "contemporaneous letters and

meeting notes"). As a result, plaintiffs' summary judgment motion should be denied and Defendant's cross-motion to dismiss Gratts' claim as untimely should be granted.

**B.      Gratts Was Never Employed by Searchlight.**

The untimeliness of Gratts' claim is dispositive. Thus, the Court need not consider the question of whether Searchlight was a "joint employer" of Gratts. Nevertheless, even assuming, *arguendo*, Gratts' claim is not time-barred, it should still be dismissed as a matter of law because she was never employed by Searchlight.

Gratts brings her claim under the CAUCL. Thus, the joint employment question must be analyzed under California law, which applies a different standard than applies under the FLSA and NYLL.[22] *See Futrell v. Payday CA, Inc.*, 190 Cal. App. 4th 1419, 1435 (Cal. App. 2d Dist. 2010) (noting that the FLSA applies a "slightly different test than California law"); *see* DSJ Br. 21-23 (identifying and analyzing factors applicable to the CA joint employer test).

Searchlight did not exercise control over Gratts' wages, hours or working conditions. "[T]o [exert] 'control over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay. . . . The employer [ ] is the party who hires the employee and benefits from the employee's work, and thus it is the employer to whom liability should be affixed for any unpaid wages." *Futrell*, 190 Cal. App. 4th at 1432. Here, the undisputed facts establish that Palmera Productions, through its Construction Foreman Steven Fox, was the sole entity with control over Gratts' wages, hours and the other conditions of her internship. Gratts Tr. 148; Fox Decl. ¶ 3. *See also* DSJ Br. 21-23 (summarizing Gratts' testimony that Steven Fox set her hours and activities and provided her work space and tools).

Searchlight also did not "suffer or permit" Gratts to work because there is no evidence that Searchlight was even aware that Gratts (or any other intern) had been engaged on the

---

[22] Plaintiffs fail to recognize a different test applies to Gratts' CAUCL claim. PSJ Br. 24-30.

production.  DSJ Br. 22-23 (summarizing testimony concerning Searchlight's lack of knowledge).[23]

Finally, Searchlight did not have a common law employment relationship with Gratts. *See* DSJ Br. 23 (identifying factors in common law test).  Searchlight did not direct or supervise Gratts in connection with her internship nor did it set her rate of pay. *See, supra,* 34.  Rather, Palmera, through Steven Fox, supervised Gratts and provided her with the tools she needed. Gratts Tr. 75-81, 188-9; Fox Decl. ¶¶ 6-7; Wolfe Decl. ¶ 4, Ex. A; *see* DSJ Br. 23.  Indeed, the building where Gratts interned was rented by Palmera – not Searchlight. *Id.*  Moreover, the construction and demolition activities performed by Gratts were not directly for Searchlight's benefit and her tasks were not integral to Searchlight's business operations. *Id.*  Thus, Gratts cannot establish – as a matter of law – that Searchlight was her joint employer.

## C.      Even Assuming Searchlight Employed Gratts, Gratts Was Always Properly Classified As an Unpaid Intern.

Even if Gratts could establish that Searchlight was her joint employer (which she cannot), her motion must still be denied because she was properly classified as an unpaid intern.  Like the statement of the law with respect to Footman and Glatt's claims, Plaintiffs' assertions with respect to the law that applies to Gratts is incomplete and misleading, and should be rejected.  In analyzing Gratts' claim under California law, this Court should consider the totality of the circumstances and apply the primary benefit test. *See, supra*, 23-27.  Such a test will provide the Court with the flexibility to consider the economic realities of the relationship. *See, supra*, 25-26.

---

[23] Plaintiffs' reliance on *Gulf King*, 407 F. 2d 513, and *Sandoz v. Cingular Wireless, LLC*, 769 F. Supp. 2d 1047, 1056 (W.D.LA. 2010), in support of its "suffer and permit" argument (PSJ Br. 13) should be rejected. In *Gulf King*, the trial  established the employer had reasons to know that work was being performed by minors. 407 F.2d at 513-514 (noting circumstances were distinguishable from where, even if the employer could have observed employees, it likely would not have known there was a FLSA violation, such as where work is subject to "training" exception).  In *Sandoz*, defendants' supervisors scheduled and assigned the improperly classified individuals' hours. 769 F. Supp. 2d at 1056, 1058 n.12.

