UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                                    :
ERIC GLATT, ALEXANDER FOOTMAN,                                      :
EDEN ANTALIK, and KANENE GRATTS, on                                 :    Civil Action No. 11 CV 6784
behalf of themselves and all others similarly                       :    (WHP)
situated,                                                           :
                                                                    :    ECF Case
        Plaintiffs,                                                 :
                                                                    :
        v.                                                          :
                                                                    :
FOX SEARCHLIGHT PICTURES, INC., and                                 :
FOX ENTERTAINMENT GROUP, INC.,                                      :
                                                                    :
        Defendants.                                                 :
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF EDEN ANTALIK'S
<u>MOTION FOR NYLL AND FLSA CERTIFICATION</u>**



Dated:    New York, New York
          March 29, 2013

                                        PROSKAUER ROSE LLP

                                        By: *s/ Elise M. Bloom*
                                        _____
                                            Elise M. Bloom
                                            Amy F. Melican
                                        Eleven Times Square
                                        New York, NY  10036-8299
                                        Phone: (212) 969-3000
                                        Fax: (212) 969-2900
                                        ebloom@proskauer.com
                                        *Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iv

INTRODUCTION ........................................................................................... 1

PROCEDURAL BACKGROUND..................................................................... 3

STATEMENT OF FACTS ............................................................................... 5

      A.  Interns' Vastly Dissimilar Internships ............................................... 5

            1.      Different Individual Supervisors and Functional Departments ...... 5

            2.      Differing Receipt/Non-Receipt of Internship Academic Credit ...... 8

            3.      Different Schools' Credit Rules...................................................... 8

            4.      Dissimilarities Based On Recruiter Hoffman's Role
                   (or Lack of a Role).......................................................................... 9

      B.      Antalik's Class Claims................................................................... 10

ARGUMENT .................................................................................................. 10

I.       THE COURT SHOULD REFUSE CERTIFICATION TO THE NY CLASS
       BECAUSE ANTALIK FAILS EVERY RULE 23 REQUIREMENT ................. 10

      A.      Applicable Legal Standards  ........................................................... 11

      B.      Antalik Cannot Satisfy Numerosity ............................................... 13

            1.      Antalik Is Not Entitled to the Number 40 Presumption................ 13

            2.      Defendants Successfully Rebut Any Numerosity
                 Presumption ................................................................................... 14

      C.      Antalik Cannot Meet Her Burden to Prove Typicality ............................ 16

            1.      Antalik Offers Insufficient Proof to Satisfy Typicality ................ 17

            2.      That Antalik Did Not Receive Academic Credit for
                 Her Internship Renders Her Claim A-Typical Of Other
                 Class Members' Claims .................................................................. 18

3.     Antalik's Claim Is A-Typical Of Others' As To Defendant FEG ...............................................................................20

D.    Antalik Cannot Prove Commonality or Predominance Since There Is No Probative Common Evidence For All Interns' Claims, And The Only Probative Evidence Shows Rampant Dissimilarities Among Those Claims ...............................................................................21

1.     Applicable Legal Standards ...........................................................21

2.     Antalik Misplaces Reliance On Interns' Common Classification..............................................................................23

3.     The Court Should Not Consider The Fall 2010 Change To A Paid Program As It Is Irrelevant Factually And Inadmissible Legally.............................................................................24

4.     Antalik's "Common" Documents Theory Does Not Work Because It Rests On Materials That Are Not Probative To The Relative Benefits Of Any Class Member's Internship ...........25

5.     Antalik Has Presented No "Common" Proofs Theory to Quantify Damages on a Class-Wide Basis ...................................27

II.    ANTALIK FAILS THE TEST FOR FLSA § 216(b) CERTIFICATION............29

A.    The Post-Discovery Legal Standard Applies..............................................29

B.    The FLSA Class Fails The Post-Discovery Test .......................................30

III.   THE COURT SHOULD DISMISS WITH PREJUDICE OR LIMIT SEVERAL OF PLAINTIFFS' CLASS CLAIMS AS WAIVED OR IMPROPERLY ASSERTED ...............................................................................34

A.    Any Class Or Collective Claims By Production Interns Are Waived ......................................................................................................34

B.    Any Claims Against Non-Proper Subsidiaries of FEG, Or Against Any Entities That Are Not FEG Subsidiaries At All Are Improperly Asserted....................................................................................35

C.    The Court Should Reject Antalik's Proposed Class Notices....................36

CONCLUSION....................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amador v. Morgan Stanley & Co., LLC,*
2013 WL 494020 (S.D.N.Y. Feb. 7, 2013)..........................................................29

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997).............................................................................................12

*Ansari v. New York University,*
179 F.R.D. 112 (S.D.N.Y. 1998) ...................................................................14, 16

*Aponte v. Comprehensive Health Management,*
2011 WL 2207586 (S.D.N.Y. June 2, 2011) .......................................................29

*Babiker v. Ross University School Of Medicine,*
2000 WL 666342 (S.D.N.Y. May 19, 2000) .......................................................19

*Blaney v. Charlotte-Mecklenburg Hospital Authority,*
2011WL 4351631 (W.D.N.C. Sept. 16, 2011)....................................................24

*Brown v. Kelly,*
609 F.3d 467 (2d Cir. 2010).................................................................................16

*Califano v. Yamasaki,*
442 U.S. 682 (1979).............................................................................................11

*Clarke v. JPMorgan Chase Bank, N.A.,*
2010 WL 1379778 (S.D.N.Y. Mar. 26, 2010) ....................................................24

*Comcast v. Behrend,*
2013 WL 1222646 (U.S. Mar. 27, 2013) ..................................................... *passim*

*Consolidated Rail Corp. v. Town of Hyde Park,*
47 F.3d 473 (2d Cir. 1995)...................................................................................13

*Conway v. Microsoft Corp.,*
414 F. Supp. 2d 450 (S.D.N.Y. 2006)..................................................................32

*Damassia v. Duane Reade, Inc.,*
250 F.R.D. 152 (S.D.N.Y. 2008) ...................................................................27, 28

*Deen v. New School University,*
2008 WL 331366 (S.D.N.Y. Feb. 4, 2008)...............................................14, 15, 16

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006)..........................................................................20

*Diaz v. S&H Bondi's Department Store, Inc.,*
   2012 U.S. Dist. LEXIS 5683 (S.D.N.Y. Jan. 17, 2012) ...............................36

*Edwards v. Publishers Circulation Fulfillment, Inc.,*
   268 F.R.D. 181 (S.D.N.Y. 2010) ...................................................................27

*Eng-Hatcher v. Sprint Nextel Corp.,*
   2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009)...........................................29, 32

*Erhardt v. Prudential Grp., Inc.,*
   629 F.2d 843 (2d Cir. 1980)...........................................................................36

*Espenscheid v. DirectSat USA, LLC,*
   705 F.3d 770 (7th Cir. 2013) .........................................................................30

*Espinoza v. 953 Assocs. LLC,*
   280 F.R.D. 113 (S.D.N.Y. 2011) ...................................................................29

*Fosamax Products Liability Litigation,*
   248 F.R.D. 389  (S.D.N.Y. 2008) ...........................................................16, 17

*Frye v. Baptist Memorial Hospital Inc.,*
   2012 WL 3570657 (6th Cir. Aug. 21, 2012).................................................37

*Grutter v. Bollinger,*
   539 U.S. 306 (2003)........................................................................................19

*Guzman v. VLM, Inc.,*
   2007 WL 2994278 (E.D.N.Y. Oct. 11, 2007)................................................36

*Hunter v. Digital Equipment Corp.,*
   136 F. App'x 28 (9th Cir. 2005) ....................................................................34

*In re IPO Securities Litigation,*
   471 F.3d 24 (2d Cir. 2006)..............................................................11, 12, 24, 27

*In re Vivendi Universal, S.A. Securities Litigation,*
   242 F.R.D. 76 (S.D.N.Y. 2007) .....................................................................21

*Javier H. v. Garcia-Botello,*
   2011 WL 4344045 (W.D.N.Y. Sept. 14, 2011) .......................................20, 32

*Jirak v. Abbott Laboratories Inc.,*
   566 F.Supp.2d 845 (N.D. Ill. 2008) ...............................................................36

*Kopera v. Home Depot U.S.A., Inc.*,
  2011 WL 135016 (S.D.N.Y. Jan. 11, 2011) ...................................................26, 28

*Kowalski v. YellowPages.com, LLC*,
  2012 WL 1097350 (S.D.N.Y. Mar. 31, 2012) ........................................................17

*Lee v. ABC Carpet & Home*,
  236 F.R.D. 193 (S.D.N.Y. 2006) ...........................................................................37

*LeSane v. Hall's Security Analyst, Inc.*,
  239 F.3d 206 (2d Cir. 2001)...................................................................................34

*Li Dong Ma v. RSM McGladrey, Inc.*,
  2010 U.S. Dist. LEXIS 81078 (N.D. Cal. Aug. 9, 2010)........................................34

*Lujan v. Cabana Management*,
  284 F.R.D. 50 (E.D.N.Y. 2012) .............................................................................24

*Lynch v. United Servs. Automobile Ass'n*,
  491 F. Supp. 2d 357 (S.D.N.Y. 2007)....................................................................28

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997)...................................................................................11

*Mike v. Safeco Insurance Co. of America*,
  274 F. Supp. 2d 216 (D. Conn. 2003) ....................................................................24

*Morano v. Intercontinental Capital Group Inc.*,
  2012 WL 2952893 (S.D.N.Y. July 17, 2012) .........................................................31

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010),
  *cert. denied*, 132 S. Ct. 368 (2011) ............................................................. *passim*

*Primavera Familienstifgung v. Askin*,
  178 F.R.D. 405 (S.D.N.Y. 1998) ...........................................................................15

*Rapcinsky v. Skinnygirl Cocktails, L.L.C.*,
  2013 WL 93636 (S.D.N.Y. Jan. 9, 2013) ...............................................................19

*Regents of University Of Michigan v. Ewing*,
  474 U.S. 214 (1985)................................................................................................19

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993).......................................................................1, 14, 16

*Romero v. H.B. Automotive Group Inc.*,
  2012 WL 1514810 (S.D.N.Y. May 1, 2012) .......................................................23, 37

*Shayler v. Midtown Investigations., Ltd.*,
  2013 WL 772818 (S.D.N.Y. Feb. 27, 2013).................................................................*passim*

*Silverstein v. AllianceBersntein L.P.*,
  No. 09 Civ. 5904 (S.D.N.Y. Aug. 24, 2011)).........................................................................29

*Smalls v. Bank of N.Y.*,
  2008 WL 1883998 (S.D.N.Y. Apr. 29, 2008).........................................................................34

*Summa v. Hofstra*,
  715 F. Supp. 2d 378 (E.D.N.Y. 2010) ...................................................................................29

*Teamsters Local 445 Freight Divison Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008)...................................................................................................11

*Thiessen v. GE Capital Corp.*,
  267 F.3d 1095 (10th Cir. 2001).........................................................................30, 31, 32, 33

*Torres v. Gristede's Operating Corp.*,
  2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006)................................................................29, 30

*Trawinsky v. KPMG LLP*,
  2012 WL 6758059 (S.D.N.Y. Dec. 21, 2012) .......................................................................27

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011).......................................................................................... *passim*

*Wang v. Hearst*,
  2012 WL 2864524 (S.D.N.Y. July 12, 2012).........................................................................29

*White v. W. Beef Properties, Inc.*,
  2011 WL 6140512 (E.D.N.Y. Dec. 9, 2011) .........................................................................23

*Zavala v. Wal-Mart Stores Inc.*,
  691 F.3d 527 (3d Cir. 2012).............................................................................................30, 32

*Zivali v. AT&T Mobility, LLC*,
  784 F. Supp. 2d 456 (S.D.N.Y. 2011)...........................................................................29, 31, 34

STATUTES AND OTHER AUTHORITIES

Fair Labor Standards Act ("FLSA") § 216(b), .................................................................... *passim*

Fed. R. Civ. P. 23 ............................................................................................................... *passim*

Fed. R. Civ. P. 41(b) ...................................................................................................................34

Fed. R. Evid. 407 .........................................................................................................................24

New York Labor Law ("NYLL") ....................................................................................... *passim*

WILLIAM F. ALLEN, DEFENDING EMPLOYERS IN COMPLEX WAGE
AND HOUR LITIGATION (2012) ...................................................................................................12

Theodore Eisenberg & Geoffrey P. Miller, "*The Role of Opt-Outs and Objectors in
Class Action Litigation: Theoretical and Empirical Issues,*"
57 Vand. L. Rev. 1529, 1533-34 (2004) ....................................................................................12

*NACE Position on U.S. Internships* (July 2012), available at
http://www.naceweb.org/connections/advocacy/internship_position_paper/.........................18

## <u>INTRODUCTION</u>

Plaintiff Eden Antalik was an unpaid student intern in the New York Publicity Office

("NY Office") of Fox Searchlight Pictures, Inc. ("Searchlight") during her 2009 college summer

break.  She asserts claims for unpaid wages under the New York Labor Law ("NYLL") and Fair

Labor Standards Act ("FLSA") against Searchlight and Fox Entertainment Group, Inc. ("FEG"),

a holding company and corporate parent of more than 500 separately incorporated U.S.

companies, including Searchlight.  Antalik now seeks certification of her claims, under Federal

Rule of Civil Procedure ("Rule") 23(b)(3) and FLSA § 216(b), respectively—despite her being

the <u>sole</u> Named Plaintiff and proposed representative of the following:

1. a class of all Corporate Interns in New York, from September 28, 2005 to September 1, 2010 (the "Class Period"), on NYLL wage claims (the "NY Class"); and

2. a collective of all Corporate Interns nationwide, from September 28, 2008 to September 1, 2010, on FLSA wage claims (the "FLSA Class").

