**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Elizabeth Wagoner
Sally Abrahamson (admitted *pro hac vice*)
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC GLATT, ALEXANDER FOOTMAN, EDEN ANTALIK, and KANENE GRATTS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FOX SEARCHLIGHT PICTURES, INC. and FOX ENTERTAINMENT GROUP, INC.,<br><br>Defendants. | No. 11 Civ. 6784 (WHP) (AJP) |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

COUNTER-STATEMENT OF FACTS .................................................................... 1

I.    Plaintiffs Performed Work for Searchlight Film Productions that Directly
Contributed to the Making of the Films.................................................... 1

    A.    Eric Glatt – *Black Swan* ................................................................ 2

    B.    Alexander Footman – *Black Swan* ............................................... 2

    C.    Kanene Gratts – *500 Days of Summer* ........................................ 3

II.    Searchlight Financed, Closely Monitored, and Set Employment Conditions on
its Film Productions .................................................................................. 4

    A.    Searchlight Had the Power to Hire and Approve Key Production Staff..... 4

    B.    Searchlight Closely Supervised the Work on the Productions on a Daily
Basis ............................................................................................. 5

    C.    Searchlight Determined the Budgets Under Which the Productions
Operated........................................................................................ 6

    D.    Searchlight Required Crew Members to Sign Its Form Employment
Agreements................................................................................... 7

    E.    Searchlight Set and Expected the Productions to Enforce
its Intern Policy............................................................................ 7

    F.    Searchlight Contracted with Single-Purpose Corporations to Produce
its Films........................................................................................ 8

III.    FEG Set and Enforced the Policies that Applied to Corporate Interns,
Including Antalik ...................................................................................... 8

STANDARD OF REVIEW ...................................................................................... 10

ARGUMENT ........................................................................................................... 11

I.    A Reasonable Jury Could Find That Searchlight Employed Plaintiffs Glatt and
Footman .................................................................................................... 11

    A.    The Formal Control Factors Favor Plaintiffs............................... 11

1. Searchlight Had the Power to Hire and Fire Plaintiffs and Their Direct Supervisors ............................................................. 12

2. Searchlight Had the Power to Supervise and Control Schedules and Conditions of Employment on *Black Swan* .......................... 15

3. Searchlight Had the Power to Determine Rates and Methods of Payment ............................................................................ 17

4. Searchlight Had the Power to Maintain Employment Records .... 18

B. The Functional Control Factors Weigh in Plaintiffs' Favor .................... 19

1. Searchlight Financed the Premises and Equipment ..................... 19

2. Lake of Tears Did Not Shift as a Unit to Another Joint Employer ........................................................................... 21

3. Plaintiffs Performed Discrete Jobs Integral to the Production of *Black Swan* .................................................................. 21

4. Responsibility for *Black Swan* Belonged to Searchlight, Not Lake of Tears ............................................................. 23

5. Searchlight Supervised Work on *Black Swan* .............................. 23

6. Plaintiffs Worked Exclusively on *Black Swan* ............................. 24

II. A Reasonable Jury Could Find that Searchlight Employed Gratts ...................... 24

A. Searchlight Had the Power to Control Gratts's Wages, Hours, and Working Conditions .......................................................... 24

B. Searchlight Suffered or Permitted Gratts's Work ..................................... 25

III. A Reasonable Jury Could Find that Plaintiff Gratts's Claim Is Timely .............. 26

A. Defendants Have Failed to Establish that Gratts's Claim Is Untimely ..... 26

B. The Court Should Apply Equitable Tolling to Gratts's Claim ................ 29

IV. FEG Is a Proper Defendant Because It Set the Internship Policies that Applied to Corporate Interns, Including Antalik .................................................. 31

A. FEG Employed Antalik as a Joint Employer Because It Exercised Formal Control over Her Conditions of Employment .............................. 31

B.    FEG and the Subsidiaries that Participated in its Internship Program, Including Searchlight, Act as a Single Integrated Enterprise .................. 33

    1.    FEG Centrally Controlled the Wage and Hour and Other Personnel Policies that Applied to Interns ................................... 34

    2.    The Operations of FEG and its Subsidiaries Were Interrelated.... 35

    3.    FEG and Searchlight Have Common Ownership and Management.................................................................................. 36

CONCLUSION............................................................................................................ 37

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Adams v. Inter-Con Sec. Sys., Inc.*,
    242 F.R.D. 530 (N.D. Cal. 2007) ........................................................................29

*Addison v. Reitman Blacktop, Inc.*,
    283 F.R.D. 74 (E.D.N.Y. 2011) ..........................................................................34

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................................11

*Anderson v. Mt. Clemens Pottery Co.*,
    328 U.S. 680 (1946) .........................................................................................26, 27

*Arculeo v. On-Site Sales & Mktg., LLC*,
    425 F.3d 193 (2d Cir. 2005) .................................................................................34

*Aryeh v. Canon Bus. Solutions, Inc.*,
    55 Cal. 4th 1185 (Cal. 2013) ...............................................................................26

*Boyke v. Superior Credit Corp.*,
    No. 01 Civ. 0290, 2006 WL 3833544 (N.D.N.Y. Dec. 28, 2006) .........................19

*Campos v. Zopounidis*,
    No. 09 Civ. 1138, 2011 WL 2971298 (D. Conn. July 20, 2011) ...........................19

*Chen v. TYT E. Corp.*,
    No. 10 Civ. 5288, 2012 WL 5871617 (S.D.N.Y. Mar. 21, 2012) ....................13, 36

*Coach Leatherware Co. v. AnnTaylor, Inc.*,
    933 F.2d 162 (2d Cir. 1991) .................................................................................10

*Cook v. Arrowsmith Shelburne, Inc.*,
    69 F.3d 1235 (2d Cir. 1995) ..............................................................................34, 36

*DeNardi v. DRA Imaging, P.C.*,
    605 F. Supp. 2d 550 (S.D.N.Y. 2009) ..................................................................35

*Eaton Corp. v. Appliance Valves Co.*,
    634 F. Supp. 974 (N.D. Ind. 1984) ......................................................................29

*Futrell v. Payday California, Inc.*,
    119 Cal. Rptr. 3d 513 (Ct. App. 2010) .................................................................24

*Glatt v. Fox Searchlight Pictures, Inc.*,
   No. 11 Civ. 6784, 2012 WL 2108220 (S.D.N.Y. June 11, 2012)...........................................30

*Godlewska v. HDA*,
   No. 03 Civ. 3985, 2013 WL 25649 (E.D.N.Y. Jan. 2, 2013)...........................................14, 21

*Hayes v. New York City Dept. of Corr.*,
   84 F.3d 614 (2d Cir. 1996)...........................................27

*Herman v. RSR Sec. Servs. Ltd.*,
   172 F.3d 132 (2d Cir. 1999) ........................................... *passim*

*Jacobson v. Comcast Corp.*,
   740 F. Supp. 2d 683 (D. Md. 2010) ...........................................19

*Jean-Louis v. Metropolitan Cable Communications, Inc.*,
   838 F. Supp. 2d 111 (S.D.N.Y. 2011)...........................................14, 16, 17

*Johnson v. Nyack Hosp.*,
   86 F.3d 8 (2d Cir. 1996)...........................................29

*Kuebel v. Black & Decker Inc.*,
   643 F.3d 352 (2d Cir. 2011)...........................................26, 27

*Lee v. ABC Carpet & Home*,
   236 F.R.D. 193 (S.D.N.Y. 2006) ...........................................29, 30

*Lekic v. 222 E. 8th St. LLC*,
   No. 11 Civ. 1242, 2012 WL 4447625 (E.D.N.Y. Sept. 25, 2012)...........................................28, 29

*Lemus v. Timberland Apartments, L.L.C.*,
   No. 10 Civ. 01071, 2011 WL 7069078 (D. Or. Dec. 21, 2011) ...........................................13

*Maidana v. La Esquina Crilla Rest., Inc.*,
   No. 11 Civ. 2606, 2012 WL 6772062 (E.D.N.Y. Nov. 6, 2012)...........................................13

*Martinez v. Combs*,
   231 P.3d 259 (Cal. 2010) ...........................................24, 25, 26

*Mitchell v. Acosta Sales, LLC*,
   841 F. Supp. 2d 1105 (C.D. Cal. 2011) ...........................................29

*Morales v. Cancun Charlie's Rest.*,
   No. 07 Civ. 1836, 2010 WL 7865081 (D. Conn. Nov. 23, 2010)...........................................19

*Moreau v. Air France*,
   356 F.3d 942 (9th Cir. 2004) ...........................................17

*Mowdy v. Beneto Bulk Transp.*,
  No. 06 Civ. 05682, 2008 WL 901546 (N.D. Cal. Mar. 31, 2008) ...........................................29

*Olin Corp. v. Am. Home Assurance Co.*,
  704 F.3d 89 (2d Cir. 2012) ..................................................................................................11

*Rattner v. Netburn*,
  930 F.2d 204 (2d Cir. 1991) ................................................................................................11

*Rivera v. Puerto Rican Home Attendants Servs., Inc.*,
  922 F. Supp. 943 (S.D.N.Y. 1996) .......................................................................................34

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947) ...........................................................................................................23

*Santiago v. Amdocs, Inc.*,
  No. 10 Civ. 4317, 2011 WL 6372348 (N.D. Cal. Dec. 19, 2011) .........................................29

*Sharkey v. Lasmo (AUL Ltd.)*,
  992 F. Supp. 321 (S.D.N.Y. 1998) .......................................................................................35

*Torres-Lopez v. May*,
  111 F.3d 633 (9th Cir. 1997) ..............................................................................................15

*Torres v. Gristede's Operating Corp.*,
  No. 04 Civ. 3316, 2011 WL 4571792 (S.D.N.Y. Sept. 9, 2011) ..........................................13

*Tracy v. NVR, Inc.*,
  No. 04 Civ. 6541L, 2009 WL 3153150 (W.D.N.Y. Sept. 30, 2009) ......................................15

*Whitehorn v. Wolfgang's Steakhouse, Inc.*,
  767 F. Supp. 2d 445 (S.D.N.Y. 2011) ..................................................................................30

*Zheng v. Liberty Apparel Co., Inc.*,
  355 F.3d 61 (2d Cir. 2003) .....................................................................................19, 22, 23

## PRELIMINARY STATEMENT

The Court should deny Defendants' Motion for Summary Judgment.  First, the joint employment factors under the formal and functional control tests decidedly weigh in favor of Plaintiffs Eric Glatt and Alexander Footman.  Defendant Fox Searchlight Pictures, Inc. ("Searchlight") financed Black Swan, determined its budget, approved wage rates, monitored the production on a daily basis, approved the hire of Plaintiffs' supervisors, set the terms and conditions of crew members' employment, and determined Black Swan's intern hiring policy.

