UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                    :

ERIC GLATT, *et al.*,                  11 Civ. 6784 (WHP)
                                 :

          Plaintiffs,        MEMORANDUM & ORDER
                                 :

     -against-
                                 :

FOX SEARCHLIGHT PICTURES
INC., *et ano.*,                  :

         Defendants      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiffs Eric Glatt, Alexander Footman, Kanene Gratts, and Eden Antalik bring this putative class action under the Fair Labor Standards Act ("FLSA"), New York Labor Law ("NYLL"), and California Unfair Competition Law ("CAUCL") against Defendants Fox Searchlight Pictures Inc. ("Searchlight") and Fox Entertainment Group, Inc. ("FEG"). Plaintiffs contend that Searchlight and FEG violated federal and state labor laws by classifying them as unpaid interns instead of paid employees.

Glatt, Footman, and Gratts move for summary judgment that (1) they were "employees" covered by the FLSA and NYLL and (2) Searchlight was their employer. Antalik moves for class certification of her NYLL claims and conditional certification of a collective action for her FLSA claims. Defendants move for summary judgment that (1) Gratts's claims are time-barred; (2) Searchlight did not employ Glatt, Footman, or Gratts; (3) FEG did not employ Antalik; and (4) Searchlight did not employ any of the production interns on five films financed by Searchlight. For the following reasons, Plaintiffs' summary judgment motion is granted in part and denied in part, Defendants' summary judgment motion is granted in part and denied in part, and Antalik's motions for class certification of her NYLL claims and conditional certification of an FLSA collective action are granted.

## BACKGROUND

<u>The Parties</u>

Glatt and Footman were unpaid interns who worked on production of the film
<u>Black Swan</u> in New York.  After production ended, Glatt took a second unpaid internship
relating to <u>Black Swan</u>'s post-production.  Gratts was an unpaid intern who worked on
production of the film <u>500 Days of Summer</u> in California.  Antalik was an unpaid intern at
Searchlight's corporate offices in New York.

FEG is the parent corporation of approximately 800 subsidiaries, including co-
defendant Searchlight.  Searchlight produces and distributes feature films.  Searchlight does not
produce the films itself.  Rather, it enters into Production-Distribution-Finance Agreements
("Production Agreements") with corporations created for the sole purpose of producing
particular films.

<u>The Film Productions</u>

<u>Black Swan</u> began as a collaboration between director Darren Aronofsky and
producer Scott Franklin.  Aronofsky and Franklin incorporated Lake of Tears, Inc. for the
purpose of producing <u>Black Swan</u>.  On November 2, 2009, Searchlight and Lake of Tears
entered into a Production Agreement for <u>Black Swan</u>.

<u>500 Days of Summer</u> was produced by 500 DS Films, Inc., a corporation created
solely to produce that film.  Searchlight entered into a Production Agreement with 500 DS Films
for <u>500 Days of Summer</u>.  The Production Agreements for <u>Black Swan</u> and <u>500 Days of Summer</u>

2

do not differ materially from one another.[1]  They gave Searchlight the power to hire and fire production personnel, set budgets, and monitor the progress of films.

FEG's Internship Program

Antalik claims she was part of a "centralized unpaid internship program" in which unpaid interns at FEG's subsidiaries were subject to a single set of policies administered by a small team of intern recruiters.  She maintains that two employees oversaw FEG's internship program during the relevant periods and their responsibilities included soliciting "intern request forms" from supervisors at subsidiaries interested in hiring interns, approving those requests, screening internship applicants, and processing interns' paperwork.  According to Antalik, she and the members of her proposed class and collective action were victims of a common policy of using unpaid interns to perform work that required them to be paid.

Defendants deny there was any "centralized" internship program.  They argue internships varied considerably among various FEG subsidiaries and departments, and interns' experiences were shaped by the particular supervisors they were matched with.

## DISCUSSION

### Summary Judgment Motions

I.   Legal Standard

Summary judgment should be granted if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving

---

[1] May 10, 2013 Tr. at 52:23-53:4.

party has made an initial showing that there is no genuine dispute of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment, Liberty Lobby, 477 U.S. at 252, but must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original); see also Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586-87).

The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. See Liberty Lobby, 477 U.S. at 255; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A party opposing summary judgment "is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion." Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir. 2001). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998).

## II.    Statute of Limitations for Gratts's CAUCL Claim

Defendants argue Gratts's CAUCL claim is time-barred. The CAUCL has a four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. Gratts was not a plaintiff when the

4

action was filed in September 2011.[2]  Pursuant to this Court's individual practices, Plaintiffs filed a pre-motion letter on August 2, 2012 requesting leave to move to file an amended complaint.[3]  The pre-motion letter attached a proposed amended complaint, adding Gratts as a plaintiff.  On September 5, 2012, Plaintiffs filed a motion to amend the complaint.[4]  On October 19, 2012, Plaintiffs filed their amended complaint.

Gratts's claims do not relate back to the filing of the original complaint.[5] Defendants contend that Gratts's action was "commenced" on September 5, 2012 because "the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000); see also Nw. Nat'l Ins. Co. v. Alberts, 769 F. Supp. 498, 510 (S.D.N.Y. 1991).  But "[t]he theory underlying this rule is that a . . . defendant is on notice at the time a plaintiff files its motion because the plaintiff attached the proposed amended complaint to the motion." In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., MDL No. 1358 (SAS), 2007 WL 2979642, at *4 (S.D.N.Y. Oct. 10, 2007).  Here, Defendants were on notice of Gratts's claims when Plaintiffs submitted their pre-motion letter and included a draft amended complaint. See Reza v. Khatun, No. 09 Civ. 233 (MKB), 2013 WL 596600, at *4 (E.D.N.Y. Feb. 15, 2013); Lekic v. 222 E. 8th St. LLC, No. 11 Civ. 1242, 2012 WL 4447625, at *1, 4 (E.D.N.Y. Sept. 25, 2012).  Thus, Gratts commenced her claim on August 2, 2012.

Accordingly, Gratts's claim is timely only if she worked on the 500 Days of Summer production on or after August 2, 2008.  The amended complaint alleges, somewhat

---

[2] Compl. (Docket Entry #1).
[3] Docket Entry #24.
[4] Docket Entry #27.
[5] Oct. 9, 2012 Tr. at 14:17-15:4 (Docket Entry # 51).

unconfidently, that Gratts's internship lasted from May 1, 2008 "through approximately August 2008."[6]  The only evidence that Gratts's internship in fact continued into August is her testimony that when she performed her last internship task, taking down movie sets, "the weather was really hot.  It was warm and it was at the end of summer.  It was in August."[7]  When asked whether she would have any basis to dispute records indicating her internship ended earlier, she conceded "I'm just going by what I remember, so if your records say one thing, I'm going by . . . the way I remember it . . . It was in the first week of August."[8]

Defendants have produced records demonstrating Gratts's internship ended before August.  Gratts testified there were approximately six weeks of shooting followed by a "wrap party," about a two week break, and then about five days of taking down sets.[9]  Charles Varga, the art director for 500 Days of Summer, maintains that shooting wrapped on June 21, 2008.[10]  And the invitation to the wrap party announces June 22, 2008 as the event date.[11]  Giving full credit to Gratts's testimony that she worked for five days two weeks after shooting wrapped, her internship would have ended July 9, 2008.