California law does not require a different approach.  Notably, no California state court has considered the analysis that should be applied to evaluate the lawfulness of an unpaid internship under California law.  Furthermore, this Court does not need to, and should not, apply the standards articulated by the California Division of Labor Standards Enforcement ("DLSE"), because over the last few years the DLSE has adopted and applied different tests when evaluating the lawfulness of an unpaid internship.  Prior to 2010, the DLSE utilized an 11-factor test. DLSE Op. 1998.11.12, at 1-2.   In an April 2010 Opinion Letter, however, the DLSE opted, instead, to apply the six-factor DOL Fact Sheet test.  Bloom II Decl. Ex. N (DLSE Op. 2010.04.07, at 4).

This Court need not adopt the April 2010 DSLE Opinion Letter.  *See, e.g., Gattuso v. Harte-Hanks Shoppers, Inc.,* 42 Cal. 4th 554, 563 (2007) (noting that DLSE opinion letters are "entitled to no deference").  Indeed, the California Supreme Court has recently rejected and refused to follow a series of DLSE opinion letters.  *See, e.g., Brinker Restaurant Corp. v. Superior Ct.*, 53 Cal. 4th 1004, 1038 (Cal. 2012). Thus, this Court may and should apply the primary benefit test to Gratts' California claim.

Gratts' claim should be dismissed because she was the primary beneficiary of her internship on *500 Days of Summer*.  There is clear evidence of the benefits Gratts received.  For example, she testified that her experience, including being credited on the film, was "very helpful" for her overall career and that it was an "accomplishment to have my name put in the Credits…because I could say I was part of a company that got an award for their movie."  Gratts Tr. 120-1.  Gratts considered her activities on *500 Days of Summer* a "valuable experience." *Id.* 148, 171.  Gratts had received a Bachelor of Arts degree in construction management (*Id.* 25), but had no experience in the construction department of any film before *500 Days of Summer*.

*Id.* 89.  She "wanted to be an art director, so [she] wanted to get as much experience as [she] could so it would get [her] further to becoming an art director some day." *Id.* 73-74.

Moreover, Gratts testified that she was not given menial tasks. *Id.* 153 (noting, for example, she never had to get people "coffee or water" or run personal errands). Rather, Gratts was closely involved with Art Director Laura Fox, discussing each other's thoughts as to where props and decorations should go after reading scripts, and Laura Fox provided her close supervision and training, giving Gratts ideas about how to arrange the sets. *Id.* 82-6. Gratts "learned from everybody there," including the "construction crew" and Laura Fox (on of her supervisors). *Id.* 87, 177-78.

Additionally, Gratts testified that she also shadowed Laura Fox and watched her do her job. *Id.* 178-79. *See also* DLSE Opinion Letter, April 7, 2010 ("substantial supervision may offset any advantage perceived to be received by the employer and may demonstrate the role of the intern or trainee as the true recipient of the benefits of experiential training consistent"); Gratts Tr. 121, Bloom II Decl. Ex. F, at D0093780) (listing *500 Days of Summer* as the *only* film on her IMDB webpage).  Gratts Tr. 25, 73-74, 87 (noting that she "soaked in the knowledge that I was getting from [the internship]").  Moreover, Gratts' assertion that she was told by her supervisor, Steven Fox, that she would be paid for her internship has been directly contradicted by Steven Fox.  *See* Fox Decl. ¶ 10.  For all these reasons, Gratts' motion should be denied and Plaintiffs' motion as to her granted.

## **CONCLUSION**

For all of the foregoing reasons, plaintiffs' partial motion for summary judgment should be denied and Defendant Fox Searchlight, Inc.'s motion should be granted, dismissing Footman, Glatt and Gratts' claims in their entirety.