P19, 28; AC ¶¶ 65, 91.[1] The Court should deny Antalik's motion ("Motion") in its entirety, as

she fails the certification requisites for both the NY and FLSA Class (together, the "Classes").

As to the NY Class, Antalik fails every Rule 23 requirement. She cannot prove Rule

23(a)(1) "Numerosity," because: (i) her assertion that the NY Class numbers "at least 45" is an

invalid inference based on data Antalik knows is inaccurate; and (ii) she fails the governing

Second Circuit *Robidoux* standards for establishing that joinder of all class members (hereinafter,

"Interns") would, *in fact*, be "impracticable"—a factor she must satisfy to have Numerosity.  Nor

can Antalik prove Rule 23(a)(3) "Typicality," because: (i) she presents no proof, from or about

any other NY Interns, as to their intern experiences, despite it being those experiences that will

---

[1]Antalik's brief and Rachel Bien's declaration, Dkt. 104, 105, are respectively cited "P_" and "RB Dec. ¶_ [or] Ex._." The original and amended complaints, Dkt. 1, 58, are respectively cited "OC ¶_." and "AC ¶_."  All other cited sources are attached to the March 29, 2013 Elise M. Bloom declaration ("EB Dec."), and are indexed with abbreviations used herein at Appx. 1.

drive resolution of all the NY Class claims, and based on which Antalik must show that her claim is "sufficiently coextensive" with the other NY Class Members—as the Typicality Rule requires; and (ii) the record evidence shows that Antalik's claim is *a*-typical of others' claims, in several material respects that further bar her from satisfying Typicality. Antalik also cannot prove Rule 23(a)(2) "Commonality" or Rule 23(b)(3) "Predominance," because she rests her Motion solely on supposed "evidence" that has no *probative* value. For example, Antalik repeatedly references Interns' non-paid classification, but that is neither facially unlawful nor probative; rather, it is similar to overtime an ("OT") exempt classification, which the Second Circuit holds has "little" value in a certification analysis.

Antalik also relies heavily on uninformative "internship" documents and Intern Request ("IR") Forms, but those too are (at best) like the training guides and high-level job descriptions in analogous exempt misclassification cases ("Exempt Cases"), which courts regularly have held are *in*sufficient for certification. Antalik does not offer anything like a class-wide job description (nor could she, because none exists); rather, she offers *dozens* of *different* IR Forms that list plans for certain future roles that *dozens* of *dissimilar* Interns *might* perform, across *dozens* of *different* Departments at *different* FEG subsidiaries, under *hundreds* of *different* Intern Supervisors. The record evidence before the Court includes, among other things, more than a dozen declarations from *actual* Intern Supervisors, and similar numbers of *actual* academic institution ("School") records—which together confirm just how *dis*similar Interns' experiences actually were. This evidence proves that Interns' claims are conclusively *un*common, and that any aggregate trial on all their claims would be one involving *individual* proof—the very antithesis of a manageable or fair proceeding, either to absent class members or Defendants.

The evidentiary bars to Antalik's Rule 23(a)(2), (a)(3) and (b)(3) compliance likewise

preclude her from satisfying the governing post-discovery, "heightened scrutiny" standard for FLSA § 216(b) certification.  Antalik cannot show that any unlawful policy was uniformly applied across a class of "similarly situated" Interns.  Instead, the record shows a *lawful* practice and dominant Intern *dis*similarities—which are even more prevalent for the FLSA Class (given its larger size and geographically dispersed Supervisors, Departments, and Schools).  Simply put, the record evidence makes it impossible for Antalik to meet her "similarly situated" burden, as § 216(b) requires.

Because the crux of this case requires a determination as to whether each Intern received the primary benefit of his or her internship, there simply is no evidence to suggest that resolving one Intern's claim can resolve the claim of any other.  There simply are too many material dissimilarities and too few (if any) commonalities among Interns in both Classes for Antalik to satisfy the certification requisites for either the NY Class or the FLSA Class.

## PROCEDURAL BACKGROUND

On September 28, 2011, former production interns, Plaintiffs Eric Glatt and Alexander Footman, filed an OC against Searchlight (not FEG) on NYLL and FLSA wage claims, for themselves and other unpaid Production Interns (defined as those engaged "on the production of one or more Searchlight Films") and Corporate Interns (defined as those engaged at Searchlight "corporate offices").  OC ¶¶ 39, 93-141.  The parties engaged in extensive discovery on those claims, during which the Court granted Plaintiffs' motion and the Court required Searchlight to produce documents with name and contact information for certain interns, including Corporate Interns.  *See* EB Dec. ¶ 2; *also* Dkt. 14.

In August 2012, the Court granted Plaintiffs leave to amend their OC, pursuant to which, on October 19, 2012, they filed their AC.  As relevant here, the AC: (i) added Antalik, to replace Glatt and Footman as the Named Plaintiff for Corporate Interns' claims; (ii) added FEG as a

Named Defendant to those claims; and (iii) purported to broaden the scope of those claims to include all individuals engaged in a purported (but critically undefined) "FEG internship program"—a term which Plaintiffs never defined.  AC ¶¶ 16-9, 23-8, 65, 91. Defendants disputed the scope and breadth of discovery on the new AC claims against FEG (and its 500+ subsidiaries).  EB Dec. Ex. T, at 8-9 (Peck Hearing Tr. 11.21.12).  On November 21, 2012, The Honorable Magistrate Judge Andrew J. Peck limited discovery to Searchlight and eight other FEG subsidiaries that Fox Group Recruiter Aimee Hoffman ("Hoffman") supported administratively with respect to unpaid interns during the Class Period.  Peck *Id.*; DJ 75-76. Hereinafter, these nine FEG subsidiaries are referred to as the "Proper Subsidiaries."  They are:

> (1) Searchlight; (2) Twentieth Century Fox Film Corporation; (3) Twentieth Century Fox Home Entertainment, LLC; (4) Fox Television Studios, Inc.; (5) TVM Productions, Inc.; (6) Fox 21, Inc.; (7) Fox International Productions, Inc.; (8) Fox Music, Inc.; and (9) Fox Atomic, Inc. / Fox Digital Entertainment, Inc.  EB Dec. Ex. D.

Defendants produced extensive discovery regarding these entities, including a PeopleSoft data report containing names, telephone numbers, and other information about various Interns (the "PS Data") at the Proper Subsidiaries and other entities, RB Dec. ¶ 12, Ex. 74 ("PS Data"); electronically stored information ("ESI") from agreed-upon custodians; policies, manuals, guidelines, and onboarding papers regarding former Interns at the Proper Subsidiaries; Plaintiff also took five depositions related to the Corporate Intern claims. EB Dec. ¶ 3; 4 (noting Defendants produced, in total in this action, more than 93,000 pages of hard copy and ESI documents for more than 40 custodians).  Since January 18, 2013, all discovery has been completed, save for that regarding damages and Defendants' "good faith" defense.  *See* P2 ("[the] parties have completed merits discovery").

4

## STATEMENT OF FACTS

### A.  Interns' Vastly Dissimilar Internships

There are abundant dissimilarities among the Interns in both Classes that Antalik seeks to certify.  These material and significant variations among Interns stem largely from (and among other things) Interns' particular associations with a diverse range of Supervisors, Departments, Schools (including their provision or denial of academic Credit for Interns' internships); and their incomparable internship programs in terms of whether any role was played by Hoffman (Antalik's sole basis for her "joint employer"-dependent claims against FEG).

### 1.  Different Individual Supervisors and Functional Departments

Each Intern's particular Supervisor and Department resulted in an Intern-unique experience and wide variation across Interns in both Classes with respect to the nature of benefits Interns derived from their internships.  Each Supervisor dictated the particular tasks and projects an Intern performed—and this controlled each Intern's overall experience.  Indeed, each Supervisor's individual managerial style, mentoring skills and initiatives, personality, and rapport with particular Interns all led to, among other things, variable types and frequencies of shadowing opportunities and one-on-one teaching meetings for different Interns.

The same is true for each Intern's Department assignment.  Depending on each Intern's academic pursuits and interests, each student applied for and was engaged as an Intern in a wide range of functionally diverse Departments.  AH 283-84.  The Interns in different Departments and locations (NY, CA or elsewhere) played diverse functional roles and experienced varying offerings and frequencies of Intern-tailored events, such as Recruitment-sponsored orientation courses, "Lunch and Learns," informative panels featuring successful industry leaders and full-time employees, and other informal networking meetings and training sessions (collectively,

"Intern Events").  AH 107-9; BS Dec. ¶¶ 37-39; LW 52-54.  Moreover, they performed vastly

diverse *types* of projects—meaning the nature of the *educational benefits* Interns received also

differed greatly by Department.  For example:

➢ Searchlight NY Publicity Intern (Plaintiff Antalik) alleges: (i) she never shadowed her
  Supervisor (Searchlight NY Publicist, John Maybee), EA 160-1, and "was never taught by,"
  nor received "guidance" from, him, EA 94, 188; *see also id.* 245-6 (admitting the chief cause
  of her overall dissatisfaction "was nothing about [her] assignments or anything," but rather
  "the way Maybee treated her"); (ii) she only performed administrative tasks, amounting to no
  more than "productive work," such as "doing breaks," "assisting with film screenings,"
  "doing errands," "doing online research," "mailings and making travel arrangements," P3 (EA
  89, 110-13, 142-60, 193-95); and (iii) she had no opportunity to attend Intern Events, EA
  198—all allegedly causing her internship experience to be of little if any benefit to her, P25.[2]

In sharp contrast to Antalik, however, other Interns under other Supervisors and in other

Departments of FEG subsidiaries, had materially different experiences, as they **performed**

**neither** "productive" work nor **any** administrative tasks.[3]  These and other Interns also, *unlike*

Antalik, participated in *extensive* shadowing and one-on-one Supervisor-led educational

meetings and training events, such as:

➢ *Bruce Shirey's FSN Interns in NY*, who attended a regular speaker series and "Media Math"
  classes, had two-week daily shadowing experiences, and engaged in a fictional Intern-sales
  pitch exercise, BS Dec. ¶¶ 23-39;

➢ *Mark Grammatke's Twentieth Century Fox ("TCF") CA Intern*, who was engaged two days a
  week from June to August 2010, and spent *eight* of those weeks exclusively shadowing
  Grammatke and other Department employees, MG Dec. ¶¶ 5-16;

➢ *Scott Vyduna's TCF Finance CA Intern, and Jacqueline Zambrana's TCF Marketing CA
  Interns*, who, respectively, received one-on-one instruction about each project, including

---

[2]There is no evidence of any other Intern dissatisfaction with Supervisor Maybee; even Antalik
admits awareness of only four Maybee Interns, but did not know what *any* of their experiences
were—even that of Erin Carr, who interned alongside Antalik in the 2009 Summer. EA 165.
Moreover, the tasks Antalik says she performed *would* have provided an educational benefit to a
college student like Antalik, who was looking for real-world publicity experience. JM 145, 235.
[3]PW Dec. ¶ 22; JGB Dec. ¶¶ 24-25; SV Dec. ¶ 15; BS Dec. ¶ 41; NG Dec. ¶ 16; MG Dec. ¶ 17;
LH Dec. ¶ 28; LK Dec. ¶¶ 23-24; MM Dec. ¶¶ 20-21; JT Dec. ¶¶ 17-18; KB Dec. ¶¶ 23-24; AK
Dec. ¶ 27; DT Dec. ¶ 30; JZ Dec. ¶¶ 26-27. Also unlike Antalik, who allegedly incurred
unreimbursed out-of-pocket expenses (because she failed to complete her expense reports), EA
213-19, 225, other Interns did *not* even incur such expenses, much less have unreimbursed ones,
*see, e.g.*, LK Dec. ¶ 24; BS Dec. ¶ 40.