Second, based on very similar evidence, Searchlight employed Plaintiff Kanene Gratts on 500 Days of Summer under California's liberal employer test because it had the power to control her wages, hours, and working conditions, and suffered or permitted her work building and dismantling sets on the film.  Defendants have not established their defense that Gratts's claim is untimely because material issues of fact exist that a jury must resolve.

Third, Defendant Fox Entertainment Group, Inc. ("FEG") employed Eden Antalik and other interns who worked for FEG subsidiaries in Defendants' corporate offices under the joint employment and single integrated enterprise tests.  FEG set the policies that applied to corporate interns, including its no pay policy, created guidelines that applied to interns and their supervisors, was named on paperwork and forms that were sent to interns and their supervisors, and enforced its policies through intern recruiters who worked out of a central human resources department that provided services across FEG's subsidiaries.

## COUNTER-STATEMENT OF FACTS

### I.    Plaintiffs Performed Work for Searchlight Film Productions that Directly Contributed to the Making of the Films.

Plaintiffs performed work that directly contributed to the production of films that Searchlight financed, produced, and later distributed.  They functioned as integral members of

the films' production teams, performing tasks alongside paid crew members and that otherwise would have been performed by paid employees.

### A.    Eric Glatt – *Black Swan*

Eric Glatt worked for Searchlight in the Accounting Department of *Black Swan* from approximately December 2009 through February 2010, five days a week from 9 a.m. to 7 p.m. Pls. SOF[1] ¶ 188; Pls. ASF ¶ 93; Defs. SOF ¶ 89.   His responsibilities included tracking and reconciling purchase orders, invoices and petty cash; reviewing personnel files for required paperwork; creating spreadsheets to track personnel file documents; communicating with cast and crew members regarding their personnel files; making deliveries to the film set and production payroll company; and scanning, photocopying, filing, and emailing accounting documents.  Pls. SOF ¶¶ 190-91; Pls. ASF ¶ 94.  Glatt also worked in the Post-Production Department two days a week from approximately March 2010 through August 2010, from 11 a.m. to approximately 6 or 7 p.m.  Pls. SOF ¶ 194; Pls. Counter-Statement ¶ 90; Defs. SOF ¶ 90. He did administrative work, such as filing, photocopying, errands, and preparing binders of materials to be sent to Searchlight.  Pls. SOF ¶¶ 195-98; Pls. ASF ¶ 95.

### B.    Alexander Footman – *Black Swan*

Alexander Footman worked for Searchlight in the Production Office of *Black Swan* from approximately October 2009 through February 2010, between 25 to 50 hours a week.  Pls. SOF ¶¶ 214, 216; Pls. ASF ¶ 96.   Footman's responsibilities included picking up and setting up office

---

[1]    References to the "Pls. SOF" are to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, ECF No 91.  References to "Defs. SOF" are to Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, ECF No. 102.  References to "Pls. Counter-Statement" are to Plaintiffs' Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1(b).  References to "Pls. ASF" are to Plaintiffs' Additional Statement of Material Disputed Facts Pursuant to Local Civil Rule 56.1(a).

furniture; arranging lodgings in hotels and apartments for the cast and crew; compiling lists of local vendors; taking out the trash; taking lunch orders; answering and transferring phone calls; watermarking scripts; drafting daily call sheets; photocopying; making coffee; making deliveries to and from the film production set, rental houses, and payroll services; receiving packages and deliveries to the office; admitting guests into the office; breaking down, removing, and selling office furniture and supplies at the end of the production; internet research; and sending invitations to the "wrap party."  Pls. SOF ¶¶ 223-25; Pls. ASF ¶ 97.

### C.  Kanene Gratts – *500 Days of Summer*

Kanene Gratts worked for Searchlight in the Art Department of *500 Days of Summer* from approximately April 2008 through August 2008, approximately 20-25 hours a week.  Pls. SOF ¶¶ 250-53; Pls. ASF ¶ 85.  Gratts's responsibilities included constructing sets; preparing the sets for film shoots by arranging props and furniture; keeping the sets neat during shooting; and restoring the film location to its original, pre-production state once filming was complete.  Pls. SOF ¶¶ 244-49; Pls. ASF ¶ 86.  Although she could not remember the name of the building, Gratts believes that she performed duties for *500 Days of Summer* in a building located on Broadway between 3rd and 4th Streets in Los Angeles.  Pls. ASF ¶ 87.

After the filming of *500 Days of Summer* wrapped, there was a break in Gratts's employment.  Pls. ASF ¶ 90.  In approximately August 2008, Steven Fox, the Construction Foreman on *500 Days of Summer*, called her back to work to break down sets and restore the filming location to its original, pre-production state.  Pls. ASF ¶ 91; Pls. Counter-Statement ¶ 22.

Gratts first learned of the lawsuit on or about July 9, 2012 when an attorney from Outten & Golden LLP called her to interview her about her internship.  Pls. ASF ¶ 92.  After some follow-up discussions, Gratts retained Outten & Golden LLP to represent her in the lawsuit on

July 17, 2012.  Bien Decl. ¶ 11.  On August 2, 2012, Plaintiffs filed a pre-motion letter with the

Court requesting permission to move for leave to file the First Amended Complaint, which,

among other things, sought to add Gratts as a named Plaintiff.  *Id*. ¶ 12.

## II.    Searchlight Financed, Closely Monitored, and Set Employment Conditions on its Film Productions.

### A.    Searchlight Had the Power to Hire and Approve Key Production Staff.

Searchlight entered into detailed Production-Finance-Distribution Agreements ("PFD

Agreements") with single-purpose companies that set forth its right to control significant aspects

of the films' productions.  Pls. SOF ¶¶ 13-17, 24-27; Pls. Counter-Statement ¶¶ 4, 5.  The PFD

Agreements gave Searchlight the power to hire and approve production department heads,

including the Unit Production Manager who supervised the production, the Production

Accountant, who supervised the Accounting Department; the Production Designer, who

supervised the Art Department (props, set dressing, construction); the Cinematographer, who

supervised the camera crew, grips, and electrical crew; the Costume Designer, who supervised

the Costume Department; and the Editor, who supervised the post-production staff.  Pls. SOF ¶¶

15, 25, 60, 63-64, 67-68; Pls. Counter-Statement ¶¶ 4, 6, 30-32, 45.  These crew members hired

and directly supervised Plaintiffs.  Pls. SOF ¶¶ 185, 208, 236; Pls. Counter-Statement ¶¶ 6, 31-

32, 42.

Searchlight exercised its hiring and approval authority.  It hired the *500 Days of Summer*

Line Producer, production department heads, and checked their references.  Pls. SOF ¶¶ 65-66;

Pls. Counter-Statement ¶ 122.  Searchlight reserved the right to replace any personnel on *Black*

*Swan* and *500 Days of Summer* if, "in its sole reasonable discretion," it decided to take over the

production entirely.  Pls. SOF ¶¶ 17, 27; Pls. Counter-Statement ¶¶ 4, 30.

### B.   Searchlight Closely Supervised the Work on the Productions on a Daily Basis.

Searchlight monitored the progress of its productions and the money spent on the productions on a daily basis.  Searchlight required the productions to send it daily "call sheets," which contained information about the scenes that were to be filmed the next day and the time each employee was to arrive to work, and allowed Searchlight to monitor any changes to the production schedule.  Pls. SOF ¶¶ 78-82; Pls. Counter-Statement ¶¶ 7, 49; Defs. SOF ¶ 67. Production interns, including Glatt and Footman, were often copied on emails sent to Searchlight attaching call sheets.  Pls. SOF ¶ 86; Pls. Counter-Statement ¶ 106.  Searchlight also received and used "Crew Lists," containing contact information for all production personnel, including Plaintiffs and other interns.  Pls. SOF ¶ 165; Pls. Counter-Statement ¶ 6.  Searchlight required the productions to send it daily production reports and "wrap reports," which contained detailed information about where filming took place, which scenes were scheduled, which of those scenes were filmed or not filmed, and employees' hours of work.  Pls. SOF ¶¶ 83-84; Pls. Counter-Statement ¶¶ 7, 49, 54.  *500 Days of Summer* production reports included the names of interns who worked on the production.  Pls. SOF ¶ 85; Pls. Counter-Statement ¶¶ 6-7.  Searchlight's Executive Vice President of Production, Elizabeth Sayre, who was responsible for the physical production of its films, regularly reviewed the call sheets, production reports, wrap reports, and cost reports to ensure that the productions were operating within Searchlight's the budget and production schedule.  Pls. SOF ¶¶ 84, 89; Pls. Counter-Statement ¶ 7; Defs. SOF ¶ 65.

In addition, Searchlight required film production employees to call Sayre or a member of her staff each morning to report on the time of the first film shot of the day, and each evening to tell them the time that shooting for the day had wrapped, to ensure that the production complied with Searchlight's production schedule.  Pls. SOF ¶ 90; Pls. Counter-Statement ¶¶ 7, 54.