But there is reason to believe Gratts's internship may have ended even sooner.  Steven Fox, head of the construction department for 500 Days of Summer, claims that his involvement with the film did not end until the sets were dismantled.[12]  His time sheets show that June 25, 2008 was the last date he worked on the film.[13]  And Varga moved to other projects in

---

[6] Am. Compl. ¶ 148 (Docket Entry #58).
[7] Dep. of Kanene Gratts dated Dec. 5, 2012 ("Gratts Tr.") at 45:7-9.
[8] Gratts Tr. 45:19-23.
[9] Gratts Tr. 93:19-22, 95:17-97:6.
[10] Declaration of Charles Varga ("Varga Decl."), dated Feb. 13, 2013 ¶ 5 (Docket Entry #100).
[11] Varga Decl. Ex. A.
[12] Declaration of Steven Fox ("Fox Decl."), dated Feb. 14, 2013 ¶ 9 (Docket Entry #101).
[13] Fox Decl. ¶ 5, Ex. A.

July 2008.[14]  As art director, all set work—including dismantling sets—was completed before he moved on.[15]

Moreover, Gratts testified that she only worked at one film location during her internship, where she helped to build sets and then dismantle them.[16]  She recalled that they built cubicles and other rooms to create an office for a greeting card company and built an apartment upstairs.[17]  That construction occurred at the historic Fenton Building, at 833 South Spring Street in Los Angeles.[18]  The call sheets for 500 Days of Summer show that filming at the Fenton Building was completed on May 17, 2008.[19]  The location rental agreement shows that the building was rented by the production only until May 23, 2008.[20]

In sum, the only evidence that Gratts worked in August 2008 is her recollection, four years later, that when her internship ended, "the weather was really hot . . . it was in August."[21]  This "scintilla of evidence" is not "evidence on which the jury could reasonably find for the plaintiff." Liberty Lobby, 477 U.S. at 252.  This conclusion does not require a credibility determination, given her concession that she could be persuaded by documentary evidence.[22]

Plaintiffs argue that even if Gratts's internship ended before August 2008, her claims should be saved by the doctrine of equitable tolling.  "[E]quitable tolling is only appropriate 'in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising [her] rights." Zerilli-Edelglass v. N.Y.C. Transit Auth., 333

---

[14] Varga Decl. ¶ 7, Exs. B-C.
[15] Varga Decl. ¶ 6.
[16] Gratts Tr. 74:24-78:3.
[17] Gratts. Tr. 76:1-10.
[18] Fox Decl. ¶¶ 6-7.
[19] Decl. of Elise M. Bloom, Esq. ("Bloom SJ Decl.") dated Feb. 15, 2013 (Docket Entry #109), Ex. DD.
[20] Decl. of Steven Wolfe ("Wolfe Decl."), dated Feb. 13, 2013 (Docket Entry #99), Ex. A.
[21] Gratts Tr. 45:7-9.
[22] Gratts Tr. 45:19-23.

F.3d 74, 80 (2d Cir. 2003) (internal quotations and alterations omitted). Equitable tolling is appropriate when the plaintiff (1) filed a defective pleading that otherwise would have been timely, (2) was unaware of her cause of action due to the misleading conduct of the defendant, or (3) has a medical or mental condition preventing her from proceeding in a timely fashion. Zerilli-Edelglass, 333 F.3d at 80. If one of those conditions applies, the plaintiff must show she "(1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." Zerilli-Edelglass, 333 F.3d at 80-81 (internal quotation omitted).

Gratts has a weaker claim to equitable tolling than her co-plaintiffs because she is the only plaintiff who was aware of her potential wage claim nearly from the day it accrued. Gratts testified that she understood she would earn minimum wage at her internship.[23] After her internship, she left several messages at the production office and even went to the Fox Studios lot to try to get her paycheck.[24] Unlike an unpaid intern who does not realize she may be entitled to compensation, Gratts was aware of her claim since 2008 and did not act with reasonable diligence in the time period she seeks to have tolled.

Gratts's CAUCL claim is time-barred because her internship ended before August 2008 and she is not entitled to equitable tolling.

III.   Was Searchlight the Employer of Glatt and Footman?

Plaintiffs and Defendants each move for summary judgment on the issue of whether Searchlight was the "employer" of Glatt and Footman as that term is defined in the FLSA and NYLL. The FLSA defines "employ" as "to suffer or permit to work." 29 U.S.C. §

---

[23] Gratts Tr. at 66:12-19; 69:12-70:8; 149:19-25.
[24] Gratts Tr. 74:6-19; 185:6-186:5.

203(g).  The law allows for the possibility of joint employers, and "all joint employers are

responsible, both individually and jointly, with all the applicable provisions of the [FLSA]." 29

C.F.R. § 791.2(a).

   "[T]he 'striking breadth' of the FLSA's definition of 'employ' 'stretches the

meaning of 'employee' to cover some parties who might not qualify as such under a strict

application of traditional agency law principles.'" Barfield v. N.Y.C. Health & Hosps. Corp.,

537 F.3d 132, 141 (2d Cir. 2008) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318,

326 (1992)).  "[W]hether an employer-employee relationship exists for purposes of the FLSA

should be grounded in 'economic reality rather than technical concepts.'" Barfield, 537 F.3d at

141 (quoting Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961)).  "Employment"

under the FLSA is "to be determined on a case-by-case basis by review of the totality of the

circumstances." Barfield, 537 F.3d at 141-42.  "Above and beyond the plain language,

moreover, the remedial nature of the statute further warrants an expansive interpretation of its

provisions so that they will have 'the widest possible impact in the national economy.'" Herman

v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (quoting Carter v. Dutchess Cmty.

Coll., 735 F.2d 8, 12 (2d Cir. 1984)).

   "When it comes to 'employer' status under the FLSA, control is key." Lopez v.

Acme Am. Envtl. Co., No. 12 Civ. 511(WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6,

2012).  The Second Circuit has set out different tests to aid in determining whether an

employment relationship exists under the FLSA.  Carter adopted a four-factor test to determine

whether an alleged joint employer exercised "formal control" over an employee: "whether the

alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled

employee work schedules or conditions of employment, (3) determined the rate and method of

payment, and (4) maintained employment records." 735 F.2d at 12 (quoting Bonnette v. Cal. Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)).

Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir. 2003) articulated another set of factors for determining whether an alleged employer exercised "functional control" over an employee even if it lacked formal control: "(1) whether the [alleged employer's] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the alleged employer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [alleged employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [alleged employer]." 355 F.3d at 72.