Vyduna spending two full hours explaining the licensing process to an intern, SV Dec. ¶¶ 10-13, and who attended and observed brainstorming meetings, weekly calls and presentations, and shadowed Zambrana to different studios to compare promotions, JZ Dec. ¶¶ 12-25;

➢ *Jill Gwen Braginets' Searchlight Finance & Operations ("F&O") CA Interns*, who had one-on-one meetings with one of Searchlight's co-Presidents Steve Gilula, as well as shadowed Gwen in weekly half-hour meetings with Gilula and at various weekly budget meetings, after which they discussed the meetings' substance with Gwen and her colleague, full-time employee Adam Martinez, JGB Dec. ¶¶ 13-18; and

➢ *Lori Hicks' TCF Finance, and Jeffrey Thompson's TCF Photo Archives (Graduate Student), CA Interns*, who, respectively, routinely shadowed Hicks and other financial managers and analysts, LH Dec. ¶ 19; and who were closely supervised by and sat across the table from, and interacted daily, with Thompson, JT Dec. ¶¶ 14-16.

The record also shows that Interns performed materially distinct *types* of projects—both from

Antalik and from one another—based on their particular Supervisor and Department, such as:

➢ *Paul Werner's TCF Food Services CA Intern*, who wanted to be a chef, and observed all food service areas (e.g., dishwashing, deliveries and inventory management, knife skills, cold food preparation and hot food preparation), PW Dec. ¶¶ 6-7, 10-11, 13-19,

> —which had great benefit to aspiring chef Interns, but would be of *no* benefit to prospective publicist Interns like Antalik;

➢ *TCF Interns under Supervisors Grammatke, Vyduna and Hicks*, who, respectively, assisted with a "post mortem" financial analysis and reviewed financial documents, MG Dec. ¶¶ 12-13; read complex contracts and isolated key deal points, SV Dec. ¶¶ 10-13; and had internships specifically tailored to their individual educational programs (Hicks also was an adjunct professor at Santa Monica College ("SMC")), including completing a mock financial report after extensive shadowing and feedback, LH Dec. ¶¶ 11-27,

> —all of which would be of great benefit to an Intern's understanding of the financial profession, but of little to no benefit to, for example, an aspiring chef, publicist or Special Events coordinator;

➢ *Dana Tuinier's Fox Broadcasting Company ("FBC") Interns*, and *Lindsey Kasabian's and Michelle Marks' TCF Interns*, who, respectively, read film scripts in conjunction with TCF employees, DT Dec. ¶ 11-25; observed auditions and casting sessions, LK Dec. ¶¶ 9-15; and/or collected materials for promotional campaigns, MM Dec. ¶¶ 11-18,

> —which benefited Interns interested in film work, but would not have benefited the food service or finance Interns described above.[4]

---

[4] *See also, e.g.*, KB Dec. ¶¶ 11-16 (explaining her Big Ten Network ("BTN") on-campus Interns learned about marketing while remaining on campus, including by participating in weekly conference calls and receiving assistance and supervision from Marketing Department personnel,

As all the foregoing illustrates, the Interns had undeniably *dis*similar internship experiences in several material respects, depending on who supervised them and their Departments.

### 2.   Differing Receipt/Non-Receipt of Internship Academic Credit

Differences also exist among Interns as to whether they received academic Credit for their internships.  Antalik did not receive Credit because she failed to submit a post-internship Supervisor recommendation letter to her School, EA 44, 51-52—however, there is no record evidence of any other Intern doing the same.  Unquestionably, this difference between Antalik and other Interns is significant, and it directly impacts their relative likelihoods of prevailing on their claims, because receipt of academic Credit is a tangible and material "benefit" to an Intern, (among a majority of intangible benefits that are harder to evaluate).

### 3.   Different Schools' Credit Rules

Dissimilarities among Interns also stem from their Schools' widely disparate preconditions to academic Credit.  For example, as to Searchlight NY Interns:  (a) Duquesne University required Intern Antalik only to keep a journal and submit a post-internship Supervisor recommendation letter; whereas (b) Barnard College required Intern Rachel Allen to participate in a seminar to discuss her internship and submit a post-intern evaluation; and yet (c) Brown University imposed ***no*** added requisites on Intern Daniel Parnes (just as NYU imposed no such requisites on any of their students' internships).[5]  Similarly, as to TCF's CA Interns: (a) CA State, Long Beach, required Intern Brianne Underwood to attend classes, research articles,

---

then submitting a marketing plan for their particular campuses for academic credit); JGB Dec. ¶¶ 12-26 (attesting her Interns were taught how to complete "film comp analysis reports" (among others), for which Gwen and Martinez explained the process of data gathering on comparable films); JT Dec. ¶¶ 14-17 (averring his Interns learned archiving techniques, which expanded on the theoretical concepts learned in School); AK Dec. ¶¶ 13-26 (providing law student Interns feedback on short memo training and shadowing opportunities, educating students about legal affairs in entertainment industry).
[5]EA 37, 169, 247, *see* EB Dec. Ex. G, at DS0002521, DS0002469, DS0002509, DS0004032.

deliver speeches, keep a journal, write a paper, and analyze how to communicate better as an intern; whereas (b) SMC required Intern Ashley Rodriguez to create a "Planned Learning Objectives" document *with* her Supervisor ***before she even was allowed to intern***; her School's instructor also was required to help plan her internship objectives, to be available as a resource during the internship, and would award Credit only for successful efforts in the program; and as another variation, (c) UCLA provided TCF Supervisor Thompson guidelines for his Interns, instructing him to have students *not* perform menial tasks and to ensure an educational experience ***before UCLA would grant pre-internship approval***.[6]  These types of dissimilarities, which are magnified by the fact that Interns *more than 40* different Schools, AH Dec. (3.26.13) ¶ 5, are particularly material, because the nature and amount (if any) of additional academic requirements Interns performed in connection with their internships undoubtedly had the potential to have a great impact on the scope and extent of educational benefit Interns derived.

### 4.  Dissimilarities Based On Recruiter Hoffman's Role (or Lack of a Role)

Finally, whereas some Interns' internships—depending on their dates and locations—received administrative support from Recruiter Aimee Hoffman, many others (such as Antalik's) did not.  The record before the Court establishes that some Supervisors did *not* involve Hoffman, or Fox Network Group, Inc. ("FNG") Recruiter Laura Wiggins, or *any* Recruiting or other Department personnel at all; instead, they recruited, interviewed and decided to retain Interns independently.  PW Dec. ¶ 7; SV Dec. ¶ 4; LH Dec. ¶ 9; BS Dec. ¶ 19; NG Dec. ¶¶ 5, 7.  For example:

➢ In connection with Antalik's Summer 2009 internship at Searchlight's NY Publicity Office, it was solely those Searchlight NY Office employees who recruited Antalik; reviewed her resume; interviewed and ultimately selected her; initially requested that she provide proof of her ability to obtain Credit; told her the internship was unpaid; provided her orientation and

---

[6]EB Dec. Ex. G, at D0091208, DS0002469, D0091180; JT Dec. ¶ 6.

training; assigned all her tasks; supervised her; and provided her feedback.[7] These Searchlight NY employees made these decisions and performed all these logistics as to Antalik (and all but one pre-Fall 2009 Intern) without consulting *anyone* outside their Searchlight NY Office, including Hoffman.  Other Supervisors, by contrast, *did* receive varying levels of support from Hoffman, such as her forwarding resumes, distributing/collecting onboarding papers, and, for Searchlight's CA Office, assisting with the coordination of Intern Events.[8]

**B.     Antalik's Class Claims**

During her approximately three-month, Summer 2009 internship, Antalik was a full-time college student between her junior and senior years.  EA 43, 80.  The Searchlight NY Publicity Office internship she had was a competitive, academic Credit-worthy position for an undergraduate, like Antalik, who was interested in experiential learning in publicity.  EA 76. Antalik, herself, noted in a 2009 email that her internship was "the BEST" in which she ever had participated.  EB Dec. Ex. C, at P0011972.  And yet, contrary to knowing at all times that her internship would be unpaid, and having *no* personal knowledge as to any other Interns' experiences in Searchlight's NY Office or *anywhere else*, EA 69, 73-5, 96-7, 163-5, 249— Antalik now seeks to prosecute all those Interns' claims for them, and to do so together in this action.  As explained below, Antalik's request should be denied.

**ARGUMENT**

**I.  THE COURT SHOULD REFUSE CERTIFICATION TO THE NY CLASS BECAUSE ANTALIK FAILS EVERY RULE 23 REQUIREMENT.**

To prevail on her certification motion for the NY Class, Antalik, the sole proposed class

---

[7] EA 70-74, 198, 107-08, 175; JM 60; AH 14-15, 32-33, 107-09, 198, 257, 281-82, 286-87, 317, 335; DJ 92-93.

[8] AH 107-9, 281-2, 286-7, 317; *see e.g.,* DT Dec. ¶¶ 6-8. Other supervisors did *not* use Hoffman or Wiggins for recruiting or engaging Internsl; *see* JT ¶¶ 9-10; PW ¶¶ 5-7; MG ¶¶ 5-7.

representative, must prove by a preponderance of the evidence that her claims satisfy each of the

Rule 23(a) requirements (numerosity, commonality, typicality, and adequacy), and both of the

Rule 23(b)(3) requirements (predominance and superiority).  *See* Fed. R. Civ. P. 23; P19.

Antalik cannot come close to meeting this burden.  In fact, she cannot satisfy *any* Rule 23

element let alone all of them as she must do. Accordingly, the Court should refuse to certify the

NY Class.