**C.      Searchlight Determined the Budgets Under Which the Productions Operated.**

Searchlight determined the amount allocated to each film's budget and approved how much would be allocated to each budget line item, including labor.  Pls. SOF ¶¶ 32-34, 36-37, 39; Pls. Counter-Statement ¶¶ 4, 49, 62, 125, 144, 150, 163; Defs. SOF ¶¶ 144, 150, 163. Searchlight did not permit productions to incur overages or cost overruns, without its prior approval.  Pls. SOF ¶ 119; Pls. Counter-Statement ¶ 63.  Searchlight's budgetary control determined how many crew members could be hired and what their pay would be.  Pls. SOF ¶¶ 50-51, 56-58, 124, 153; Pls. Counter-Statement ¶ 140.   Searchlight also determined the reimbursement or "box rental" rates for employees who used their personal equipment, such as computers and cell phones, for work-related purposes.  Pls. SOF ¶¶ 52, 163; Pls. Counter-Statement ¶ 7; Pls. ASF ¶¶ 79, 127.  Searchlight required the productions to send it weekly cash flow schedules that showed the amount of money spent.  Pls. SOF ¶¶ 101-04; Pls. Counter-Statement ¶ 5.  The productions were also required to submit weekly cost reports detailing how the production spent money with respect to each budget line item, including labor, so that Searchlight could monitor the production's expenditures on wages.  Pls. SOF ¶¶ 105-110; Pls. Counter-Statement ¶¶ 7, 54, 65; Defs. SOF ¶ 65.  Searchlight also required the productions to sell props and other physical property that they did not return to Searchlight when filming concluded, and required purchasers sign a "Sale of Prop Assets Agreement" that listed Twentieth Century Fox Film Corporation as the seller.  Pls. SOF ¶¶ 129-130; Pls. Counter-Statement ¶ 96. Footman assisted with selling this property.  Pls. SOF ¶ 129; Pls. Counter-Statement ¶ 78.

**D.   Searchlight Required Crew Members to Sign Its Form Employment Agreements.**

Searchlight required crew members to sign form employment agreements or "deal memos" that it drafted, confidentiality agreements, and box rental reimbursement forms.  Pls. SOF ¶¶ 146-156, 161-64; Pls. ASF ¶¶ 77, 123.  Film production employees would not be paid until they provided signed deal memos to Searchlight.  Pls. SOF ¶ 151; Pls. ASF ¶¶ 78, 125.   On *Black Swan*, even though some employees had already signed deal memos before Searchlight became involved in the production, Searchlight required them to sign new ones on its approved forms.  Pls. SOF ¶¶ 154-56; Pls. ASF ¶ 126.  One of Glatt's responsibilities was to collect deal memos from film production employees.  Pls. SOF ¶¶ 156-57; Pls. Counter-Statement ¶ 105.

**E.   Searchlight Set and Expected the Productions to Enforce its Intern Policy.**

Searchlight expected the productions to follow its intern policy under which interns could only be hired without pay if they were able to obtain academic credit.  Pls. SOF ¶¶ 133-34; Pls. Counter-Statement ¶¶ 6, 183.  Searchlight was aware that interns worked on its productions.  Pls. SOF ¶ 138; Pls. Counter-Statement ¶¶ 56, 59-60.  Interns' names were listed on production reports, which set forth the names of individuals who were scheduled to work; interns received film credits, which Searchlight approved; and interns were listed on crew lists, which the productions submitted to Searchlight and which Searchlight used.  Pls. SOF ¶¶ 139-141, 172, 178; Pls. Counter-Statement ¶¶ 6, 59-60.  Searchlight also heard about interns working on its productions from production crew members.  For example, *Black Swan*'s Line Producer copied Sayre on an email in which she alerted Sayre and others that a union representative had been on set and complained that an intern was doing work that should have been assigned to a "loader," a union position responsible for loading film in the movie camera.  Pls. SOF ¶ 142; Pls. Counter-Statement ¶ 60.  Searchlight also approved the inclusion of interns' names on the credits of *500*

*Day of Summer*.  Pls. SOF ¶ 178; Pls. ASF ¶ 80.  Glatt's supervisors told him that Searchlight

had authorized his hire even though Glatt could not receive academic credit for his internship.

Pls. SOF ¶¶ 143-45; Pls. Counter-Statement ¶ 100.  Searchlight approved Glatt's request to list

him in the *Black Swan* film credits as a "post-production assistant."  Pls. SOF ¶¶ 176-77; Pls.

Counter-Statement ¶ 60.  Searchlight's current policy is that interns who work on its productions

must be paid.  Pls. SOF ¶ 137; Pls. ASF ¶ 81.

> **F.      Searchlight Contracted with Single-Purpose Corporations to Produce its
> Films.**

Searchlight contracted with "single-purpose" corporations to produce its films.  Pls. SOF

¶¶ 10-11, 13, 20, 24; Pls. Counter-Statement ¶ 6.  "Single-purpose" corporations, which are

common in the film industry, are legal fictions created solely to facilitate the production of a

particular film, do not have any independent purpose other than the making of the film, and cease

operations after the film is completed.  Pls. SOF ¶¶ 11, 18-20, 28, 129-32; Pls. Counter-

Statement ¶¶ 4-5, 119, 138; Defs. SOF ¶¶ 119, 138.  The "single-purpose" companies that

produced *Black Swan* and *500 Days of Summer*, Lake of Tears, Inc. and 500DS Films Corp.,

respectively, did not retain any assets, maintain employment records, keep any physical property,

or conduct any other business after production ended and were required to transmit all of their

assets to Searchlight.  Pls. SOF ¶¶ 18-19, 28, 129-32; Pls. ASF ¶¶ 82, 128.

**III.    FEG Set and Enforced the Policies that Applied to Corporate Interns, Including
Antalik.**

Aimee Hoffman, whose title was "Recruiter, Intern and Outreach Programs" for "Fox

Entertainment Group," was responsible for administering FEG's internship program for several

FEG subsidiaries, including Searchlight.  Pls. ASF ¶¶ 26, 28-29, 32, 45, 51-52.  As part of her

duties, Hoffman reviewed and approved Intern Request Forms submitted by intern supervisors,

screened internship applicants through the "Fox Careers" website, www.foxcareers.com, processed interns' new hire paperwork, and oversaw the internship program.  *Id*. ¶¶ 45, 51. Antalik applied for her internship through the Fox Careers website and was required to submit paperwork to Hoffman in order to continue interning at Searchlight.  *Id*. ¶¶ 49, 58, 60, 64, 66.

Numerous policies that applied to Antalik and to other interns who participated in FEG's internship program refer to FEG and were developed by FEG.  A form offer letter welcomed interns, including Searchlight interns who worked in New York, to "Fox Entertainment Group's Internship Program."  *Id*. ¶ 53.  Hoffman sent Intern Request Forms to intern supervisors, including Antalik's supervisor, that she required them to complete and submit to her for her approval in order to hire interns.  *Id*. ¶¶ 34-35, 38, 45, 47.  These forms said "Fox Entertainment Group" at the top of the page.  *Id*. ¶ 38.   Hoffman also transmitted the internship "Guidelines" to intern supervisors, including Antalik's supervisor, that applied to all interns who participated in the FEG internship program.  *Id*. ¶ 32.  These Guidelines set forth the program's purpose, the goals of the program, what interns "Should Be" and "Should NOT Be," intern qualifications, and intern supervisor expectations.  *Id*. ¶ 33.  FEG also issued and required all intern supervisors, including Antalik's supervisor, to undertake the same intern supervisor trainings.  *Id*. ¶ 44. FEG also set and, through its intern recruiters, enforced the policy that all interns, including Antalik, were required to submit proof of their eligibility to obtain academic credit, complete an I-9 Employment Eligibility Verification form, and agree to a Worker's Compensation agreement, under which they were deemed to be an "employee" covered by News Corporation's worker's compensation insurance plan.  *Id*. ¶¶ 57-58, 59-61, 65-66.  Although Antalik's supervisor failed to comply with this policy by collecting and submitting these materials to Hoffman before Antalik began her internship, when Hoffman found out, he was required to submit the materials

for her in order for her to continue interning. *Id.* ¶ 73.

FEG limited the number of hours that interns could work – between 16 and 24 hours – and determined that only part-time availability was required when interns were typically in school and that overtime was prohibited. *Id.* ¶¶ 34-36. Hoffman required intern supervisors to state in Intern Request Forms the number of days that the interns they requested would work, what their start date would be, and which days of the week they would work. *Id.* ¶ 34.

With limited exceptions, interns who participated in FEG's internship program were not paid wages until approximately fall 2010, when FEG changed the policy and starting paying wages to interns, including interns who worked in New York. Pls. ASF ¶¶ 39, 42. This policy also applied to Antalik who was not paid any wages for her internship. *Id.* ¶ 39.

FEG and its subsidiaries shared human resources personnel, including Hoffman and other intern recruiters and human resources "business partners" who partnered with employees of FEG's subsidiaries on personnel matters. *Id.* ¶¶ 6-7, 9-10, 16, 18, 20-21, 23, 25-26. These human resources employees reported to the head of FEG's human resources department, Linda Johns. *Id.* ¶¶ 8-10, 13-15, 18, 22. FEG's internship policies, including its no pay policy and academic credit policy, the decision to start paying interns in fall 2010, and the guidelines and training materials that applied to intern supervisors, all came from Johns and the human resources personnel she oversaw. *Id.* ¶¶ 19, 24-26, 28-29, 32, 34-36, 38-39, 42-45, 47. These personnel also maintained personnel information relating to interns. *Id.* ¶¶ 50, 67-70.

**STANDARD OF REVIEW**

As the moving party, Defendants must show that "no reasonable jury could return a verdict" for Plaintiffs to prevail on their motion. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991). In making this determination, "'[the court] may not make

credibility determinations or weigh the evidence.'" *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 96 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  Rather, Plaintiffs' evidence "is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  All ambiguities in the evidence must also be resolved Plaintiffs' favor.  *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).