The NYLL's definitions are nearly identical to the FLSA's. See N.Y. Lab. Law § 2(7); see also Garcia v. La Revise Assocs. LLC, No. 08 Civ. 9356 (LTS) (THK), 2011 WL 135009, at *5 (S.D.N.Y. Jan. 13, 2011). Courts use the same tests to determine joint employment under both the NYLL and the FLSA. See Paz v. Piedra, No. 09 Civ. 03977 (LAK) (GWG), 2012 WL 121103, at *5 (S.D.N.Y. Jan. 12, 2012); Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003).

## A. Formal Control Test

### 1. Hiring and Firing Power

This factor focuses on the "the power to hire and fire," not whether that power was exercised. See Carter, 735 F.2d at 12. The Black Swan Production Agreement required Searchlight's approval to hire key production staff, including the department heads where Glatt

10

and Footman interned.[25]   Though Searchlight did not hire the line producers or department heads

on Black Swan, it often did on other films with similar Production Agreements.[26]   Searchlight's

ability to hire managerial staff is enough to satisfy this factor.  See Herman, 172 F.3d at 140

(Although Defendant's "hiring involved mainly managerial staff, the fact that [Defendant] hired

individuals who were in charge of the [Plaintiffs] is a strong indication of control."); Torres v.

Gristede's Operating Corp., No. 04 Civ. 3316 (PAC), 2011 WL 4571792, at *2 (S.D.N.Y. Sept.

23, 2011) ("There is no evidence that [Defendant] hired any class member, but there does not

have to be.  It stands uncontradicted that he hired managerial employees.").

      Searchlight's power to fire Black Swan production staff was unbridled.

Searchlight reserved the right, "in its sole reasonable discretion," to "require [Lake of Tears] to

dispense with the services of any person rendering services with respect to [Black Swan]."[27]

Because Searchlight acquired the power to fire, it is irrelevant that Glatt was offered his

internship and Footman began his before Searchlight became involved with Black Swan.  Glatt's

supervisor told Glatt he needed "to clear with the Fox production executive for interns to be

working for free and getting no college credits."[28]

      Defendants argue that Searchlight had the right to fire employees "only if certain

conditions were met."[29]   But Searchlight had the right to require Lake of Tears to fire any worker

---

[25] Decl. of Rachel Bien in Supp. of Pls.' Mot. For Partial Summ. J., dated Feb. 15, 2013, ("Bien SJ Decl.") (Docket Entry #92), Ex. 22 ("Production Agreement").

[26] Dep. of Elizabeth Sayre dated Aug. 15, 2012 ("Sayre Tr.") 22:5-11; 53:5-55:12.  The Court may consider evidence of Searchlight's control over the productions of films other than Black Swan, because as Defendants conceded, Searchlight's rights with respect to the films did not differ materially.  May 10, 2013 Tr. at 52:23-53:4; see also Herman, 172 F.3d at 139 ("Since economic reality is determined based upon all the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." (emphasis in original)).

[27] Production Agreement (emphasis added).

[28] Bien SJ Decl. Ex. 14.

[29] Mem. of Law in Opp. to Pls.' Mot. for Partial Summ. J. ("Defs.' SJ Opp. Br.") (Docket Entry #118) at 11.

at Searchlight's "sole reasonable discretion."[30]  Regardless, "[c]ontrol may be restricted, or

exercised only occasionally, without removing the employment relationship from the protections

of the FLSA, since such limitations on control do not diminish the significance of its existence."

Herman, 172 F.3d at 139.

        2.  Searchlight's Ability to Supervise or Control Work Schedules or Conditions

        Searchlight closely supervised work on Black Swan.  The production sent

Searchlight "crew lists" with the contact information for all staff, including interns.[31]

Searchlight required them to send daily "call sheets" listing the scenes to be filmed the next day

and the work schedules for all personnel.[32]  The production also sent Searchlight daily "wrap

reports" listing scenes scheduled to be filmed that day, scenes actually filmed, and the hours

worked by production employees.[33]  Searchlight Executive Vice President Elizabeth Sayre

required production employees to call her each morning to let her know what time filming began

and again each evening to let her know what time shooting wrapped.[34]  The production sent

Searchlight weekly schedules and cost reports detailing expenses.[35]  It needed Searchlight's

permission to incur cost overruns.[36]

        Status as a joint employer "does not require continuous monitoring of employees,

looking over their shoulders at all times."  Herman, 172 F.3d at 139.  In Herman, the Second

Circuit affirmed the district court's finding that the defendant supervised and controlled

employee work schedules where he "kept himself apprised of [] operations by receiving periodic

---

[30] Production Agreement.
[31] Sayre Tr. 78:1-79:1.
[32] Sayre Tr. 46:21-48:10.
[33] Sayre Tr. 50:11-51:1, 81:15-82:16.
[34] Sayre Tr. 82:3-22.
[35] Sayre Tr. 125:1-22; Production Agreement; Bien SJ Decl. Ex. 6 Ex. B, Ex. 27.
[36] Sayre Tr. 177:22-179:5.

reports from employees," including phoning managerial employees "reasonably frequently." Herman, 172 F.3d at 137.

### 3. Whether Searchlight Determined the Rate and Method of Payment

Searchlight set the overall budget for Black Swan and set the allocations for each line item.[37] Glatt and Footman argue that through its control of the budget, Searchlight "de facto" set wages for all production workers.[38] In Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947), the Supreme Court held that a slaughterhouse jointly employed meat de-boners even though they were directly controlled by a boning supervisor who contracted with the slaughterhouse. In Zheng, the Second Circuit discussed Rutherford and noted that "the slaughterhouse de facto set the workers' wages, because the boners did no meat boning for any other firm and shared equally in the funds paid to the boning supervisor." Zheng, 355 F.3d at 72. Here, the crucial factor of equally sharing wages is absent. An increase in the wages budget would not necessarily result in across the board raises; the production might have hired additional workers or increased pay to particular employees.

But even though Lake of Tears hired Glatt, it needed Searchlight's permission to have an unpaid intern who was not receiving college credit.[39] Moreover, Searchlight withheld employees' pay until they signed Searchlight-approved employment agreements.[40] While Searchlight may not have had the power to set employees' rate of pay, it was involved in their method of pay. Cf. Herman, 172 F.3d at 140 ("little evidence" showed defendant determined plaintiffs' rate of payment, "[b]ut he did participate in the method of payment").

---

[37] Sayre Tr. 17:11-18:12.

[38] Mem. of Law in Support of Pls.' Mot. For Partial Summ J. ("Pls.' SJ Br.") (Docket Entry #90) at 26 (citing Zheng, 355 F.3d at 72).

[39] Bien SJ Decl. Ex. 14.

[40] Sayre Tr. 75:24-76:11; Bien Decl. Ex. 19.