A.      **Applicable Legal Standards**

Antalik's recounting of the Rule 23 law governing her Motion is incomplete, and her

assertion that courts "give Rule 23 a 'liberal rather than restrictive construction,'" P19 (quoting

*Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)) is simply incorrect.  Even if that once

was the standard, it is not now.  The *current* standard is that putative class actions, which are "***an***

***exception to the usual rule that litigation is conducted by and on behalf of the individual***

***named parties only***," *cannot* properly be certified unless and until a court is *convinced* that a

named plaintiff has "*affirmatively* demonstrate[d]" that *all* Rule 23 requirements have been met,

and that she has done so by *a preponderance* of the evidence.[9]  To determine if a plaintiff has

met this burden, a court must conduct a "rigorous analysis" that includes consideration *and*

*resolution of* all disputed facts and legal issues, including those relating to the merits of proposed

class members' underlying, substantive claims insofar as they bear on the Rule 23 determination,

which "frequently" is the case (and unquestionably is so here, as Antalik herself apparently

---

[9] *Comcast v. Behrend,* 2013 WL 1222646, at *4 (U.S. Mar. 27, 2013) (emphasis added) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979) and *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-51 (2011) ("*Dukes*")); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008) ("*Local 445*"); *see In re IPO Securities Litig.*, 471 F.3d 24 (2d Cir. 2006) ("*In re IPO*").

concedes, *see* P22-25).[10]  The U.S. Supreme Court resolved any doubt in its March 27 decision

in *Comcast v. Behrend*, 2013 WL 1222646, at \*4-7 (U.S. Mar. 27, 2013) that Rule 23 "does not

set forth a mere pleading standard," denying certification on plaintiffs' failure to establish that

damages are capable of class-wide measurement, even though such arguments touched on the

merits of their claims.  Should the Court have *any* doubts as to whether Plaintiff has met *all* Rule

23 requirements, the Court *must* deny certification.[11]

Read together, the foregoing clearly does not stand for the "liberal" Rule 23 standard that

Antalik posits.  Rather, the hurdles to certification are high, designed so because if a court

certifies such a class, it will be composed primarily of individuals who have shown no desire to

be class members, yet their fates will be bound by the ultimate case outcome (favorable or

unfavorable).[12]  This reality is of particular concern here, where despite Plaintiffs having contact

information of Interns for many months, ***not one former NY Corporate Intern*** (save for Antalik)

has evidenced a desire to join the case.  EB Dec. Ex. B (Dkt. Rpt. showing no Corporate Intern

opt-ins to Antalik's parallel FLSA claims).  The Court thus should account for the dire outcome

of a certified NY Class made up of almost all unwilling members.[13]  If there is a risk that their

rights, or those of Defendants, will be sacrificed in a certified class trial, the Court must refuse

---

[10]*Comcast v. Behrend,* 2013 WL 1222646, at \*4; *see Myers v. Hertz Corp.*, 624 F.3d 537, 550-52 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 368 (2011); *see also Dukes*, 131 S. Ct. at 2552 n.6 (holding that when disputed issues as to ability to prove merits of claims overlap with those as to ability to satisfy Rule 23, named plaintiffs must convince the court of the merits of their substantive claims at the certification stage, even though (should they prevail there), they again must convince a fact-finder of the merits at trial).

[11] *Id.* at \*7; *In re IPO*, 471 F.3d at 41; *see Dukes*, 131 S. Ct. at 2551-52, 2561.

[12] Fed. R. Civ. P. 23(b)(3); *see generally Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

[13]Recognized studies estimate that Rule 23(b)(3) class actions have only an approximately 1% opt-out rate. *See* WILLIAM F. ALLEN, DEFENDING EMPLOYERS IN COMPLEX WAGE AND HOUR LITIGATION (2012), available at 2012 WL 5900370, at \*8; Theodore Eisenberg & Geoffrey P. Miller, "The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues," 57 Vand. L. Rev. 1529, 1533-34 (2004).

12

certification.[14]  Under these standards, the NY Class claims plainly are unsuited for certification.

**B.      Antalik Cannot Satisfy Numerosity.**

To pass Numerosity, a plaintiff must show a class is "so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1).  The NY Class does not satisfy this standard.

### 1.      Antalik Is Not Entitled to the Number 40 Presumption.

Courts generally apply "[w]hat is akin to a rebuttable presumption of numerosity," for a potential class of 40 or more.[15]  Despite Antalik's assertion that the NY Class numbers "at least 45," however, no Numerosity presumption applies here, for two reasons.

<u>First</u>, Antalik's 45 number is based on PS Data that she knows is inaccurate and unreliable.  As discussed before Judge Peck at the October 23, 2012 discovery conference, the PS Data was produced with the express caveat that it could *not* be relied upon for its accuracy *or* for any understanding that the interns listed in it would be potential class members.  *See* EB Dec. Ex. S, 30-31 (Peck Hearing Tr. 10.23.12).  Indeed, Judge Peck ruled only that Defendants should produce the PS Data because:  (i) it at least would "give[] [Plaintiffs] some information, *albeit inaccurate*," regarding potential class members' *names* and contact *information* (*i.e.*, the data was not produced to provide information regarding any Class's size), *id.* (emphasis added); and (ii) it was responsive in part to Plaintiffs' otherwise overbroad, infeasible demand for production of information about former unpaid interns involved in the purported "FEG Internship program," which as alleged by Plaintiffs included more than 500+ FEG subsidiaries.  *Id.*

<u>Second</u>, Antalik's 45 assertion is based on an invalid premise that there were "45 New

---

[14] *See Dukes*, 131 S. Ct. at 2561 (defendants have irrefutable right to available defenses, and a class action in which that right is abridged violates the Rules Enabling Act and improper).
[15] *Shayler v. Midtown Investigations., Ltd.*, 2013 WL 772818, at *4 (S.D.N.Y. Feb. 27, 2013); *see Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

York interns between 2007 and 2010." RB Dec. ¶ 12; *see* P21. Any NY Class may only include former interns at Proper Subsidiaries, but the PS Data on which Antalik relies is both under- and over-inclusive in this respect. *See* EB Dec. Ex. S, 20-22. In fact, the number of former NY interns at the Proper Subsidiaries in the PS Data (Searchlight and TCF) is only <u>seventeen</u> (17), as the other business unit entities on the PS Data are subsidiaries of Fox Networks Group (FNG) that Hoffman never supported. AH 336; NB Dec. ¶¶ 4-7.

In the end, and because it is admittedly inaccurate (and, therefore, unreliable) the most that can be gleaned from the PS Data is that the NY Class size may be a number greater than 17. The actual number is far too indefinite and speculative for Antalik to satisfy her Rule 23(a)(1) burden to "prove that there are *in fact* sufficiently numerous parties." *Dukes*, 131 S. Ct. at 2551 (emphasis in original). The Court can, and should, conclude that Antalik has not met her burden of proving a class of 40 or more. Thus, Antalik is not entitled to any presumption on Numerosity. *See, e.g.*, *Shayler v. Midtown Investigations, Ltd.*, 2013 WL 772818, at *16 n.5 (S.D.N.Y. Feb. 27, 2013) (concluding Numerosity was unmet, and that although a "lack of records is not plaintiffs' fault…the burden to demonstrate that they meet the Rule 23 requirements is"); *Ansari v. N.Y. Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998) (class of 21 insufficient for Numerosity presumption).

### 2.     Defendants Successfully Rebut Any Numerosity Presumption.

Even were the Court to credit Antalik's speculation on the NY Class size—resulting in a rebuttable presumption with respect to Numerosity—Antalik still fails to satisfy Rule 23(a)(1) because Defendants defeat any such presumption. Antalik cannot prove that joinder would, in fact, be impracticable—especially where, as here, even her asserted class size is relatively small (not much more than the magic 40). *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) (even where a Numerosity presumption applies, if defendant challenges Numerosity, the Court

14

must evaluate whether it has *actually* been proved).[16]  A "rigorous analysis" on Numerosity

entails a weighing of seven factors to determine if joinder of all potential class members would,

in fact, be "impractical" (the "*Robidoux* Test").  *Shayler*, 2013 WL 772818, at *4 (quoting

*Dukes*, 131 S. Ct. at 2551; citing *Robidoux*, 987 F.2d at 935).[17]  Here, all the factors weigh

against actual "sufficient and appropriate numerosity." *Id.*

      The <u>first</u> and <u>sixth</u> factors (respectively, judicial economy and the extent of plaintiffs'

knowledge of class members' names and existence (which has been described as "the most

important factor")), both weigh against Numerosity because Antalik cannot demonstrate any

"difficulty of joining all members," that would "make[] class litigation desirable," given that

Defendants' document productions between June 2012 and the close of discovery (including a

December 5, 2012 PS Data report) supplied putative class members' names and contact

information.  *See e.g.,* Bien Dec. Ex. 74 ("PS Data").  These facts "militate[] against a finding

that joinder is impracticable, because having the ability to contact prospective class members

eases any purported burden of seeking joinder in the first place."[18]

      Antalik also cannot satisfy the <u>second</u> factor (geographic dispersion of class members),

---

[16] *Deen v. New Sch. Univ.*, 2008 WL 331366, at *2-3 (S.D.N.Y. Feb. 4, 2008) (holding that a court must conduct a "rigorous analysis," as prescribed in *Robidoux*, to test whether Numerosity is met, even where the parties had agreed that the proposed class comprised 100+ members, because despite such agreement, defendant disputed whether the named plaintiff could prove that joinder was impracticable, as Rule 23(a)(1) requires before *actual* Numerosity can be established); *see also Shayler*, 2013 WL 772818, at *4 (explaining that the smaller an asserted class size in general, the less likely Numerosity can be met).

[17] The factors are: (1) judicial economy; (2) the geographic dispersion of class members; (3) class members' financial resources; (4) their ability to file individual suits; (5) any claims for relief in the case that could affect future class members; (6) the extent of plaintiffs' knowledge of class members' names and existence; (7) and whether class members already have joined in other cases. *See Shayler*, 2013 WL 772818, at *4 (citations omitted).

[18] *Deen*, 2008 WL 331366, at *3, *16, n.3 (citation omitted); *see Primavera Familienstifgung v. Askin*, 178 F.R.D. 405, 410 (S.D.N.Y. 1998) (denying certification to class of 118 because, *inter alia*, no proof as to first and sixth factors).

because the unreliability of the PS Data precludes her from demonstrating that class members actually are dispersed beyond New York (where they all interned), nor does she meet the <u>third</u> and <u>fourth</u> factors (respectively, class members' financial resources and their ability to file individual lawsuits), because Antalik has provided *no* evidence as to Interns' financial resources or associated ability to file suit, and any speculation as to these points should be rejected.[19]

As to the <u>fifth factor</u> (whether the case involves claims affecting future class members), Antalik also fails:  there can be no future class members because it is undisputed the Proper Subsidiaries switched to a paid internship program beginning in Fall 2010, DJ 119, such that there is a "finite number of people all of whom are identifiable and all of whom have been injured, if at all, in the past."[20]  As to the <u>last factor</u> (whether class members have joined other cases), there is no evidence at all.  All told, with no *Robidoux* factor suggesting joinder is impracticable, Antalik fails to prove Numerosity. Thus, the Court should deny the motion.

## C.   <u>Antalik Cannot Meet Her Burden to Prove Typicality.</u>

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of [those] of the class" ("Typicality"), Fed. R. Civ. P. 23(a)(3).  To satisfy this Rule, a plaintiff must prove that her own claims and those of others are sufficiently "coextensive" such that she will be a trusted, "vigorous[]" advocate for all their claims alike, and that she can do so in a class that is "economical," in which absent class members are "adequately protected."

---

[19]*Deen*, 2008 WL 331366, at *3 n.3, 4 (holding that named plaintiffs could not establish Numerosity, rejecting their arguments and affidavits that class members were "aspiring acting professionals," who "regularly move from city to city and from state to state in order to obtain work" as "conclusory assertions" that were insufficient to satisfy their burden on geographic dispersion, financial resources, and inability to file suit).  Nor is there any evidence to suggest that any Interns are currently "incarcerated, unsophisticated or elderly," such as might render them unable to join this suit as individual plaintiffs. *Ansari v. N.Y. Univ.,* 179 F.R.D. 112, 115 (S.D.N.Y. 1998) (no Numerosity where no proof of class-member incarceration or the like).
[20]*Deen*, 2008 WL 331366, at *4 (no Numerosity where "this is not a case where the existence of 'future class members' makes joinder impracticable") (*citing Ansari*, 179 F.R.D. at 116)).

*Dukes*, 131 S. Ct. at 2551 n.5; *see Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010).  The premise of Typicality, as oft stated by courts, is: as goes the claim of the named plaintiff, so go the claims of the class.[21]  That premise is not true here for three independently dispositive reasons.