## ARGUMENT

I.     **A Reasonable Jury Could Find That Searchlight Employed Plaintiffs Glatt and Footman.**[2]

Defendants cannot sustain their burden as the moving party to show that Searchlight did not employ Glatt and Footman because, as Plaintiffs explain herein,  and in their Motion for Partial Summary Judgment, the relevant factors decidedly weigh in Plaintiffs' favor under the formal and functional control tests.

### A.     **The Formal Control Factors Favor Plaintiffs.**

The Second Circuit has squarely rejected Defendants' argument that Plaintiffs must show that Searchlight hired them or directly supervised them in order for it to be held liable as their employer.  Although there is substantial evidence that Searchlight played a hands-on role in the production of *Black Swan*, "[employer] status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  What matters is

---

[2]     Although Defendants have asked the Court to rule on whether Searchlight employed all production interns (not just Plaintiffs Glatt, Footman, and Gratts) in Section II.E. of its brief, there is no basis for the Court to do so because these interns are not parties in this case and Plaintiffs have not sought to join them as collective members or to certify a class of production interns under Rule 23 of the Federal Rules of Civil Procedure.  Thus, Plaintiffs respectfully request that the Court disregard this portion of Defendants' brief.

"whether the alleged employer possessed the *power to control* the workers in question." *Id.*

(emphasis added).  An employer who has the power to control workers' terms and conditions of

employment is liable even if its control is "restricted, or exercised only occasionally[.]" *Id.*

(internal quotation marks omitted).

### 1. Searchlight Had the Power to Hire and Fire Plaintiffs and Their Direct Supervisors.

Searchlight had the "authority to hire" workers on *Black Swan*, including Glatt[3] and

Footman and their direct supervisors.  Evidence that an alleged employer was involved in hiring

supervisory employees is "a strong indication of control" and is sufficient to demonstrate the

authority to hire.  *Herman*, 172 F.3d at 140.

The *Black Swan* PFD Agreement gave Searchlight the power to hire and approve key

production department heads, including the Unit Production Manager, who supervised the entire

production; the Production Accountant, who supervised the Accounting Department; the

Production Designer, who supervised the Art Department (props, set dressing, and construction);

the Cinematographer, who supervised the camera crew, grips, and electrical crew; the Costume

Designer, who supervised the Costume Department; and the Editor, who supervised the post-

production staff.  Pls. SOF ¶¶ 15, 25, 60, 63-64, 67-68.  These crew members hired and directly

supervised Plaintiffs.  *Id.* ¶¶ 185, 208, 236; Pls. Counter-Statement ¶¶ 6, 31-32, 42.

Searchlight also exercised its authority.  For example, it specifically approved the

continued employment Jennifer Roth, the Line Producer and one of Footman's supervisors.  Pls.

Counter-Statement ¶¶ 6, 31-32.  It also required all *Black Swan* employees to sign its form "deal

memos," which set forth their terms and conditions of work, or else they would not be paid.  Pls.

---

[3]     Although not material, there is no basis for Defendants' claim that Glatt had multiple internships.  Although he worked in different departments during his internship, his work was at all times in furtherance of the *Black Swan* production.  Pls. Counter-Statement ¶ 87.

SOF ¶¶ 146-157; Pls. Counter-Statement ¶ 38.  Even though some employees had already signed deal memos before Searchlight became involved in *Black Swan*, Searchlight required them to sign new ones on its approved forms.  Pls. SOF ¶¶ 154-56; ASF ¶ 126.

The fact that Searchlight did not directly hire Plaintiffs is not material.  Courts routinely hold that employers may possess the power to control employees that they did not hire.  *See Herman*, 172 F.3d at 139-40 (upholding a finding of liability even though employer did not hire the employees in question); *Chen v. TYT E. Corp.*, No. 10 Civ. 5288, 2012 WL 5871617, at *5 (S.D.N.Y. Mar. 21, 2012) (finding employer liable where it hired managerial staff even though it did not hire the plaintiffs); *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316, 2011 WL 4571792, at *2 (S.D.N.Y. Sept. 9, 2011) (granting summary judgment to plaintiffs where alleged employer did not hire them but did hire managerial staff); *see also Maidana v. La Esquina Crilla Rest., Inc.*,  No. 11 Civ. 2606, 2012 WL 6772062, at *2-4 (E.D.N.Y. Nov. 6, 2012) (fact that alleged employer did not hire plaintiff did not preclude employer liability).

Searchlight also had the power to fire Plaintiffs and their supervisors.  The PFD Agreement gave Searchlight the right to take over *Black Swan* entirely and to replace film production employees "in its sole reasonable discretion."  *See* Pls. SOF ¶¶ 15-17; Pls. Counter-Statement ¶ 4.  The power to set policies that could result in the *de facto* firing of employees is sufficient to satisfy the hire/fire requirement.  *See Torres*, 2011 WL 4571792, at *1 (fact that alleged employer could "shut down the business, declare bankruptcy, as well as provide the personal signature necessary for a bank letter of credit to be issued" is sufficient to demonstrate control); *Lemus v. Timberland Apartments, L.L.C.*, No. 10 Civ. 01071, 2011 WL 7069078, at *10 (D. Or. Dec. 21, 2011) ("power to hire and fire" demonstrated where alleged employer

"retained both a limited right to fire [the] employees for specific violations of [its] policy and a more general right to remove [the] employees from the job site for safety concerns").

Moreover, Defendants do not dispute that Glatt's supervisors obtained Searchlight's permission to continue to employ him as an unpaid intern who could not receive academic credit. *See* Defs. Br. at 11 (relying on evidence in the record that Searchlight agreed to "overlook" the fact that Plaintiffs were not paid and had already graduated).  The fact that Searchlight agreed to overlook its policy and continue to employ Plaintiff shows that it had authority to set his employment conditions, not that it lacked this power.[4]

The cases on which Defendants rely are easily distinguished.  In *Godlewska v. HDA*, No. 03 Civ. 3985, 2013 WL 25649 (E.D.N.Y. Jan. 2, 2013), the plaintiffs, home health attendants employed by a contractor agency, argued that New York City jointly employed them because the agency provided services under contracts with the City's Human Resources Administration.  *Id.* at *2, 9.  However, the contracts did not authorize the City to hire or fire either the plaintiffs or their supervisors and the City did not have the power to approve the home healthcare agency's decision to hire employees.  *Id.* at *9.  Moreover, although the City could ask the agency to remove a home health attendant from a patient's case, it had no power to end the worker's employment with the agency.  *Id.*  Similarly, in *Jean-Louis v. Metropolitan Cable Communications, Inc.*, 838 F. Supp. 2d 111 (S.D.N.Y. 2011), the alleged employer did not have the power to fire the workers and could only ask that they not be assigned to particular jobs.  *Id.*

---

[4]     Glatt's supervisor, Au, testified that he believed that Searchlight's approval was required to hire unpaid interns and pushed Glatt's start date back by a week so that his supervisors could obtain the necessary approvals from Searchlight.  Pls. Counter-Statement ¶ 100.

at 123-25.  Here, under the PFD Agreement, Searchlight had the express power to hire, fire, and approve employment.  Pls. SOF ¶¶ 15-17; Pls. Counter-Statement ¶¶ 6, 31-32, 42, 48.[5]

### 2. Searchlight Had the Power to Supervise and Control Schedules and Conditions of Employment on *Black Swan*.

Searchlight had the power to supervise and control schedules and conditions of employment on *Black Swan*.  Defendants concede that Searchlight regularly exercised its power because of its "interests in keeping the production on schedule and within budget" and its "role as a financier and distributor" of the film.  *See* Defs. Br. at 13.  Evidence that an alleged employer keeps in regular contact with supervisory employees and makes decisions that affect workers' schedules supports a finding of liability.  *See Herman*, 172 F.3d at 137 (fact that alleged employer "telephoned [supervisory employees] reasonably frequently" supported liability finding); *Torres-Lopez v. May*, 111 F.3d 633, 637 (9th Cir. 1997) (alleged employer controlled the overall harvest schedule, including when to begin the harvest, and indirectly supervised the work by being in contact with workers' supervisors).

Searchlight exercised tight control over the film's production schedule.  Searchlight required productions to send it daily "call sheets," which contained information about the scenes that were to be filmed the next day and the time each employee was to arrive to work, and allowed Searchlight to monitor any changes to the production schedule.  Pls. SOF ¶¶ 78-82; Pls. Counter-Statement ¶¶ 7, 49; Defs. SOF ¶ 67.  Production interns, including Glatt and Footman, were often copied on emails sent to Searchlight attaching call sheets.  Pls. SOF ¶ 86; Pls. Counter-Statement ¶ 106.  Searchlight also received and used "Crew Lists," containing contact

---

[5]     *Tracy v. NVR, Inc.*, No. 04 Civ. 6541L, 2009 WL 3153150 (W.D.N.Y. Sept. 30, 2009), is not applicable here because, in that case, the court denied a motion to amend the pleadings to add two individual defendants because the only facts that the plaintiffs alleged to support their allegations that the individuals employed them were their positions as Chairman and President of the company.  *Id.* at *5.

information for all production personnel, including Plaintiffs and other interns.  Pls. SOF ¶ 165;

Pls. Counter-Statement ¶ 6.  Searchlight required the productions to send it daily production

reports and "wrap reports," which contained detailed information about where filming took

place, which scenes were scheduled, which of those scenes were filmed or not filmed, and

employees' hours of work.  Pls. SOF ¶¶ 83-84; Pls. Counter-Statement ¶¶ 7, 49, 54.