4.   Whether Searchlight Maintained Employment Records

Searchlight required production staff to sign confidentiality agreements and employment agreements known as "deal memos."  Moreover, Searchlight insisted that Black Swan employees sign revised deal memos it drafted even if they had signed memos before Searchlight's involvement.[41]  Searchlight did not allow production employees to be paid until they signed one of Searchlight's deal memos.[42]  After shooting wrapped, Searchlight required Lake of Tears to send it the signed memos.[43]

Searchlight takes a narrow view, pointing out there is no evidence that Glatt, Footman, or any other unpaid intern signed a deal memo.[44]  But the fact that Searchlight required memos from the paid employees who oversaw the unpaid interns is evidence of control over the interns.

B.   Functional Control Test

A district court must "look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA."  Zheng, 355 F.3d at 69.  "[A]n entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them."  Zheng, 355 F.3d at 70.

1.   Whether Searchlight's Premises and Equipment Were Used for Plaintiffs' Work

Glatt and Footman's internships were based at Lake of Tears' offices, which it leased before signing the Production Agreement with Searchlight.[45]  There is no evidence either

---

[41] Bien SJ Decl. Ex. 21; Sayre Tr. 172:9-74:4, 115:8-23.
[42] Sayre Tr. 75:24-76:11; Bien Decl. Ex. 19.
[43] Bien Decl. Ex. 42.
[44] Defs.' SJ Opp. Br. at 17.
[45] Dep. of Alexander Footman, dated May 7, 2012 ("Footman Tr.") at 198:2-4.

Glatt or Footman ever visited Searchlight offices or used its equipment.  The fact that Lake of Tears' office space and equipment may have been rented or purchased in part by funds from Searchlight does not transform them into Searchlight's premises or equipment.

    2.   <u>Whether Lake of Tears Could Shift From One Putative Joint Employer to Another</u>

        This factor is derived from <u>Rutherford</u>, where the plaintiff meat boners "had no business organization that could or did shift as a unit from one slaughterhouse to another." <u>Rutherford</u>, 331 U.S. at 730.  The Second Circuit observed this is relevant to joint employment "because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." <u>Zheng</u>, 355 F.3d at 72.

        The <u>Black Swan</u> production could not shift from one film studio to another.   The Production Agreement prohibited Lake of Tears from taking <u>Black Swan</u> elsewhere unless Searchlight abandoned the project or failed to advance funds.[46]  It is irrelevant that the Production Agreement did not prohibit Lake of Tears from working on other projects.  This ignores economic reality in the film industry, where a film is produced by a single-purpose entity whose operations cease after the film is made.[47]

    3.   <u>Extent to Which Plaintiffs Performed a Discrete Line-Job That Was Integral to Searchlight's Process of Production</u>

        In <u>Rutherford</u>, the meat boners' work was "a part of the integrated unit of production" at the slaughterhouse. <u>Rutherford</u>, 331 U.S. at 729.  "Interpreted broadly, this factor could be said to be implicated in <u>every</u> subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service." <u>Zheng</u>,

---

[46] Production Agreement.
[47] <u>See</u> Franklin Tr. 16:5-14.

355 F.3d at 73 (emphasis in original). But the Second Circuit has held this factor "to mean that work on a production line occupies a special status under the FLSA." <u>Zheng</u>, 355 F.3d at 73. Glatt and Footman's work was not part of an "integrated production unit" comparable to a production line. <u>Zheng</u>, 355 F.3d at 73.

### 4. Whether Responsibility Could Pass From One Subcontractor to Another Without Material Changes

In <u>Rutherford</u>, "even when the boning supervisor abandoned his position and another supervisor took his place . . . the <u>same</u> employees would continue to do the <u>same</u> work in the same place." <u>Zheng</u>, 355 F.3d at 74 (emphasis in the original). "[T]his factor weighs in favor of a determination of joint employment when employees are tied to an entity such as the slaughterhouse rather than to an ostensible direct employer such as the boning supervisor." <u>Zheng</u>, 355 F.3d at 74.

The crew of <u>Black Swan</u> was tied to Searchlight, not Lake of Tears. Searchlight, in its "sole reasonable discretion," had the power to replace key production personnel without material changes to those underneath them.[48] Searchlight could even have dismissed Lake of Tears and taken over the production.[49] The crew was not tied to Lake of Tears, which everyone knew would cease operations after delivering <u>Black Swan</u> to Searchlight.

### 5. Degree to Which Searchlight Supervised the Plaintiffs' Work

Supervision "weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." <u>Zheng</u>, 355 F.3d at 75 (citing <u>Rutherford</u>, 331 U.S. at 726)). "By contrast, supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry."

---

[48] Production Agreement.
[49] Production Agreement.

Zheng, 355 F.3d at 75. As discussed above, Searchlight closely monitored work on the Black Swan production and exercised effective control over it.

6. Whether Plaintiffs Worked Exclusively or Predominantly for Searchlight

As Defendants concede, Footman and Glatt worked exclusively on Black Swan, which weighs in favor of finding joint employment.[50]

In sum, the formal and functional control tests "state no rigid rule" and "provide 'a nonexclusive and overlapping set of factors' to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." Barfield, 537 F.3d at 143 (quoting Zheng, 355 F.3d at 75-76). Summary judgment may be granted to the plaintiffs "even when isolated factors point against imposing joint liability." Zheng, 355 F.3d at 77. Searchlight emphasizes the lack of evidence that Glatt or Footman themselves were ever "controlled" by Searchlight, but "[s]uch a contention ignores the relevance of the totality of the circumstances." Herman, 172 F.3d at 140 (rejecting argument that overall operational control is irrelevant "and that only evidence indicating [] direct control over [Plaintiffs] should be considered").

The fact that all four formal control factors weigh in favor of finding Searchlight was a joint employer is sufficient to find Searchlight was Plaintiffs' employer even if no functional control factors were satisfied. That conclusion is bolstered by the finding that Searchlight also exercised significant functional control. And, in the end, it is all about control. Lopez, 2012 WL 6062501, at *3.

---

[50] Defs.' SJ Opp. Br. at 22.

IV.    Was Searchlight the Employer of All Production Interns?

Discovery in this putative class action has been limited to interns on the productions of five representative Searchlight films: Black Swan, 500 Days of Summer, Our Family Wedding, Cedar Rapids, and The Savages. Defendants move for summary judgment finding that none of the production interns on any of these films were employed by Searchlight. But Glatt, Footman, and Gratts are the only production interns who are plaintiffs in this action. There is no proposed class containing any other production interns. As previously discussed, Gratts's claim is time-barred, and Searchlight was the employer of Glatt and Footman. Summary judgment is denied as moot as to any other production interns, as there are none in this action.