### 1.      Antalik Offers Insufficient Proof to Satisfy Typicality.

Antalik bases her Typicality argument on no more than a cursory description of the *nature* of some Interns' claims, followed by her conclusion, at the highest level of abstraction, that her claim is "typical" of all others.  *See* P25 (alleging that Antalik's NYLL claim "is based on the same legal theory as the [class] members," that she "participated in FEG's internship program, was not paid, performed productive work…received only on-the-job training and minimal 'classroom' training," and that all class members were "subject to the same personnel policies").  But that is no more than what *any* litigant, in any *other* misclassification case, involving *any other* absent class members, might recite in a court complaint.  As the U.S. Supreme Court has explained, Rule 23 is not "a mere pleading standard"; rather, as the "party seeking class certification," Antalik "must affirmatively demonstrate" that her own claims "are *in fact*" sufficiently "coextensive" with other class members' claims.[22]  This Antalik has not done.

Indeed, **Antalik does not offer even a single affidavit** from any other NY Intern, nor any probative documentary proof, as to what any other NY internships *actually* entailed—much less any proof as to the particular benefit (or lack thereof) derived from their internships.  Significantly, she also, admittedly, has no personal knowledge as to any other class members' experiences.  EA 69, 96-7, 106, 111, 163-4.  There thus is nothing in the record the Court can use

---

[21]*Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 398-99 (S.D.N.Y. 2008).
[22]*Dukes*, 131 S. Ct. at 2551 (emphasis in original).  *See also Comcast,* 2013 WL 1222646, at *9.

17

to compare the viability of Antalik's claim with those of any other class members as is required

before the Court may rule that Antalik's claim is "coextensive" with others' claims.  By itself,

this absence of evidence should result in denial of certification.  Antalik simply has not sustained

her burden of "affirmatively demonstrat[ing]" Typicality.[23]

### 2.    That Antalik Did Not Receive Academic Credit for Her Internship Renders Her Claim A-Typical Of Other Class Members' Claims.

In addition to Antalik's inability to proffer evidence , Typicality is also defeated by the

record evidence—which shows that Antalik's internship was materially a-typical from others

because she is the sole known class member *not* to have received academic Credit for her

internship.  *See supra*, FACTS § A.2 (EA 44, 51-52).  This factor alone bars Antalik from

proving Typicality.  Indeed, even the Wage & Hour Division, U.S Department of Labor, Intern

Fact Sheet ("DOL")—which Antalik otherwise touts—provides that an internship is <u>*less* likely</u> to

be an "employment relationship" if an academic institution provides oversight and Credit for it.

EB Dec. Ex. U (DOL at 2).[24]  The National Association of Colleges and Employers (NACE) also

recently remarked, in a position statement advocating for a primary benefit test (over any strict

application of DOL Fact Sheet criteria) that: a School's Credit requirements "should be used to

---

[23]*Id.*; *see, e.g.*, *Shayler*, 2013 WL 772818, at *8 (denying certification on NYLL IC classification claims since sole named plaintiff "put forth insufficient evidentiary material" from which court could compare the facts that would drive his claim's resolution with those for others' claims); *Fosamax*, 248 F.R.D. at 398-99 (holding Typicality unmet where plaintiff described all class claims as arising from defendant's allegedly unlawful acts under the same law, but offered nothing by which court could compare the "proofs needed" for her and others' claims).  Having presented nothing about other NY Interns in her Motion, Antalik is barred from doing so in reply. *Kowalski v. YellowPages.com, LLC*, 2012 WL 1097350, at *10 (S.D.N.Y. Mar. 31, 2012) ("Arguments made for the first time in a reply brief need not be considered by a court").
[24]Moreover, when asked, Antalik testified that she *believed* (but was not certain) she could have received both pay *and* academic Credit, due to her School's "loopholes that you can work around," EA 41—which creates an open question as to whether Schools that did not allow both pay and Credit might retroactively retract Credit if Interns were awarded back-wages in this case.

determine" whether any unpaid internship is "legitimate."[25]  The NACE Position is persuasive, because Interns whose Schools impose preconditions and additional coursework to academic credit receipt may receive additional benefits from an internship.   A School-administered course relating to the topic of an internship, for example, would enable Interns to make direct academic use of their internships (*e.g.,* through being required to write a paper about or discuss their internship experience).

Indeed, the *only* common factor among Interns who received academic Credit weighs *in favor* of finding *no* misclassification and *no* liability.  All Interns' Schools evaluated the educational value of each internship before approving student applicants' Credit eligibility, concluding that Defendants' internship experiences were sufficiently related and beneficial to each Intern's academic studies, likely to "augment" their classroom preparation "in ways that both complement their studies," and to "enhance their professional experience."  EB Dec. Ex. G, at DS0002521, D0092562.  Our judicial system has a "tradition of giving a degree of deference to a university's academic decisions," *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003), which the Court should do here.[26]

It also would be fundamentally unfair to certify a NY Class headed by Antalik, as Defendants could end up being liable to a class composed primarily of interns who *did* receive Credit and who might not have prevailed if they pursued their claims individually.  Preventing

---

[25] *See* EB Dec. Ex. V (*NACE Position on U.S. Internships* (July 2012)).

[26] *See also Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision…they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment"); *Babiker v. Ross Univ. Sch. Of Med.*, 2000 WL 666342, at *6 (S.D.N.Y. May 19, 2000) ("[B]ecause the decisions that educational institutions make about academic standards involve 'the subjective judgment of professional educators,' claims regarding such matters are subject to judicial review only 'to determine whether [defendants] abided by their own rules" and "in good faith").

such an unfair result is precisely the purpose of Rule 23(a)(3).  *See Dukes*, 131 S. Ct. at 2551 n.5;

*Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, 2013 WL 93636, at *5 (S.D.N.Y. Jan. 9, 2013) ("At

bottom, the typicality requirement concerns the fairness of allowing an entire class's claim to rise

or fall with the fate of the named representative's claims; thus, that representative's claims must

be typical of the class so as to prevent a false prophet from bearing the standard for an entire

class of claims").  For this additional reason, Antalik's Motion should be denied.

### 3.  Antalik's Claim Is A-Typical Of Others' As To Defendant FEG.

Antalik's claim against FEG also is materially a-typical of other Interns' claims against

FEG.  Antalik's FEG claim is based on the theory that FEG and Searchlight were her "joint

employers."  P17.  The sole basis for that claim, however, is an alleged role by Recruiter

Hoffman in all NY Class members' internships.  However, it is undisputed that:  (1)  ***Hoffman***

***had no role with respect to Antalik's initial recruitment or onboarding***, nor was she involved

with any but one of Searchlight NY Office's Interns until those for the Fall 2009 semester (*after*

Antalik's internship concluded);[27] and (2) Hoffman played no such role with respect to any of

the 500+ FEG subsidiaries other than the Proper Subsidiaries.[28]  That the sole common thread for

Antalik's motion (*i.e.,* Hoffman's involvement) is *in*consistent and *un*common, among Interns in

both Classes, alone are grounds for certification denial.  Indeed, this material dissimilarity in

---

[27]*See supra*, FACTS § A.3 (EA 70-4, 198, 107-8, 175; JM 60; AH 14-5, 32-3, 107-9, 198, 257, 281-2, 286-7, 317, 335; DJ 92-3).  In fact, before Fall 2009, Hoffman only had two informal contacts with the NY Office: one in April 2009, when she first learned of an Intern there, and one in July 2009, when she learned of four other Interns there (including Antalik). EB Dec. Ex. H. Hoffman also never was employed by FEG nor engaged or otherwise played any role with respect to any FEG (parent holding company) interns.  AH Dec. (9.19.12) ¶ 2 (Dkt. 40).

[28]Hoffman provided support during the Class Period to only *some* Proper Subsidiaries' Interns' supervisors, but she attests that insofar as any internship documents "contained a reference to FEG, that reference was not accurate," and her use of any such FEG reference on a document was not meant "to suggest that [she] was responsible for any internship program that may have been administered by FEG," as she was not. *Id.*  ¶ 4.  *See supra*, n. 8 (citing other Supervisor declarations indicating Hoffman was not involved in internships in their Departments).

experience unquestionably makes Antalik a-typical of the NY Class as a whole because it affects *the* most important factor requiring resolution before any Intern can prevail on a claim against FEG, as each Intern needs to establish standing to sue FEG as a "joint employer."

Accordingly, Antalik cannot satisfy Rule 23(a)(3) and should refuse to certify the NY Class.  *See Denney v. Deutsche Bank AG,* 443 F.3d 253, 264 (2d Cir. 2006) ("no class may be certified that contains members lacking Article III standing"); *Javier H. v. Garcia-Botello,* 2011 WL 4344045, at *6 (W.D.N.Y. Sept. 14, 2011) (holding Typicality unsatisfied because plaintiffs failed to establish standing to sue defendants as their "joint employers").[29]

**D.     Antalik Cannot Prove Commonality or Predominance Since There Is *No* Probative Common Evidence For All Interns' Claims, And The *Only Probative* Evidence Shows Rampant *Dissimilarities* Among Those Claims.**

The test for determining whether a plaintiff can show a "common question" under Rule 23(a)(2) ("Commonality") is prescribed by *Dukes*, 131 S. Ct. 2541 (2011), and the test for determining whether she can show common questions predominate under Rule 23(b)(3) ("Predominance") is prescribed by the Supreme Court's recent ruling in *Comcast*, 2013 WL 1222646 and *Myers v. Hertz Co.,* 624 F.3d 537 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 368 (2011).  Antalik fails both tests.

**1.     Applicable Legal Standards**

To pass the *Dukes'* test, a plaintiff must prove that the claims of all class members hinge on a "common contention…capable of classwide resolution," in that "determination of its truth or falsity will resolve an issue central to the validity of *each one* of the[ir] claims in one stroke,"

---

[29]These facts also preclude Antalik from "fairly and adequately protect[ing] the interests of the class," as Fed. R. Civ. P. 23(a)(4) ("Adequacy") requires. Adequacy "tends to merge" with Typicality, *Dukes*, 131 S. Ct. at 2551 n.5 (quotation omitted), and courts generally hold that if a named plaintiff is not "typical" of a class, she also is not an "adequate" representative. *See*, *e.g.*, *Shayler,* 2013 WL 772818, at *8; *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84-85 (S.D.N.Y. 2007).

and will produce "common *answers*…apt to drive the resolution of the litigation."  *Dukes*, 131 S. Ct. at 2551 (emphasis added) (citation omitted).  Should Antalik somehow pass that test (and she cannot), she still faces the more onerous *Myers* test for proving that her *Dukes*-compliant "common questions" "predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  That test involves a court's identifying each question needing an answer for each class member's claim and then evaluating them to determine whether each can be answered with generalized proof (making the question "common"), or will require individualized proof (making it an "individual" question); only if the common questions represent a more substantial aspect of the case is Predominance satisfied.  *See Myers*, 624 F.3d at 547.  The Supreme Court recently remarked that the "predominance criterion is even more demanding than Rule 23(a)."[30]

A court must conduct a rigorous analysis of the proofs needed for class members' substantive claims, and that must include an assessment of "dissimilarities" among class members' respective required proofs—because dissimilarities are what can preclude resolution on all class members' claims in a single, "economical," and "productive[]" trial based on evidence common to the class rather than particular to its members.  *Dukes*, 131 S. Ct. at 2551, 2561; *see Myers*, 624 F.3d at 550-52.  For example, the plaintiffs in *Dukes* could not satisfy Commonality on claims for systemic gender discrimination because the crux of that case was *why* were plaintiffs denied promotions?  *Dukes*, 131 S. Ct. at 2552.  The Court held that Commonality was not satisfied because plaintiffs could not prove that the *answer* to "why?" would be "discrimination" against all class members. *Id.*

Here, the NY Class Members assert claims for unpaid-intern misclassification (a requisite to their prevailing on their Wage Claims as to either Defendant).  The crux of this case is: *who*

---

[30] *Comcast v. Behrend,* 2013 WL 1222646, at *4.

was the primary beneficiary of NY Class members' internships?  The Court should hold that Commonality is not satisfied because Antalik cannot prove that the *answer* to "who?" will be "Searchlight *and* FEG" for every Intern.[31]  Rather, the six-DOL Factors are individualized in nature requiring Intern-specific proof, yielding only Intern-specific answers and thus unsuitable for Class-wide treatment.  Moreover, each Intern individually must establish that Searchlight and/or FEG employed them, which also requires a fact-intensive analysis.[32]

Applying the foregoing standards, Antalik must demonstrate by a preponderance of the evidence: (i) a question central to the validity of NY Class Members' claims that can be answered with evidence common to the class, not particular to its individual members; (ii) the answer will be the *same* for all class members; and (iii) the answer can be generated in a manageable and fair class trial, in which the interests of both Defendants and absent class members are protected. Antalik can do none of these things.