Searchlight's Executive Vice President of Production, Elizabeth Sayre, who was

responsible for overseeing the physical production of its films, regularly reviewed call sheets,

production reports, and wrap reports to ensure that the productions operated within Searchlight's

budget and production schedule.  Pls. SOF ¶¶ 84, 89; Pls. Counter-Statement ¶ 7; Defs. SOF ¶

65.  In addition, Searchlight required film production employees to call Sayre or a member of her

staff each morning to tell them the time of the first film shot of the day, and each evening to tell

them the time that shooting for the day had wrapped, to ensure that the production complied with

the production schedule.  Pls. SOF ¶ 90; Pls. Counter-Statement ¶¶ 7, 54.

Searchlight also had the power to control workers' employment conditions.  Searchlight

required *Black Swan* cast and crew to sign its deal memos that set forth their terms and

conditions of employment.  *See Herman*, 172 F.3d at 140 (evidence that alleged employer

revised employment application forms supported liability finding).  Searchlight also set the

policy that applied to unpaid interns on *Black Swan* and made exceptions to its policy.  Pls. SOF

¶¶ 133-34, 142-45, 176-77; Pls. Counter-Statement ¶¶ 6, 100, 183.

This case is not like *Jean-Louis v. Metropolitan Cable Communications, Inc.,* where there

was no evidence that the alleged employer "control[led] the day-to-day manner in which"

technicians provided services to its customers.   838 F. Supp. 2d at 127.  Unlike Searchlight's

daily monitoring of the work on *Black Swan*, in *Jean-Louis*, the alleged employer's oversight

was limited to quality control: it spot checked approximately 4% of jobs, sought feedback from customers, and conducted monthly meetings to discuss its findings. *Id*. Similarly, in *Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004), the alleged employer's quality-control checks were just to meet safety regulations. *Id*. at 951. Here, Searchlight did not perform quality control and was not required to oversee the productions to meet safety or other regulatory requirements. Rather, as Defendants admit, Searchlight exercised control over *Black Swan* because it served its financial interests as the financier and distributor of the film to do so. *See* Defs. Br. at 13.

### 3. Searchlight Had the Power to Determine Rates and Methods of Payment.

Searchlight had the power to determine rates and methods of pay for workers on *Black Swan*. It determined the film's budget and approved how much would be allocated to each budget line item, including for labor. Pls. SOF ¶¶ 32-34, 36-37, 39; Pls. Counter-Statement ¶¶ 4, 49, 62, 125, 144, 150, 163; Defs. SOF ¶¶ 144, 150, 163. Its control over the budget determined how many crew members could be hired and what their pay would be. Pls. SOF ¶¶ 50-51, 56-58, 124, 153; Pls. Counter-Statement ¶ 140. The production was also required to submit weekly cost reports detailing how the production spent money with respect to each budget line item, including labor, so that Searchlight could monitor the production's expenditures on wages. Pls. SOF ¶¶ 105-110; Pls. Counter-Statement ¶¶ 7, 54, 65; Defs. SOF ¶ 65.

Searchlight also determined the reimbursement or "box rental" rates for employees who used their personal equipment, such as computers and cell phones, for work-related purposes. Pls. SOF ¶¶ 52, 163; ASF ¶ 126. Searchlight's approval was even required to continue to pay the *Black Swan* Director's assistant. Pls. SOF ¶ 124; Pls. ASF ¶ 127.

Furthermore, Searchlight set the policy that applied to interns on *Black Swan* that they could continue to work for no pay. Pls. SOF ¶¶ 133-34, 142-45, 176-77; Pls. Counter-Statement

¶ 100.  The evidence refutes Defendants' claim that Searchlight did not know that interns worked on *Black Swan*.  Interns' names were listed on production reports, which set forth the names of individuals who were scheduled to work; interns received film credits, which Searchlight approved; and interns were listed on crew lists, which the productions submitted to Searchlight and which Searchlight used.  Pls. SOF ¶¶ 139-141, 172, 178; Pls. Counter-Statement ¶¶ 6, 59-60.  Searchlight also heard about interns working on *Black Swan* from production crew members.  *Black Swan*'s Line Producer copied Sayre on an email in which she alerted Sayre and others that a union representative had been on set and complained that an intern was doing work that should have been assigned to a "loader," a union position responsible for loading film in the movie camera.  Pls. SOF ¶ 142; Pls. Counter-Statement ¶ 60.  Glatt's supervisors told him that Searchlight had authorized him to continue to work even though he could not receive academic credit for his internship, and Searchlight approved Glatt's request to list him in the *Black Swan* film credits as a "post-production assistant."  Pls. SOF ¶¶ 143-45, 176-77; Pls. ASF ¶¶ 130-31.

### 4.  Searchlight Had the Power to Maintain Employment Records.

The evidence demonstrates that Searchlight had the power to maintain employment records for *Black Swan* workers and exercised this power by requiring them to sign its personnel forms, including deal memos, confidentiality agreements, and box rental reimbursement forms.  Pls. SOF ¶¶ 146-56, 161-64; Pls. Counter-Statement ¶ 38.  After the production ended, Searchlight required all of these documents to be sent to its offices where they were kept and maintained.  Pls. Counter-Statement ¶ 57; Pls. ASF ¶ 124.  In fact, Searchlight maintained a personnel file for Glatt that contained an I-9 employment verification form and a paystub.  Pls. ASF ¶¶ 121-22.  The fact that Searchlight maintained a personnel file for Glatt shows that it could have maintained one for Footman.  *See Morales v. Cancun Charlie's Rest.*, No. 07 Civ. 1836, 2010 WL 7865081, at *4 (D. Conn. Nov. 23, 2010) (alleged employer was liable where he

maintained some employment records even though he failed to maintain employment records for the plaintiff and other "off-the-books" employees); *Boyke v. Superior Credit Corp.*, No. 01 Civ. 0290, 2006 WL 3833544, at *4, 7 (N.D.N.Y. Dec. 28, 2006) (alleged employer was liable where he kept time records for other employees but not for the plaintiff); *see also Campos v. Zopounidis*, No. 09 Civ. 1138, 2011 WL 2971298, at *6 (D. Conn. July 20, 2011) (pizza delivery driver was an employee, not an independent contractor, where alleged employer had the power to maintain employment records for plaintiff but failed to do so).

This case is unlike *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683 (D. Md. 2010), where the alleged employer maintained records only as a quality control measure. *Id.* at 692. Here, Searchlight maintained records for *Black Swan* to establish terms and conditions of employment. Pls. SOF ¶¶ 146-157; Pls. Counter-Statement ¶ 57; Pls. ASF ¶¶ 123-24.

## B.  The Functional Control Factors Weigh in Plaintiffs' Favor.

The functional control factors, which look beyond "an entity's formal right to control the physical performance of another's work" to "give[] content to the broad 'suffer or permit' language in the statute," also weigh in Plaintiffs' favor. *See Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d at 61, 69, 75-76 (2d Cir. 2003).

### 1.  Searchlight Financed the Premises and Equipment.

Searchlight financed and/or purchased the premises and equipment used to make *Black Swan*, including film stock, and closely monitored expenditures on such items. Pls. SOF ¶¶ 32-34, 36-37, 39; Pls. ASF ¶¶ 99-100, 110-118. Searchlight exercised oversight over film expenditures by requiring crew members to send it detailed weekly cash flow schedules and cost reports of expenditures on equipment and locations, and to confer with it about spending decisions that would impact the budget. Pls. SOF ¶¶ 95-96, 101-110; Pls. Counter-Statement ¶ 7. *Black Swan*'s Line Producer conferred with Searchlight before making decisions about

19

shooting locations, and was required to do so under the terms of the PFD Agreement. Pls. SOF ¶ 15(f), 62, 96. Searchlight's approval was required before *Black Swan* crew members could incur non-budgeted expenses on premises and equipment. *Id*. ¶ 117-124; Pls. ASF ¶ 110. The Approved Direct Production Costs Budget also contained line items for virtually every piece of equipment used to make the film, including construction and rental of all film sets, rentals of all props, trucks and vehicles, film stock, and cameras. Pls. ASF ¶¶ 111-12, 114-16. Other than funds that Lake of Tears received from Searchlight as set forth in the PFD Agreement, it had no assets with which to pay for premises and equipment. *Id*. ¶ 119.

It is immaterial that Searchlight did not sign the rental agreement for the production office in which Plaintiffs worked because it approved the budget line item for the office in the Approved Direct Production Costs Budget, provided all of the funds to rent the office, and even reimbursed the previous financier that had incurred office rental costs. Pls. ASF ¶¶ 111-113. Searchlight also approved costs for the purchase and delivery of furniture and equipment for the production office, such as copiers, telephones, the internet connection, postage, office supplies, and the accounting safe, among other items. *Id*. ¶ 112.

In addition, Searchlight had specific requirements for disposing of and returning rented and purchased premises and equipment. Pls. SOF ¶¶ 125-132; Pls. Counter-Statement ¶ 48. Searchlight required the production to send it a "wrap memo" explaining what it did to clean up the rented properties and return them to their pre-rental state. Pls. SOF ¶ 125; Pls. ASF ¶ 117. The wrap memo explained whether or not security deposits were returned and whom Searchlight should contact about them. Pls. ASF ¶ 117. Searchlight required these reports because all of the physical property used on *Black Swan* belonged to it. Pls. SOF ¶¶ 125-130; Pls. ASF ¶ 118.