V.    Was FEG Antalik's Employer?

Defendants move for summary judgment holding that FEG was not a joint employer of Antalik under the FLSA or NYLL. Defendants argue that FEG is not liable for its subsidiary's acts except in extraordinary circumstances because of the "strong presumption that a parent is not the employer of its subsidiary's employees."[51] But that standard relates to piercing the corporate veil, not finding joint employment under the FLSA. Cf. Flemming v. REM Conn. Cmty. Servs. Inc., No. 11 Civ. 689 (JBA), 2012 WL 6681862, at *4-5 (D. Conn. Dec. 21, 2012). When a parent is held to be a joint employer under the FLSA, it is not being held liable for the acts of its subsidiary, rather, it is liable for its own acts of control over an employee. The same formal and functional control tests discussed earlier apply in determining whether FEG was Antalik's employer.

Antalik asserts that she was part of a centralized internship program run by FEG. Interns received offer letters welcoming them to "Fox Entertainment Group's internship

---

[51] Defs.' SJ Br. at 26 (quoting Balut v. Loral Elec. Sys., 988 F. Supp. 339, 344 (S.D.N.Y. 1997)).

program."[52]  Intern recruiters Aimee Hoffman and Laura Wiggins oversaw internships at various

FEG companies.[53]  Hoffman did not recruit Antalik, but when Hoffman became aware of

Antalik's internship, she required Antalik to submit paperwork to continue her internship.[54]

Hoffman sent internship guidelines applicable to all FEG interns to Antalik's supervisor at

Searchlight.[55]  Hoffman provided training to intern supervisors at FEG.[56]  FEG exercised some

control over interns' schedules at its subsidiaries by requiring interns to work between 16 and 24

hours per week, or 40 hours in the summer.[57]  And FEG maintained employment records and a

personnel file for Antalik.[58]

    This evidence raises factual disputes that preclude summary judgment in favor of

the Defendants.

   VI. <u>Were Glatt and Footman "Employees" Covered by the FLSA and NYLL?</u>

    Glatt and Footman move for summary judgment holding they were "employees"

covered by the FLSA and NYLL and do not fall under the "trainee" exception established by

<u>Walling v. Portland Terminal Co.</u>, 330 U.S. 148 (1947).

    In <u>Walling</u>, a case involving a railroad that held a week-long training course for

prospective brakemen, the Supreme Court determined that "trainees" were not covered

employees under the FLSA.  The trainees "[did] not displace any of the regular employees, who

---

[52] Decl. of Rachel Bien in Opp. to Defs.' Mot. for Summ. J, dated Mar. 29, 2013 ("Bien SJ Opp. Decl.") (Docket Entry #140) Exs. 87, 99.

[53] Dep. of Aimee Hoffman, dated Aug. 16, 2012 ("Hoffman Tr.") at 265:2-268:22.  Defendants emphasize Hoffman was employed by Fox Group, New America Inc. and not by FEG.  Decl. of Aimee Hoffman, dated Mar. 26, 2013 ¶2 (Docket Entry #128).  However, this does not preclude the possibility she administered a centralized FEG internship program.  Her email signature lists her position as "FEG intern recruiter."  Bien Class Cert. Decl. Ex. 22.

[54] Bien SJ Opp. Decl. Ex. 63.

[55] Bien SJ Opp. Decl. Ex. 95.

[56] Bien SJ Opp. Decl. Ex. 86.

[57] Bien SJ Opp. Decl. Exs. 65, 78.

[58] Bien SJ Opp. Decl. Exs. 68, 69.

[did] most of the work themselves, and must stand immediately by to supervise whatever the trainees do." Walling, 330 U.S. at 149-50. The trainees' work "[did] not expedite the company business, but may, and sometimes [did], actually impede and retard it." Walling, 330 U.S. at 150. The Court held that the FLSA "cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction . . . the [FLSA] was not intended to penalize [employers] for providing, free of charge, the same kind of instruction [as a vocational school] at a place and in a manner which would most greatly benefit the trainee." Walling, 330 U.S. at 153. The Court concluded that "[a]ccepting the unchallenged findings here that the railroads receive no 'immediate advantage' from any work done by the trainees, we hold that they are not employees within the Act's meaning." Walling, 330 U.S. at 153.

A Department of Labor fact sheet helps to determine whether interns at for-profit businesses fall within this exception. See U.S. Dep't of Labor Fact Sheet #71 (April 2010) ("DOL Intern Fact Sheet"). The Fact Sheet notes that "[t]he Supreme Court has held that the term 'suffer or permit to work' cannot be interpreted so as to make a person whose work serves only his or her own interest an employee of another who provides aid or instruction." It enumerates six criteria for determining whether an internship may be unpaid:

> 1. The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;
>
> 2. The internship experience is for the benefit of the intern;
>
> 3. The intern does not displace regular employees, but works under close supervision of existing staff;
>
> 4. The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

20

5. The intern is not necessarily entitled to a job at the conclusion of the internship; and

6. The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

"This exclusion from the definition of employment is necessarily quite narrow because the FLSA's definition of 'employ' is very broad." DOL Intern Fact Sheet.

The Second Circuit has not addressed the "trainee" exception to the FLSA. Defendants urge that the DOL factors are not the applicable standard and that this Court should apply a "primary benefit test" by determining whether "the internship's benefits to the intern outweigh the benefits to the engaging entity."[59]

While some Circuits have applied a "primary beneficiary" test, it has little support in Walling. The Supreme Court did not weigh the benefits to the trainees against those of the railroad, but relied on findings that the training program served only the trainees' interests and that the employer received "no 'immediate advantage' from any work done by the trainees." Walling, 330 U.S. at 153 (emphasis added).

Thus, Walling created a narrow exception to an expansive definition. "A broader or more comprehensive coverage of employees . . . would be difficult to frame." United States v. Rosenwasser, 323 U.S. 360, 362 (1945). There is "no doubt as to the Congressional intention to

---

[59] Defs.' SJ Opp. Br. at 23. (citing Solis v. Laurelbrook Sanitarium & Sch., Inc., 642 F.3d 518, 525 (6th Cir. 2011) ("[T]he ultimate inquiry in a learning or training situation is whether the employee is the primary beneficiary of the work performed."); Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005) (finding students' chores at boarding school were not work where they "were primarily for the students' . . . benefit"); McLaughlin v. Ensley, 877 F.2d 1207, 1209 (4th Cir. 1989) ("[T]he general test used to determine if an employee is entitled to the protections of the Act is whether the employee or the employer is the primary beneficiary of the trainees' labor.")); see also Velez v. Sanchez, 693 F.3d 308, 330 (2d Cir. 2012) (in determining whether a plaintiff is a domestic service worker covered by the FLSA, "[a] court should also consider who is the primary recipient of benefits from the relationship").

include all employees within the scope of the Act unless specifically excluded." Courts should be cautious in expanding the "trainee" exception established in Walling.

Moreover, a "primary beneficiary" test is subjective and unpredictable. Defendants' counsel argued the very same internship position might be compensable as to one intern, who took little from the experience, and not compensable as to another, who learned a lot.[60] Under this test, an employer could never know in advance whether it would be required to pay its interns. Such a standard is unmanageable.