## 2.    Antalik Misplaces Reliance On Interns' Common Classification.

To begin, Antalik's repeated references to Defendants' treating all Interns as non-employee, student-Interns are a red-herring because Defendants did not have a facially unlawful policy.  That all Interns uniformly were classified as exempt from NYLL wage rules is of little significance in a certification analysis, because it is irrelevant to any question central to the validity of their underlying claims.[33]  While Rule 23 does not require plaintiffs to show that all

---

[31] *See supra*, FACTS § A.1-4 (summary of Supervisor declarations).

[32] *See* Defendants Motion for Summary Judgment (Dkt. 94, at 25-29) (requesting the Court dismiss Antalik's joint employer claims against FEG as a matter of law because of a "strong presumption that a parent is not the employer of its subsidiary's employees" and "extraordinary circumstances" that must be present for joint employment to exist).

[33] *See, e.g., Myers*, 624 F.3d at 549-52 (affirming certification denial on misclassification claims for failure to prove Predominance, concluding that plaintiffs' reliance on Hertz's "blanket" exempt classifying policy, even where testimony from Hertz representatives that managers' duties did not vary "materially" across locations, was insufficient, and that Hertz' blanket policy, in particular, "demonstrated little"); *Romero v. H.B. Auto. Grp., Inc.,* 2012 WL 1514810, at *18

class members had "identical job responsibilities," certification is proper only if their actual job duties were "*largely consistent*" or "*generalizable*," and neither is true here.[34]  Given the limited size of the NY Intern Class, the record evidence is limited; however, comparing Antalik's experience to those of Interns in Bruce Shirey's program (also in NY) makes clear that their actual "job duties" were not at all "consistent" or "generalizable." BS Dec. ¶¶ 23-39.[35]  Simply put, Antalik has not presented sufficient evidence to answer the ultimate "primary benefit" question as to her, let alone to satisfy that burden on a Class-wide basis.

### 3.   The Court Should Not Consider The Fall 2010 Change To A Paid Program As It Is Irrelevant Factually And Inadmissible Legally.

Antalik's second basis for Commonality and Predominance rests on Defendants' change to a paid intern program in Fall 2010.  As with her other deficient proof, though, this too does nothing to advance her certification bid.  The change that occurred is irrelevant because it provides no information as to the actual experiences of any unpaid Intern, nor does it account for what each unpaid Intern did at the time he or she was engaged, which *alone* drives the analysis and is necessary for assessing whether each Intern received the primary benefit of his or her internship.  *See, e.g., Clarke v. JPMorgan Chase Bank, N.A.*, 2010 WL 1379778, at *22 (S.D.N.Y. Mar. 26, 2010) ("The mere fact of" defendant's "reclassification [to non-exempt] is not enough to raise a genuine issue"); *Mike v. Safeco Ins. Co. of Am.,* 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (denying motion for FLSA certification, ruling that company's post-suit reclassification did not "provide the necessary common thread," where "[t]he merits of [plaintiff's] claim will turn upon evidence relating to [his] day-to-day tasks, and not upon

---

(S.D.N.Y. May 1, 2012) (no Commonality since "central question" was "[were] salespersons [] primarily engaged in selling vehicles," which required individualized proof).

[34] *White v. W. Beef Props., Inc.,* 2011 WL 6140512, at *3 (E.D.N.Y. Dec. 9, 2011) (emphasis in original).

[35] *See supra*, FACTS § A.1 (discussing the "productive work" Antalik alleged to have performed, as compared to Shirey's Interns' shadowing, fictional exercises and "Math Class").

any…*company policy or decision*") (emphasis added).[36]

### 4.    Antalik's "Common" Documents Theory Does Not Work Because It Rests On Materials That Are Not Probative To The Relative Benefits Of *Any* Class Member's Internship.

Antalik devotes the bulk of her brief to Internship Program Guidelines ("Guidelines") and Request Forms ("IR Forms").  *See* P6-15.[37]  She then explains, in seemingly formulaic fashion, how a fact-finder will be able to: take each document; follow a set of directions (applying each to the six DOL Fact Sheet criteria); and ultimately arrive at a class-wide "common answer."  *See* P22-23, 25.  Antalik's attempt should be rejected.

As a start, and as detailed in Defendants' Opposition to Plaintiffs' Partial Summary Judgment Motion (3.29.13), at 22-26, the test for determining Interns' claims is not simply a plug-and-play exercise using the DOL Fact Sheet.  Rather, it depends on resolution of which party was the primary beneficiary of each internship, which can only be analyzed based on the internship itself and the Intern.  In any event, and notwithstanding the test the Court adopts, the documents on which Antalik relies do not amount to "common evidence" that can resolve *any*

---

[36]Indeed, even if the change was a subsequent remedial measure (as Antalik suggests, P16), the Court should not consider it since it is inadmissible under Fed. R. Evid. 407. *See Lujan v. Cabana Mgmt.*, 284 F.R.D. 50, 64-5 (E.D.N.Y. 2012) (evaluating certification motion proof under admissibility standards, citing *dictum* in *Dukes* and *In re IPO*); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011WL 4351631, at *9 (W.D.N.C. Sept. 16, 2011) (proof of defendant's post-suit meal break policy change ran "afoul of Fed. R. Evid. 407's exclusion of evidence of subsequent remedial measures"); *see also* P7, n.47 (appearing to concede Antalik's need to offer admissible evidence here).
Moreover, the change to a paid program was made to provide entities "more flexibility" after the 2010 DOL Guidelines were issued, to reduce the administrative onus of collecting School Credit letters, and to allow students to "expand" on projects and be involved in more productive work, if necessary; significantly, there is no evidence that more full- or part-time employees were hired or regular employees had to work more overtime after the change. AH 43-44, 349-50; LJ 68-70.
[37]The common HR policies Antalik cites have even less, if any, value, and deserve at most cursory review: that Interns had to show proof of lawful U.S. existence, to sign confidentiality agreements, were included in workers compensation ("WC") insurance and anti-harassment/discrimination policies, have no bearing on their substantive claims, as these policies are devoid of facts as to internship experiences and benefits derived therefore (in fact, the provision of WC insurance was a *benefit* for Interns, and arguably legally required).

Intern's claim, much less produce common outcomes on all of them "in one stroke," because none reflect what any internship *actually* entailed (*e.g.,* the Intern Request Forms were completed weeks, if not months prior to any internship starting).[38]  Antalik's attempt to pick and choose various tasks from at least 30 completed IR Forms and then aggregate them into a supposed "common" Intern job description applying across dozens of Departments and supervisors is completely misleading.  In fact, the evidence *shows* there is no "common" description in the IR Forms that will support finding a common, Class-wide job description.  P8-11.  The Guidelines[39] Hoffman gave to some Supervisors and a *blank* version of the Intern Request Forms may be "common" to the class in the dictionary sense of the word, however; they do not make Interns or their claims "common" under Rule 23.  Antalik's documents are of little, if any, value, in a rigorous analysis as to what Interns *will need to prove their substantive claims* as is required.  Indeed, Antalik's proffers are much less informative than even the high-level, general "job descriptions" and training guidelines courts have discounted in Exempt Cases, since at least one of the purported "common" documents (*i.e.* the IR Forms) materially varied depending on the Department, Supervisor and semester.[40]

---

[38]*See e.g.,* JGB Dec. ¶ 9 (averring that IR Forms were "not intended to be an exhaustive or exact list of everything the intern would do or learn when he or she arrived"); JZ Dec. ¶ 7.

[39]The Guidelines also *support* Defendants' position more than the reverse; Antalik recounts only Guideline snippets which she then contorts into Fact Sheet criteria in an attempt to support her view that all Interns were misclassified. P7. She omits mention of the other Guideline parts that suggest the opposite, such as: "[t]he purpose of the internship is to complement, reinforce and place in realistic perspective, the objectives of classroom instruction"; interns would be "[v]iewed as trainees here to learn more about the business," and "[g]iven professional feedback"; interns would **not be** "[h]ired to replace regular employees," and **not be viewed as** "[a]dministrative support or cheap labor." EB Dec. Ex. J, at D0050621-2.

[40] The IR Forms do not support a finding that *all* Interns were misclassified, as each Form entailed *different* projects, tasks and learning objectives from each another. *See, e.g.*, EB Dec. Ex. K, at D0048770 ("Fox Searchlight Creative Advertising provides interns with a valuable, hands on working experience," and enables them to "[s]tay clear of the typical Hollywood intern duties of making coffee and getting lunch"). Nor do these forms match what Interns actually did.

Instructive is this Court's certification denial in *Kopera v. Home Depot U.S.A., Inc.*, 2011 WL 135016, at *1 (S.D.N.Y. Jan. 11, 2011), where plaintiff alleged he "worked eleven-hour days and had no managerial authority" while training for an assistant store manager ("ASM") position, and sought certification as to all other ASM trainees.  The Court held that the ASM training guide that stated training would "provide a structure for effective hands on learning to help [trainees] prepare for [their] new job as an [ASM]," and "describe[d] a final evaluation in which the trainee [wa]s tested as to whether they 'c[ould] apply all that [they] ha[d] learned to [their] own store'"—was insufficient for Rule 23.  *Id.* at *2.  The Court reasoned that the "central question" on class members' claims was whether they qualified as NYLL OT-exempt, and that "general corporate policies bear on a predominance analysis only 'where…there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies.'" *Id.* at *3 (quoting and distinguishing *Damassia*, 250 F.R.D. at 160).  Significantly, the training guide *was no such evidence*. *Id.*[41]

### 5. Antalik Has Presented No "Common" Proofs Theory to Quantify Damages on a Class-Wide Basis.

Antalik also has presented no proof that she could measure and quantify damages on a class-wide basis, as is required to satisfy the Predominance requirement.  *See Comcast*, 2013 WL

---

[41] *See supra,* FACTS § A.1.
*See also Myers*, 624 at 549-52 (no Predominance because no uniform corporate policy detailing all class members' actual duties; court distinguished *Damassia* on that basis and concluded that Hertz's liability was not "provable in common," but would rest on "individual factual analysis to resolve that the primary duties of" *all* managers was non-exempt) (quotation and citation omitted); *Trawinsky v. KPMG LLP*, 2012 WL 6758059, at *6-7 (S.D.N.Y. Dec. 21, 2012) (denying certification for lack, *inter alia*, of Commonality—despite all class members having "same general job requirements," being "retained" through "same job posting," and offering proof that their job duties were "highly correlated, *if not largely interchangeable*—where other evidence showed the specifics of their duties could and did "vary widely"); *Edwards v. Publrs. Circulation Fulfillment, Inc.,* 268 F.R.D. 181, 184 n. 4 (S.D.N.Y. 2010) (distinguishing cases before *In re IPO* as being under "a different and generally less restrictive standard," denying certification where class dissimilarities bore on liability, and distinguishing cases like *Damassia* in which employers conceded that job tasks were uniform and embodied in one job description).

1222646, at *5, 7 (denying certification and noting that "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*") (emphasis in original) (citations omitted).  Indeed, the Supreme Court just stated that such methodology must be based on a "just and reasonable inference" and may not be "speculative," otherwise the Predominance requirement would become "a nullity."  *Id.* at *5.  Antalik has not, and cannot, proffer a common methodology for calculating damages should certification be granted.  Indeed, the damage permutations as to the Interns are individualized and innumerable—*e.g.,* regarding schedules (which were not tracked or centralized),[42] unreimbursed costs[43] and receipt/non-receipt of academic credit.  *See supra,* FACTS § A.2-3.