Searchlight also required Lake of Tears to resell or return all physical property to it when filming concluded, which was one of Footman's responsibilities at the end of his internship. Pls. SOF ¶¶ 129-130; Pls. ASF ¶ 99. Searchlight required those who purchased equipment to sign a Twentieth Century Fox "Sale of Prop Assets" agreement. Pls. SOF ¶ 129. Lake of Tears did not sign these agreements because the assets belonged to Searchlight. *Id.*

### 2.   Lake of Tears Did Not Shift as a Unit to Another Joint Employer.

Searchlight admits that Lake of Tears did not shift as a unit from one employer to another and that workers on *Black Swan* worked only for that film. *See* Defs. Br. at 16-17. Searchlight's argument that Lake of Tears could have shifted as a unit, even though it did not, is not credible because Lake of Tears' sole purpose was to produce *Black Swan*. Pls. SOF ¶ 11; Pls. Counter-Statement ¶ 5; Defs. SOF ¶ 27. It ceased operations altogether when *Black Swan* was finished.[6] *Id. See Godlewska*, 2013 WL 25649, at *14 (where contract required joint employer to be "organized . . . for the sole purpose of providing personal care services under contract with the City," joint employer could not "shift as a unit" to another employer). Contrary to Searchlight's contention, Lake of Tears did not have the right to make *Black Swan* with another studio once principal photography began, unless Searchlight decided to abandon the project. Pls. ASF ¶ 98.

### 3.   Plaintiffs Performed Discrete Jobs Integral to the Production of *Black Swan*.

Plaintiffs performed work that was integral to *Black Swan*'s production, which Defendants do not rebut. Even if Plaintiffs "were only a small piece of completing the film," Defs. Br. at 18, they still performed day-to-day tasks that facilitated the film's production. For

---

[6]     Defendants note that Lake of Tears did not dissolve at that time, however, there is no dispute that it did not produce another film or conduct business after the *Black Swan* production ended. *See* Pls. SOF ¶ 19; Pls. Counter-Statement ¶ 68.

example, Glatt tracked and reconciled purchase orders, invoices and petty cash; collected documents for employee personnel files; made deliveries to the film set and production payroll company; and performed other administrative tasks in the accounting and post-production departments. Pls. SOF ¶¶ 190-91, 194-98; Pls. ASF ¶ 94. Footman ran errands for the production; arranged lodgings in hotels and apartments for the cast and crew; compiled lists of local vendors; took out the trash; took lunch orders; answered and transferred phone calls; watermarked scripts; drafted daily call sheets; did other administrative tasks; sold office furniture and supplies at the end of the production; did internet research; and sent invitations to the "wrap party." Pls. SOF ¶¶ 223-25; Pls. ASF ¶ 97.

Although Defendants claim that "industry custom and historical practice" legitimizes its relationship with Lake of Tears,[7] a jury could infer that the practice is "a contracting device developed in response to and as a means to avoid applicable labor laws" because Defendants do not point to any evidence to the contrary. *See Zheng*, 355 F.3d at 73-74. In fact, the evidence suggests that Searchlight attempted to set up a framework to avoid liability: although it required film production workers to sign its deal memos and other personnel documents, Searchlight also required them to agree that Lake of Tears was their employer and to be paid through a third party payroll company. Pls. SOF ¶¶ 42, 146-159; Pls. Counter-Statement ¶ 38. Defendants do not even argue that Lake of Tears had any purpose other than insulating Searchlight from liability.

---

[7] Defendants do not support their claim with actual evidence of the custom and practice in the film industry. Instead, they point to a line of testimony from one of Lake of Tears' owners. *See* Defs. Br. at 18.

> 4. **Responsibility for *Black Swan* Belonged to Searchlight, Not Lake of Tears.**

The evidence demonstrates that Plaintiffs were tied to Searchlight – not to Lake of Tears – because Searchlight possessed all of the rights relating to *Black Swan*, including the screenplay, the power to set the film's budget and pay the crew, and the power to approve or replace key personnel on the film.  *See* Pls. SOF ¶¶ 15-17, 25-27, 36-55; Pls. Counter-Statement ¶¶ 30, 37, 49, 51-55.  Searchlight even had the right to terminate Darren Aronofsky, the Director of *Black Swan*.  Pls. Counter-Statement ¶¶ 26-28, 30; Pls. ASF ¶ 102.  *See Zheng*, 355 F.3d at 74 ("even when [the subcontractor's] supervisor abandoned his position and another supervisor took his place, [] the same employees would continue to do the *same* work in the *same* place") (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 725, 730 (1947)).

Moreover, Lake of Tears was not a stand-alone production company, as Defendants suggest, because it did not operate independently of its sole purpose to create *Black Swan*.  The fact that Glatt may have been interested in working on *Black Swan* because of its director does not mean that he was more closely tied to Lake of Tears than Searchlight.  If Searchlight had exercised its right to fire the director and replace him with another, Glatt's work would have continued unchanged.  Pls. Counter-Statement ¶¶ 30, 37, 49, 51-55.

> 5. **Searchlight Supervised Work on *Black Swan*.**

As discussed above, substantial evidence demonstrates that Searchlight supervised work on *Black Swan*, including by regularly communicating with Plaintiffs' supervisors and reviewing weekly cost reports, daily call sheets, production reports, crew lists, and wrap reports.  Pls. SOF ¶¶ 78-84, 86, 89-90, 125, 165; Pls. Counter-Statement ¶¶ 7, 49; Defs. SOF ¶ 67.  *See Rutherford*, 331 U.S. at 730 (evidence that "[t]he managing official of the [alleged employer] kept close touch on the operation" supported liability).  Searchlight also authorized the employment of the

individuals who supervised Plaintiffs, gave them assignments, and set their schedules, and required those individuals to report to Searchlight on a daily basis. Pls. SOF ¶¶ 47, 71, 95, 185, 208, 236; Pls. Counter-Statement ¶¶ 6, 31-32, 42; *see Herman*, 172 F.3d at 140 (hiring and supervision of managers is a "strong indication of control").

### 6.    Plaintiffs Worked Exclusively on *Black Swan*.

Defendants admit that Plaintiffs worked exclusively on *Black Swan* during their internships. Defs. Br. at 19-20. It is also undisputed that Lake of Tears did not perform work for any company other than Searchlight. Pls. SOF ¶¶ 10-11, 20.

## II.    A Reasonable Jury Could Find that Searchlight Employed Gratts.

Defendants do not create an issue of fact that Searchlight did not employ Gratts. The evidence heavily favors Plaintiffs. Searchlight falls under at least two definitions of "employer" under California law. Like the FLSA, California also recognizes that an employee can be jointly employed by multiple entities.[8]

### A.    Searchlight Had the Power to Control Gratts's Wages, Hours, and Working Conditions.

Searchlight is liable as Gratts's employer if it had the right to control just one of the following: wages, hours, or working conditions. *See Martinez v. Combs*, 231 P.3d 259, 274 (Cal. 2010). This "alternative" phrasing is meant to "reach[] situations in which multiple entities control different aspects of the employment relationship[.]" *Id*. Here, Searchlight "had the power or authority to negotiate and set" Gratts's wages. *See Futrell v. Payday California, Inc.*, 119 Cal. Rptr. 3d 513, 524 (Ct. App. 2010) ("'control over wages' means that a person or entity

---

[8]     *Martinez*, 231 P.3d at 274, 284-86. Even if Palmera Productions, Inc. employed Gratts, that does not mean that Searchlight was not also her employer. *Id*. Moreover, there is little evidence, if any, that Gratts was employed by Palmera Productions, Inc. because it did not sign the *500 Days of Summer* PFD Agreement and it is not the entity listed on Steven Fox's paystubs or his payroll documents. Pls. Counter-Statement ¶¶ 123, 131; Pls. ASF ¶¶ 83-84.

has the power or authority to negotiate and set an employee's rate of pay").  Searchlight set the policy under which Gratts was hired to work as an intern for free on *500 Days of Summer*.  Pls. SOF ¶ 133-140; Pls. Counter-Statement ¶¶ 6, 183.  Searchlight also had the authority to pay Gratts because it determined and approved the labor budget for the film.  Pls. SOF ¶¶ 25, 36-43, 56-59; Pls. Counter-Statement ¶¶ 4, 49, 62, 125, 144, 150, 163; Defs. SOF ¶¶ 144, 150, 163.

Searchlight also had authority to control Gratts's hours and working conditions because it determined the *500 Days of Summer* production schedule, monitored adherence to the schedule on a daily basis, and approved the locations where Gratts performed her duties and the expenditures for equipment that Gratts used during her internship to build sets.  Pls. SOF ¶¶ 36-43, 56-59, 78-93; Pls. Counter-Statement ¶ 137.

**B.    Searchlight Suffered or Permitted Gratts's Work.**

The "suffer or permit" standard is intended to "reach[] irregular working arrangements" that an alleged employer "might otherwise disavow with impunity."  *Martinez*, 231 P.3d at 273. It reaches not only work that is "permit[ted] by acquiescence," but also work that is "suffer[ed] by a failure to hinder."  *Id*. at 274 (internal quotation marks omitted).  Here, even if Searchlight did not directly engage interns on *500 Days of Summer*, Searchlight permitted Gratts's work through its acquiescence.  Despite Searchlight's claim to the contrary, Searchlight was aware that interns worked on *500 Days of Summer* because their names were listed on crew lists and call sheets that it reviewed and on film credits that it approved.  Pls. SOF ¶¶ 138-140, 169, 175, 178; Pls. Counter-Statement ¶ 6.  Moreover, even assuming Searchlight was not aware that interns were working, it nonetheless suffered Gratts's work because it failed to take any steps to prevent her and other interns from working.  *See Martinez*, 231 P.3d at 273-74 (suffer or permit standard imposes a duty of "reasonable care" on the employer to see that work is not performed that

would violate the statute).  Searchlight did not take any steps to ensure that interns on *500 Days of Summer* were not performing work that should have been compensated.

## III.    A Reasonable Jury Could Find that Plaintiff Gratts's Claim Is Timely.

Defendants have failed to establish that there are no fact questions with respect to their defense that Gratts's claim under the California Unfair Competition Law ("UCL") is time-barred.  *See Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1197 (Cal. 2013) (under the UCL, the four-year statute of limitations is a defense that defendants have the burden of proving).  Gratts has consistently testified that her internship ended in August 2008 and Defendants' evidence at most creates a fact issue that a jury must resolve.