By contrast, the DOL factors have support in Walling. Because they were promulgated by the agency charged with administering the FLSA and are a reasonable application of it, they are entitled to deference.[61] Wang v. Hearst Corp., --- F.Supp.2d ----, 2013 WL 1903787, at *5 (S.D.N.Y. May 8, 2013) (citing United States v. Mead Corp., 533 U.S. 218, 234 (2001)). No single factor is controlling; the test "requires consideration of all the circumstances." Archie v. Grand Cent. P'ship, 997 F. Supp. 504, 532 (S.D.N.Y. 1998); see also Wang, 2013 WL 1903787, at *4 ("[T]he prevailing view is the totality of the circumstances test.").

As noted above, "since the NYLL's definition of employment is nearly identical to the FLSA's[,] courts in this circuit have held that the New York Labor Law embodies the same standard for employment as the FLSA." Cano v. DPNY, Inc., 287 F.R.D. 251, 260 n.2 (S.D.N.Y. 2012) (internal quotation and alterations omitted). The analysis for the trainee

---

[60] May 10, 2013 Tr. 42:23-43:8.

[61] Defendants argue the DOL factors do not deserve deference because DOL opinion letters, which do not stem from "formal agency adjudication or notice-and-comment rulemaking, are not binding authority." Defs.' SJ Opp. Br. at 25 n.14. (quoting Barfield, 537 F.3d at 149). But even if not binding, "such agency letters represent 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" Barfield, 537 F.3d at 149 (quoting Gualandi v. Adams, 385 F.3d 236, 243 (2d Cir. 2004)). The DOL Intern Fact Sheet was issued in 2010, but the same six factors "have appeared in Wage and Hour Administrator opinions since at least 1967." Reich v. Parker Fire Prot. Dist., 992 F.2d 1023, 1027 (10th Cir. 1993).

exception to the NYLL is the same as that for the FLSA.[62]   See Wang, 2013 WL 1903787, at *3
n.3.

1.   Training Similar to an Educational Environment

    While classroom training is not a prerequisite, internships must provide
something beyond on-the-job training that employees receive.   "A training program that
emphasizes the prospective employer's particular policies is nonetheless comparable to
vocational school if the program teaches skills that are fungible within the industry."   Reich v.
Parker Fire Prot. Dist., 992 F.2d 1023, 1028 (10th Cir. 1993).

    Footman did not receive any formal training or education during his internship.[63]
He did not acquire any new skills aside from those specific to Black Swan's back office, such as
how it watermarked scripts or how the photocopier or coffee maker operated.[64]   It is not enough
that Footman "learned what the function of a production office was through experience."[65]   He
accomplished that simply by being there, just as his paid co-workers did, and not because his
internship was engineered to be more educational than a paid position.

    The record for Glatt is inconclusive on this factor.   Plaintiffs argue he "did not
receive any training on Black Swan."[66]   But Glatt claimed only that he didn't learn much.[67]
Whether someone learned anything does not answer the question of whether training or useful
knowledge was offered.   As any student knows, even a classic educational environment
sometimes results in surprisingly little learning.

---

[62] The New York State Department of Labor has its own fact sheet for unpaid internships incorporating the six DOL
factors and adding five additional considerations.  See Bien SJ Decl. Ex. 35.
[63] Footman Tr. 140:4-10; 221:18-222:8.
[64] Footman Tr. 36:22-27:16; 93:12-21; 96:9-97:5.
[65] Footman Tr. 97:6-14.
[66] Pls. SJ Br. at 4,
[67] See Glatt Tr. 121:4-11; 305:25-306:6.

2.  Whether the Internship Experience is for the Benefit of the Intern

Undoubtedly, Glatt and Footman received some benefits from their internships, such as resume listings, job references, and an understanding of how a production office works.[68] But those benefits were incidental to working in the office like any other employee and were not the result of internships intentionally structured to benefit them.  Resume listings and job references result from any work relationship, paid or unpaid, and are not the academic or vocational training benefits envisioned by this factor.

On the other hand, Searchlight received the benefits of their unpaid work, which otherwise would have required paid employees.  Even under Defendants' preferred test, the Defendants were the "primary beneficiaries" of the relationship, not Glatt and Footman.

3.  Whether the Plaintiffs Displaced Regular Employees

Glatt and Footman performed routine tasks that would otherwise have been performed by regular employees. In his first internship, Glatt obtained documents for personnel files, picked up paychecks for coworkers, tracked and reconciled purchase orders and invoices, and traveled to the set to get managers' signatures.[69]  His supervisor stated that "[i]f Mr. Glatt had not performed this work, another member of my staff would have been required to work longer hours to perform it, or we would have needed a paid production assistant or another intern to do it."[70]  At his post-production internship, Glatt performed basic administrative work such as drafting cover letters, organizing filing cabinets, making photocopies, and running errands.[71] This is work that otherwise would have been done by a paid employee.

---

[68] Footman Tr. 97:6-14, 212:24-213:10.
[69] Bien SJ Decl. Ex. 9 ¶ 16.
[70] Bien SJ Decl. Ex. 9 ¶ 16.
[71] Bien SJ Decl. Ex. 6 ¶ 7-8.

Footman performed similar chores, including assembling office furniture, arranging travel plans, taking out trash, taking lunch orders, answering phones, watermarking scripts, and making deliveries.[72]  Again, if Footman had not performed these tasks for free, a paid employee would have been needed.  When Footman went from five to three days a week, Black Swan hired another part-time intern.[73]

### 4.   Whether Searchlight Obtained an Immediate Advantage From Plaintiffs' Work

Searchlight does not dispute that it obtained an immediate advantage from Glatt and Footman's work.  They performed tasks that would have required paid employees.  There is no evidence they ever impeded work at their internships.  Menial as it was, their work was essential.  The fact they were beginners is irrelevant.  The FLSA recognizes this by authorizing the Secretary of Labor to issue certificates allowing "learners" and "apprentices" to be paid less than minimum wage.  See 29 U.S.C. § 214(a).  "An employee is entitled to compensation for the hours he or she actually worked, whether or not someone else could have performed the duties better or in less time."  Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 471 n.3 (11th Cir. 1982).

### 5.   Whether Plaintiffs Were Entitled to a Job at the End of Their Internships

There is no evidence Glatt or Footman were entitled to jobs at the end of their internships or thought they would be.