        Just as in all these cases, the absence of common proof or documents that can resolve all Interns' claims at once make it impossible for any aggregate trial to produce common outcomes for all on any question central to their substantive claims.  Any class trial would be dominated by Intern-specific facts, inquiries, and answers.  That scenario is the antithesis of the type of proceeding that *Dukes* endorses under Rule 23(a)(2), or that the commands of Rule 23(b)(3) allow.[44]  The Court should apply *Comcast* and *Dukes*, follow *Myers*, *Kopera*, and the many other

---

[42] AH 178; Interns were engaged for different hours, depending on the semester, Department or Supervisor.  *See e.g.,* EA 204-05, 209 (3 days a week, from 8:30 a.m. to 5 p.m., but that some days she stayed late to attend screenings or publicity events and she only took lunch "sometimes"); EB Dec. Ex. E, at D0058762 (different hours in 2007); BS Dec. ¶ 11 (Monday through Thursday "approximately" 9:00 am to 5:00 pm and one hour for lunch).

[43] EA 213-224 (analyzing unreimbursed costs and noting this was an "issue" for at least one other Intern); *but see* BS Dec. Paragraph 40 (his Interns did *not* incur out-of-pocket expenses).

[44] All the Rule 23 cases Antalik cites are distinguishable. She relies heavily on *Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152 (S.D.N.Y. 2008), but, as described above, that case has been distinguished repeatedly by courts on records like this one because it involved a highly detailed job description that did, in fact, comprehensively describe what classmembers *actually* did on a daily basis, and defendant conceded that all job duties *were*, in fact, accurately described in that job description, that it *did*, in fact, show exactly what they all did daily; and that there were, in fact, common business practices applicable to work experiences of *all* class members. *Id.* None of those facts present here.  *See supra,* 26 (noting IR Forms contained planned tasks and that

cases denying certification on records like that here.

## II.   ANTALIK FAILS THE TEST FOR FLSA § 216(b) CERTIFICATION.

### A.   <u>The Post-Discovery Legal Standard Applies</u>

When all merits and class discovery has been completed and closed by court order—as is the case here, Dkt. 76—courts apply a "stringent" standard to FLSA § 216(b) certification motions when assessing if a named plaintiff has *proved* that she and unnamed class members are, *in fact*, "similarly situated." 29 U.S.C. § 216(b); *see Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007); P29 (citing *Torres v. Gristede's Op. Corp.*, 2006 WL 2819730, at *29 (S.D.N.Y. Sept. 29, 2006) (applying "heightened scrutiny" "[p]ost-discovery")).[45]   It is ***only*** where merits- and class certification-related discovery is ***not*** complete that courts have applied Antalik's proposed "fairly lenient" standard, P29, less stringent than that applicable to post-discovery FLSA § 216(6) motions.  *See, e.g.*, *Amador v. Morgan Stanley & Co., LLC*, 2013 WL 494020, at *4 (S.D.N.Y. Feb. 7, 2013).[46]   The one unpublished slip opinion Antalik cites in support of her proposed "fairly lenient" standard, P26 (citing *Silverstein v. AllianceBersntein L.P.*, No. 09 Civ. 5904 (S.D.N.Y. Aug. 24, 2011)), is off-point because it addressed initial FLSA notice certification *before* plaintiffs had name and contact information for putative class members—a far cry from this case, where Plaintiffs have had most such

---

actual experiences varied by Department and Supervisor).

[45]*Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011); *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 123 (S.D.N.Y. 2011); *Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383, at *3 (S.D.N.Y. Nov. 13, 2009)

[46]Antalik bases her incorrect suggestion on some supposed concern for protecting "workers' rights" that "will diminish each day" absent formal, Court-authorized "timely notice" to putative class members.  But any such concern cannot be genuinely asserted here, where *Plaintiffs* delayed more than 16 months after filing their OC before moving for "timely notice."  *See* Dkt. 1, 103.  Indeed, during a discovery conference, Judge Peck suggested to Plaintiff's counsel that they stay discovery, motion for certification, and then conduct opt-in discovery, but Plaintiff's counsel declined that approach, reassuring Judge Peck that no further opt-in discovery would be done even *if* the FLSA Class is certified.  EB Dec. Ex. T, at 4-6.

information for nearly a year, yet have located only a single Corporate Intern opt-in beyond

Antalik with a timely FLSA claim, and even he is not viable because he did not intern at a Proper

Subsidiary.[47]  *See infra*, 35.  Antalik's suggestion that her post-discovery burden of proof is

"fairly lenient," P29, thus is wrong.

      Further, while the Second Circuit has not defined the particular level of proof required to

prevail on a post-discovery § 216(b) motion (nor, apparently, has any Second Circuit district

court), the most recent—and apparently only—circuit to have done so, the Third Circuit in

*Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 534, 537 (3d Cir. 2012), prescribes a

"preponderance of the evidence" standard, which the Third Circuit arrived at by reasoning that

the Second Circuit's *Myers* decision effectively stood for the same.  *Zavala*, 691 F.3d at 534,

537.[48]  Given the close of discovery here, the Court should follow the reasoning of the Third and

Seventh Circuits and apply a preponderance of the evidence standard (as applies to Rule 23

certification in this Circuit) or, at the very least, a "stringent" standard, which Second Circuit

district courts have applied to post-discovery FLSA certification motions.  *See supra* n. 43.  No

matter what standard the Court applies, Antalik cannot meet her burden.

**B.**    <u>**The FLSA Class Fails The Post-Discovery Test.**</u>

      When determining whether a named plaintiff and other putative class members were

"similarly situated" victims of a uniform employer policy that, if proved unlawful, would

---

[47] The same differing procedural posture also makes *Wang v. Hearst*, 2012 WL 2864524
(S.D.N.Y. July 12, 2012), P20, inapt. The court there granted conditional certification only four
months after an initial Complaint, and based its ruling on the named plaintiff's assertions and
affidavits, as there had been no substantial discovery; here, by contrast, the parties have
completed more than a year of relevant discovery, and it is closed.  *See also Aponte v.
Comprehensive Health Mgmt.,* 2011 WL 2207586 (S.D.N.Y. June 2, 2011) (preliminary stage
certification); *Summa v. Hofstra,* 715 F. Supp. 2d 378 (E.D.N.Y. 2010) (same).
[48]*See also Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770, (7th Cir. 2013) (applying Rule 23
standard applied with equal force to FLSA § 216(b) and affirming decertification of a hybrid
Rule 23 class and FLSA § 216(b) class action together).

provide grounds for all their claims alike, Courts apply a totality test, taking into account the three considerations prescribed in *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001) (the "*Thiessen* Factors"): (i) whether disparate factual and employment settings of the individual plaintiffs exist; (ii) whether any individual defenses exist; and (iii) fairness and procedural considerations.[49]  Antalik cannot prove that FLSA Class members were similarly situated under any possible unlawful policy, and she fails every factor in the *Thiessen* totality test.  Thus the Court should deny her motion.

As an initial matter, courts routinely reject FLSA certification motions where the employer policy at issue is facially *lawful*, and its application among class members differed. *See, e.g., Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 463-4, 469 (S.D.N.Y. 2011) (when a policy is facially lawful, plaintiffs are required to "demonstrate that the 'practices' and 'culture' of which they complain are sufficiently uniform and pervasive as to warrant class treatment," denying certification because evidence indicated a "wide range of company practices in the context of varied factual and employment settings" whose resolution would require each individual plaintiff to present evidence—serving as the "antithesis of collective action treatment").  Here, the unpaid intern programs at issue are not facially unlawful, and, moreover, Antalik has provided no evidence to suggest any uniform unlawful application in practice. Further, Antalik fails each of the three *Thiessen* factors.

As to the <u>first</u> factor, the dominant dissimilarities among Interns are thoroughly demonstrated by the record—they stem from, among other things, ***different*** Supervisors, Departments, assignments, receipt or non-receipt of academic Credit, Schools' Credit rules, and Hoffman's administrative (or lack of any) role with respect to their internships.  As detailed

---

[49]*See, e.g.*, *Torres*, 2006 WL 2819730, at *9 (adopting and applying *Thiessen* factors).

exhaustively above, *see supra* FACTS § A.1-4; ARGUMENT § I.C, the record leaves no doubt

but that at the Proper Subsidiaries: (i) individual Supervisors, of which there were *at least* 150,

had wide latitude, discretion, and autonomy in running their internship programs; (ii) Interns

were scattered nationwide among *at least* 30 different Departments in which they performed

functionally disparate tasks and projects; and (iii) all these variables resulted in materially

*dis*similar Intern experiences.[50]   These record facts preclude Antalik from meeting her burden to

prove that Interns were similarly situated in their "factual and [internship] settings," as the first

*Thiessen* factor requires.  *See, e.g.*, *Morano v. Intercon. Cap. Grp., Inc.*, 2012 WL 2952893, at

*6-7 (S.D.N.Y. July 17, 2012) (holding that plaintiffs were not "similarly situated," given

differences among their autonomous supervisors at seven different branches); *Zavala*, 691 F.3d

at 538 (affirming § 216(b) certification denial in IC Exempt Case where plaintiffs premised

certification on distribution of a manual of comprehensive policies and practices that applied

class-wide, reasoning that plaintiffs were not "similarly situated" because they worked for 70

different contractors, meaning that "any common links [were] of minimal utility" since the

differences among the contractors  meant that "[l]iability and damages still [would] need to be

individually proven").[51]

    As to the second *Thiessen* factor, FEG has highly individualized defenses against *each*

Intern's claim, regarding whether FEG was legally each Intern's "joint employer" with the

multiple different entities and sub-entities that engaged the Interns (*e.g.,* Searchlight, Twentieth

---

[50] AH Dec. (3.26.13) ¶¶ 4-5.

[51] *See also Eng-Hatcher v. Sprint*, 2009 WL 7311383, at *4 (denying certification on claims attacking employer's facially lawful OT policy (following months of discovery), and holding that named plaintiff was not "similarly situated" to other class members due to variables stemming from class members' different stores, time periods at the employer, and related factors); *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) ("In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are…similarly situated") (collecting cases).

32

Century Fox, etc.)—which defense can only be established through Intern-specific evidence that depends on many distinguishing features relating to each Intern.[52]

Beyond Antalik's indisputable non-participation in any program to which Hoffman (or Wiggins) provided recruitment or onboarding support, her allegation that she and all other class members were engaged with a "centralized" internship program run by Hoffman and Wiggins, P5-6, is specious.  Specifically, Antalik offers no evidence (since there is none) that the programs Hoffman or Wiggins did support were *all* the same; to the contrary, the record establishes that their respective programs were distinctly different in virtually every material respect; each Recruiter maintained ***different***: (i) recruiting systems; (ii) onboarding processes and paperwork; (iii) orientation programs; and (iv) academic Credit eligibility rules—all of which differ materially from Antalik's internship experience.[53]  Indeed, regardless of Hoffman or Wiggins' involvement in any internship, it is undisputed that neither played *any* role in Antalik's recruiting or onboarding, and, moreover, ***all*** internship Supervisors (including Antalik's) selected the Interns who would be offered internships, assigned tasks to them, and supervised them—wholly independent of both Hoffman and Wiggins.[54]

Based on the foregoing, Antalik also cannot satisfy the <u>third</u> *Thiessen* factor (fairness and procedural considerations).  The dominating dissimilarities among class members that are

---

[52]*See* DSJ Br. 25-29 (seeking dismissal of Antalik's claims against FEG for failure to satisfy the requisite "formal" and "functional" joint-employer control tests as a matter of law); EB Dec. Ex. T, at 6-7 (Plaintiff's counsel acknowledged that without naming each FEG subsidiary as a defendant, they need to establish FEG is each Intern's "joint employer"); *Javier H.,* 2011 WL 4344045, at *6 (denying FLSA certification because plaintiffs failed to establish standing to sue defendants as their "joint employers").