### A.    Defendants Have Failed to Establish that Gratts's Claim Is Untimely.

As the non-moving party, Gratts's testimony about her dates of work "must be credited" with all credibility determinations reserved for trial.  *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 363 (2d Cir. 2011) ("While ultimately a factfinder might or might not credit [the plaintiff's] testimony, that is a determination for trial, not summary judgment.")  Defendants' evidence presents a factual issue "that [Defendants] should test through cross-examination at trial and allow the jury to weigh[.]"  *Id.* at 364 (internal citation and quotation marks omitted).

Gratts testified that her work during the first week in August 2008 consisted of clean up after the filming of *500 Days of Summer* had ended.  Pls. SOF ¶¶ 9, 253; Pls. ASF ¶ 91.  Her testimony alone is sufficient to satisfy her "light" burden to establish the work that she performed because the law places the burden on employers – not employees – to maintain records of the amount and extent of work.  *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) ("It is the employer who has the duty . . . to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce

the most probative facts concerning the nature and amount of work performed."); *Kuebel*, 643 F.3d at 362 ("[A]t summary judgment, if an employer's records are inaccurate or inadequate, an employee need only present sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference[.]") (citation omitted).

In order to rebut Gratts's evidence of time worked, Defendants must produce "evidence of the precise amount of work performed," such as time records, or "evidence to negative the reasonableness of the inference to be drawn from [Gratts's] evidence." *See Mt. Clemens*, 328 U.S. at 687-88; *Kuebel*, 643 F.3d at 362. Defendants have not submitted any evidence showing the precise amount of work that Gratts performed. Instead, they submit the uncross-examined testimony[9] of two individuals, Steven Fox and Charles Varga, who provide their recollections of their *500 Days of Summer*'s schedules and a few pieces of circumstantial evidence. *See* ECF No. 101 (Fox Decl.) ¶¶ 8-9; ECF No. 100 (Varga Decl.) ¶¶ 6-8. To the extent that Defendants' witnesses' testimony conflicts with Gratts's testimony, it raises credibility issues that must be reserved for trial and are not appropriate for summary judgment. *See Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (in considering a motion for summary judgment, "the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury.") (citations omitted).

The circumstantial evidence on which Defendants rely also does not rebut Gratts's testimony. In fact, some of it is conflicting. For example, although Defendants rely on the Fenton Building lease to argue that work in that building ended in May 2008, Defendants' witness, Steven Wolfe, says that work in the building continued in June 2008. *See* ECF No. 99

---

[9]     Defendants did not identify either Fox or Varga as witnesses on whom they intended to rely in their Rule 26(a) disclosures. Bien Decl. ¶ 13.

(Wolfe Decl.) ¶ 4.  Defendants also have not established that Gratts dismantled sets in the Fenton Building.  Gratts testified that she believed that she worked in a building located on Broadway between 3rd and 4th Streets in Los Angeles.  Pls. Counter-Statement ¶¶ 13-14; Pls. ASF ¶ 87.  The Fenton Building is not at that location.  Pls. ASF ¶ 89.  Another building, the Bradbury Building, which was also used to film scenes of *500 Days of Summer*, is located on Broadway between 3rd and 4th Streets.  *Id.* ¶ 88.  Other circumstantial evidence raises an inference that supports Gratts's testimony that work on the film continued beyond June 2008.  For example, a *500 Days of Summer* crew list that Defendants produced was issued on July 25, 2008.  Pls. SOF ¶ 166; Pls. Counter-Statement ¶ 124.  The *500 Days of Summer* budget indicates that the film's "post" schedule (after shooting ended) was 22 weeks long.  Pls. Counter-Statement ¶ 18.

Finally, Defendants are wrong that Gratts's claim tolled only as of the date on which Plaintiffs filed their motion to amend on September 5, 2012, and not on August 2, 2012, the date on which Plaintiffs filed a pre-motion letter with the Court requesting permission to move to amend the complaint and attaching a draft First Amended Complaint.  *See Lekic v. 222 E. 8th St. LLC*, No. 11 Civ. 1242, 2012 WL 4447625, at *1, 3-4 (E.D.N.Y. Sept. 25, 2012) (the date plaintiff filed "a letter requesting a pre-motion conference in connection with an anticipated motion for leave to file an amended complaint[]" was the date the amended complaint was filed for statute of limitations purposes because at that point "defendant [wa]s on notice of the new claims").  Although courts often use the filing date of a motion for leave to amend to toll the statute of limitations, where, as here, a plaintiff must first file a pre-motion letter requesting leave to amend and attaches the draft complaint, the date of the pre-motion letter should be used to toll the statute of limitations.  *See id.*  "This is the only just and proper result since once leave to amend has been requested and a proposed complaint is on file, the plaintiff has taken those steps

within his power to toll the statute and must await the appropriate court order." *Eaton Corp. v. Appliance Valves Co.*, 634 F. Supp. 974, 983 (N.D. Ind. 1984), *aff'd sub nom. Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874 (Fed. Cir. 1986).

### B.   The Court Should Apply Equitable Tolling to Gratts's Claim.

The Court should toll Gratts's claim for the approximately three and a half month period discussed below because she would have asserted her rights before August 2012 if not for Defendants' efforts to prevent Plaintiffs from learning of her existence and contacting her. *See Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (the doctrine of equitable tolling "allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances."). Courts routinely permit equitable tolling where defendants refuse to produce contact information for similarly-situated employees in order to "counter[] the advantage defendants would otherwise gain by withholding potential plaintiffs' contact information until the last possible moment." *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 542-43 (N.D. Cal. 2007); *see Mitchell v. Acosta Sales, LLC*, 841 F. Supp. 2d 1105, 1120 (C.D. Cal. 2011) (tolling statute of limitations where the plaintiffs had requested, but the defendants had refused to produce, class member contact information); *Santiago v. Amdocs, Inc.*, No. 10 Civ. 4317, 2011 WL 6372348, at *8 (N.D. Cal. Dec. 19, 2011) (tolling statute of limitations based on the defendant's refusal to produce contact information for members of the putative FLSA collective during discovery); *Mowdy v. Beneto Bulk Transp.*, No. 06 Civ. 05682, 2008 WL 901546, at *11-12 (N.D. Cal. Mar. 31, 2008) (tolling statute of limitations for 11-month period beginning 30 days after the plaintiffs made their request for contact information until contact information was produced); *see also Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 200-02 (S.D.N.Y. 2006) (granting plaintiffs' motion for class member contact information and tolling

the statute of limitations until defendants produced it); *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 451 (S.D.N.Y. 2011) (where defendant delayed producing contact information for collective members, postponing decision whether to apply equitable tolling to collective members' claims until after notice issued in order to determine "whether or not any potential plaintiffs will be barred from this action due to [the] delay").

Here, Plaintiffs requested contact information for interns who worked on the five "sample" Searchlight films, including Gratts, on February 8, 2012. Bien Decl. ¶ 6. Defendants refused to produce this information and instead produced crew lists with interns' names and contact information redacted on April 12, 2012. *Id*. ¶ 7. After efforts to meet and confer failed, Plaintiffs were forced to seek an order compelling Defendants to produce the contact information on May 8, 2012, which the Court granted on June 11, 2012. *See Glatt v. Fox Searchlight Pictures Inc.*, No. 11 Civ. 6784, 2012 WL 2108220 (S.D.N.Y. June 11, 2012). Defendants still did not produce un-redacted versions of the crew lists until June 20, 2012. Bien Decl. ¶ 9. On or about July 10, 2012, Outten & Golden LLP contacted Gratts in order to interview her about her *500 Days of Summer* internship. *Id*. ¶ 10. Gratts did not know about the lawsuit before she spoke to Outten & Golden LLP attorneys. Pls. ASF ¶ 92. Gratts retained Outten & Golden LLP on July 17, 2012. Bien Decl. ¶ 11. Just two weeks later, on August 2, 2012, Plaintiffs sought to amend their complaint to add Gratts as a named Plaintiff by filing a pre-motion letter with the Court and attaching a draft First Amended Complaint. *Id*. ¶ 12.

If Defendants had produced Gratts's contact information when Plaintiffs requested it, instead of requiring Plaintiffs to move to compel it, Gratts would have sought to protect her rights months earlier. Accordingly, Plaintiffs respectfully request that the Court toll Gratts's statute of limitations for the period from March 9, 2012, Defendants' deadline to produce contact

information in response to Plaintiffs' request, through June 20, 2012, the date on which

Defendants produced the un-redacted crew lists in response the Court's June 11, 2012 order.

**IV.    FEG Is a Proper Defendant Because It Set the Internship Policies that Applied to Corporate Interns, Including Antalik.**

There is overwhelming evidence that FEG is the corporate entity that designed and

enforced the policies that applied to Antalik and the corporate intern class and collective that she

seeks to represent.  FEG employed Antalik and other corporate interns under the joint employer

test discussed above and under the single integrated enterprise test because it and the subsidiaries

for which Antalik and other corporate interns worked operated as a single employer.

**A.     FEG Employed Antalik as a Joint Employer Because It Exercised Formal Control over Her Conditions of Employment.**

Defendants are not entitled to summary judgment because all of the formal control

factors weigh in Plaintiffs' favor.  *See Herman*, 172 F.3d at 139.  First, FEG had the power to

hire and fire interns who participated in its internship program, including Antalik.  *See id*.  A

form offer letter welcomed interns, including Searchlight interns who worked in New York, to

"Fox Entertainment Group's internship program."  Pls. ASF ¶ 53.  Aimee Hoffman, whose title

was "Recruiter, Intern and Outreach Programs" for "Fox Entertainment Group," was responsible

for administering FEG's internship program for several FEG subsidiaries, including Searchlight.