### 6.   Whether Searchlight and the Plaintiffs Understood They Were Not Entitled to Wages

Glatt and Footman understood they would not be paid.[74]  But this factor adds little, because the FLSA does not allow employees to waive their entitlement to wages.  "[T]he

---

[72] Pls.' Rule 56.1 Statement (Docket Entry #91) ¶ 223.
[73] Footman Tr. 43:3-9.
[74] Glatt Tr. 77:5-18; Footman Tr. 20:24-21:3.

purposes of the Act require that it be applied even to those who would decline its protections. If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 299, 301 (1985). This protects more than the Plaintiffs themselves, because "[s]uch exceptions to coverage would . . . exert a general downward pressure on wages in competing businesses." Tony & Susan Alamo Found., 471 U.S. at 302. It also protects businesses by preventing anticompetitive behavior. "An employer is not to be allowed to gain a competitive advantage by reason of the fact that his employees are more willing to waive [FLSA claims] than are those of his competitor." Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 710 (1945).

Considering the totality of the circumstances, Glatt and Footman were classified improperly as unpaid interns and are "employees" covered by the FLSA and NYLL. They worked as paid employees work, providing an immediate advantage to their employer and performing low-level tasks not requiring specialized training. The benefits they may have received—such as knowledge of how a production or accounting office functions or references for future jobs—are the results of simply having worked as any other employee works, not of internships designed to be uniquely educational to the interns and of little utility to the employer. They received nothing approximating the education they would receive in an academic setting or vocational school. This is a far cry from Walling, where trainees impeded the regular business of the employer, worked only in their own interest, and provided no advantage to the employer. Glatt and Footman do not fall within the narrow "trainee" exception to the FLSA's broad coverage.

26

<u>Class Certification of Antalik's NYLL Claims</u>

Antalik moves to certify a class consisting of

[a]ll individuals who had unpaid internships in New York between September 28, 2005 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

She asserts Defendants violated the NYLL with respect to the proposed class.

I.    <u>Legal Standard</u>

A party seeking class certification must first satisfy Federal Rule of Civil Procedure 23(a), which "requires that a proposed class action (1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 547 (2d Cir. 2010) (citing Fed. R. Civ. P. 23(a)). In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2548 (2011). Here, Antalik relies on Rule 23(b)(3), which "requires the party seeking certification to show that 'questions of law or fact common to class members predominate over any questions affecting only individual members' and that class treatment would be superior to individual litigation." <u>Myers</u>, 624 F.3d at 547 (quoting Fed. R. Civ. P. 23(b)(3)).

Rule 23 "does not set forth a mere pleading standard." <u>Wal-Mart</u>, 131 S. Ct. at 2551. Rather, "[t]he party seeking class certification must affirmatively demonstrate compliance with the Rule, and a district court may only certify a class if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met." <u>In re Am. Int'l Grp., Inc. Sec. Litig.</u>, 689 F.3d 229, 237-38 (2d Cir. 2012).

27

II.   Numerosity

The numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 2005). While a party seeking class certification must prove "there are in fact sufficiently numerous parties," Wal-Mart, 131 S. Ct. at 2551 (emphasis in original), "[c]ourts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).

Antalik offers Defendants' intern personnel database as proof there were at least 45 class members who interned between 2007 and 2010.[75] But Defendants argue that their database can "not be relied upon for its accuracy."[76] If anything, the proposed class is likely to be larger than the database indicates. The proposed class period dates to 2005, but 36 of the 45 interns in the database were hired in 2009, and none before 2007.[77] Based on this, the Court is permitted to draw a "reasonable inference" that there are at least 40 class members. See Alcantara v. CAN Mgmt., Inc., 264 F.R.D. 61, 64-65 (S.D.N.Y. 2009). Moreover, the Defendants cannot argue that the class size "is far too indefinite and speculative"[78] and thereby capitalize on their own inability to produce accurate information. See McNeill v. N.Y.C. Hous. Auth., 719 F. Supp. 233, 252 (S.D.N.Y. 1989) ("[T]he lack of knowledge as to the exact number

---

[75] Decl. of Rachel Bien in Support of Pls.' Mot. for Class Certification and Court-Authorized Notice, dated Feb. 15, 2013 ("Bien Class Cert. Decl.") (Docket Entry #105) ¶ 12, Ex. 74.

[76] Mem. of Law in Opp. to Pl. Eden Antalik's Mot. for NYLL and FLSA Certification ("Defs.' Class Cert. Opp. Br.") at 13 (Docket Entry #138) (emphasis in original).

[77] Bien Class Cert. Decl. Ex. 74; see also Dep. of David Johnson, dated Dec. 13, 2012 111:11-19 (People Soft was only used to track interns for "a relatively short period of time").

[78] Defs.' Class Cert. Opp. Br. at 14.

of affected persons is not a bar to maintaining a class action where the defendants alone have access to such data.")

Nor have Defendants rebutted the presumption of numerosity. Joinder is impracticable here because Plaintiffs do not have accurate information regarding potential class members. Thus they cannot invite them to join as plaintiffs. A class action serves judicial economy and makes recovery economically feasible for class members who would otherwise need to retain lawyers for individual actions seeking relatively small recoveries. See Robidoux, 987 F.2d at 936 (citing Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980)).

III.   Commonality

A party seeking certification must show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" Wal-Mart, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. Law Rev. 97, 131-32 (2009)). Class claims "must depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Wal-Mart, 131 S. Ct. at 2551 (emphasis in original) (quoting Nagareda, supra, at 132).

Antalik has identified several common questions relevant to determining NYLL violations, including: (1) whether Defendants derived an immediate advantage from interns'

29

work, (2) whether interns displaced regular employees, and (3) whether FEG's internship program was for the benefit of interns.[79]   Some evidence Antalik claims may answer these questions is either individualized proof or of little evidentiary value.   For example, there is nothing facially unlawful about the FEG internship guidelines that might generate common answers to drive the litigation.[80]   She also claims FEG's internship request forms, which describe various internship positions, constitute classwide evidence that interns provided an immediate advantage to Defendants.   A completed request form may be evidence that a particular internship did not fall within the NYLL's "trainee" exception, but that is individualized proof.   Only the blank request form is common to the class, and it is not capable of resolving any question.[81]

But Antalik also identifies evidence that is capable of answering common questions on a classwide basis.   Departments at FEG companies requested interns based on their "needs," and they requested more when they were busier, the opposite of what one would expect if interns provided little advantage to the company and sometimes impeded its work.[82]   An internal memo reports that because paid internships were eliminated and overtime pay and temporary employees scaled back, "the size of our [unpaid] intern program more than doubled."[83]   Using unpaid interns to fill the interstices created by eliminating paid positions is a clear violation of the NYLL.

The April 2010 release of the DOL Intern Fact Sheet did not represent a change in applicable law.   See, e.g., Reich, 992 F.2d at 1027 (The six DOL criteria "were derived almost directly from [Walling] and have appeared in Wage and Hour Administrator opinions since at

---

[79] See Mem. of Law in Support of Pls.' Mot. for Class Certification and Court-Authorized Notice ("Pls.' Class Cert. Br.") at 22-24 (Docket Entry #104).

[80] See Bien Class Cert. Decl. Ex. 30.

[81] See, e.g., Bien Class Cert. Decl. Ex. 50.

[82] Hoffman Tr. 31:17-33:3.