[53]*See* AH 78-79, 128, 271; LW 26, 41-42, 47-48; *compare* EB Dec. Ex. CC (Hoffman sample onboarding forms and checklist) *with* EB Dec. Ex. I (Wiggins sample onboarding forms)

[54]*See supra* FACTS § A.1-4; ARGUMENT § I.C (AH 208, 281; LW 35-7; LK Dec. ¶ 8; DK Dec. ¶ 10); *see also, e.g.*, JGB Dec. ¶¶ 8, 11 (no one from HR or Recruiting is involved in the retention decision; Interns' schedules coordinated without any HR or Recruiting involvement); *accord* MM Dec. ¶¶ 6-10; LH Dec. ¶¶ 9, 12, 15; SV Dec. ¶ 5; KB Dec. ¶ 8-11; AK Dec. ¶¶ 7-12.

directly relevant to Defendants' liability (if any) means that allowing Antalik to proceed

collectively with aggregate proof (the only way any class trial would be efficient or manageable),

would be tantamount to potentially *more than 400 separate mini-trials* under the guise of a

collective action before a single jury.[55]  There would be great potential for confusion (as the jury

is bound to struggle to compartmentalize what evidence relates to which intern) that would

violate the due process rights of both the interns and Defendants.  Of course, any trial in which

all or most of the FLSA Class members and their supervisors testified and otherwise participated

necessarily would be unmanageable and inefficient.  Courts facing a comparable record of

dissimilar FLSA Class members (such as in *Zivali*, 784 F. Supp. 2d at 468) have denied

certification and held that "[r]esolution of the many fact-specific issues in this case would

essentially require… mini-trials in which each individual plaintiff could present evidence that"

his or her experience *in fact* ran afoul of the FLSA, "evidence that would then be subject to

cross-examination and similar challenge by the defendant," and that "[s]uch a result is the

antithesis of collective action treatment and would overwhelm the judicial system and eliminate

any judicial efficiency that might be gained through a collective approach."

The Court should thus reject certification of Antalik's proposed FLSA Class.

## III.   THE COURT SHOULD DISMISS WITH PREJUDICE OR LIMIT SEVERAL OF PLAINTIFFS' CLASS CLAIMS AS WAIVED OR IMPROPERLY ASSERTED.

### A.   Any Class Or Collective Claims By Production Interns Are Waived.

This Court's December 10, 2012 Scheduling Order required the parties to serve any

motion for class or collective certification ("Class Motion") by February 15, 2013.  Dkt. 76.

Plaintiffs have only filed a Class Motion by Antalik as to Corporate Interns' claims.  Dkt. 103.

The class and collective claims *by any and all Production Interns* (as asserted in the AC but on

---

[55]AH Dec. (3.26.13) ¶ 5 (*at least* 400 different unpaid interns at the Proper Subsidiaries).

which no timely Class Motion has been filed), thus are now abandoned.  The Court should

dismiss the following Production Intern claims: (1) FLSA collective (Glatt and Footman); (2)

NYLL class (Glatt and Footman); and (3) CA state law class (Gratts).[56]

**B.      Any Claims Against Non-Proper Subsidiaries of FEG, Or Against Any Entities That Are Not FEG Subsidiaries At All, Are Improperly Asserted.**

As detailed throughout above, the record is clear that the FEG subsidiaries to which

Judge Peck limited discovery (i.e., the "Proper Subsidiaries")—the only FEG subsidiaries to

which Hoffman provided internship support during the Class Period—all had independently-run

internships; *i.e.,* the individual Supervisors in each Department at each such FEG subsidiary

alone ran the day-to-day features of their internship programs, and they alone were the drivers of

Interns' overall internship experiences in accord with their Departments' functional role.  DJ 92-

93; AH 32-33; *see supra*, FACTS §A.1-4.  Based on this record evidence, the Court should reject

Plaintiff's undefined "FEG Internship Program" and dismiss with prejudice any and all claims

against: (i) any FEG subsidiary that is not a Proper Subsidiary;[57] and (ii) Fox Interactive Media,

---

[56] *See generally* AC; *see cf. LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (citing Fed. R. Civ. P. 41(b) as authorizing dismissal with prejudice for failure to comply with court order); *see also, e.g., Smalls v. Bank of N.Y.*, 2008 WL 1883998 (S.D.N.Y. Apr. 29, 2008) (dismissing class part of case after failure to comply with court briefing schedule); *accord Hunter v. Digital Equip. Corp.*, 136 F. App'x 28, 29 (9th Cir. 2005); *Li Dong Ma v. RSM McGladrey, Inc.*, 2010 U.S. Dist. LEXIS 81078, at *1 (N.D. Cal. Aug. 9, 2010).

[57] For these same reasons, the Court should not consider any sworn statements by purported CA Corporate Intern FLSA-claim opt-ins, Brian Nichols or David Stevenson, *see* Dkt. 82, 83. Neither was based in NY or engaged at a Proper Subsidiary:  Stevenson interned in the FNG Recruiting Department, and Nichols at Fox Sports Net, Inc. ("FSN"), a FNG subsidiary, RB Dec. Ex. 78 ¶ 2 ("Nichols Declaration"); LW 14.  In addition, Stevenson's internship, by his own admission, ended before May 2008, DS 13, 76, EB Dec. Ex. F, at P012195 (Stevenson resume), meaning he has no potential claims in this case (any FLSA claim is time-barred and he never had a NYLL claim), and he thus can offer no relevant evidence.
Insofar as the Court does consider their statements (which the Court should not), they only demonstrate more class dissimilarities, because (1) each performed tasks that differed from Antalik and from each other:  Nichols reviewed sporting event video footage and located and logged highlights, RB Dec. Ex. 78 ¶ 2, and Stevenson allegedly performed primarily filing, editing legal contracts, conducting research, and preparing orientation bags for employees, DS

Inc. and News America, Inc. (including Fox Group)—because **they are not and never have been FEG subsidiaries**, VA Dec. ¶¶ 21-23.  Indeed, allowing any claims against entities that are not FEG subsidiaries would be unduly prejudicial and a violation of their due process rights, since none have been served with notice or had the opportunity to participate in any aspect of this case.

**C.**     <u>**The Court Should Reject Antalik's Proposed Class Notices.**</u>

As detailed above, the Court should not certify any class.  Should it do so, however, the Court should reject Antalik's proposed Notices, *see* RB Dec. Exs. 81, 82.  <u>First</u>, Antalik is the sole Named Plaintiff of any relevance to the Notices at issue here.  In order to prevent any Notices from constituting a "misleading communication[]" to any certified class members,[58] **only** Antalik's name should appear as a Named Plaintiff in any Notice (and **not** the names of Glatt, Footman, or Gratts).  <u>Second</u>, to avoid further confusion, should the Court certify both a NYLL class and an FLSA collective, any authorization to issue notices should mandate there be *three* different forms (for issuance to different certified class members depending on which claims they may assert here):  one for those in an FLSA class only; a second for those in a NYLL class only; and a third for anyone who is potentially a member of both.  <u>Third</u>, Antalik's proposed Notices also should be rejected as currently proposed, because they:

       (i)       fail to fully and accurately describe Defendants' position as their defenses;

       (ii)      set an overly long opt-in period (75 days);[59]

       (iii)     include the Court's name, creating the impression of judicial
                      sponsorship of this litigation;[60] and

---

31-32, 35-36, 47-48.  Stevenson also attested that for his internship in Wiggins' HR office at FNG, he was told academic Credit only was "encouraged," but "not required," *see* DS 29— which contradicts everything that is known about every other proposed class member's internships.

[58] *See Erhardt v. Prudential Grp., Inc.*, 629 F.2d 843, 846 (2d Cir. 1980).

[59] *See Diaz v. S&H Bondi's Dep't Store, Inc.*, 2012 U.S. Dist. LEXIS 5683, at * 22-23 (S.D.N.Y. Jan. 17, 2012) (citing cases noting many courts in this district set a 60-day period).

[60] *See Jirak v. Abbott Labs., Inc.,* 566 F.Supp.2d 845, 851 (N.D. Ill. 2008) (holding a proposed

(iv)    mislead potential class members by:  (a) stating that they "*will* be represented" by Outten & Golden if they choose to join the lawsuit, without explaining that they may retain their own counsel; and (b) failing to notify them that they may seek further information about the case from Defendants.[61]

Finally, Antalik's proposed Notices define the proposed scope of both Classes and the time period applicable to such Classes' claims too broadly.  As to scope, the Court should limit issuance of any notices to individuals who interned at Proper Subsidiaries (for the reasons detailed above).  As to time period, since FLSA opt-in forms do not relate back to a complaint,[62] and as the Court already had ruled that Antalik's FLSA claim against FEG does *not* relate back to the OC, Dkt. 71, the Court should restrict any class time period in any FLSA Class Notice to commence no more than three years back from the Court's Order on this Motion, and to end (as Antalik proposes) on September 1, 2010.

Should the Court grant Antalik's Motion in part or whole, the Court should follow by directing that the parties meet and confer in good faith to prepare a mutually agreeable notice(s) for joint submission to the Court in advance of any notice's issuance.  In the event the parties cannot agree, or the Court declines to direct such a meet and confer, Defendants have attached proposed revised notices and comparisons to Plaintiff's proposed notices for the Court's consideration.  *See* EB Dec. Exs. W-BB.

## CONCLUSION

For all the foregoing reasons, Plaintiff's motion for class certification of her FLSA and NYLL claims and Court-authorized notice should be denied in its entirety.

---

notice with the court's name at the top of the first page was inappropriate since it "could suggest to potential plaintiffs that the Court has lent its imprimatur to the merits of this case").
[61]*See, e.g., Guzman v. VLM, Inc.*, 2007 WL 2994278, at *7-8 (E.D.N.Y. Oct. 11, 2007).
[62]*See Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 199 (S.D.N.Y. 2006); *accord Frye v. Baptist Mem'l Hosp., Inc.*, 2012 WL 3570657 (6th Cir. Aug. 21, 2012); *Romero v. H.B. Auto. Grp., Inc.*, 2012 WL 1514810 (S.D.N.Y. May 1, 2012).

<u>**Appendix 1**</u>

**Declarations Referenced in this Opposition:**

- "AH Dec. (3.26.13)"—Aimee Hoffman, sworn to on March 26, 2013;

- "AH Dec. (9.19.12)"—Aimee Hoffman, sworn to on September 19, 2012; Docket Entry 40, previously filed with the Court on September 19, 2012;

- "AK Dec."—Anatole Klebanow, sworn to on March 27, 2013;

- "BS Dec."—Bruce Shirey, sworn to on March 22, 2013;

- "DT Dec."—Dana Tuinier, sworn to on March 27, 2013;

- "EB Dec."—Elise Bloom, Esq., sworn to on March 29, 2013, with attached exhibits;

- "JGB Dec."—Jill Gwen Braginets, sworn to on March 21, 2013;

- "JT Dec."—Jeffrey Thompson, sworn to on March 21, 2013;

- "JZ Dec."—Jacqueline Zambrana, sworn to on March 26, 2013;

- "KB Dec."—Kim Beauvais, sworn to on March 27, 2013;

- "LH Dec."—Lori Hicks, sworn to on March 20, 2013;

- "LK Dec."—Lindsey Kasabian, sworn to on March 26, 2013;

- "MG. Dec."—Mark Grammatke, sworn to on March 26, 2013;

- "MM Dec."—Michelle Marks, sworn to on March 22, 2013;

- "NB Dec."—Nicholas Bunin, sworn to on March 28, 2013;

- "NG Dec."—Natalie Gibbons, sworn to on March 27, 2013;

- "PW Dec."—Paul Werner, sworn to on March 19, 2013;

- "RB Dec."—Rachel Bien, Esq., sworn to on February 15, 2013, Docket Entry 105, previously filed with the Court on February 15, 2013;

- "SV Dec."—Scott Vyduna, sworn to on March 19, 2013; and

- "VA Dec."—Veronica Arroyo, sworn to on March 27, 2013.

**Deposition Testimony Referenced in this Opposition:**

- "AH"—Aimee Hoffman (9.19.12, 12.14.12)

- "DJ"—David Johnson (12.13.12)

- "DS"—David Stevenson (1.14.13)

- "EA"—Eden Antalik (7.21.12)

- "JM"—John Maybee (8.9.12)

- "LJ"—Linda Johns (1.18.13)

- "LW"—Laura Wiggins (1.16.13)