*Id*. ¶¶ 26, 28-29, 32, 45, 51-52.  Hoffman reviewed and approved Intern Request Forms

submitted by intern supervisors, screened applicants who applied for their internships through

the "Fox Careers" website, www.foxcareers.com, processed interns' new hire paperwork, and

oversaw the internship program.  *Id*. ¶¶ 45, 51.  Antalik applied for her internship through the

Fox Careers website and was required to submit paperwork to Hoffman in order to continue

interning at Searchlight.  *Id*. ¶¶ 49, 58, 60, 64, 66.

Second, FEG had the power to control interns' conditions of employment and schedules and exercised its powers. *See Herman*, 172 F.3d at 139. Numerous policies that applied to Antalik and to other interns who participated in FEG's internship program refer to FEG and were developed by FEG. Hoffman sent Intern Request Forms to intern supervisors, including Antalik's supervisor, that she required them to complete and submit to her for her approval in order to hire interns. Pls. ASF ¶¶ 34-35, 38, 45, 47. These forms said "Fox Entertainment Group" at the top of the page. *Id*. ¶ 38. Hoffman also regularly transmitted internship "Guidelines" to intern supervisors, including Antalik's supervisor, that applied to all interns who participated in the FEG internship program. *Id*. ¶ 32. They set forth the program's purpose, the goals of the program, what interns "Should Be" and "Should NOT Be," intern qualifications, and intern supervisor expectations. *Id*. ¶ 33. FEG also issued and required all intern supervisors, including Antalik's supervisor, to undertake the same intern supervisor trainings. *Id*. ¶ 44.

FEG also set and, through its intern recruiters, enforced the policy that all interns, including Antalik, were required to submit proof of their eligibility to obtain academic credit, complete an I-9 Employment Eligibility Verification form, and agree to a Worker's Compensation agreement, under which they agreed to be deemed an "employee" covered by News Corporation's worker's compensation insurance plan. *Id*. ¶¶ 57-58, 59-61, 65-66. Although Antalik's supervisor failed to comply with this policy by collecting and submitting these materials to Hoffman before Antalik began her internship, Hoffman eventually required Maybee to submit the materials for her in order for Antalik to continue interning. *Id*. ¶ 73. Maybee admitted that he had no authority to violate FEG's internship policies. *Id*. ¶ 74.

FEG controlled interns' work schedules by setting limits on the number of hours that interns should work – between 16 and 24 hours – and by determining that only part-time

availability was required during periods of the year when interns were typically in school.  *Id*. ¶¶ 34-36.  Hoffman required intern supervisors to state in Intern Request Forms the number of days that the interns they requested would work, what their start date would be, and which days of the week they would work.  *Id*. ¶ 34.

Third, FEG determined the rate and method of payment for interns who participated in its internship program.  *See Herman*, 172 F.3d at 139.  With limited exceptions, interns who participated in FEG's internship program were not paid wages until approximately fall 2010, when FEG changed the policy and starting paying wages to interns, including interns who worked in New York.  Pls. ASF ¶ 39, 42.  This policy also applied to Antalik who was not paid any wages for her internship.  *Id*. ¶ 39.

Fourth, FEG maintained employment records for interns, including Antalik.  Information for interns who participated in FEG's internship program was inputted into centralized databases, including VirtualEdge, Taleo, and/or PeopleSoft.  *Id*. ¶¶ 50, 67-70.  FEG human resources employees maintained personnel files for interns, including Antalik.  *Id*. ¶ 70.

## B.   FEG and the Subsidiaries that Participated in its Internship Program, Including Searchlight, Act as a Single Integrated Enterprise.

FEG also employed Antalik and the interns that participated in its internship program because it acted as a single integrated enterprise with its wholly-owned subsidiaries, including Searchlight, for which they worked.  Single integrated enterprise liability, which derives from federal common law, analyzes the responsibilities of interrelated corporate entities under federal employment statutes.  Such a "situation exists where two nominally separate entities are actually part of a single integrated enterprise.  In such circumstances, of which examples may be . . . separate corporations under common ownership and management, the nominally distinct entities can be deemed to constitute a single enterprise."  *Arculeo v. On-Site Sales & Mktg., LLC*, 425

F.3d 193, 198 (2d Cir. 2005) (citation omitted).  Under these circumstances, an employee "who is technically employed on the books of one entity, which is part of a larger 'single-employer' entity," may impose liability "not only on [her] nominal employer" but also on "another entity" that is part of the single integrated enterprise.  *Arculeo*, 425 F.3d at 198.

Courts consider the following factors to determine whether separate corporate entities are a single integrated enterprise: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control.  *Addison v. Reitman Blacktop, Inc.*, 283 F.R.D. 74, 84 (E.D.N.Y. 2011) (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)). Plaintiffs need not satisfy all four factors for the theory to apply and no one factor is dispositive.  *Rivera v. Puerto Rican Home Attendants Servs., Inc.*, 922 F. Supp. 943, 949 (S.D.N.Y. 1996).  The "test ultimately depends on whether 'all the circumstances of the case' tend to show the absence of an arm's length relationship between two entities." *Id*. (quoting *Lihli Fashions Corp., Inc. v. NLRB,* 80 F.3d 743, 747 (2d Cir. 1996)).

### 1.   FEG Centrally Controlled the Wage and Hour and Other Personnel Policies that Applied to Interns.

Centralized control of labor relations – the most significant factor of the four-part test – is met here because FEG centrally controlled its internship program through its intern recruiters whose responsibilities included recruiting and overseeing the interns who participated in the program and ensuring that the policies that applied to them were followed.  Pls. ASF ¶¶ 26, 28-29, 32, 45, 51-52.  In addition, FEG's name was printed on documents setting forth the policies that applied to interns and the intern program itself was identified on intern offer letters as "Fox Entertainment Group's Internship Program." *Id*. ¶¶ 38, 53.  This evidence is sufficient to establish the centralized control factor.  *See Cook*, 69 F.3d at 1241 (evidence that "applications

for employment with [the subsidiary] went through [the parent]; all personnel status reports were approved by [the parent]; and [the subsidiary] cleared all major employment decisions with [the parent]" supported centralized control factor); *DeNardi v. DRA Imaging, P.C.*, 605 F. Supp. 2d 550, 558-59 (S.D.N.Y. 2009) (where employment application and confidentiality statement that plaintiff signed were on parent corporation's letterhead, evidence "indicate[d] that they may have exercised control over these aspects of labor relations at [the subsidiary]"); *Turley*, 2013 WL 150382, at *6 (evidence demonstrated centralized control of labor relations where parent company set the policies giving rise to the litigation and "the parent company's name and logo appeared on documents associated with" trainings about the policies); *Sharkey v. Lasmo (AUL Ltd.)*, 992 F. Supp. 321, 322, 332 (S.D.N.Y. 1998) (finding evidence of centralized control of labor relations where the same person served as general counsel of the parent and subsidiary and where he made employment offers to employees of the subsidiary).

## 2.   The Operations of FEG and its Subsidiaries Were Interrelated.

FEG and its subsidiaries shared human resources personnel, including intern recruiters and "business partners" who worked out of a common human resources department and partnered with employees of FEG's subsidiaries on personnel matters.  Pls. ASF ¶¶ 6-7, 9-10, 16, 18, 20-21, 23, 25-26.  These human resources employees all reported Linda Johns, the Executive Vice President of Human Resources of Fox Entertainment Group.  *Id*. ¶¶ 8-10, 13-15, 18, 22. The policies that applied to interns who participated in FEG's internship program, including its no pay policy and academic credit policy, the decision to start paying interns in fall 2010, and the guidelines and training materials that applied to intern supervisors, all emanated from Johns and the human resources personnel whom she oversaw.  *Id*. ¶¶ 19, 24-26, 28-29, 32, 34-36, 38-39, 42-45, 47.  These personnel also maintained information relating to interns, including their personnel files, intern job requisitions, and onboarding forms and templates.  *Id*. ¶¶ 50, 67-70.

Although Defendants argue that Hoffman was not listed as a FEG employee, its payroll department and other human resources personnel testified that they were employees of FEG subsidiaries, not FEG, this is actually a product of how interrelated FEG and its subsidiaries are. For example, Johns testified that, although the employer on her W-2 is News America, Inc., it is really FEG or Fox Group, terms that are used interchangeably at the company. Pls. ASF ¶ 5. In fact, Hoffman, who reports to Johns, testified that she did not know who her current employer was until she asked someone in payroll. *Id.* ¶ 31. These examples show that, as a result of the interrelation of FEG's operations, employees who are technically listed on the payrolls of different subsidiaries are actually also employed by one integrated employer – FEG.

### 3.    FEG and Searchlight Have Common Ownership and Management.

The last two factors are also met. Searchlight and FEG have common ownership because Searchlight is a wholly-owned subsidiary of FEG. Pls. ASF ¶ 1; *see Cook*, 69 F.3d at 1241 (a wholly-owned subsidiary shares "common ownership" with the parent); *Chen*, 2012 WL 5871617, at *4 (same). They also share management in common. For example, the human resources personnel who have responsibilities with respect to interns at Searchlight, as well as other FEG subsidiaries, report to Johns, who leads FEG's human resources department. Pls. ASF ¶ 9-10, 13-16, 19-22. Searchlight's New York office is also located in the headquarters of FEG's parent-company, News Corporation. *Id.* ¶ 71. *See Cook*, 69 F.3d at 1241 (evidence that the president of a subsidiary "operated out of the Texas office of [the parent]" may support finding of common management).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motion for Summary Judgment.

Dated:        March 29, 2013
              New York, New York

                              Respectfully submitted,

                              **OUTTEN & GOLDEN LLP**
                              By:


                              /s/ Rachel Bien
                              Rachel Bien

                              Adam T. Klein
                              Rachel Bien
                              Elizabeth Wagoner
                              Sally Abrahamson (admitted *pro hac vice*)
                              3 Park Avenue, 29th Floor
                              New York, New York 10016
                              Telephone: (212) 245-1000

                              *Attorneys for Plaintiffs*