[83] Bien Class Cert. Decl. Ex. 38.

least 1967."). But the reactions to the fact sheet indicate FEG's internship overseers believed "the regulations have been changed significantly creating a lot more risk going forward."[84] Antalik's supervisor, John Maybee, asked intern recruiter Aimee Hoffman "[w]hy would an office have an intern that provides no immediate advantage from said intern's activities?"[85] Hoffman responded, "That is the question! . . . If we give them work to benefit the company, we really should pay them . . . these DOL guidelines really make you think about whether it's worth it or not to have [an unpaid intern]."[86]

At least one FEG department bowed out of the internship program, believing it could not comply with the DOL criteria.[87] Hoffman informed internship supervisors that "internships will be changing considerably" and "we are tightening up our guidelines due to the department of labor's definition of a [sic] unpaid intern."[88] An internal memo in August 2008 states that "[s]tarting with the Fall 2010 internship program . . . Fox will only provide paid internships unless a manager can comply with the six criteria provided by the DOL."[89] Ultimately, FEG eliminated unpaid internships altogether because of "the new regulation on [unpaid] interns."[90]

Evidence that interns were recruited to help with busy periods, that they displaced paid employees, and that those who oversaw the internships did not believe they complied with applicable law is evidence capable of generating common answers to questions of liability.

---

[84] Bien Class Cert. Decl. Ex. 46; see also Ex. 21 ("the 'suggested' guidelines and the former reality [sic] differ quite drastically"); Ex. 24 (DOL factors "indicate[] that [interns'] duties and participation here may change substantially").

[85] Bien Class Cert. Decl. Ex. 22.

[86] Bien Class Cert. Decl. Ex. 22.

[87] Bien Class Cert. Decl. Ex. 32.

[88] Bien Class Cert. Decl. Ex. 26.

[89] Bien Class Cert. Decl. Ex. 38.

[90] Bien Class Cert. Decl. Ex. 27.

IV.    Typicality

Typicality "requires that the claims of the class representative[] be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). "The commonality and typicality requirements tend to merge into one another." Marisol, 126 F.3d at 376. "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux, 987 F.2d at 936-37. Antalik participated in the same internship program administered by the same set of recruiters as all class members, was classified as an unpaid intern like all class members, and brings an NYLL wage claim like all class members. She satisfies the typicality requirement.

Defendants argue vigorously that Antalik has not met this requirement because she did not receive academic credit for her internship and Aimee Hoffman did not recruit her.[91] Receipt of academic credit is of little moment. A university's decision to grant academic credit is not a determination that an unpaid internship complies with the NYLL. Universities may add additional requirements or coursework for students receiving internship credit, but the focus of the NYLL is on the requirements and training provided by the alleged employer.

---

[91] Defs.' Class Cert Opp. Br. at 17-21.

That Hoffman did not recruit Antalik does not defeat typicality because Antalik still worked in the same FEG internship program supervised by Hoffman. The potential liability arises from the operation of the program, not recruitment of the interns. And though Hoffman did not hire Antalik, she required Antalik to send her the same paperwork as all other interns.[92]

V.     Adequacy

Adequacy requires determining whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class." Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 158 (S.D.N.Y. 2008). Defendants do not dispute either point. Antalik has no known conflicts with the class. Her counsel are experienced in prosecuting employment class actions. See Capsolas v. Pasta Res., Inc., No. 10 Civ. 5595 (RLE), 2012 WL 4760910, at *3 (S.D.N.Y. Oct. 5, 2012).

VI.     Predominance

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).

As discussed above, Antalik submitted generalized proof on the issue of Defendants' liability. In an FLSA class, common questions of liability predominate over

---

[92] Bien SJ Opp. Decl. Ex. 63.

33

individual calculations of damages.  See Torres v. Gristede's Operating Corp., No. 04 Civ. 3316

(PAC), 2006 WL 2819730, at *15 (S.D.N.Y. Sept. 29, 2006); Noble v. 93 Univ. Place Corp., 224

F.R.D. 330, 345 (S.D.N.Y. 2004).

VII.    Superiority

In determining whether "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy," the Court must consider

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Here, the relatively small recoveries available to individual plaintiffs

make a class action a more efficient mechanism.  There are no known litigations raising the same

issues.  This Court is a desirable forum because the proposed class worked in New York.  And

there is no reason to expect manageability difficulties.

For the foregoing reasons, the Court certifies Antalik's proposed class under Rule

23(b)(3) with Antalik as class representative.  The Court appoints Outten & Golden LLP as class

counsel under Rule 23(g).

### Conditional Certification of Antalik's FLSA Claims

The FLSA allows plaintiffs to bring claims on behalf of "other employees

similarly situated." 29 U.S.C. § 216(b).  "Although they are not required to do so by [the] FLSA,

district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating

notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as

represented plaintiffs." Myers, 624 F.3d at 554 (quoting Hoffmann-La Roche Inc. v. Sperling,

493 U.S. 165, 169 (1989)).  To be entitled to notice, Plaintiffs must make a "'modest factual

34

showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" Myers, 624 F.3d at 555 (quoting Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).

Courts apply "heightened scrutiny" to motions for court-authorized notice made after discovery. Torres, 2006 WL 2819730, at *9. For post-discovery motions, courts consider whether the plaintiff and proposed class members are "similarly situated" by considering "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." Torres, 2006 WL 2819730, at *9 (internal alteration omitted) (quoting Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001)).

Antalik moves for authorization to send notice of this action to

> all individuals who had unpaid internships between September 28, 2008 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

As discussed above, Antalik has put forth generalized proof that interns were victims of a common policy to replace paid workers with unpaid interns. Though there are disparate factual and employment settings, the common issues of liability predominate over individual issues and defenses. See Torres, 2006 WL 2819730, at *10. And the same fairness and procedural considerations that make a class action a superior mechanism for the NYLL claims make a collective action a superior mechanism for the FLSA claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment that Gratts's CAUCL claim is time-barred is granted, and the remainder of its summary judgment

35

motion is denied.  Glatt and Footman's motion for summary judgment that they are "employees" covered by the FLSA and NYLL and that Searchlight is their joint employer is granted.  Gratts's motion for summary judgment is denied.  Antalik's motions for class certification of her NYLL claims and conditional certification of an FLSA collective action are granted and the law firm of Outten & Golden LLP is appointed as class counsel.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 89, 93, and 103.

Dated: June 11, 2013
     New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Adam T. Klein, Esq.
Rachel M. Bien, Esq.
Jennifer L. Liu, Esq.
Juno E. Turner, Esq.
Sally J. Abrahamson, Esq.
Outten & Golden, LLP
3 Park Avenue, 29th Floor
New York, NY 10016
*Counsel for Plaintiffs*

Elise M. Bloom, Esq.
Amy F. Melican, Esq.
Proskauer Rose LLP
11 Times Square
New York, NY 10036
*Counsel for Defendant*